UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DEZAREA W.,

                                    Plaintiff,

v.                                                          6:21-cv-01138-MAD-TWD

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

DEZAREA W., PLAINTIFF, PRO SE

SOCIAL SECURITY ADMINISTRATION          JESSICA RICHARDS, ESQ.
OFFICE OF THE GENERAL COUNSEL
*Counsel for Defendant*
J.F.K Federal Building, Room 625
Boston, MA 02203

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## **REPORT-RECOMMENDATION AND ORDER**

Dezarea W. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a final decision of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying her application for disability insurance benefits ("DIB").  (Dkt. No.

1.)  Plaintiff did not consent to the jurisdiction of a Magistrate Judge.  (Dkt. No. 5.)  The matter

was referred to the undersigned for the issuance of a report and recommendation, pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3.  Both parties filed briefs, which the Court treats as cross-

motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure

in accordance with General Order 18.  (Dkt. Nos. 15, 16.)

For the reasons set forth below, the Court recommends Plaintiff's motion for judgment on the pleadings be granted, Defendant's motion for judgment on the pleadings be denied, and the case be remanded to the Commissioner for further administrative proceedings.

## I.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born in 1987 and has completed cosmetology school and two years of college. (Administrative Transcript at 120, 287.[1]) She has previously worked as a cosmetologist, customer service representative, and sales associate. (T. 288.) Plaintiff has not worked full-time since 2015 but has worked as a per diem school district substitute since 2018. (T. 45, 288.)

On November 12, 2015, Plaintiff was in a car accident. (T. 44.) Since the accident, she developed hip and shoulder pain which required surgical intervention. (T. 387-89, 708-10.) On November 1, 2017, Plaintiff underwent surgery to correct a large labral tear in her right hip. (T. 378, 387-89.) Her hip initially improved but has since deteriorated. (T. 52, 390, 393-94, 409-11, 721-22, 728-29, 731-33.) Plaintiff's shoulder surgery took place on July 9, 2019. (T. 52-53, 708-10.) Plaintiff testified her shoulder was "better" since her surgery in July, but she tries not to push her shoulder too hard or lift too much on her right side so as not to hurt it more. (T. 51.) It is still difficult for her to reach behind her back and over her head. *Id.*

On February 13, 2019, Plaintiff protectively filed an application for DIB, claiming a disability onset date of November 14, 2015. (T. 14, 120-21.) She alleged the following

---

[1] The Administrative Transcript is found at Dkt. No. 10. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers the Court's CM/ECF electronic filing system assigns. Page references to other documents identified by docket number are to the original page numbers at the bottom of the page instead of the pagination generated by CM/ECF. Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

disabilities: back pain, neck pain, hip pain, torn labrum "which was repaired 11/2017," Fibromyalgia, and right shoulder pain. (T. 120-21.) The Commissioner denied Plaintiff's application on May 23, 2019, and again upon reconsideration on August 19, 2019. (T. 14, 139-50, 167-78.) Plaintiff then filed a written request for hearing received on September 16, 2019. (T. 14, 179-80.) The relevant time period at issue is March 20, 2018, to March 31, 2019. (T. 16.)

On May 1, 2020, Plaintiff, represented by a non-attorney representative, appeared at a hearing before the Administrative Law Judge ("ALJ") during which Plaintiff testified. (T. 35-63.) Plaintiff reported she started experiencing pain in her neck and between her shoulder blades after the 2015 car accident. (T. 47-48.) She feels numbness and tingling in both arms, but more so in her right arm. (T. 48.) She also reported pain, aches, numbness, and tingling in her middle lower back. *Id.*

Plaintiff reported her shoulder pain has gotten better since her surgery in July 2019, but her hip pain has gotten worse. (T. 52-53.) It is still difficult for her to reach behind her and overhead on her right side, but it was more difficult prior to her surgery. (T. 53.) After the surgery to repair the torn labrum, her hip initially improved. *Id.* However, a few months later she experienced a jolt down her leg while walking and her hip pain has since gotten progressively worse. *Id.* She testified that her doctors believe she might have another tear in her labrum. *Id.* She sometimes still experiences a sharp jolt in her right leg that "stops [her] dead in [her] tracks." (T. 48.) Her hip pain is worse when she is sitting with her leg at a 90-degree angle, so she usually sits with her leg hanging off the chair so it is completely straight. (T. 48-49.) She testified she usually does not sit down at home, but rather lies flat on her bed with pillows supporting her neck and back. *Id.* She can sit five to ten minutes in a work position at

one time, but ten minutes is "usually excruciating."  (T. 49.)  While standing is a bit easier, she cannot stand very long without leaning and 90 to 98 percent of the time she is leaning or putting her weight on her left leg when she stands.  (T. 48-49.)  Plaintiff can stand about five minutes without leaning and about 10 minutes with leaning.  (T. 50.)  Her doctor recently prescribed her a cane to use.  (T. 55-56.)  She has not been able to walk without leaning for "quite some []time," at least prior to March 31, 2019.  (T. 56.)

Plaintiff testified that she has rheumatoid arthritis and fibromyalgia, which cause her to experience pain throughout her body every day.  (T. 54-56.)  The pain includes back aches and muscle spasms.  (T. 55.)  Plaintiff reported having difficulty getting out of bed.  *Id.*  She says she uses ice or heat to manage the pain in her hips and back.  (T. 56.)  She also tries not to go up and down the stairs and spends a lot of her day lying flat in her bedroom.  *Id.*  Plaintiff was prescribed Naproxen and the muscle relaxer Baclofen for her conditions.  (T. 57.)  However, she prefers not to take Baclofen because it causes memory loss and makes her feel unbalanced.  *Id.*  Plaintiff also has a TENS unit, but it is difficult for her to put it on and take it off her back.  *Id.*  Plaintiff testified she usually does not socialize but when she does, her husband or mother is there playing buffer, and she is usually sitting down.  (T. 59-60.)  While Plaintiff used to enjoy photography, she testified she can no longer photograph due to the bending, getting up and down, and moving in different directions that is required.  (T. 62.)

During the hearing on December 16, 2020, the medical expert, Nitin Dhiman, M.D., and a vocational expert ("VE") testified.  (T. 67-91.)  Dr. Dhiman testified about his answers to written interrogatories regarding Plaintiff's abilities, discussed in more detail below.  (T. 71-76.)  The ALJ posed a hypothetical to the VE based on the Plaintiff's residual functioning capacity ("RFC") who testified Plaintiff could not perform past relevant work as a cosmetologist but

could work as a customer complaint clerk.  (T. 84-85.)  The VE testified Plaintiff could also

work as a cashier, a storage facility rental clerk, or a marker, all of which are classified as a light

level of physical exertion.  (T. 85-86.)

The ALJ denied Plaintiff's claim for benefits on January 22, 2021, and the Appeals

Council denied Plaintiff's request for review on August 16, 2021.  (T. 26, 1-4.)  Plaintiff,

proceeding *pro se*, now seeks this Court's review.  (Dkt. No. 1.)

## II.     THE ALJ's DECISION

The ALJ applied the five-step sequential evaluation promulgated by the Commissioner

for adjudicating disability claims.  (T. 14-26.)  At step one, the ALJ found Plaintiff had not

engaged in substantial gainful activity during the period from March 20, 2018, the day after the

decision was made on the claimant's prior application for disability benefits, through her date

last insured of March 31, 2019.  (T. 18.)  Proceeding to step two, the ALJ determined Plaintiff

had the following severe impairments through the date last insured: right shoulder rotator cuff

impingement, AC joint arthritis, proximal biceps tendinitis; right hip impairment, status post

right hip arthroscopy with osteoplasty and labral repair; obesity; asthma/Chronic Obstructive

Pulmonary Disease ("COPD"); fibromyalgia; cervical spine degenerative disc disease; and

lumbar spine mild degenerative disc disease.  *Id*.  At step three of the sequential evaluation, the

ALJ found Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of a listed impairment.  (T. 18-19.)

Thereafter, the ALJ determined Plaintiff had the RFC to perform a range of light work.

(T. 20.)  Specifically, she found Plaintiff:

> in an eight-hour workday, the claimant could occasionally lift and
> carry twenty pounds and frequently lift and carry ten pounds.  She
> could sit for two hours at one time, for a total of six hours; stand
> for two hours at one time, for a total of six hours; and walk for two

hours at one time, for a total of six hours. She should avoid
working at unprotected heights, climbing ladders, ropes, or
scaffolds, and working in close proximity to dangerous machinery
or moving mechanical parts of equipment. She is able to
occasionally operate foot controls. The claimant could
occasionally climb ramps or stairs; and could perform occasional
stooping, kneeling, crouching, and crawling. With her bilateral
arms, the claimant could occasionally reach overhead and
frequently reach in all other directions. With her bilateral hands,
she can frequently handle and continuously finger and feel. The
claimant should avoid exposure to excessive amounts of
respiratory irritants such as dust, odors, fumes, and gases and
extreme hot and cold temperatures.

*Id.*

Proceeding to step four of the sequential evaluation, the ALJ determined Plaintiff was

capable of performing past relevant work as a customer complaint clerk which did not require

the performance of work-related activities precluded by her RFC. (T. 23-24.) Accordingly, the

ALJ determined Plaintiff was not disabled, as defined in the Social Security Act, from the

alleged amended onset date through the date of her decision. (T. 25.)

## III.    RELEVANT LEGAL STANDARDS

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the

correct legal standards were applied and whether substantial evidence supports the decision.

*Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted). A reviewing

court may not affirm the ALJ's decision if it reasonably doubts whether the proper legal

standards were applied, even if the decision appears to be supported by substantial evidence.

*Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the decision. 42

U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is evidence amounting to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation marks and citation omitted). Where evidence is deemed susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's findings must be sustained "even where substantial evidence may support the plaintiff's positions and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). A reviewing court cannot substitute its interpretation of the administrative record in place of the Commissioner's if the record contains substantial support for the ALJ's decision. *See Rutherford*, 685 F.2d at 62. However, when inadequacies in the ALJ's decision frustrate meaningful review of the substantial evidence inquiry, remand may be appropriate. *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

### B.  Standard for Benefits[2]

---

[2]  While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3) and Title II, 42 U.S.C. § 423(d), are identical, so "decisions under these sections are cited interchangeably." *Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

To be considered disabled, a plaintiff seeking disability benefits must establish he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § (d)(2)(A).

The Social Security Administration regulations outline a five-step process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

The claimant bears the burden of proof regarding the first four steps. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). If the claimant meets his or her burden of proof, the burden shifts to the Commissioner at the fifth step to prove the claimant is capable of working. *Id.*

## IV.    THE PARTIES' CONTENTIONS

Plaintiff contends, albeit indirectly, the RFC is not supported by substantial evidence. (Dkt. No. 15.) Plaintiff argues the Medical Interrogatory answers and Medical Statement of Ability to Do Work-Related Activities prepared by Dr. Dhiman, and relied on by the ALJ, are inconsistent with the record, specifically the portion of the record Dr. Dhiman cites to support his analysis. *Id.* at 1-2. Defendant argues the RFC is supported by substantial evidence and Plaintiff's subjective allegations of pain are not supported by the record. (Dkt. No. 16 at 3-12.)

## V.    THE COURT'S ANALYSIS

"In a case such as this, where Plaintiff is proceeding *pro se*, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for *pro se* litigants." *Hubbard v. Comm'r of Soc. Sec.*, No. 6:14-CV-1401 (GTS/WBC), 2016 WL 551783, at *4 (N.D.N.Y. Jan. 14, 2016). As such, this Court will "examine[ ] the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence." *Id.* (citing *Gregorka v. Comm'r of Soc. Sec.*, No. 6:13-CV-1408 (GTS/TWD), 2015 WL 3915959, at *4 (N.D.N.Y. June 25, 2015)).

A claimant's RFC is the most he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d

45 52 (2d Cir. 1999)).  "In making a residual functional capacity determination, the ALJ must

consider a claimant's physical abilities, mental abilities, symptomology, including pain and other

limitations which could interfere with work activities on a regular and continuing basis."  *Id*.

(citing 20 C.F.R. § 404.1545(a)).  "Ultimately, '[a]ny impairment-related limitations created by

an individual's response to demands of work . . . must be reflected in the RFC assessment.'"

*Hendrickson v. Astrue*, No. 11-CV-0927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11,

2012) (quoting Social Security Ruling ("SSR") 85-15, 1985 WL 56857, at *8).  The RFC

determination "must be set forth with sufficient specificity to enable [the Court] to decide

whether the determination is supported by substantial evidence."  *Ferraris v. Heckler*, 728 F.2d

582, 587 (2d Cir. 1984).

As more fully set forth below, this Court finds the RFC is not supported by substantial

evidence and remand is required.

**A.  The ALJ's Evaluation of the Medical Evidence**

As an initial matter, the ALJ appears to have based the RFC on a selective or cursory

reading of the medical records often without providing necessary context.  To support the RFC,

the ALJ first cites to Plaintiff's March 2018 orthopedic visit to Russell M. LaFrance, M.D.,

where she reported her hip had been doing well since her surgery.  (T. 21, 405.)  At the

examination, Plaintiff's range of motion of her right hip was 0-130 degrees of flexion with

excellent preservation of periarticular muscle tone and strength in hip flexion, abduction, and

adduction.  (T. 406.)  While there was no pain with palpation, she had positive flexion,

adduction, and internal rotation ("FADIR") and positive flexion, abduction and external rotation

("FABER") tests, eliciting pain.  *Id.*  These findings were almost identical to those previously

found when Plaintiff was diagnosed with a large labral tear which caused her 7/10 pain and

ultimately needed to be corrected via surgery. (T. 378-79, 383-85, 387-89.) Moreover, at the same March 2018 exam, Plaintiff "continue[d] to have significant shoulder difficulty." (T. 405.) She was diagnosed with right shoulder impingement with AC joint arthritis and biceps tendinitis and received an injection into the right subacromial space. (T. 406, 407.) Plaintiff's diagnosis and treatment for her right shoulder directly followed an "unremarkable" right shoulder x-ray on the same day. (T. 21, 404-07.)

The ALJ next cites to Plaintiff's April 11, 2018, exam where her primary care physician, Andrea Finocchiaro, D.O., did indicate improved range of motion in the right hip since the surgery, but also noted Plaintiff's report of continued chronic neck, back, and hip pain; decreased anterior right thigh sensation to light touch; and decreased range of motion of her neck with extension and rotation of bilateral shoulders. (T. 21, 476, 479.) The next day, on April 12, 2018, Plaintiff presented to her orthopedist, Dr. LaFrance, with shoulder and hip pain. (T. 409.) She reported that she continued to have pain with sitting or standing for long periods of time and the pain was mostly anterior. *Id.* She thought her hip was better than it was prior to the surgery but continued to have symptoms. *Id.* Plaintiff had received a cortisone injection in her right shoulder at her last visit which had helped temporarily but was wearing off. *Id.* On examination of her right shoulder there was tenderness over the AC joint and biceps tendon. (T. 410.) The shoulder had a range of motion from 0-170 degrees of flexion, 5/5 strength with rotator cuff testing, and positive impingement testing. *Id.* There was pain with the rotator cuff testing. *Id.* On examination of her right hip, there was significant anterior tenderness and mild lateral tenderness. *Id.* The hip had a range of motion from 0-110 degrees of flexion; 5/5 strength with hip flexion, abduction, and adduction; and stable logroll. *Id.* She was diagnosed with right shoulder rotator cuff impingement, AC joint arthritis, and proximal biceps tendinitis. *Id.* While

the Plaintiff continued to gradually improve with her right hip, she still had symptoms with

sitting and prolonged standing and walking. (T. 411.) Her shoulder was doing well after the

injection, but the doctor discussed further treatment options including arthroscopy if the pain

persisted. *Id.*

As the ALJ mentions, by June 10, 2019, Plaintiff had returned to her orthopedist, Dr.

LaFrance. (T. 21, 502.) Plaintiff complained of anterior, lateral, and superior shoulder pain;

recurrent anterior hip pain; trouble sleeping; and difficulty sitting and standing. *Id.* Examination

of Plaintiff's right shoulder revealed tenderness over the AC joint and over the biceps. (T. 503.)

She had 170 degrees of flexion and 160 degrees of abduction, positive impingement sign, with

rotator cuff strength 5/5. *Id.* Her left shoulder had 180 degrees of flexion and 175 degrees of

abduction with rotator cuff strength 5/5. *Id.* Her right hip exam revealed tenderness in the

anterior aspect with 110 degrees of flexion, 25 degrees of internal rotation, and 40 degrees of

external rotation with a positive FADIR test. *Id.* Plaintiff agreed to go forward with right

shoulder arthroscopy, subacromial decompression, acromioplasty, distal clavicle excision, and

open biceps tenodesis. (T. 504.) She was also prescribed a shoulder immobilizer because there

was "weakness and instability of [her] extremity which require[d] stabilization to improve [her]

function." (T. 504, 506.) Plaintiff's shoulder surgery took place July 9, 2019. (T. 708-10.)

While Plaintiff testified her shoulder was "better" since her surgery in July, she also

testified she tries not to push her shoulder too hard so as not to hurt it more. (T. 51.) Plaintiff

tries not to lift too much on that side, and it is still difficult to reach behind her back and over her

head.[3] *Id.* She further testified she can carry a gallon of milk on her left side, but on her right

---

[3] The Court notes the Transcript reads "Like, I try not to lift too much on that and it's still [sic] to
reach behind my back as well as over head." (T. 51.) Given the context, the Court assumes

side she tries not to carry much.  *Id.*  Plaintiff attested that the limitations she described were all present prior to her date last insured.  (T. 51-52.)

The ALJ also cites to Plaintiff's CT of February 16, 2017, which was negative, nerve conduction studies, and x-ray results in support of the RFC.  (T. 21, 813-820.)  Plaintiff's spinal x-rays taken on February 8, 2017, noted mild degenerative changes with anterior endplate spurring in the mid to lower thoracic spine.  (T. 811.)  The January 30, 2017, nerve conduction study of her low back was normal, but the doctor noted clinical evaluation suggested there was a myofascial component to the lumbosacral axial symptoms, as well as an element of right SI joint dysfunction.  (T. 820.)  The January 31, 2017, nerve conduction study of her cervical area was normal, but the doctor noted that clinical history and evaluation suggested there was a myofascial component to the cervical axial symptoms and further myofascial release techniques may be considered in the future.  (T. 815.)  Additionally, the report indicated a cervical sensory radicular component could not be completely ruled out, thus, cervical interlaminar epidural injection could be considered in the future for further diagnostic as well as therapeutic purposes. *Id.*

Just a few weeks earlier, on January 12, 2017, Plaintiff presented to Upstate Neurosurgery with 7/10 pain in her neck and shoulder blades bilaterally down which was worsening with time.  (T. 805.)  Plaintiff's range of motion of her neck in flexion, extension, rotation, and lateral bending was decreased.  *Id.*  Plaintiff's range of motion in *all of* her upper and lower extremities was also decreased.  (T. 806 (emphasis added.))  It was noted "[d]ue to the diffuse nature of her symptoms in conjunction with the relatively normal findings [on] her

Plaintiff is describing difficulty reaching and the missing word after "still" was likely a clerical error.

13

imaging, it is likely that she has a whiplash injury which is affecting her entire spine from cervical to lumbar" and CT and nerve conduction testing were ordered to better determine her current condition.  (T. 808.)  At her February 16, 2017, follow-up, she was diagnosed with "[w]hiplash injury, sequela."  (T. 811.)  Plaintiff presented with continued low back and right hip pain.  *Id.*  Her right hip pain was worse than the lower back pain.  *Id.*  Plaintiff had received an injection in her low back and neck on January 26, 2017, which had provided some degree of relief for three days.  *Id.*  The office referred Plaintiff to a pain management clinic for her diffuse pain symptoms.  *Id.*

Certainly, the ALJ is not required to discuss every piece of evidence she considered in making her decision.  *See Holler v. Saul*, 852 F. App'x 584, 586 (2d Cir. 2021).  However, the ALJ cannot cherry-pick evidence to support her conclusion.  *See Lee G. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1558 (DJS), 2021 WL 22612, at *5 (N.D.N.Y. Jan. 4, 2021) ("Cherry picking refers to improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source.") (internal quotations and citation omitted); *Starzynski v. Colvin*, No. 1:15-cv-00940(MAT), 2016 WL 6956404, at *3 (W.D.N.Y. Nov. 29, 2016) ("It is plainly improper for an ALJ to cherry-pick evidence that supports a finding of not-disabled while ignoring other evidence favorable to the disability claimant."); *Younes v. Colvin*, No. 1:14-CV-170(DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) ("Cherry picking can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both.") (internal quotations and citation omitted); *Angelo A. C. v. Comm'r*, No. 20-CV-1579-A, 2022 WL 682654, at *6 (W.D.N.Y. Mar. 8, 2022) ("It is well-settled that an ALJ cannot 'cherry pick' only the evidence from medical sources that support a particular conclusion and ignore the contrary evidence.") (internal quotations and citation

omitted).  Here, the ALJ emphasized a few records that showed apparent normal findings with some improvements in Plaintiff's conditions without providing relevant context and ignored many entries to the contrary[4] in the RFC determination.  This amounts to impermissible cherry-picking and the Court therefore cannot conclude substantial evidence supports the RFC. Therefore, remand is warranted on this basis for the ALJ to consider all of the medical evidence in determining the RFC.

### B.  The ALJ's Evaluation of the Opinion Evidence

The ALJ did not adequately explain the supportability and consistency of Dr. Dhiman's opinion in her RFC determination.

### 1.  Standard of Review

Under the new regulations, applicable here, the Commissioner "will no longer give any specific evidentiary weight to medical opinions."  *Raymond M. v. Comm'r of Soc. Sec.*, 5:19-CV-1313 (ATB), 2021 WL 706645, at *4 (N.D.N.Y. Feb. 22, 2021) (citations and quotations omitted).  Rather, the Commissioner will consider all medical opinions and "evaluate their persuasiveness" based on their "supportability; consistency; relationship with the claimant; specialization; and 'other factors.'"  *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(1)-(5); 416.920c(c)(1)-(5)).

Supportability and consistency are "the most important factors" in determining whether a medical opinion is persuasive.  20 C.F.R. § 416.920c(b)(2).  Under the supportability factor, the more a medical opinion or prior administrative medical finding is reinforced by "relevant . . .

---

[4] Beyond what is already mentioned, Plaintiff's medical records repeatedly and consistently note pain and/or limited rotation and/or range of motion in her neck, back, right hip, and right shoulder.  (2017: T. 376-80; 383-86; 393-94; 399-402; 636-40; 641-45; 651-55; 2018: T. 405-08; 409-11; 475-80; 2019: T. 432-38; 679-84; 700-04; 718-20; 721-23; 728-30.)

objective medical evidence and supporting explanations," the "more persuasive" it will be.  20 C.F.R. § 404.1520c(c)(1); *Carmen M. v. Comm'r of the Soc. Sec. Admin*, No. 20-CV-06532-MJR, 2021 WL 5410550, at *4 (W.D.N.Y. Nov. 19, 2021) ("The 'supportability' factor asks how well a medical source supported their opinion(s) with objective medical evidence and supporting explanations.").  Under the consistency factor, a medical opinion or prior administrative medical finding is "more persuasive" if it is consistent "with the evidence from other medical sources and nonmedical sources in the claim."  20 C.F.R. § 404.1520c(c)(2); *Vellone v. Saul*, No. 1:20-cv-00261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 1:20-CV-261 (RA), 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("Simply put, consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record.").

While "the new regulations eliminate the perceived hierarchy of medical sources [and] deference to specific medical opinions . . . the ALJ must still 'articulate how [she] considered the medical opinions' and 'how persuasive [she] finds all of the medical opinions.'" *Brian O. v. Comm'r of Soc. Sec.*, 1:19-CV-983 (ATB), 2020 WL 3077009 at *4 (N.D.N.Y. June 10, 2020) (quoting 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b)).  An ALJ is explicitly required to "explain how [she] considered the supportability and consistency factors."  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  Additionally, the ALJ "must consider, but need not explicitly discuss, the [other] three factors." *Brian O.*, 2020 WL 3077009, at *5 (citing 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)).

### 2.  Application

Dr. Dhiman answered a Medical Interrogatory form as an impartial medical expert on June 4, 2020.  (T. 23, 851.)  Dr. Dhiman had an opportunity to review all available evidence

from the record, which had since been developed following two separate findings of insufficient

evidence from the relevant time period to adjudicate the claim.  (T. 23, 843.)  Dr. Dhiman

specified Plaintiff's impairments as Degenerative Disc Disease and Asthma/COPD but found

that these impairments did not meet or equal any impairment described in the Listings.  (T. 843-

44.)  The form instructed Dr. Dhiman to explain the specific Listings he considered and why the

Listings were not met.  (T. 844.)  Dr. Dhiman simply responded "[Plaintiff] has numerous

musculoskeletal complaints due to [a motor vehicle accident].  However,

signs/symptoms/presentation do not meet/equal 1.02/1.04. . . . Imaging: 2F – 6F, 8F do not

meet/equal 1.02/1.04/11.14" without further explanation.  *Id.*

In the Medical Statement of Ability to Do Work-Related Activities, Dr. Dhiman checked

boxes indicating Plaintiff could frequently lift/carry up to 10 pounds and occasionally lift/carry

up to 20 pounds.  (T. 846.)  He further found Plaintiff could sit, stand, or walk for 6 hours out of

an 8-hour workday "in any combination."  (T. 847.)  Dr. Dhiman indicated Plaintiff could use

both her right and left hands to occasionally reach overhead and push/pull; frequently reach in all

other directions and handle; and continuously finger and feel.  (T. 848.)  He also opined Plaintiff

could frequently operate foot controls with both her left and right feet; continuously balance;

occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl; and never climb ladders or

scaffolds.  (T. 848-49.)  Dr. Dhiman signed off on his findings on June 4, 2020.  (T. 851.)

The Court finds the ALJ erred in her assessment of Dr. Dhiman's opinion.  Although

under the new regulations the ALJ is not required to give specific evidentiary weight to a

particular medical opinion, she is still required to articulate how she considered the medical

opinion, including explaining how she considered the supportability and consistency factors.

*See Jaleesa H. v. Comm'r of Soc. Sec.*, 580 F. Supp. 3d 1, 8–9 (W.D.N.Y. 2022).  Here, the ALJ

did not explain anything; she simply made the conclusory statement that Dr. Dhiman's opinion was "supported by the findings set forth in his report and the testimony that cites to evidence in the record and is consistent with the evidence in the record" without explaining *how* she assessed the opinion in connection with the consistency and supportability factors as required by the new regulations. (T. 23.) *See Jaleesa H.*, 580 F. Supp. 3d at 9.

The ALJ's lack of explanation on the supportability and consistency of Dr. Dhiman's opinion is particularly troublesome for a number of reasons. First, Dr. Dhiman repeatedly cited to examinations in the record outside of the relevant time period which, at best, did not support his findings, or at worst, completely contradicted them.[5] (T. 566-69, 570-74, 580-84, 846-51.) Indeed, after a complete review of the record, it is unclear to the Court whether Dr. Dhiman actually read the portions of the record he cited. For example, Dr. Dhiman cited to Plaintiff's physical examination on March 7, 2016, to support the following findings: (1) Plaintiff could sit, stand, or walk for six hours out of an eight-hour workday in any combination; (2) Plaintiff could use her right and left hands to occasionally reach overhead and push/pull; frequently handle and reach in all other directions; and continuously finger and feel; (3) Plaintiff could frequently use her right and left feet to operate foot controls; and (4) Plaintiff could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl. (T. 570-74, 847-49.) However, at the March 7, 2016, exam with Dr. Finocchiaro, Plaintiff presented with continued lower back and bilateral shoulder pain. (T. 570.) Plaintiff was going to physical therapy three days a week and to a chiropractor two days a week. *Id.* While she was slowly gaining more function and range of motion, she was "[s]till unable to sit unsupported, stand or walk for more than 5 minutes." *Id.*

---

[5] Dr. Dhiman cites to Exhibit 14F pages 62, 64, 66, 77 which are reflected in the Transcript as T. 568, 570, 572, and 583 respectively.

Dr. Finocchiaro noted Plaintiff was in moderate pain/distress and recorded a decreased range of motion of her neck with extension and "RL of bilat shoulders and bilat hips secondary to pain" with antalgic gait.  (T. 572.)  She also noted Plaintiff's range of motion was somewhat improved since last visit.  *Id.*

To support his findings that Plaintiff could frequently lift and carry up to 10 pounds and occasionally lift and carry up to 20 pounds, Dr. Dhiman cited to Plaintiff's examination by Dr. Finocchiaro on April 6, 2016.  (T. 568, 846.)  At this exam, Plaintiff presented to Dr. Finocchiaro with bilateral shoulder and back pain which she rated a 7/10.  *Id.*  Plaintiff denied any changes in her condition and reported she believed her condition may be worsening.  *Id.*  Her pain medication, physical therapy, and chiropractor visits provided some relief.  *Id.*  Dr. Finocchiaro noted Plaintiff was feeling continuous pain in her lower back and from mid thoracic spine to neck since her injury.  *Id.*  She also intermittently experienced right shoulder pain.  *Id.*  Plaintiff had been unable to work, went to physical therapy three times a week, and saw a chiropractor two times a week.  *Id.*  Plaintiff reported that over the past few weeks her upper back pain, neck pain, and stiffness had increased.  *Id.*  She was "[s]till unable to sit unsupported, stand or walk for more than 5 minutes."  *Id.*  Dr. Finocchiaro assessed Plaintiff was in "moderate pain/distress" and had a decreased range of motion in her neck with extension and rotation and in her bilateral shoulders.  (T. 568.)  Dr. Finocchiaro further assessed that Plaintiff's ligament sprain in her thoracic spine had "[d]eteriorated."  (T. 569.)

When asked at the December 16, 2020, hearing to clarify if he had based his finding on Plaintiff's ability to sit, stand, and walk at least in part on the March 7, 2016, examination, which noted Plaintiff was "[s]till unable to sit unsupported, stand or walk for more than 5 minutes" (T.

570), and which he had specifically cited to for that determination (T. 847)[6], Dr. Dhiman denied

doing so and claimed he had looked at a pattern of physical examinations and opinions in making

his finding.  (T. 74-75.)  However, Dr. Dhiman did not cite to any other examinations, or patterns

in examinations, that he used to support this determination.[7]  *Id.*

Second, all of the radiology or imaging reports Dr. Dhiman cited to in the interrogatories

(T. 844)[8] are outside of the relevant time period, except for one CT scan of Plaintiff's neck/soft

tissue which took place on October 26, 2018 (T. 423-24), and which appears to have been

ordered for unrelated ear pain Plaintiff had been experiencing.  (T. 450-55.)  More importantly,

Dr. Dhiman offers no explanation why those reports supported his finding that Plaintiff did not

meet any of the Listings.  (T. 844.)  Further, in his hearing testimony, Dr. Dhiman stated "the

imaging studies such as 14F, [p]age 35, shows that there's very few degenerative changes in the

lumbar spine and of the shoulder and of the cervical spine"[9] and this supported his finding on

Plaintiff's ability to sit, stand, and walk within the relevant time period.  (T. 74-75.)  Yet, the

imaging report Dr. Dhiman specifically cites to in his testimony took place two days after

Plaintiff's initial accident in 2015.  (T. 541.)  It does not appear Dr. Dhiman cited any evidence

in the record from the relevant time period to support his findings, as instructed by the ALJ, or

any evidence in the record to support his findings at all.  (T. 71, 843-58.)

The ALJ's conclusory analysis precludes the Court from undertaking meaningful review

of her evaluation of Dr. Dhiman's opinion.  *See, e.g., Elizabeth P. v. Comm'r of Soc. Sec.,* No.

---

[6] Exhibit 14F, page 64 is reflected in the Transcript as T. 570.

[7] If Dr. Dhiman had made mistakes in his citations on the written interrogatories, he had 6
months between when he submitted his findings and when he testified to rectify them.  (T. 67,
845, 851.)  If this was, in fact, the case, he failed to do so.

[8] Exhibits 2F through 6F are reflected in the Transcript as T. 364-74. Exhibit 8F is reflected as T.
412- 24.

[9] Exhibit 14F, page 35 is reflected in the Transcript as T. 541.

3:20-CV-891 (CFH), 2022 WL 507367, at *6 (N.D.N.Y. Feb. 18, 2022) (finding the ALJ's

assessment that a doctor's opinion "was persuasive and consistent with the record as well as the

examination findings" was cursory and insufficient to explain how she considered the

supportability and consistency factors) (internal citations and quotations omitted); *Prieto v.

Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *13 (S.D.N.Y. Aug. 6,

2021) ("[R]ather than analyzing the supportability and consistency factors as applied to Dr.

Long's opinion, the only reasoning the ALJ provided was entirely conclusory; the ALJ said only

that Dr. Long's opinion was 'supported by the medical evidence of record and by her underlying

examination.'  Such a conclusory statement is an insufficient explanation of the supportability

factor and is grounds for remand.") (internal citations omitted); *Matthews v. Comm'r of Soc.

Sec.*, No. 1:17-cv-00371-MAT, 2018 WL 4356495, at *3 (W.D.N.Y. Sept. 13, 2018) ("The

ALJ's failure to explain his assessment of this portion of Dr. Baskin's opinion prevents the Court

from meaningfully reviewing his decision, and warrants remand.") (internal citation omitted).

Accordingly, remand is required on this basis.  On remand, the ALJ must articulate in a more

detailed fashion her assessment of Dr. Dhiman's opinion, including specifically how she

considered the supportability and consistency factors—especially in light of Dr. Dhiman's

confounding "support" for his opinion.

### C.  The ALJ's Evaluation of Activities of Daily Living

Finally, the ALJ's RFC determination appears to be based upon a mischaracterization

and/or overstatement of evidence concerning Plaintiff's activities of daily living.  First, "[s]uch

activities do not by themselves contradict allegations of disability," as people "should not be

penalized for enduring the pain of their disability in order to care for themselves." *Woodford v.

Apfel*, 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000) (internal quotations and citations omitted); *see*

*also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("We have stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act.").

The ALJ selectively cited portions of the record concerning Plaintiff's daily activities without mentioning important details. The ALJ described Plaintiff's ability to take care of her children with assistance from friends and family as needed, drive herself to doctors' appointments, drive her kids to sports practices, and prepare quick meals. (T. 22.) However, Plaintiff testified whenever she goes out with her family, her husband has to be there because it is physically difficult for her to do the things her kids want to do. (T. 59.) She noted in the activities report that she only prepared simple and quick meals for herself when no one is there to assist her because she could only stand for short periods of time. (T. 297.) She testified that she uses a crockpot to cook so she does not have to stand. (T. 60-61.) The ALJ also noted Plaintiff could dress herself with slight difficulty and can fold laundry but does not put clothes away. (T. 22.) Plaintiff testified she can "pretty much" dress herself and has some difficulty putting her bra on, but she wears tank tops and capris "every day because it's the simplest thing to put on." (T. 60-61.) She further testified folding laundry is the only household chore she does. (T. 61-62.) Her children bring clothes downstairs, put them in the washer and dryer, and then bring them back upstairs because Plaintiff cannot carry the baskets to and from the basement. (T. 62.) Her father-in-law, who lives with Plaintiff and her family, does dishes and cleans the kitchen and her husband usually does the grocery shopping. (T. 61-62.)

It is well settled that "[t]here are critical differences between activities of daily living (which one can do at his own pace when he is able) and keeping a full time job," *Harris v. Colvin*, 149 F. Supp. 3d 435, 444-45 (W.D.N.Y. 2016) (internal quotations and citations omitted), and "the fact that [an] appellant can still perform simple functions, such as driving,

grocery shopping, dish washing and floor sweeping, does not necessarily indicate that this appellant possesses an ability to engage in substantial gainful activity." *Mecklenburg v. Astrue*, No. 07-CV-760, 2009 WL 4042939, at *8 (W.D.N.Y. Nov. 19, 2009) (internal quotations and citations omitted).  As such, where an ALJ has "mischaracterize[d] the plaintiff's ability to perform activities of daily living to her disadvantage" in determining plaintiff's credibility, remand is appropriate. *Mecklenburg*, 2009 WL 4042939, at *7-8; *White v. Comm'r of Soc. Sec.*, No. 5:14-CV-1140 (GTS/WBC), 2016 WL 2865724, at *7 (N.D.N.Y. Apr. 21, 2016), *report and recommendation adopted*, No. 5:14-CV-1140 (GTS/WBC), 2016 WL 2858859 (N.D.N.Y. May 16, 2016) (remand is appropriate where ALJ "mischaracterized Plaintiff's activities of daily living" in rejecting medical source statement as inconsistent with those activities); *Henderson v. Berryhill*, 312 F. Supp. 3d 364, 370 (W.D.N.Y. 2018) (remanding where "the ALJ clearly misunderstood or exaggerated the degree to which plaintiff could independently perform daily activities such as housework and personal care, and diminished her credibility findings on that basis in a manner which significantly altered and influenced her RFC finding").  Here, the ALJ mischaracterized Plaintiff's activities of daily living by excluding important details or caveats regarding her limitations.  As a result, remand is also warranted on this basis.

## VI.  CONCLUSION

In reaching a decision, the ALJ "must *both* identify evidence that supports his conclusion *and* 'build an accurate and logical bridge from that evidence to his conclusion.'" *Gutowski v. Comm'r of Soc. Sec.*, No. 17-CV-1246, 2019 WL 2266796, at *4 (W.D.N.Y. May 28, 2019) (emphasis in original) (internal quotations and citations omitted). "[P]roviding 'an accurate and logical bridge' require[s] him to confront the evidence in [a plaintiff's] favor and explain why it [is] rejected before concluding that her impairments [do] not impose more than a minimal

limitation on her ability to perform basic work tasks." *Lynn S. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1915-DB, 2022 WL 17828844, at *8 (W.D.N.Y. Dec. 21, 2022) (internal citations and quotations omitted). "Where [the court is] 'unable to fathom the ALJ's rationale in relation to the evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ,' [the court] will not 'hesitate to remand for further findings or a clearer explanation for the decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (internal citations omitted); *see also Lynn S.*, 2022 WL 17828844, at *8.  Such is the case here.

There is no accurate and logical bridge between the evidence and the ALJ's conclusions as to Plaintiff's RFC.  After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court recommends remand.

WHEREFORE, it is hereby

**RECOMMENDED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 15) be **GRANTED**; and it is further

**RECOMMENDED** that Defendant's motion for judgment on the pleadings (Dkt. No. 16) be **DENIED**, that the decision of the Commissioner be reversed, and that the case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Report and Recommendation and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[10]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

   **SO ORDERED.**

Dated: February 10, 2023
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[10]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2016 WL 551783
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kim HUBBARD, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

6:14-CV-1401 (GTS/WBC)
|
Signed 01/14/2016

**Attorneys and Law Firms**

KIM HUBBARD, PRO SE, 270 Day Ave., Rome, NY 13440.

DANIEL R. JANES, ESQ., U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL – REGION II, Counsel for Defendant, 26 Federal Plaza – Room 3904, New York, NY 10278.

### *REPORT and RECOMMENDATION*

William B. Mitchell Carter, U.S. Magistrate Judge

 **\*1**  This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 19.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Kim Hubbard ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is Defendant's unopposed motion for judgment on the pleadings. (Dkt. No. 17.) For the reasons set forth below, it is recommended that Defendant's motion be granted.

## I. RELEVANT BACKGROUND

### A. Factual Background
Plaintiff was born on July 20, 1982. (T. 88.) She completed four years of college. (T. 109.) Generally, Plaintiff's alleged disability consists of diabetes, attention deficit hyperactivity disorder ("ADHD"), back impairments, and anxiety. (T. 108.) Her alleged disability onset date is September 22, 2010. (T. 60.) Her date last insured is June 30, 2015. (*Id.*) She

previously worked as a customer service representative, medical records scanner, processor, waitress, and child care provider. (T. 109.)

### B. Procedural History
On February 25, 2012, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II of the Social Security Act. (T. 60.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On March 11, 2013, Plaintiff appeared, pro se, before the ALJ, David J. Begley. (T. 25–59.) The ALJ advised Plaintiff of her right to be counseled by an attorney or representative, but Plaintiff waived that right. (T. 28–29.) On June 5, 2013, ALJ Begley issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 7–24.) On September 22, 2014, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1–4.) Thereafter, Plaintiff, again appearing pro se, timely sought judicial review in this Court. On November 19, 2014, the Court issued Plaintiff a copy of this Court's General Order 18, governing the procedural rules with respect to Social Security appeals. (Dkt. No. 3.) At that time the Court also issued Plaintiff a copy of the Pro Se Handbook and Notice. (Dkt. No. 4.)

Pursuant to General Order 18, plaintiffs are notified that "the failure to file a brief as required by this order will result in the consideration of this appeal without the benefit of plaintiff's arguments and may result in a decision heavily influenced by the commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order 18 at 4.

Plaintiff failed to file a brief by the April 27, 2015 deadline and because of her pro se status, the Court granted an extension to June 1, 2015. (Dkt. No. 14.) Plaintiff failed to file a brief by June 1, 2015 and the Court directed Defendant to file her brief. (Dkt. No. 15.) As of the date of this report and recommendation, Plaintiff has not filed a brief.

### C. The ALJ's Decision
 **\*2**  Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 12–24.) First, the ALJ found that Plaintiff met the insured status requirements through June 30, 2015 and Plaintiff had not engaged in substantial gainful activity since September 22, 2010. (T. 12.) Second, the ALJ found that Plaintiff had the severe impairments of diabetes mellitus, hyperthyroidism,

Case 6:21-cv-01138-MAD-TWD  Document 19  Filed 02/13/23  Page 27 of 189

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

degenerative disc disease of the lumbar and cervical spine, left wrist tendinitis, left wrist carpal tunnel syndrome (status post release), right wrist capsulitis, panic disorder, and ADHD. (*Id*.) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 12-13.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except Plaintiff:

> [could] not climb ladders, ropes, or scaffolds; could occasionally climb ramps/stairs, balance, stoop, kneel, crouch or crawl; work [was] limited to simple, routine, and repetitive tasks, involving only simple, work-related decisions, with few, if any, work-place changes, and only occasional interaction with coworkers and supervisors; [and] no regular interaction with the general public.

(T. 13–14.) [1] Fifth, the ALJ determined that Plaintiff was incapable of performing her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 20–21.)

[1]    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

## II. DEFENDANT'S BRIEFING ON HER MOTION FOR JUDGMENT ON THE PLEADINGS

In support of her motion for judgment on the pleadings, Defendant makes four arguments. First, Defendant argues Plaintiff knowingly and voluntarily waiver her right to representation. (Dkt. No. 17 at 11–12 [Def.'s Mem. of Law].) Second, Defendant argues the ALJ's RFC finding was supported by substantial evidence. (*Id*. at 12–14.) Third, Defendant argues the ALJ's step five finding was supported by substantial evidence. (*Id*. at 14.) Fourth, and lastly, Defendant argues Plaintiff failed to meet her burden. (*Id*. at 14–15.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

**\*3** "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

### A. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant

is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982).

## IV. ANALYSIS

In a civil case, the Court may dismiss an action where, as here, "the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order...." Fed.R.Civ.P. 41(b); *Storey v. O'Brien,* No. 10–3303, 2012 WL 1889408, at *1 (2d Cir. May 25, 2012). Further, other districts in the Second Circuit have dismissed Social Security appeals, sua sponte, due to a pro se plaintiff's failure to prosecute. *See Gonzalez v. Commissioner of Social Security,* No. 09–CV–10179, 2011 WL 2207574, at *2 (S.D.N.Y. June 2, 2011), *see also Winegard v. Barnhart,* No. 02–CV–6231, 2006 WL 1455479, at *9–10 (W.D.N.Y. Apr. 5, 2006). However, the Court declines to do so in this case.

**\*4** In this District, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order No. 18 at 4. General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.* In a case such as this, where Plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiff's failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial

Case 6:21-cv-01038-MAD-TWD   Document 19   Filed 02/13/23   Page 29 of 189

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

evidence. *See Gregorka v. Comm'r of Soc. Sec.*, No. 6:13–CV–1408, 2015 WL 3915959, at \*4 (N.D.N.Y. June 25, 2015).

After a careful review of the administrative record on appeal, the Court recommends the Commissioner's determination be affirmed, for the reasons stated in Defendant's memorandum of law, that (1) the Plaintiff knowingly and voluntarily waived her right to representation, (2) the ALJ's RFC finding was supported by substantial evidence, (3) the ALJ's step five finding was supported by substantial evidence, and (4) Plaintiff failed to meet her burden. (Dkt. No. 17 at 11–15 [Def.'s Mem. of Law].)

### A. Plaintiff Knowingly and Voluntarily Waived Her Right to Representation

Although plaintiffs do not have a constitutional right to counsel at a Social Security hearings, they do have a statutory and regulatory right to be represented if they chose to obtain counsel. 42 U.S.C. § 406; 20 C.F.R. § 404.1705. Here, the Commissioner sent Plaintiff an acknowledgement letter explaining the hearing process and advising her of her right to representation, as well as the availability of free legal services. (T. 77–78.) At the hearing, the ALJ again reviewed with Plaintiff her right to have representation and Plaintiff knowingly waived that right. (T. 28–30.) Therefore, the Commissioner and ALJ complied with their obligations to inform Plaintiff of her right to counsel and Plaintiff knowingly and voluntarily waived her right.

### B. The ALJ's RFC Determination

A plaintiff's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a). Here, the ALJ's RFC determination was supported by substantial evidence, specifically, the medical source opinions of consultative examiners Dennis Noia, M.D. and Pamela Tabb, M.D.

An ALJ "is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants," particularly where the consultant's opinion is supported by the weight of the evidence. *Garrison v. Comm'r of Soc. Sec.*, No. 08–CV–1005, 2010 WL 2776978 at \*4 (N.D.N.Y. June 7, 2010).

Dr. Noia performed a psychiatric consultative exam on April 30, 2012. At that time he observed Plaintiff was cooperative and her manner of relating, social skills, and overall presentation were adequate. (T. 205.) He further

observed her speech was normal, her thought process was normal, her mood was calm, and her affect was congruent. (T. 206.) Dr. Noia observed Plaintiff's attention and concentration were intact, her recent and remote memory skills were "mildly to moderately" impaired; and her intellectual functioning was average. (*Id.*) In a medical source statement, Dr. Noia opined Plaintiff was capable of understanding and following simple instructions and directions; capable of performing simple and some complex tasks; capable of maintaining attention and concentration; could regularly attend to a routing and maintain a schedule; capable of making appropriate decisions; able to relate to and interact moderately well with others; and Plaintiff had some difficulty dealing with stress. (T. 206–207.) [2]

> [2]
>
> Plaintiff did not undergo mental health treatment. In November of 2011, during an evaluation by her orthopedic provider, Plaintiff denied depression and anxiety. (T. 183.) In December of 2011, Plaintiff complained to her primary care provider of "slight depression." (T. 177.) A prescription history indicated Plaintiff was prescribed Alprazolam for her anxiety by Scott Brehaut, M.D. (T. 167.)

 **\*5** Dr. Tabb performed a physical consultative exam on April 30, 2012. At that time she observed Plaintiff appeared in no acute distress, had a normal gait, could walk on heels and toes, needed no help changing for exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (T. 209.) Dr. Tabb observed Plaintiff's cervical spine and lumbar spine showed full flexion, extension, later flexion bilaterally and full rotary movement bilaterally. (T. 210.) Dr. Tabb observed Plaintiff had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. (*Id.*) Dr. Tabb observed Plaintiff had mild tenderness in the medial aspect of her left wrist. (*Id.*) In a medical source statement Dr. Tabb opined Plaintiff had mild restrictions for performing activities involving repetitive movement of the left wrist. (T. 211.) [3]

> [3]
>
> In June of 20120, subsequent to Plaintiff's examination by Dr. Tabb, she underwent CTS release surgery. (T. 255.)

In making his physical RFC determination, the ALJ also relied on objective medical imagining from March of 2012 which indicated "very minimal" degenerative change and "mild" disc space narrowing in the mid thoracic spine. (T. 200.) Medical imaging from March of 2012

indicated degenerative disc disease with "mild" multilevel bulging in the lumbar spine. (T. 201.) Medical imaging of Plaintiff's cervical spine revealed "mild" disc desiccation with "minimal" disc bulging at multiple levels.

The ALJ thoroughly discussed all the medical evidence in the record and his RFC determination was supported primarily by the consultative examiners, Drs. Noia and Tabb. In addition to Dr. Tabb's opinion, the ALJ's physical RFC determination was supported by Plaintiff's treating physicians who reported Plaintiff had normal gait and stance, appeared in no acute distress, ambulated well, and had negative straight leg raises. (T. 182–185, 192–197.)

Plaintiff's orthopedic surgeon, Gregory Shankman, M.D., completed a medical source statement in August of 2007, which the ALJ discussed in his opinion but ultimately rejected. Dr. Shankman opined Plaintiff's pain was "too severe for her to work" and she was "totally and permanently disabled." (T. 161.) Dr. Shankman further opined Plaintiff could not walk for more than five minutes without pain, could not sit for more than five minutes without severe pain, and could not sleep for more than a few hours without pain. (*Id.*) He opined Plaintiff could not lift or carry more than ten pounds. (*Id.*) The ALJ properly assigned Dr. Shankman's opinion "limited weight" because there were no records to support his opinion, Plaintiff's own allegations of limitations were not as restrictive as Dr. Shankman's, and the opinion predated Plaintiff's alleged onset date by over three years. Therefore, for the reasons stated herein, and for the reasons provided in Defendant's brief, the ALJ's RFC determination was supported by substantial evidence.

### C. The ALJ's Credibility Determination

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue,* 614 F.Supp.2d 252, 270 (N.D.N.Y.2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood,* 614 F.Supp.2d at 270.

**\*6** "The ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged." *Id.,* at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id.,* see 20 C.F.R. § 416.929(c)(3)(i)-(vii). Further, "[i]t is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses," including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue,* 534 F. App'x 71, 75 (2d Cir.2013) (citing *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983)).

Here, the ALJ properly applied the Regulations in his credibility analysis. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

effects of these symptoms were not entirely credible. (T. 15.) The ALJ provided an accurate synopsis of Plaintiff's testimony. (T. *Id*.) The ALJ discussed objective medical evidence and opinion evidence which he found to be inconsistent with Plaintiff's statements. (T. 15–18.) The ALJ discussed Plaintiff's activities of daily living, treatment she received for her impairments including medication, and aggravating factors. (T. 15.) Therefore, for the reasons stated herein, the ALJ properly adhered to the Regulations in making his credibility determination and substantial evidence supports the ALJ's credibility determination.

### D. The ALJ's Step Five Determination

At step five of the sequential process, the ALJ considered Plaintiff's age, education, and RFC, to determine whether there were a significant number of jobs in the national economy which Plaintiff could perform. 20 C.F.R. § 404.1569. In making his determination, the ALJ relied on the testimony of a vocational expert ("VE"). (T. 5658.) At the hearing the VE testified that based on a hypothetical individual with Plaintiff's age, education, and RFC, there were jobs that existed in significant numbers in the national economy which she could perform. (T. 56–57.) Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (approving a hypothetical question to a vocational expert that was based on substantial evidence in the record). **ACCORDINGLY**, based on the findings above, it is

**\*7 RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health* and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in Fed. Supp., 2016 WL 551783

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3915959
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leo GREGORKA; and Eve Gregorka, Plaintiffs,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 6:13–CV–1408 (GTS/TWD).
|
Signed June 25, 2015.

**Attorneys and Law Firms**

Leo Gregorka and Eve Gregorka, Little Falls, NY, pro se.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, NY, Office of General Counsel, Social Security Administration, Emily M. Fishman, Esq., of Counsel, New York, NY, for Defendant.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

**\*1** The above matter comes to this Court following a Report–Recommendation by United States Magistrate Judge Thérèse Wiley Dancks, filed on May 28, 2015, recommending that the Commissioner's decision denying benefits be affirmed with regard to Social Security income benefits ("SSI") but reversed with regard to disability insurance benefits ("DIB"). (Dkt. No. 14.) No objections to the Report–Recommendation have been filed and the time in which to do so has expired. After carefully reviewing all of the papers herein, including Magistrate Judge Dancks' thorough Report–Recommendation, the Court can find no error in the Report–Recommendation, clear or otherwise. As a result, the Report–Recommendation is accepted and adopted in its entirety; and the case is remanded to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 20) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that the Commissioner's decision is **AFFIRMED** with regard to the denial of SSI benefits but **REVERSED** with regard to the denial of DIB benefits; and it is further

**ORDERED** that this matter is **REMANDED** to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

### REPORT AND RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This matter was referred to the undersigned for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3. This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Oral argument was not heard. For the reasons discussed below, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to supplemental security income ("SSI") benefits but remand the disability insurance benefits ("DIB") claim to the Commissioner for further proceedings.

### I. BACKGROUND AND PROCEDURAL HISTORY

On June 9, 2011, Thomas Leo Gregorka ("Mr.Gregorka") submitted applications for SSI and DIB. (Dkt. No. 15–2 at 21.) The applications were denied on December 13, 2011. *Id.* On January 19, 2012, Mr. Gregorka filed a request for a hearing before an Administrative Law Judge ("ALJ"). *Id.* Mr. Gregorka died on April 1, 2012. *Id.* Mr. Gregorka was fifty-eight years old when he died. *Id.* at 30.

Plaintiffs Leo and Eve Gregorka, the parents of Mr. Gregorka, filed a substitution of party to proceed with the hearing requested by their son. (Dkt. No. 15–2 at 21.) They did not, however, wish to appear at the hearing in person. *Id.* Thus, the ALJ based his decision on the record alone. *Id.*

**\*2** On June 19, 2012, the ALJ issued a decision finding that Mr. Gregorka was not disabled. (Dkt. No. 15–2 at 21–31.) Plaintiffs filed a request for review by the Appeals Council (Dkt. No. 15–2 at 16) and submitted additional evidence (Dkt.

No. 15–2 at 5). On September 5, 2013, the Appeals Council issued separate decisions on Mr. Gregorka's SSI claim and his DIB claim. (Dkt. No. 15–2 at 1–4, 8 .) The Appeals Council dismissed the request for review of the SSI claim, finding that Plaintiffs were not proper parties pursuant to Social Security regulations. (Dkt. No. 15–2 at 8.) The Appeals Council denied the request for review of the DIB claim, finding that there was no basis for changing the ALJ's decision. (Dkt. No. 15–2 at 2, 3.)

Plaintiffs commenced this action on November 12, 2013. (Dkt. No. 1.)

## II. APPLICABLE LAW

### A. Standard for Benefits

To be considered disabled, a claimant seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a) (3)(A) (2006). In addition, the claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20

C.F.R. § 416.920(a)(4) (2015). Under that five-step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir.2014.) "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

**\*3** The claimant bears the burden of proof regarding the first four steps. Kohler v. As true, 546 F.3d 260, 265 (2d Cir.2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir.1996)). If the claimant meets his or her burden of proof, the burden shifts to the Commissioner at the fifth step to prove that the claimant is capable of working. Id.

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Featherly v. Astrue, 793 F.Supp.2d 627, 630 (W.D.N.Y.2011) (citations omitted); Rosado v. Sullivan, 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir.1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. Johnson, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Roat v. Barnhart,* 717 F.Supp.2d 241, 248 (N.D.N.Y.2010);[1] *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly,* 793 F.Supp.2d at 630; *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972); *see also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

[1]   On Lexis, this published opinion is separated into two documents. The first is titled *Roat v. Barnhart,* 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the district court judge's short decision adopting the magistrate judge's report and recommendation. The second is titled *Roat v. Comm'r of Soc. Sec.,* 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the magistrate judge's report and recommendation. Westlaw includes both the district court judge's decision and the magistrate judge's report and recommendation in one document, titled *Ross v. Barnhart,* 717 F.Supp.2d 241 (N.D.N.Y.2010). The Court has used the title listed by Westlaw.

### III. THE ALJ'S DECISION

Here, the ALJ found at step one that Mr. Gregorka was not engaged in any substantial gainful activity from September 27, 2008, to April 1, 2012. (Dkt. No. 15–2 at 23.) At step two, the ALJ found that Mr. Gregorka suffered from the severe conditions of hypertensive and arthroscopic cardiovascular disease, chronic obstructive pulmonary disease, degenerative disc disease of the cervical and lumbar spine, and physical residuals from chronic alcohol abuse, including seizures, near syncope, and tremor. *Id.* at 23–24. The ALJ found that Mr. Gregorka did not have any severe mental impairment, granting "great weight" to the medical opinion of a non-examining agency medical consultant and "little weight" to the opinion of consultative psychologist Dennis Noia, Ph .D. *Id.* at 25. At step three, the ALJ found that none of Mr. Gregorka's impairments met or medically equaled a listed impairment. *Id.* at 25–26. At step four, the ALJ found that Mr. Gregorka had the RFC to perform medium work, except that he needed to avoid climbing ladders or scaffolds and should avoid working at heights or around dangerous machinery. *Id.* at 26. Based on that RFC, the ALJ found that Mr. Gregorka was not able to perform any past relevant work. *Id.* at 29. At step five, however, the ALJ found that Mr. Gregorka could perform jobs that exist in significant numbers in the national economy. *Id.* at 30. Accordingly, the ALJ found that Mr. Gregorka was not disabled. *Id.* at 30–31.

### IV. PLAINTIFFS' FAILURE TO FILE A BRIEF

 **\*4**  This Court's General Order 18 sets forth the briefing schedule in Social Security cases. After Plaintiffs failed to comply with General Order 18, the undersigned issued an order of June 9, 2014, which directed Plaintiffs to file their brief within forty-five days after service of Defendant's brief. (Dkt. No. 17.) Despite this, Plaintiffs filed neither papers opposing Defendant's motion nor a request to enlarge the time within which to oppose Defendant's motion.

In the usual civil case, a plaintiff's failure to comply with court orders would subject the complaint to dismissal under Federal Rule of Civil Procedure 41(b). In addition, other Districts in the Second Circuit have held that where a Social Security plaintiff files a complaint but fails to file a brief on the merits, the complaint is conclusory and insufficient to defeat a motion for judgment on the pleadings. *Winegard v. Barnhart,* No. 02–CV–6231 CJS, 2006 U.S. Dist. LEXIS 31973, at *27–28, 2006 WL 1455479, at *9–10 (W.D.N.Y. Apr.5, 2006); *Feliciano v. Barnhart,* Civ. No. 04–9554 KMW AJP, 2005 U.S. Dist. LEXIS 14578, at *34–36, 2005 WL 1693835, at

2015 WL 3915959

*10 (S.D.N.Y. July 21, 2005); *Reyes v. Barnhart,* Civ. No. 01–4059 LTS JCF, 2004 U.S. Dist. LEXIS 3689, at *6–7, 2004 WL 439495, at *3 (S.D.N.Y. Mar.9, 2004).

In this District, however, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." (General Order No. 18 at 4.) General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.* In a case such as this, where the plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiffs' failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence.

## V. DISCUSSION

### A. SSI Claim

The ALJ denied Mr. Gregorka's claim for both SSI and DIB on the merits. (Dkt. No. 15–2 at 21–31.) The Appeals Council dismissed Plaintiffs' request for review of the ALJ's decision regarding SSI on the grounds that Plaintiffs were not eligible survivors for underpayment of SSI under the agency's regulations. *Id.* at 8. In their complaint, Plaintiffs explicitly challenge the denial of "Title II benefits (Social Security Disability)." (Dkt. No. 1 at 1.) The complaint does not explicitly challenge the denial of SSI benefits under Title XVI. Defendant argues that to the extent that the complaint can be construed as asserting an SSI claim, that claim is moot and was properly dismissed by the Appeals Council. (Dkt. No. 18 at 8–10.) Defendant is correct.

**\*5** Agency regulations drastically limit the categories of individuals who can recover benefit underpayments on behalf of a deceased individual. 20 C.F.R. § 416.542(b)(4). Surviving parents can recover only if the deceased underpaid recipient was a disabled or blind child when the underpayment occurred. 20 C.F.R. § 416.542(b)(2)-(3). A "child" is an individual under the age of eighteen or an unmarried individual under the age of twenty-two who is attending school. 20 C.F.R. § 416.1856. Here, Mr. Gregorka was fifty-seven years old when he applied for SSI. (Dkt. No. 15–2 at 21, 30.) Accordingly, Plaintiffs are not the surviving parents of a disabled child pursuant to agency regulations. Therefore, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to recover SSI benefits.

### B. DIB Claim

Defendant concedes that remand is appropriate regarding Plaintiffs' DIB claim. (Dkt. No. 18 at 10–14.) Specifically, remand is appropriate because it is not clear from the Appeals Council's decision whether it considered four medical assessments by Mr. Gregorka's treating physician that were submitted as new evidence. (Dkt. No. 15–2 at 5; Dkt. No. 15–9 at 59–66.) Those assessments related to the period on or before the ALJ's decision and contradicted the ALJ's RFC finding. (Dkt. No. 15–9 at 59–66.) The Appeals Council was thus required to consider it. 20 C.F.R. § 404.970(b). Accordingly, it is recommended that the Court remand this matter to the Commissioner for further proceedings regarding Plaintiff's DIB claim.

**WHEREFORE,** it is hereby

**RECOMMENDED,** that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[2] for further proceedings consistent with the above.

[2]    Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 87 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15, 16 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

2015 WL 3915959

Dated: May 28, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3915959

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by DuBois v. Commissioner of Social Security, S.D.N.Y.,
March 21, 2022

2012 WL 7784156
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Ray HENDRICKSON, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of the
Social Security Administration, Defendant.

Civil Action No. 5:11–927.
|
Dec. 11, 2012.

### REPORT AND RECOMMENDATION

EARL S. HINES, United States Magistrate Judge.

**\*1** Plaintiff Kenneth Ray Hendrickson ("Hendrickson") brings this action under 42 U.S.C. § 405(g) for review of a decision denying his application for disability-based benefits under the Social Security Act. Complying with General Order # 18, the parties join issues through competing briefs.[1]

[1]
General Order # 18 is dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

### I. Background

Hendrickson applied for disability insurance ("DIB") and supplemental security income ("SSI") benefits claiming disability due to *depression* and *anxiety.* (T. 106–13, 136).[2] His applications, filed on June 25, 2007, alleged that disability commenced on April 28, 2007. *Id.* After being denied benefits initially (T. 66–67), Hendrickson requested a hearing before an administrative law judge ("ALJ"). (T. 76).

[2]
"T." followed by a number refers to the page of the administrative

ALJ Thomas John S. Pope ("ALJ Pope") conducted a video evidentiary hearing on September 10, 2009. (T. 19, 29–65). Hendrickson was represented by counsel, Jason Mintz, Esq., at the hearing. (T. 19, 29, 31). Hendrickson and an impartial vocational expert gave testimony.[3] ALJ Pope received additional evidence consisting of Hendrickson's medical records, a psychiatric evaluation of a state agency psychiatric consultative examiner, Kristen Barry, Ph.D., and a psychiatric review report and mental residual functional capacity assessment of a state agency psychology medical consultant, E. Kamin, Ph.D.

[3]
ALJ Pope presided over the hearing from Chicago, Illinois. Hendrickson appeared and testified through interactive video in Syracuse, New York. The impartial vocational expert, Edward Pagella, appeared by telephone. (T. 19).

When ALJ Pope denied Hendrickson's applications (T. 19–28), Hendrickson appealed to the Appeals Council of the Social Security Administration's Office of Hearings and Appeals. (T. 13–14). On June 28, 2011, the Appeals Council denied Hendrickson's request to review. (T. 3–5). This rendered ALJ Pope's opinion the final decision. *See Sims v. Apfel,* 530 U.S. 103, 107 (2000).

Represented by new counsel, Howard D. Olinsky, Esq., Hendrickson timely instituted this case on August 4, 2011. (Dkt. No. 1).

### II. Preliminary Discussion

An initial discussion of the Social Security benefit programs at issue and the administrative decision-making process (including certain terms of art) will aid comprehension of Hendrickson's underlying claim, ALJ Pope's decision and Hendrickson's challenges thereto.

#### A. Eligibility for Benefits

*Disability Insurance benefits,* authorized by Title II of the Social Security Act and funded by social security taxes, provide income to insured individuals forced into involuntary, premature retirement by reason of disability. *Supplemental Security Income* benefits, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provide an additional resource to assure that disabled individuals' income does not fall below the poverty line.

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 38 of 189
Hendrickson v. Astrue, Not Reported in F.Supp.2d (2012)
2012 WL 7784156

Maximum benefits available under SSI are considerably less than under DIB. Here, ALJ Pope found that Hendrickson meets the insurance requirements of the DIB program. The practical effect of that finding makes Hendrickson's SSI application superfluous since Hendrickson, if found to be disabled, obviously would elect the higher benefit available under DIB.

**\*2** The Social Security Act defines disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).

*B. Sequential Evaluation Procedure*
The law requires *individualized* determinations. *See Heckler v. Campbell,* 461 U.S. 458, 467 (1983). Hence, Commissioner Astrue generally must make both medical and vocational assessments in every case. To satisfy this requirement, the Commissioner utilizes a five-step, sequential evaluation procedure for adjudicating disability-based claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920.[4] This model is "sequential" in the sense that when a decision can be made at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920. It enjoys judicial approval as a fair and just way for determining disability applications in conformity with the Social Security Act. *See Bowen v. Yuckert,* 482 U.S. 137, 153 (1987) (citing *Heckler,* 461 U.S. at 461) (use of the sequential evaluation process "contribute[s] to the uniformity and efficiency of disability determinations")).

[4]   In this circuit, the Commissioner's five-step sequential procedure is described as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment [that meets or equals a] listed [impairment] in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the

Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000) (citing *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing 20 C.F.R. §§ 404.1520, 416.920)).

Claimants bear the burden to prove their disability under the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998). When they do, a *prima facie* case of disability has been proven. *See Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984). The burden then shifts to the Commissioner in Step 5 to show "that there is work in the national economy that the claimant can do." *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009); *see also DeChirico,* 134 F.3d at 1180; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); 20 C.F.R. § 416.966.

Specialized rules—some imposed externally by courts—govern the Commissioner's applications of these five steps. Those particularly pertinent to Hendrickson's case are described in the remainder of this section:

*1. Step 2 Severity Determination*
In the Commissioner's view, "[a] 'severe' impairment is one that significantly limits an individual's physical or mental ability to do 'basic work activities.' " *Meadors v. Astrue,* 370 Fed. App'x 179, 182 (2d Cir.2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *see also* 20 C.F.R. § 416.921(b) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities"). The phrase "significantly limits," however, is not tantamount to an ultimate determination of disability. In this circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' ...

[with] ...'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen,* 482 U.S. at 154 n. 12).

**\*3** When mental impairments are present, determining severity thereof is a complex undertaking. The Commissioner has promulgated additional regulations that require application of a "special technique" at the second (and third) steps of the five-step framework. *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir.2008) (citing 20 C.F.R. § 404.1520a). This technique requires an initial determination of whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). If so, the reviewing authority must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c), § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) *concentration, persistence, or pace* (underscored because of relevance to instant case); and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). When the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, the claimant's mental impairment is not "severe." 20 C.F.R. § 404.1520a(d)(1).[5] Conversely, when a mental impairment is severe, evaluation proceeds to Step 3 to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. 20 C.F.R. § 404.1520a(d)(2)(3).

[5]     "[A] pplication of the special technique [must] be documented." *Petrie v. Astrue,* 412 Fed. App'x 401, 408 (2d Cir.2011) (citing 20 C.F.R. § 404.1520a(e)). "Generally, a medical or psychological consultant will complete a standard document, known as a 'Psychiatric Review Technique Form' ("PRTF")." *Id.* "Pursuant to the regulations, the ALJ's written decision must 'reflect application of the technique, and ... "include a specific finding as to the degree of limitation in each of the [four] functional areas." ' " *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

*2. Step 4 Residual Functional Capacity Determination*
When making a Step 4 finding (as to whether a severely impaired claimant can perform past relevant work), an ALJ must first assess and articulate that claimant's "residual functional capacity" ("RFC"), *i.e.,* what that claimant can still do in a work setting (8 hours a day, 5 days a week,

or equivalent scheduled) despite physical and/or mental limitations caused by impairments and any related symptoms, such as pain. *See* 20 C.F.R. § 404.1545, 416.945(a); *see also Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (defining RFC). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed.Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

When *physical* impairments are at issue, the Commissioner's regulation and an internal policy ruling (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-byfunction assessments of those activities, and (c) dictate that the ultimate RFC determination account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b), 416.945(a)(2), 416.945(b); SSR 96–8p, 1996 WL 374184, at * *5, 7.

When mental impairments are in the picture, the RFC assessment ("mental RFC") involves an even more detailed analyses of claimants' functional limitations than were undertaken at Step 2. Mental RFC consists of four broad categories (*i.e.,* understanding and memory; sustained concentration and persistence; social interaction; and adaptation) with a total of twenty subparts that are each reviewed and rated (*i.e.,* "not significantly limited"; "moderately limited"; "markedly limited"; "no evidence of limitation in this category"; and "not ratable on available evidence"). (T. 389–391). Ultimately, "[a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment." SSR 85–15, THE MEDICAL–VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857, at *5–6 (SSA 1985).

*3. Step 5 Evidentiary Burden When Nonexertional Impairments Exist*
**\*4** At Step 5, the Commissioner can satisfy his burden to show that a claimant can still do work existing in the national economy by eliciting or consulting several extrinsic sources of relevant evidence.[6] In limited circumstances, moreover, the Commissioner may take administrative notice

Hendrickson v. Astrue, Not Reported in F.Supp.2d (2012)

2012 WL 7784156

of disability *vel non* by adopting findings published in *"Medical–Vocational Guidelines,"* commonly called *"the grids."* See *Roma v. Astrue,* 468 Fed. App'x 16, 20–21 (2d Cir.2012); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When only exertional impairments [7] are in play, and when an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir.2009); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 2; *see also Thompson v. Barnhart,* 75 Fed. App'x 842, 844 (2d Cir.2003) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"). [8]

6   Generally, the Commissioner elicits or consults two principal sources of evidence relevant to whether claimants can perform alternative, available work. First, witnesses qualified as "Vocational Experts" may testify as to whether jobs exist for a person with the claimant's precise abilities. *See* 20 C.F.R. §§ 404.1566(e), 416. 966(e); *see also* SSR 00–4p, POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, 2000 WL 1898704, at *1–2 (SSA Dec. 4, 2000). Second, a United States Department of Labor publication titled *Dictionary of Occupational Titles* ("DOT") can assist in determining when a claimant's residual work skills can be used in other work and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1560(d)(1), 416.966(d)(1); *see also* SSR 00–4p, 2000 WL 1898704, at *1–2.

7   "An exertional impairment is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet ... strength demands of jobs (*i.e.,* sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Bogardus–Fry v. Astrue,* No. 7:11–CV–883 (MAD), 2012 WL 3779132, at *15 n.14 (N.D.N.Y. Aug. 31, 2012) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *Rodriguez v. Apfel,* No. 96 Civ. 8330(JGK), 1998 WL 150981, at *10, n.12 (S.D.N.Y. Mar. 31, 1998)).

8   The grids are a matrix of general findings—established by rule—as to whether work exists in the national economy that a person can perform. "The grids take into account a claimant's RFC, as well as [his] age, education, and work experience." *Calabrese v. Astrue,* 358 Fed. App'x 274, 276 & n.1 (2d Cir.2009) (citing *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999)). Ultimately, the grids yield a decision of "disabled" or "not disabled." *Zorilla v. Chater,* 915 F.Supp. 662, 667 & n.2 (S.D.N.Y.1996) (citing 20 C.F.R. § 404.1567(a)).

But, when claimants also suffer from nonexertional impairments, [9] direct application of the grids to determine disability is not permitted. The Commissioner nonetheless permits administrative law judges to consult them as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by ... nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2). SSR 85–15 addresses this "framework" analysis, and directs that when evaluating nonexertional impairments, an administrative law judge should first consult the grids, along with consideration of the claimant's RFC and vocational factors, to determine the extent of impairment caused by *exertional* limitations. *See* SSR 85–15, 1985 WL 56857, at *3. The administrative judge should next determine how much that claimant's "occupational base," (the entire exertional span from sedentary work through heavy work), is *further reduced* by effects of *nonexertional* impairments. *See id.*

9   "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect [ing] only your ability to meet ... demands of jobs other than ... strength demands...." *See* 20 C.F .R. §§ 404.1569a(c)(1), 416.969a(c)(1). A nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions (*e.g.,* difficulty tolerating some physical features of certain work settings, such as dust and fumes) are also considered to be nonexertional limitations. *See*

20 C.F.R. §§ 404.1569a (c)(1) (v), 416.969a (c)(1) (v).

The net effect is that when both exertional and nonexertional impairments are present, an administrative law judge theoretically can find a claimant *disabled* when the grids direct such a finding solely on the basis of severity of exertional impairments. But, when exertional impairments alone generate a grids finding of *not disabled,* an administrative judge then must determine (usually from other evidence) how much nonexertional impairments further diminish that claimant's occupational base. Only when a meaningful occupational base remains can an administrative judge then deny a claim using the grids as a framework. *See Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996) (a claimant's work capacity is "significantly diminished" if there is an additional loss of work capacity that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity).

### III. The Commissioner's Decision

**\*5** ALJ Pope utilized the sequential evaluation procedure described earlier. (T. 19—28). Findings generally favorable to Hendrickson at the first four steps established a *prima facie* case of disability. At Step 5, however, ALJ Pope concluded that Hendrickson "has not been under a disability" and his claim was denied. (T. 27–28).

ALJ Pope's complete findings and conclusions appear on pages 21—27 of the administrative transcript contained in the record before the court. (Dkt. No. 9). For present purposes, however, it is necessary to identify and then amplify certain findings at sequential Steps 2, 4 and 5:

| Step 2 | Hendrickson has severe impairments consisting of depression, anxiety, and substance abuse. (T. 21–23). |
| --- | --- |
| Step 4 | (a) Hendrickson has *physical capacity* to perform a full range of work at all exertional levels; (b) his *mental capacity* for work at all levels is diminished by depression, anxiety and substance abuse; and, consequently, (c) his overall *residual functional capacity* is limited to unskilled work that does not involve working closely with others. (T. 23–26). |
| Step 5 | (a) The grids (Medical–Vocational Rule 204.00) indicate "not disabled" with reference to Hendrickson's exertional impairments (none); (b) Hendrickson's nonexertional limitations, however, erode the occupational base of unskilled work at all exertional levels by 70%; but (c) many remaining jobs exist in the national economy for individuals with Hendrickson's residual functional capacity. (T. 27). |

*A. Step 4 Residual Functional Capacity Assessment*

When making his Step 4 findings summarized above, ALJ Pope gave "great weight" to the opinions and analyses of the two state agency experts identified earlier. Dr. Barry examined Hendrickson. Dr. Kamin conducted an "extensive review of [Hendrickson's] medical records and objective tests from all the claimant's treatment providers." (T. 27). Their respective evaluations relating to concentration, persistence and pace chronicled that Hendrickson:

• has a difficult time handling stress and making appropriate decisions (T. 373, 391);

• has a "guarded" prognosis (T. 374);

• is moderately limited in ability to perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances (T. 389);

• is moderately limited in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (T. 390);

• is moderately limited in ability to respond appropriately to changes in the work setting (T. 390);

- is moderately limited in ability to work in coordination with or proximity to others without being distracted by them (T. 390); and

- is moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 390).

**\*6** Dr. Kamin also concluded from his overall review of Hendrickson's medical records that Hendrickson has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in concentration, persistence or pace, and one or two repeated episodes of deterioration (each of extended duration). (T. 385).

In ALJ Pope's view, this information indicates that Hendrickson's capacity for work-related activity is limited to performing unskilled work and only when not required to work closely with others. ALJ Pope explained:

"[T]he residual functional capacity finding by the undersigned accommodates some difficulties in the claimant's ability to concentrate and focus and his anxiety by providing for unskilled work which does not require working closely with other people. *The unskilled work will allow for a lower level of concentration and focus, and the limited contact with others should lessen the claimant's anxiety level and accordingly reduce the risk of panic attacks."*

(T. 25) (emphasis added).

### B. Step 5 Finding Regarding Ability to Perform Alternative Work

Hendrickson cannot perform his past relevant work under the RFC rating ascribed to him above. Consequently, the sequential analysis proceeded to Step 5 where the burden rests with the Commissioner to show that Hendrickson can still perform alternative, available work. There, ALJ Pope could not apply the grids (Medical–Vocational Guidelines) directly because Hendrickson has nonexertional impairments. Consequently, ALJ Pope properly elicited extrinsic evidence from an impartial vocational expert, Edward Pagella, CRC, LCPC ("VE Pagella"). (T. 58–64, 101).

As is customary in these type proceedings, VE Pagella provided expert opinions in response to hypothetical questions. (T. 58–64). ALJ Pope asked VE Pagella to assume that a person of Hendrickson's age, education and experience has limitations requiring that he engage only in unskilled work that does not require working closely with others. (T. 59–60). Based on those assumptions, VE Pagella opined that such a person's occupational base will be reduced by 70%. (T. 60–61). VE Pagella also opined that thousands of jobs in the light and sedentary categories exist in the remaining 30% of the occupational base. *Id.* He identified several representative occupations within this remaining occupational base. *Id.*

In sum, VE Pagella provided testimony concerning (a) extent of erosion of Hendrickson's occupational base caused by limitations posed in the hypothetical question posed and (b) availability of a meaningful remaining occupational base for a person with such limitations. Given this evidence, ALJ Pope concluded that Hendrickson is not disabled because there are jobs that he can perform despite his limitations. (T. 27).

### IV. Alleged Errors

Hendrickson claims that ALJ Pope committed multiple errors in his application of sequential Steps 4 and 5. Specifically, Hendrickson contends:

- **\*7** • The ALJ failed to develop the record by failing to obtain opinions from Plaintiff's treating physicians.

- The ALJ failed to obtain opinions from Plaintiff's social workers, nurse, and counselors.

- The ALJ's residual functional capacity finding is not supported by substantial evidence and is the product of legal error.

- The ALJ failed to apply appropriate legal standards in assessing Plaintiff's credibility.

- The ALJ's Step 5 determination is unsupported by substantial evidence and is the product of legal error.

(Dkt. No. 12, pp. 1, 8–24).

In response, the Commissioner maintains that ALJ Pope properly evaluated his RFC assessment with substantial evidence at Step 4, sufficiently developed the record of Hendrickson's impairments, and correctly found that Hendrickson could perform other work existing in significant numbers in the national economy at Step 5. (Dkt. No. 14, pp. 15–25).

### V. Judicial Review

The court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.,* 562 F.3d 503, 507 (2d Cir.2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 1503 (2010); *Berry,* 675 F.2d at 467; *see also* 42 U.S.C. § 405(g). When proper principles of law are applied, and when the Commissioner's decision is supported by substantial evidence, [10] the Commissioner's findings are conclusive and must be affirmed. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004).

[10]  "Substantial evidence" is a term of art. It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004). Stated another way, to be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.,* 306 U.S. 262, 299–300 (1939), *cited in* Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed.1991).

### VI. Discussion and Analysis

Hendrickson's proffered errors regarding inadequate development of the record and a flawed credibility determination need not be addressed on their merits because a necessary and proper disposition reveals itself by focusing initially on points arguing that (a) correct principles of law were not applied to the Step 4 RFC finding and (b) substantial evidence does not support the Step 5 finding that Hendrickson can still perform alternative, available work. These two points, while analytically distinct, are closely entwined.

*A. Failure to Apply Correct Principles of Law at Step 4*

A legally-correct RFC determination must account for all of a claimant's limitations imposed by both severe and non-severe impairments. *See* discussion in Section II.*B*.2, *supra.* ALJ Pope, giving great weight to the state agency experts' findings and opinions, found Hendrickson's capacity to perform a full range of work at all exertional levels to be limited only to the extent that such work must be (a) unskilled and (b) not involve working closely with others. (T. 23, 26). This RFC assessment clearly accounts for the state agency experts' determinations that Hendrickson has moderate limitations in working in coordination with or proximity to others, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 25–26). It does not, however, reckon the remaining limitations found by Dr. Barry and Dr. Kamin unless those limitations are subsumed in a generic, catch-all limitation for "unskilled work."

*\*8 ALJ Pope's written decision is thoughtful, considerate and generally meticulous. [11] Hendrickson undisputably has long-standing and severe mental limitations, [12] and ALJ Pope obviously intended to factor them into his residual functional capacity analysis. His unskilled-work limitation is problematic, however, if he intended it to account for all of Hendrickson's other mental impairments.

[11]  ALJ Pope acknowledged that SSR 96–8p requires that the mental residual functional capacity assessment used at steps 4 and 5 requires a more detailed assessment by itemizing the various functions contained in the broad categories found in paragraph B and paragraph C of the adult mental disorders listing in 12.00 of the Listing impairments. (T. 22–23).

[12]  Treatment notes and a multitude of Global Assessment of Functioning ("GAF") scores document Hendrickson's serious mental limitations. "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.' " *Kohler,* 546 F.3d at 262 n.1 (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.2000)). GAF "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Pollard v. Halter,* 377 F.3d 183, 186 (2d Cir.2004).

Hendrickson has been diagnosed with several GAF ratings, ranging in June 2007 from 20 (GAF score 11–20 indicates an individual is in "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygeine ... or gross impairment in communication") (T. 251–52) to a GAF of 35 (GAF score 31–40 indicates an individual has "[s]ome impairment in reality testing or communication ... or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood") (T. 233). *See Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV–TR" )* 34 (4th ed.2000). In July 2007, he was diagnosed with a GAF of 30 (T. 278, 299, 300). *See id.* In January 2008, his GAF was rated at 37 (T. 397) and, later, at 42 (GAF score 41–50 indicates an individual has "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning") (T. 402). *See id.* In August 2009, Hendrickson's GAF was scored at 50. *See id.*

Treatment notes also reflect that Hendrickson's episodes are triggered by major stresses. (T. 427).

First, it is not *self-evident* that a person with limited ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances will function more acceptably when assigned only unskilled tasks. Second, the Commissioner's *official definition* of unskilled work does not support such premise, nor does it indicate that unskilled work ameliorates stress, or better enables a worker to complete a normal workday and workweek without interruptions from psychologically-based symptoms, or to work at a consistent pace, or to respond appropriately to changes in the work setting. [13] Third, no *extrinsic evidence* presented to ALJ Pope shows that unskilled work appropriately addresses these additional limitations, and, finally, the Commissioner's brief cites no *other authoritative sources* supporting that supposition.

[13]   The basic demands of unskilled work include abilities (on a sustained basis) to understand, carry out and remember simple instructions; make simple work-related decisions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. SSR 96–9, POLICY INTERPRETATION RULING TITLES II AND XVI: DETERMINING CAPABILITY

TO DO OTHER WORK–IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 1996 WL 374185, at *9 (SSA July 2, 1996).

Intuitively, one might suppose that unskilled work probably involves less stress. In an interpretive Ruling, however, the Commissioner cautions against making such broad assumptions. In SSR 85–15, the Commissioner states unequivocally that "*[a] claimant's condition [due to stress and mental illness] may make performance of an unskilled job as difficult as an objectively more demanding job.*" The Ruling elucidates that mentally impaired individuals' reactions to demands of work stress are highly individualized, and that in some cases, they have difficulty meeting requirements of even low stress jobs. And, of special relevance here, the Ruling emphasizes that "*the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job.*" *Id.* Accordingly the Ruling directs that (a) ALJs make particularized findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work, and (b) every impairment-related limitation created by an individual's response to demands of work be reflected in the RFC assessment. *Id.*

Finally, interpretive jurisprudence generally rejects the idea that a broad limitation of "unskilled work" suffices as a detailed assessment of the type required by SSR 96–8p, 1996 WL 374184, at *4. Thus, an administrative judge may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work. *See, e.g., Thompson v. Astrue,* No. 10–CV–6576 CJS, 2012 WL 2175781, at *13 (W.D.N.Y. May 30, 2012) (when making findings about a claimant's RFC, an ALJ may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work); *Sweat v. Astrue,* No. 08–CV–1108 (FJS/VEB), 2011 WL 2532932, at *6 (N.D.N.Y. May 23, 2011) (on remand ALJ admonished to address the consultative examiners' findings that claimant had difficulty dealing with stress during the relevant time period, as ALJ did not explain how he reconciled those findings with his RFC assessment).

 **\*9**  For all these reasons, a conclusion that ALJ Pope did not apply correct principles of law when making his RFC determination is warranted. He did not make particularized findings about the nature of Hendrickson's stress, the circumstances that trigger it, and how those factors affect

his difficulty to work. He did not—possibly could not under evidence before him—sufficiently connect the dots between all of Hendrickson's impairments and his RFC finding.

*B. Substantial Evidence Error at Step Five*

Given a legally-flawed RFC finding, a Step 5 error was sure to follow. ALJ Pope used his RFC as the basis for his hypothetical question to the vocational expert. Thus, his hypothetical question failed to include all of Hendrickson's nonexertional limitations. (T. 58–64). Specifically, ALJ Pope's hypothetical question to the vocational expert did not include limitations related to Hendrickson's stress or three of the five other moderate impairments listed earlier. (T. 58–64, 373, 389–91).

For expert vocational opinion to constitute substantial evidence, the hypothetical question posed to the vocational expert must include all limitations supported by medical evidence in the record. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence.); *see also Burns v. Barnhart,* 312 F.3d 113, 123 (3d Cir.2002) ("A hypothetical question posed to a vocational expert must reflect all of a claimant's impairments.... Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question ..., the expert's response is not considered substantial evidence." (internal citations and quotation marks omitted)). The reason for this requirement is that it is important for the vocational expert to understand the full extent of the applicant's disability so that the expert does not declare an applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform.

VE Pagella expressed opinions concerning the extent to which Hendrickson's job base is eroded by nonexertional limitations and also the existence and extent of jobs within the remaining occupational basis that Hendrickson can perform. Because the hypothetical question on which VE Pagella based these opinions failed to account for additional specific impairments that are medically undisputed, his testimony does not constitute substantial evidence. [14] ALJ Pope adduced no other evidence that Hendrickson is capable of performing jobs existing in significant numbers in the national economy. Thus, his conclusion that Hendrickson is

not disabled lacks substantial evidentiary support. In this circumstance, reversal and remand are warranted.

[14] The Second Circuit has not directly addressed the question of whether an ALJ's hypothetical question to a VE must specifically account for limitations in concentration, persistence, and pace. Other circuits, however, have addressed the issue and answer in the affirmative. *See, e.g., Winschel v. Commissioner of Soc. Sec.,* 631 F.3d 1176, 1180–81 (11th Cir.2011) (ALJ erred by failing to either "explicitly include[ ]" or "implicitly account for" moderate limitations in maintaining concentration, persistence, and pace in a hypothetical); *Stewart v. Astrue,* 561 F.3d 679, 685 (7th Cir.2009) (restricting hypothetical to ability to do "simple, routine tasks that do not require constant interactions with coworkers or the general public" does not accurately describe documented limitations in concentration, persistence, or pace); *Bowers v. Astrue,* 271 Fed. App'x 731, 733 (10th Cir.2008) (hypothetical including limitations for simple, repetitive, and routine work with a low stress level and only brief contact with the public did not account for impairment in concentration and attention); *Ramirez v. Barnhart,* 372 F.3d 546, 554 (3d Cir.2004) (hypothetical restriction to simple one or two-step tasks did not account for limitations in concentration); *Kasarsky v. Barnhart,* 335 F.3d 539, 544 (7th Cir.2003) (hypothetical about a person with borderline intelligence did not account for deficiencies in concentration); *Newton v. Chater,* 92 F.3d 688, 695 (8th Cir.1996) (hypothetical limiting claimant to performing only simple tasks did not account for deficiencies in concentration, persistence, or pace).

**VII. Recommendation**

1. The Commissioner's decision should be **REVERSED** and the case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings including reexamination of: (a) Hendrickson's difficulties in handling stress, including but not limited to his moderate limitations in the areas of ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to respond appropriately to changes in the work setting; and (b) the extent to which Hendrickson's occupational base is eroded by his difficulties handling stress and the moderate limitations listed above.

 **\*10**   2. To guard against necessity for further actions seeking judicial review, the court also should request that, on remand, the Commissioner also reflect on *all* errors asserted in this action as set forth herein at Section IV.

### VIII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn,* 474 U.S. 140, 155 (1985); *Graham v. City of New York,* 443 Fed. App'x 657, 658 (2d Cir.2011); *FDIC v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the *10* day of *December* 2012.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7784156

---

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   10

SSR 85-15 (S.S.A.), 1983-1991 Soc.Sec.Rep.Serv. 343, 1985 WL 56857

Program Policy Statement

TITLES II AND XVI: CAPABILITY TO DO OTHER WORK--THEMEDICAL-VOCATIONAL
RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS

**SSR 85-15**
**(PPS-119)**
1985

**\*1  This supersedes Program Policy Statement No. 116 (SSR 85-7) with the same title (which superseded Program
Policy Statement No. 104 (SSR 83-13) and is in accord with an order of the U.S. District Court for the District of
Minnesota.**

**PURPOSE**: The original purpose of SSR 83-13 was to clarify how the regulations and the exertionally based numbered
decisional rules in Appendix 2, Subpart P, Regulations No. 4, provide a framework for decisions concerning persons who have
only a nonexertional limitation(s) of function or an environmental restriction(s). The purpose of this revision to SSR 83-13 and
SSR 85-7 is to emphasize, in the sections relating to mental impairments: (1) that the potential job base for mentally ill claimants
without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their
remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive,
remunerative work on a sustained basis; and (2) that a finding of disability can be appropriate for an individual who has a severe
mental impairment which does not meet or equal the Listing of Impairments, even where he or she does not have adversities
in age, education, or work experience.

   **CITATIONS (AUTHORITY)**: Sections 223(d)(2)(A) and 1614(a)(3)(E) of the Social Security Act; Regulations
   No. 4, Subpart P, sections 404.1505(a), 404.1520(f)(1), 404.1521(b), 404.1545, and 404.1560 through
   404.1569; Appendix 2 of Subpart P, sections 200.00(c), 200.00(e)(1), and 204.00; and Regulations No.
   16, Subpart 1, sections 416.905(a), 416.920(f)(1), 416.921(b), 416.945, and 416.960 through 416.969.

**PERTINENT HISTORY**: If a person has a severe medically determinable impairment which, though not meeting or equaling
the criteria in the Listing of Impairments, prevents the person from doing past relevant work, it must be determined whether
the person can do other work. This involves consideration of the person's RFC and the vocational factors of age, education,
and work experience.

The Medical-Vocational Guidelines (Regulations No. 4, Subpart P, Appendix 2) discuss the relative adjudicative weights which
are assigned to a person's age, education, and work experience. Three tables in Appendix 2 illustrate the interaction of these
vocational factors with his or her RFC. RFC is expressed in terms of sedentary, light, and medium work exertion. The table
rules reflect the potential occupational base of unskilled jobs for individuals who have severe impairments which limit their
exertional capacities: approximately 2,500 medium, light, and sedentary occupations; 1,600 light and sedentary occupations;
and 200 sedentary occupations--each occupation representing numerous jobs in the national economy. (See the text and glossary
in SSR 83-10, PPS-101, Determining Capability to Do Other Work--the Medical-Vocational Rules of Appendix 2.) Where
individuals also have nonexertional limitations of function or environmental restrictions, the table rules provide a framework
for consideration of how much the individual's work capability is further diminished in terms of any types of jobs within these
exertional ranges that would be contraindicated by the additional limitations or restrictions. However, where a person has solely
a nonexertional impairment(s), the table rules do not direct conclusions of disabled or not disabled. Conclusions must, instead,
be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case
situations in Appendix 2.

**\*2**  This PPS clarifies policies applicable in cases involving the evaluation of solely nonexertional impairments.

**POLICY STATEMENT**: Given that no medically determinable impairment limits exertion, the RFC reflecting the severity of the particular nonexertional impairment(s) with its limiting effects on the broad world of work is the first issue. The individual's relative advantages or adversities in terms of age, education, and work experience is the second. Section 204.00 of Appendix 2 provides an example of one type of nonexertional impairment-environmental restrictions--and states that environmental restrictions ordinarily would not significantly affect the range of work existing in the national economy for individuals with the physical capability for heavy work (or very heavy work); i.e., with no medically determinable impairment which limits exertion. However, numerous environmental restrictions might lead to a different conclusion, as might one or more severe losses of nonexertional functional capacities. The medical and vocational factors of the individual case determine whether exclusion of particular occupations or kinds of work so reduces the person's vocational opportunity that a work adjustment could not be made.

Nonexertional Impairments Contrasted With Exertional Impairments

The term "exertional" has the same meaning in the regulations as it has in the U.S. Department of Labor's classifications of occupations by strength levels. (See SSR 83-10, PPS-101, Determining Capability to Do Other Work--The Medical-Vocational Rules of Appendix 2.) Any job requirement which is not exertional is considered to be nonexertional. A nonexertional impairment is one which is medically determinable and causes a nonexertional limitation of function or an environmental restriction. Nonexertional impairments may or may not affect a person's capacity to carry out the primary strength requirements of jobs, and they may or may not significantly narrow the range of work a person can do.

Nonexertional limitations can affect the abilities to reach; to seize, hold, grasp, or turn an object (handle); to bend the legs alone (kneel); to bend the spine alone (stoop) or bend both the spine and legs (crouch). Fine movements of small objects, such as done in much sedentary work and in certain types of more demanding work (e.g., surgery), require use of the fingers to pick, pinch, etc. Impairments of vision, speech, and hearing are nonexertional. Mental impairments are generally considered to be nonexertional, but depressions and conversion disorders may limit exertion. Although some impairments may cause both exertional limitations and environmental restrictions (e.g., a respiratory impairment may limit a person to light work exertion as well as contraindicate exposure to excessive dust or fumes), other impairments may result in only environmental restrictions (e.g., skin allergies may only contraindicate contact with certain liquids). What is a nonexertional and extremely rare factor in one range of work (e.g., crawling in sedentary work) may become an important element in arduous work like coal mining.

**\*3**  Where a person's exertional capacity is compromised by a nonexertional impairment(s), see SSR 83-14, PPS-105, Capability to Do Other Work--The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments.

Jobs which can possibly be performed by persons with solely nonexertional impairments are not limited to the approximately 2,500 unskilled sedentary, light and medium occupations which pertain to the table rules in Appendix 2. The occupational base cuts across exertional categories through heavy (and very heavy) work and will include occupations above the unskilled level if a person has skills transferable to skilled or semiskilled occupations within his or her RFC. (Note the examples in item 4.b of SSR 82-41, PPS-67, Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations effective February 26, 1979, where medical factors prevent not only the performance of past work but also the transferability of skills.)

Given no medically determinable impairment which limits exertion, the first issue is how much the person's occupational base--the entire exertional span from sedentary work through heavy (or very heavy) work--is reduced by the effects of the nonexertional impairment(s). This may range from very little to very much, depending on the nature and extent of the impairment(s). In many cases, a decisionmaker will need to consult a vocational resource.

The publications listed in sections 404.1566 and 416.966 of the regulations will be sufficient vocational resources for relatively simple issues. In more complex cases, a person or persons with specialized knowledge would be helpful. State agencies may use personnel termed vocational consultants or specialists, or they may purchase the services of vocational evaluation workshops. Vocational experts may testify for this purpose at the hearing and appeals levels. In this PPS, the term vocational specialist (VS) describes all vocational resource personnel.

The second issue is whether the person can be expected to make a vocational adjustment considering the interaction of his or her remaining occupational base with his or her age, education, and work experience. A decisionmaker must consider sections 404.1562-404.1568 and 416.962-416.968 of the regulations, section 204.00 of Appendix 2, and the table rules for specific case situations in Appendix 2. If, despite the nonexertional impairment(s), an individual has a large potential occupational base, he or she would ordinarily not be found disabled in the absence of extreme adversities in age, education, and work experience. (This principle is illustrated in rules 203.01, 203.02, and 203.10 and is set out in SSR 82-63, PPS-79, Medical- Vocational Profiles Showing an Inability to Make an Adjustment to Other Work.) The assistance of a vocational resource may be helpful. Whenever vocational resources are used and the decision is adverse to the claimant, the determination or decision will include: (1) citations of examples of occupations/jobs the person can do functionally and vocationally, and (2) a statement of the incidence of such work in the region in which the individual resides or in several regions of the country.

Examples of Nonexertional Impairments and Their Effects on the Occupational Base

**\*4**  1. Mental Impairments

There has been some misunderstanding in the evaluation of mental impairments. Unless the claimant or beneficiary is a widow, widower, surviving divorced spouse or a disabled child under the Supplemental Security Income program, the sequential evaluation process mandated by the regulations does not end with the finding that the impairment, though severe, does not meet or equal an impairment listed in Appendix 1 of the regulations. The process must go on to consider whether the individual can meet the mental demands of past relevant work in spite of the limiting effects of his or her impairment and, if not, whether the person can do other work, considering his or her remaining mental capacities reflected in terms of the occupational base, age, education, and work experience. The decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work. This decision requires careful consideration of the assessment of RFC.

In the world of work, losses of intellectual and emotional capacities are generally more serious when the job is complex. Mental impairments may or may not prevent the performance of a person's past jobs. They may or may not prevent an individual from transferring work skills. (See SSR 82-41, PPS-67, Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations effective February 26, 1979.)

Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

Example 1: A person whose vocational factors of age, education, and work experience would ordinarily be considered favorable (i.e., very young age, university education, and highly skilled work experience) would have a severely limited occupational base if he or she has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations. A finding of disability would be appropriate.

Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis. However, persons with this large job base may be found disabled because of adversities in age, education, and work experience. (This is illustrated in examples 2 and 3 immediately following.)

 **\*5**  Example 2: Someone who is of advanced age, has a limited education, has no relevant work experience, and has more than a nonsevere mental impairment will generally be found disabled. (See SSR 82-63, PPS-79, Medical-Vocational Profiles Showing an Inability to Make an Adjustment to Other Work.)

Example 3: Someone who is closely approaching retirement age, has a limited education or less, worked for 30 years in a cafeteria doing an unskilled job as a "server," almost constantly dealing with the public, and now cannot, because of a severe mental impairment, frequently deal with the public. In light of the narrowed vocational opportunity in conjunction with the person's age, education, lack of skills, and long commitment to the particular type of work, a finding of disabled would be appropriate; but the decision would not necessarily be the same for a younger, better-educated, or skilled person. (Compare sections 404.1562 and 416.962 of the regulations and rule 203.01 of Appendix 2.)

Where a person has only a mental impairment but does not have extreme adversities in age, education, and work experience, and does not lack the capacity to do basic work-related activities, the potential occupational base would be reduced by his or her inability to perform certain complexities or particular kinds of work. These limitations would affect the occupational base in various ways.

Example 4: Someone who is of advanced age, has a high school education, and did skilled work as manager of a housing project can no longer, because of a severe mental impairment, develop and implement plans and procedures, prepare budget requests, schedule repairs or otherwise deal with complexities of this level and nature. Assuming that, in this case, all types of related skilled jobs are precluded but the individual can do work which is not detailed and does not require lengthy planning, the remaining related semiskilled jobs to which skills can be transferred and varied unskilled jobs, at all levels of exertion, constitute a significant vocational opportunity. A conclusion of "not disabled" would be appropriate. (Compare rules 201.07, 202.07, and 203.13 of Appendix 2.)

Example 5: Someone who is of advanced age, has a limited education, and did semiskilled work as a first-aid attendant no longer has the mental capacity to work with people who are in emergency situations and require immediate attention to cuts, burns, suffocation, etc. Although there may be very few related semiskilled occupations to which this person could transfer work skills, the large occupational base of unskilled work at all levels of exertion generally would justify a finding of not under a disability. (This is consistent with rules 203.11-203.17 of Appendix 2.)

Stress and Mental Illness--Since mental illness is defined and characterized by maladaptive behavior, it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings. Determining whether these individuals will be able to adapt to the demands or "stress" of the workplace is often extremely difficult. This section is not intended to set out any presumptive limitations for disorders, but to emphasize the importance of thoroughness in evaluation on an individualized basis.

 **\*6**  Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day-care programs, social work programs and similar assistance.

The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.

Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. for example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the *knowledge* that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons. Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.

2.Postural-Manipulative Impairments

a. Limitations in *climbing and balancing* can have varying effects on the occupational base, depending on the degree of limitation and the type of job. Usual everyday activities, both at home and at work, include ascending or descending ramps or a few stairs and maintaining body equilibrium while doing so. These activities are required more in some jobs than in others, and they may be critical in some occupations. Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. Certain occupations, however, may be ruled out; e.g., the light occupation of construction painter, which requires climbing ladders and scaffolding, and the very heavy occupation of fire-fighter, which sometimes requires the individual to climb poles and ropes. Where the effects of a person's actual limitations of climbing and balancing on the occupational base are difficult to determine, the services of a VS may be necessary.

 *7  b. *Stooping, kneeling, crouching, and crawling* are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending. Some stooping (bending the body downward and forward by bending the spine at the waist) is required to do almost any kind of work, particularly when objects below the waist are involved. If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact. However, because of the lifting required for most medium, heavy, and very heavy jobs, a person must be able to stoop frequently (from one-third to two-thirds of the time); inability to do so would substantially affect the more strenuous portion of the occupational base. This is also true for crouching (bending the body downward and forward by bending both the legs and spine). However, crawling on hands and knees and feet is a relatively rare activity even in arduous work, and limitations on the ability to crawl would be of little significance in the broad world of work. This is also true of kneeling (bending the legs at the knees to come to rest on one or both knees).

c. *Reaching, handling, fingering, and feeling* require progressively finer usage of the upper extremities to perform work-related activities. Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a VS may be needed to determine the effects of the limitations. "Fingering" involves picking, pinching, or otherwise working primarily with the fingers. It is needed to perform most unskilled sedentary jobs and to perform certain skilled and semiskilled jobs at all levels of exertion. As a general rule, limitations of fine manual dexterity have greater adjudicative significance--in terms of relative numbers of jobs in which the function is required-- as the person's exertional RFC decreases. Thus, loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work. The varying degrees of loss which can occur may require a decision-maker to have the assistance of a VS. However, a VS would not ordinarily be required where a person has

a loss of ability to feel the size, shape, temperature, or texture of an object by the finger-tips, since this is a function required in very few jobs.

3. Hearing Impairments

Communication is an important factor in work. The inability to hear, because it vitally affects communication, is thus of great importance. However, hearing impairments do not necessarily prevent communication, and differences in types of work may be compatible with various degrees of hearing loss. Occupations involving loud noise, such as in printing, have traditionally attracted persons with hearing impairments, whereas individuals with normal hearing have to wear ear protectors to be able to tolerate the working conditions. On the other hand, occupations such as bus driver require good hearing. There are so many possible medical variables of hearing loss that consultation of vocational reference materials or the assistance of a VS is often necessary to decide the effect on the broad world of work.

 *8  4. Visual Impairments

As a general rule, even if a person's visual impairment(s) were to eliminate all jobs that involve very good vision (such as working with small objects or reading small print), as long as he or she retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels. However, a finding of disability could be appropriate in the relatively few instances in which the claimant's vocational profile is extremely adverse, e.g., closely approaching retirement age, limited education or less, unskilled or no transferable skills, and essentially a lifetime commitment to a field of work in which good vision is essential.

5. Environmental Restrictions

A person may have the physical and mental capacity to perform certain functions in certain places, but to do so may aggravate his or her impairment(s) or subject the individual or others to the risk of bodily injury. Surroundings which an individual may need to avoid because of impairment include those involving extremes of temperature, noise, and vibration; recognized hazards such as unprotected elevations and dangerous moving machinery; and fumes, dust, and poor ventilation. A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels.

Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.

Where an individual can tolerate very little noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions.

Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the services of a VS.

**EFFECTIVE DATE**: Final regulations providing the Medical-Vocational Guidelines were published in the *Federal Register* on November 28, 1978, at FR 55349, effective February 26, 1979. They were rewritten to make them easier to understand and were published on August 20, 1980, at 45 FR 55566. The policies in this PPS also became effective as of February 26, 1979.

**CROSS-REFERENCES: Program Operations Manual System, Part 4 (Disability Insurance State Manual Procedures) sections DI 00401.691 and 00401.694; SSR 83-10, PPS-101, Determining Capability to Do Other Work--The Medical-Vocational Rules of Appendix 2 (with a glossary); SSR 83-11, PPS-102, Capability to Do Other Work--The Exertionally Based Medical-Vocational Rules Met; SSR 83-12, PPS-103, Capability to Do Other Work--The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work; and SSR 83-14, PPS-105, Capability to Do Other Work-- The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments.**

Social Security Administration

Department of Health and Human Services

SSR 85-15 (S.S.A.), 1983-1991 Soc.Sec.Rep.Serv. 343, 1985 WL 56857

**End of Document**                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 22612
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

LEE G., Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

5:19-CV-1558 (DJS)
|
Signed 01/04/2021

**Attorneys and Law Firms**

OF COUNSEL: HOWARD D. OLINSKY, ESQ., OLINSKY LAW GROUP, Attorney for Plaintiff, 250 South Clinton Street, Suite 210, Syracuse, NY 13202.

OF COUNSEL: CHRISTOPHER L. POTTER, ESQ., U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL, Attorney for Defendant, J.F.K. Federal Building - Room 625, 15 New Sudbury Street, Boston, MA 02203.

**MEMORANDUM-DECISION AND ORDER** [1]

[1]    Upon Plaintiff's consent, the United States' general consent, and in accordance with this District's General Order 18, this matter has been referred to the undersigned to exercise full jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. *See* Dkt. No. 7 & General Order 18.

DANIEL J. STEWART, United States Magistrate Judge

**\*1** Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security that Plaintiff was not disabled. Dkt. No. 1. Currently before the Court are Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Judgment on the Pleadings. Dkt. Nos. 11 & 15. For the reasons set forth below, Plaintiff's Motion for Judgment on the Pleadings is granted and Defendant's Motion is denied. The Commissioner's decision is reversed and the matter is remanded for further proceedings.

# I. RELEVANT BACKGROUND

## A. Factual Background

Plaintiff was born in 1979. Dkt. No. 8, Admin. Tr. ("Tr."), p. 242. Plaintiff reported that he did not complete high school or obtain an equivalency diploma, and left school after completing the eleventh grade. Tr. at p. 50. He has past work experience as a molding machine tender and retail sales associate. Tr. at pp. 247 & 274. Plaintiff alleges disability due to anxiety, depression, agoraphobia, arthritis, sleep apnea, high blood pressure, acid reflux, and high cholesterol. Tr. at p. 94.

## B. Procedural History

Plaintiff applied for Supplemental Security Income on May 16, 2016. Tr. at p. 94. He alleged a disability onset date of September 15, 2015. *Id.* Plaintiff's application was initially denied on July 8, 2016, after which he timely requested a hearing before an Administrative Law Judge ("ALJ"). Tr. at pp. 110 & 122. Plaintiff appeared at a hearing before ALJ John Ramos on July 26, 2018 and November 13, 2018 at which he and a vocational expert testified. Tr. at pp. 32-68. On November 29, 2018, the ALJ issued a written decision finding Plaintiff was not disabled under the Social Security Act. Tr. at pp. 15-25. On October 18, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. at pp. 1-6.

## C. The ALJ's Decision

In his decision, the ALJ made the following findings of fact and conclusions of law. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 16, 2016, the application date. Tr. at p. 17. Second, the ALJ found that Plaintiff had the following severe impairments: social anxiety and panic disorders. *Id.* Third, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings"). Tr. at p. 18. Fourth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to

perform a full range of work at all exertional levels. Mentally, the claimant retains the ability to understand and follow simple instructions and directions, perform simple tasks with supervision and independently, and maintain attention/concentration for simple tasks. He can regularly attend to a routine and maintain a schedule. The claimant can have occasional interaction with coworkers and supervisors to the extent necessary to carry out simple tasks. For example, he can ask for help when needed, accept instruction or criticism from supervisors, handle conflicts with others, state his own point of view, initiate or sustain a conversation, and understand and respond to physical, verbal and emotional social cues. However, he should avoid work requiring more complex interaction, negotiation, or joint efforts with coworkers to achieve work goals, and he should not interact with the public. The claimant can handle reasonable levels of simple work-related stress, in that he can make decisions directly related to the performance of simple work, and can handle the usual workplace changes and interactions associated with simple work in a position where he is not responsible for the work of or required to supervise others. The claimant should also perform goal-oriented work, rather than work involving a production pace, in a workplace with little change in daily routine and processes.

**\*2** Tr. at pp. 20-21.

Fifth, the ALJ found that Plaintiff was unable to perform any past relevant work. Tr. at p. 23. Sixth, the ALJ found that Plaintiff was categorized as a "younger individual," had a limited education, and was able to communicate in English. *Id.* Seventh, the ALJ found that transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled. *Id.* Finally, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. Tr. at p. 24. The ALJ, therefore, concluded that Plaintiff was not disabled. Tr. at pp. 24-25.

## II. RELEVANT LEGAL STANDARDS

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the

[Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

**\*3** The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. § 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work,

the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson*, 540 U.S. 20, 24 (2003).

### III. ANALYSIS

Plaintiff presents a single question for the Court's review – whether the ALJ committed reversible error by improperly weighing the opinions of Plaintiff's treating providers. Dkt. No. 11, Pl.'s Mem. of Law. In response, Defendant asserts that the ALJ reasonably gave some weight to the joint opinion of Plaintiff's treating physicians, and that he reasonably discounted the opinions of Plaintiff's other treating providers. Dkt. No. 15, Def.'s Mem. of Law.

The Second Circuit has long recognized the "treating physician rule" set forth in 20 C.F.R. § 416.927(c). " '[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.' " *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). However, "the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

In deciding how much weight to afford the opinion of a treating physician, the ALJ must " 'explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist.' "

*Greek v. Colvin*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)).

**\*4** However, where the ALJ's reasoning and adherence to the regulation is clear, and it is obvious that the "substance of the treating physician rule was not traversed," no "slavish recitation of each and every factor" of 20 C.F.R. § 416.927 is required. *Atwater v. Astrue*, 512 Fed Appx. 67, 70 (2d Cir. 2013) (citing *Halloran v. Barnhart*, 362 F.3d at 31-32). The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant replacing the consideration of the treatment relationship between the source and the claimant. 20 C.F.R. §§ 416.927(c)(1)-(6).

In *Estrella v. Berryhill*, the Second Circuit more recently addressed an ALJ's failure to "explicitly" apply the regulatory factors set out in *Burgess* when assigning weight to a treating physician's opinion. 925 F.3d 90 (2d Cir. 2019). In *Estrella*, the Court explained that such a failure is a procedural error and remand is appropriate "[i]f 'the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment][.]' " 925 F.3d at 96 (alteration in original) (quoting *Halloran v. Barnhart*, 362 F.3d at 32). The Court further clarified that "[i]f, however, 'a searching review of the record' assures us 'that the substance of the treating physician rule was not traversed,' we will affirm." *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d at 32). The Court also noted the question of "whether 'a searching review of the record ... assure[s us] ... that the substance of the ... rule was not traversed' " is "whether the record otherwise provides 'good reasons' for assigning 'little weight' to [the treating psychiatrist's] opinion." *Id.*

The Second Circuit recently reiterated its *Estrella* findings in *Ferraro v. Saul*, indicating that the ALJ did not explicitly consider the frequency, length, nature, and extent of treatment that the claimant had with his treating physicians, did not otherwise provide "good reasons" for assigning reduced weight to the opinions of those physicians, and a searching review of the record did not assure the Court that the substance of the treating physician rule was not traversed. 806 Fed. Appx. 13, 15-16 (2d Cir. 2020). The Court in *Ferraro* also indicated that "merely acknowledging the existence of treatment relationships is not the same as explicitly considering 'the frequency, length, nature, and extent of treatment.' " *Id.* at 14.

Judicial deference to the opinion of a treating physician is especially important in the context of mental illness, as the Second Circuit has recently affirmed, cautioning that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Id.* at 16. In cases where "mental health treatment is at issue, the treating physician rule takes on added importance." *Bodden v. Colvin*, 2015 WL 8757129, at \*9 (S.D.N.Y. Dec. 14, 2015).

Plaintiff contends that the ALJ failed to properly weigh the opinion evidence from his treating providers regarding his functional limitations in reaching his RFC determination. Pl.'s Mem. Of Law.

**A. Drs. Joyce and Cummings**

Donald Joyce, M.D. prepared a Medical Source Statement in which he reported treating Plaintiff five times within a twelve-month period. Tr. at p. 878. Dr. Joyce's medical opinion indicated that Plaintiff would be off-task from ten to fifteen percent of the workday, would be absent about three days per month, and would have "good days" and "bad days." Tr. at pp. 878-80. This opinion was co-signed by Dr. Joyce's supervisor, DeAnn Cummings, M.D. *Id.*

**\*5** If an ALJ chooses not to afford controlling weight to a treating physician's opinion he must "explain the reasoning for h[is] decision not to do so with specificity." *Jarvis v. Colvin*, 2016 WL 4148352, at \*8 (N.D.N.Y. Aug. 4, 2016). "If the Court finds the ALJ erred in failing to adequately explain his reasoning for not crediting the opinion of any of the treating physicians, then the case must be remanded." *Meadors v. Colvin*, 2015 WL 224759, at \*7 (N.D.N.Y. Jan. 15, 2015). Here, the ALJ not only failed to acknowledge the existence of the treating relationship, but also failed to address the frequency, length, nature, and extent of the treatment. In addition, the ALJ did not offer sufficiently specific reasons for his conclusion, and his analysis of the opinion did not satisfy the requirements of the treating physician rule. The matter, therefore, must be remanded for further consideration.

While the record in this case made clear that Dr. Joyce had a treatment history with Plaintiff, spanning at least twelve months, Tr. at p. 878, the ALJ's decision makes no reference to this history, nor to the nature or extent of Dr. Joyce's treatment relationship with Plaintiff. *See* Tr. at pp. 18-23. This was error. *Andrew L. v. Berryhill*, 2019 WL 1081460, at \*5 (N.D.N.Y.

Mar. 7, 2019); *Robert B. v. Comm'r of Soc. Sec.*, 2018 WL 4215016, at *5 (N.D.N.Y. Sept. 5, 2018).

The ALJ's analysis of the opinion also makes no reference to evidence supporting Dr. Joyce's asserted limitations. *See* Tr. at p. 22. Plaintiff argues that there is significant evidence supporting Dr. Joyce's assessment. *See* Pl.'s Mem. of Law at p. 17 (citing to the administrative record). While the Court must not re-weigh opinion evidence so long as there is substantial evidence to support the ALJ's determination, the ALJ was required to consider "the amount of medical evidence supporting the opinion." *Greek v. Colvin*, 802 F.3d at 375. Here, his opinion fails to show he did so. There is clearly evidence supportive of Plaintiff's position and absent some discussion of that evidence in the context of evaluating Dr. Joyce's opinion, the Court cannot find that the ALJ's decision was supported by the necessary "good reasons." *Estrella v. Berryhill*, 925 F.3d at 96 ("the ALJ must give good reasons" in explaining the weight afforded to a treating physician's opinion).

It also appears that in discussing the extent to which Dr. Joyce's opinion was consistent or inconsistent with other evidence, the ALJ engaged in improper "cherry picking" of the evidence. "Cherry picking 'refers to improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source.' " *Tara S. v. Berryhill*, 2019 WL 121243, at *6 (N.D.N.Y. Jan. 7, 2019) (quoting *Dowling v. Comm'r of Soc. Sec.*, 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015)). The ALJ afforded the opinion of Drs. Joyce and Cummings some weight, but ultimately decided not to adopt the specific portions of their findings related to the amount of time that Plaintiff would be off-task and absent from work. The ALJ chose not to adopt those portions because he found them to be "purely speculative" and inconsistent with other portions of their opinion: namely, that the Plaintiff has an "unlimited or very good" ability to maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at p. 22. It is difficult to ascertain why exactly the ALJ felt that the opinion of Plaintiff's treating physician was more speculative than that of the consultative physician, especially considering that the opinions in these categories remain consistent among Plaintiff's other treating providers. The ALJ's decision to disregard only the portions of the opinion most supportive of the presence of a disability seems to be indicative of cherry-picking.

*6 Moreover, the presence of cherry-picking is particularly troublesome where, as here, mental health symptoms are involved. "Mental health patients have good days and bad days; they 'may respond to different stressors that are not always active.' " *Pagan v. Saul*, 2020 WL 2793023, at *6 (S.D.N.Y. May 29, 2020) (citation omitted). "Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Estrella v. Berryhill*, 925 F.3d at 97 (citations omitted).

The ALJ also pointed to Plaintiff's ability to pick up his bedroom, wash dishes, take care of pets, and sometimes do yard work or watch television as evidence that his impairments were not as severe as alleged. Tr. at p. 23. It is not clear, however, that the parallel that has been drawn between these at-home activities and Plaintiff's anxiety and panic disorder symptoms is appropriate, as his symptoms seem to be exacerbated primarily in situations outside of his home. Tr. at p. 21.

The ALJ's cherry picking of evidence in concluding to discount the opinion of Dr. Joyce was not consistent with the treating physician rule. *Ardito v. Barnhart*, 2006 WL 1662890, at *5 (D. Conn. May 25, 2006) (cherry picked decision violates treating physician rule); *Tim v. Colvin*, 2014 WL 838080, at *7-8 (N.D.N.Y. Mar. 4, 2014) (cherry picked analysis "cannot constitute a good reason").

Taken together, these factors demonstrate that the ALJ failed to properly articulate his reasoning for not affording Dr. Joyce's opinion controlling weight and therefore remand is required for a more complete consideration of the weight to be afforded that opinion. *See, e.g.*, *Sheri S. v. Berryhill*, 2019 WL 1429522, at *5 (N.D.N.Y. Mar. 29, 2019); *Robert B. v. Comm'r of Soc. Sec.*, 2018 WL 4215016, at *6 (citing cases).

## B. Other Providers

Under the regulations, Plaintiff's therapists are not acceptable medical sources, but are classified as "other" sources. 20 C.F.R. § 416.927(f)(1)-(2). Therefore, while the ALJ is "free to consider the opinion of [non-acceptable medical sources] in making his overall assessment of a claimant's

impairments and residual abilities," he is not required to treat the opinions with the same level of deference as a treating physician. *Genier v. Astrue*, 298 Fed. Appx. 105, 108 (2d Cir. 2008) (summary order). "However, an ALJ should adequately explain why he rejected an opinion from such a source if it is significantly more favorable to the plaintiff and may well 'have an effect on the outcome of the case.' " *Decker v. Saul*, 2020 WL 5494369, at *5 (W.D.N.Y. Sept. 11, 2020) (citing 20 C.F.R. § 404.1527(f)). Plaintiff advances treatment reports prepared by Caitlin McArdle, MSW, and Stephanie Starie, LMSW, which are in fact significantly more favorable to the Plaintiff and may well have had an effect on the outcome of the case if given more weight.

In addressing the opinions of Plaintiff's therapists, rather than adequately explaining his rationale, the ALJ instead combined the content of both opinions from separate providers into a single sentence as if they were one report. Tr. at p. 19. He only notes that "some of the claimant's providers have reported greater limitations in several areas of functioning (B3F, B10F)." *Id.* Starie and McArdle are not mentioned by name, but rather acknowledged only by a parenthetical reference (B3F, B10F) within the sentence. However, aside from noting that "this level of limitation does not comport with the claimant's mental status exam or other opinions of record," the ALJ does not identify which limitations he specifically disagrees with, or from which treatment provider. For that matter, he cites to Dr. Shapiro's exam in particular as providing contrary evidence to these reports. Tr. at p. 19. As the Second Circuit has cautioned, "ALJs should not rely heavily on the findings of consultative physicians" such as Dr. Shapiro "after a single examination." *Ferraro v. Saul*, 806 Fed. Appx. at 16. This is especially true in the mental health context, where patients may have "good days" and "bad days," rendering a longitudinal assessment of symptoms by a treating provider more accurate. *See Pagan v. Saul*, 2020 WL 2793023, at *6.

### 1. Caitlin McArdle, MSW

 *7  Caitlin McArdle completed a Medical Source Statement on April 20, 2016, indicating at that time that she had been treating Plaintiff with weekly one-hour therapy sessions since March 2, 2016. Tr. at p. 365. In her report, McArdle indicated that Plaintiff would likely be absent from work four or more days per month due to his impairments, and that he would be unable to meet competitive standards for attendance. Tr. at pp. 367 & 369. This assessment is generally congruent with

the assessment of Drs. Joyce and Cummings, who opined that Plaintiff was likely to be absent about three days per month. Tr. at p. 880.

Although there are, as the ALJ noted, many aspects of McArdle's report that describe higher levels of impairment than contained in other opinions, there are also a number that are consistent with the findings of Plaintiff's treating physician and with his other treating therapist's opinion. Without sufficient explanation by the ALJ, it is not possible to speculate which portions of the report he found specifically objectionable or which evidence in the record he felt was adequate to disprove and discount the opinion entirely.

### 2. Stephanie Starie, LMSW

A Medical Source Statement was also completed by Stephanie Starie, LMSW, on July 5, 2018. Tr. at pp. 833-37. Starie indicated that Plaintiff would have "no useful ability to function" in the area of maintaining attendance within customary, usually strict tolerances. Tr. at p. 834. She opined that Plaintiff would be absent from work about four days per month, and that he would be off-task for more than twenty percent of an eight-hour workday. Tr. at p. 835. Starie indicated that Plaintiff would have "good" days and "bad" days, but "most often 'bad' days." *Id.* Again, although the ALJ is correct that Starie's report describes much more marked limitations than did many of the other providers, it is also generally consistent with the findings of Caitlin McArdle and Drs. Joyce and Cummings related to the time Plaintiff would be off-task and absent from work. In fact, it appears that all of Plaintiff's treating providers are in agreement as to the degree of limitation in those specific categories, and the only disagreement comes from the non-treating physicians. While the ALJ is certainly entitled to give more weight to the other physicians' opinions if supported by substantial evidence, he should do so with caution, particularly given the mental health nature of Plaintiff's claims. Given the caution required in this category, and the lack of sufficient analysis by the ALJ, this case must be remanded for further consideration.

### IV. CONCLUSION

**ACCORDINGLY**, it is

**ORDERED**, that Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 11) is **GRANTED**; and it is further

**ORDERED**, that Defendant's Motion for Judgment on the Pleadings (Dkt. No. 15) is **DENIED**; and it is further

**ORDERED**, that Defendant's decision denying Plaintiff disability benefits is **VACATED** and **REMANDED** pursuant to Sentence Four of section 405(g) for further proceedings; and it is further

**ORDERED,** that the Clerk of the Court shall serve copies of this Memorandum-Decision and Order on the parties.

**All Citations**

Slip Copy, 2021 WL 22612

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 61 of 189

Starzynski v. Colvin, Not Reported in Fed. Supp. (2016)

2016 WL 6956404

2016 WL 6956404
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Henry J. STARZYNSKI, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

No. 1:15-cv-00940(MAT)
|
Signed 11/29/2016

**Attorneys and Law Firms**

Timothy Hiller, Kenneth R. Hiller, Law Offices of Kenneth
Hiller, Amherst, NY, for Plaintiff.

Emily Maxine Fishman, Social Security Administration, New
York, NY, for Defendant.

### DECISION AND ORDER

HON. MICHAEL A. TELESCA, United States District Judge

### INTRODUCTION

**\*1** Represented by counsel, Henry J. Starzynski ("Plaintiff")
instituted this action pursuant to Title II of the Social
Security Act ("the Act"), seeking review of the final
decision of the Acting Commissioner of Social Security
("the Commissioner") denying his applications for Disability
Insurance Benefits ("DIB"). This Court has jurisdiction over
the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

### PROCEDURAL STATUS

On October 11, 2012, Plaintiff protectively filed an
application for DIB, alleging disability beginning August
13, 2011. After the claim was denied on January 14, 2013,
Plaintiff requested a hearing, which was held in Buffalo,
New York, on March 28, 2014, before administrative law
judge Donald T. McDougall ("the ALJ"). Plaintiff appeared
with his attorney and testified, as did Josiah L. Pearson, a
vocational expert ("the VE"). On May 14, 2014, the ALJ
issued an unfavorable decision. (T.17-26).[1] The Appeals

Council denied Plaintiff's request for review on September
1, 2015, making the ALJ's decision the final decision of the
Commissioner. This timely action followed.

[1]      Citations to "T." in parentheses refer to pages from
the certified transcript of the administrative record.

Presently before the Court are the parties' cross-motions for
judgment on the pleadings pursuant to Rule 12(c) of the
Federal Rules of Civil Procedure. Plaintiff has filed a reply
brief. The parties have comprehensively summarized the
administrative transcript in their briefs, and the Court adopts
and incorporates these factual summaries by reference. The
Court will discuss the record evidence in further detail below,
as necessary to the resolution of the parties' contentions.

For the reasons discussed below, the Commissioner's
decision is reversed and the matter is remanded for further
administrative proceedings consistent with this opinion.

### THE ALJ'S DECISION

At step one of the sequential evaluation, see 20 C.F.R. §§
404.1520(a), 416.920(a), the ALJ found that Plaintiff had
not engaged in substantial gainful activity ("SGA") since the
alleged onset date of August 13, 2011.

At step two, the ALJ found that Plaintiff had the following
"severe" impairments: vertobrogenic disorder of the lumbar
spine, and recent left hip replacement. The ALJ found
that Plaintiff's history of post-operative methicillin-resistant
staphyloccus aureus ("MRSA"), osteoarthritis of the right
hip, and osteoarthritis of the right knee were "non-severe"
impairments.

At step three, the ALJ determined that Plaintiff does not
have an impairment or combination of impairments that meets
or medically equals the severity of the one of the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix I
(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). The ALJ
gave particular consideration to Listing 1.03 (reconstructive
surgery or surgical arthrodesis of a major weight-bearing
joint) and Listing 1.04 (disorders of the spine). The ALJ
found that the evidence did not include the clinical findings
or diagnostic testing results, or the degree of functional
limitation necessary to meet or equal either listing.

**Starzynski v. Colvin, Not Reported in Fed. Supp. (2016)**
2016 WL 6956404

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 62 of 189

**\*2** Before proceeding to the next step, the ALJ assessed Plaintiff as having the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that he must be able to change positions briefly at least every 30 minutes; he cannot climb ladders, ropes, or scaffolds; he can do no more than occasionally climb stairs and ramps; he can only occasionally stoop or crouch; he cannot kneel or crawl; he is unable to work at heights or around dangerous moving machinery; and he cannot stand or walk or more than 15 minutes at a time.

At step four, the ALJ noted that Plaintiff, who was 53 years old as of the date of the ALJ's decision, had past relevant work ("PRW") as an employment counselor (DOT No. 045.107-010) with the Erie County Department of Social Services, a skilled job (SVP 7) requiring a sedentary level of exertion. Plaintiff had performed this job at the SGA level during the last 15 years. Relying on the VE's testimony, the ALJ found that Plaintiff's PRW as it is generally performed in the national economy does not require the performance of work-related activities precluded by Plaintiff's RFC, and Plaintiff can perform his PRW. Based on that finding, the ALJ did not need to proceed to step five, and accordingly entered a finding of not disabled.

### SCOPE OF REVIEW

When considering a claimant's challenge to the Commissioner's decision denying benefits under the Act, a district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted), but "defer[s] to the Commissioner's resolution of conflicting evidence." Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

### DISCUSSION

### I. Failure to Develop the Record (Plaintiff's Point 2)
Plaintiff argues that the ALJ failed to fulfill his regulatory duty to develop the record when he did not contact either Drs. Fahrback and Romanowski, two of Plaintiff's treating physicians, for clarification and amplification of their consistent description of Plaintiff as being "100% disabled."

"[B]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record[,]" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and brackets omitted), a duty which is not obviated "when a claimant is represented by counsel." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). "Treating physicians' opinions generally are entitled to more weight because 'these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations, such as consultative examinations." Ubiles v. Astrue, No. 11–CV–6340T(MAT), 2012 WL 2572772, at \*7 (W.D.N.Y. July 12, 2012) (quoting 20 C.F.R. § 404.1527(d)(2); brackets in original). "Consequently, 'the opinion of a treating physician is an especially important part of the record to be developed by the ALJ.' " Id. (quoting Hilsdorf, 724 F. Supp.2d at 343).

**\*3** Here, in reviewing the medical opinion evidence and assessing Plaintiff's RFC, the ALJ "considered the repeated statements of Dr. Fahrbach and the claimant's primary care provider that the claimant is '100%' disabled" but gave them "no weight" because, inter alia, they were "vague and address[ed] a conclusion reserved to the Commissioner[.]" (T.25). The Court is well aware that the ultimate question as to whether a claimant is disabled is reserved to the Commissioner. However, "as courts in this Circuit have previously observed, 'it is unreasonable to expect a physician to make, on his own accord, the detailed functional assessment demanded by the Act in support of a patient seeking SSI benefits.' " Cadet v. Colvin, 121 F. Supp.3d 317, 320 (W.D.N.Y. 2015) (quoting Ubiles, 2012 WL 2572772, at \*9). While the ALJ, in his decision, faulted Drs. Fahrbach and Romanowski for failing to provide detailed RFC assessments, there is no evidence that ALJ requested such assessments from Plaintiff's treating physicians or directed Plaintiff to obtain them prior to the hearing; nor did he mention, at the hearing, any concerns about what he felt was the questionable conclusory nature

Starzynski v. Colvin, Not Reported in Fed. Supp. (2016)

2016 WL 6956404

of these doctors' opinions. The substantiality of the evidence supporting the RFC assessment is further undermined by the ALJ's admission that the opinions of consultative examiner Dr. Miller and independent medical examiner Dr. Michaels were "vague insofar as they [did] not provide a function-by-function assessment of the claimant's capabilities and limitations[.]" (T.25). Despite this defect, which the ALJ had just found to preclude the according *of any* weight to Plaintiff's treating physicians' opinions, the ALJ nonetheless assigned Dr. Miller's and Dr. Michaels' opinions "some weight." (T.25). The Court can discern no reasoned basis for the ALJ to accord "some weight" to certain physicians' opinions despite their vagueness, yet totally discount other physicians' opinions on the very same basis. It is plainly improper for an ALJ to cherry-pick evidence that supports a finding of not-disabled while ignoring other evidence favorable to the disability claimant. See Trumpower v. Colvin, No. 6:13–cv–6661(MAT), 2015 WL 162991, at *16 (W.D.N.Y. Jan. 13, 2015) ("While an ALJ is entitled to resolve conflicts in the evidentiary record, [he or] she 'cannot pick and choose evidence that supports a particular conclusion.' ") (quoting Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988); citations omitted). Even more troubling is the fact that the ALJ improperly applied two different standards for weighing evidence, depending on which party was offering that evidence. This quasi-judicial "thumb on the scale" seriously calls into question the fairness of the proceeding below. See Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) ("[I]n deciding whether the Secretary's conclusions ... are supported by substantial evidence, which is the test on review, 42 U.S.C. s 1383(c)(3) (incorporating 42 U.S.C. s 405(g)), we must first satisfy ourselves that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.' ") (quotation omitted); see also Schweiker v. McClure, 456 U.S. 188, 195 (1982) ("As this Court repeatedly has recognized, due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities.").

## II. Erroneous Credibility Assessment: Failure to Consider Plaintiff's Good Work History (Plaintiff's Point 1)

Plaintiff argues that the ALJ, prior to finding that he could return to his PRW at step four, erroneously failed to consider his excellent work history. Specifically, Plaintiff was employed at the SGA level every year from 1987 and 2011; he earned more than $40,000 annually until 2009; and in his last full year of work, he earned over $51,000. (T.165-66).

Plaintiff testified that he left this well-paying position as an employment counselor at the Erie County DSS due to his multiple medical issues. (T.74-75).

In cases involving substantial allegations of pain, where an ALJ is required to resolve medical evidence and the claimant's own testimony about his subjective symptomatology, the ALJ "must make credibility findings when there is conflicting evidence with respect to a material issue such as pain or other disability." Donato v. Sec'y of Dep't of Health & Human Servs. of U.S., 721 F.2d 414, 418 (2d Cir. 1983). "[S]ubjective pain may serve as the basis for establishing disability, even if ... unaccompanied by positive clinical findings or other 'objective' medical evidence." Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979) (emphasis in original); accord Donato, 721 F.2d at 418; see also Social Security Ruling ("SSR") 16-3p, Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *1 & n.1 (S.S.A. Mar. 16, 2016) (superseding SSR 96-7p "to clarify that subjective symptom evaluation is not an examination of an individual's character, but rather is an evidence-based analysis of the administrative record to determine whether the nature, intensity, frequency, or severity of an individual's symptoms impact his or her ability to work"). The Second Circuit has stated that "[a] proper consideration of credibility should have involved considering factors such as evidence of a good work record, which [it] views as entitling a claimant to 'substantial credibility.' " Montes-Ruiz v. Chater, 129 F.3d 114, 1997 WL 710607, at *2 (2d Cir. 1997) (unpublished opn.) (quoting Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983)) ("[T]he ALJ's reliance on [the claimant]'s testimony regarding his desire to work is misplaced. First, a review of the transcript of the hearing reveals no such admission by Rivera that he could work despite the headaches and neck pains. Second, any evidence of a desire by [the claimant] to work would merely emphasize the positive value of his 32-year employment history. A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.") (citation and footnote omitted).

**\*4** There are other errors in the ALJ's credibility analysis that also must be addressed on remand. In particular, the ALJ relied on Plaintiff's "admissions" that he did light cooking and cleaning, showered and dressed daily, enjoyed watching television and listening to the radio, reading, going out to eat, and socializing with friends to reject his complaints of disabling limitations. This reasoning is flawed for at least three reasons. First, "[t]here is nothing

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 64 of 189
Starzynski v. Colvin, Not Reported in Fed. Supp. (2016)
2016 WL 6956404

inherent in these activities that proves Plaintiff has the ability to perform '[t]he basic mental demands of competitive, remunerative, unskilled work[, which] include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting[,]' SSR 85-15, much less to do so '8 hours a day, for 5 days a week, or an equivalent work schedule[,]' " Harris v. Colvin, 149 F. Supp. 3d 435, 445–46 (W.D.N.Y. 2016) (quoting SSR 96–8p, 1996 WL 374184, at *2 (S.S.A. 1996)). Courts in this Circuit consistently have observed that "[a] claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job." Polidoro v. Apfel, No. 98 CIV.2071(RPP), 1999 WL 203350, at *8 (S.D.N.Y. 1999) (citing Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983) (finding that Secretary failed to sustain burden of showing that claimant could perform sedentary work on the basis of (1) testimony that he sometimes reads, watches television, listens to the radio, rides buses and subways, and (2) ALJ's observation that claimant " 'sat still for the duration of the hearing and was in no evident pain or distress' "; circuit found "[t]here was no proof that [claimant] engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job")). Second, the ALJ disregarded well-established precedent holding that a claimant need not be reduced to a vegetative state before being found disabled. See, e.g., Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.") Third, the ALJ fell prey to the tendency to "play doctor" and relied on his own lay intuition when he surmised that Plaintiff's "interest in and ability to read, watch television and socialize" "*suggests* [he has] the capacity for sedentary work not significantly limited by pain." See, e.g., Hilsdorf v. Comm'r of Social Sec., 724 F. Supp.2d 330, 354 (E.D.N.Y. 2010) ("[T]he ALJ improperly drew his own conclusions about [the claimant]'s daily functioning, which

were not supported by substantial evidence."). Here, not only did the ALJ misapply the Commissioner's policy rulings and regulations regarding the credibility assessment, he failed to explain how, in a manner sufficient to allow for meaningful appellate review, Plaintiff had the ability to engage in any of these activities for sustained periods comparable to those required to hold a sedentary job. See Meadors v. Astrue, 370 Fed.Appx. 179, 184 (2d Cir. 2010) ("Because we agree that the ALJ did not properly evaluate the [claimant]'s testimony regarding her pain, we are unable to give his calculation of [the claimant]'s RFC meaningful review."). [2]

[2]     Indeed, the Court has significant doubts as to *how* the ability to read, watch television and socialize, even if performed for 8 hours a day, 5 days a week, could ever be exertionally comparable to a sedentary job, in which a specific level of performance is required.

### CONCLUSION

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is granted to the extent the Commissioner's decision is reversed, and the matter is remanded for further administrative proceedings consistent with the instructions in this Decision and Order. In particular, the Commissioner is directed to request detailed RFC assessments from Dr. Fahrbach and Romanowski; re-evaluate Plaintiff's credibility; and re-evaluate Plaintiff's RFC, in light of the supplementation of the record directed above.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2016 WL 6956404

---

2015 WL 1524417
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Samantha Isolina YOUNES, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner
Of Social Security, Defendant.

No. 1:14–CV–170 (DNH/ESH).
|
Signed April 2, 2015.

**Attorneys and Law Firms**

Law Offices of Steven R. Dolson, Maggie W. Mcomber, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Office of General Counsel, Social Security Administration, Sixtina Fernandez, Esq., of Counsel, New York, NY, for Defendant.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff Samantha Isolina Younes filed this action seeking judicial review of a final decision of the Commissioner of Social Security denying her applications for child's and disability insurance benefits and supplemental security income available under the Social Security Act. By Report–Recommendation dated March 13, 2015, the Honorable Earl S. Hines, United States Magistrate Judge, recommended that the decision of the Commissioner be affirmed and plaintiffs complaint be dismissed. Plaintiff filed timely objections to the Report–Recommendation.

Based upon a de novo determination of the portions of the Report–Recommendation to which plaintiff objected, the Report–Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. The Commissioner's decision is AFFIRMED; and

2. Plaintiffs complaint is DISMISSED in its entirety.

The Clerk is directed to file a judgment accordingly.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

EARL S. HINES, United States Magistrate Judge.

Samantha Isolina Younes ("Younes") seeks review of an adverse decision on her applications for child's and disability insurance benefits and supplemental security income available under the Social Security Act.[1] *See* 42 U.S.C. § 402(d), 423(d)(1)(A), 1382c(a)(3).

[1]     Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line. *See* Social Security Administration, Social Security Handbook, § 2100 (14th ed.2001). Supplemental Security Income is available to persons of all ages. Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability. *See* 42 U.S.C. § 423(a); *see also Mathews v. Castro,* 429 U.S. 181, 186 (1976). A disabled, unmarried child under the age of 22 is entitled to child's insurance benefits (generally higher than Supplemental Security Income) based on the earnings record of an insured parent who is entitled to old-age or disability benefits or who has died. 20 C.F.R. § 404.350(a); *see also* 402(d)(1)(G). ALJ Grabeel's decision indicates that the insured wage earner in this case was "Ronald P. Yones." (T. 12).

### I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.,* 562 F.3d

503, 507 (2d Cir.2009), *cert. denied,* 559 U.S. 962 (2010); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998). Neither can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue,* 465 Fed. App'x 4, 5 (2d Cir.2012) (summary order).

Congress further directs reviewing courts to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* Fed. R. C iv. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

## II. Background

### A. Personal

Younes, born in 1990, attended regular education classes, but dropped out of school in the eleventh grade. (T. 30, 37, 117). She subsequently obtained a GED certificate.[2] (T. 30, 37).

[2]   General Educational Development ("GED") tests are a group of subject tests which, when passed, certify that the test taker has high school-level academic skills. Generally, States award a Certificate of High School Equivalency or similarly titled credential to persons who meet the passing score requirements.

Younes's longest term of employment was for about eight months as a cashier. She stopped working in 2010 after being fired for excessive absenteeism. (T. 30, 161–62). She has not worked since 2010. (T. 161).

**\*2**   Younes smokes cigarettes, and uses "1 bowl pack" of marijuana once a week. (T. 502). During the period between 2005 and 2008, she was arrested on various minor criminal charges including criminal trespassing, petty larceny, and possession of a forged instrument. (*Id.*) She performed community service. (*Id.*). Her last arrest was for domestic harassment, and those charges were dropped. (*Id.*).

### B. Claims

In 2010, when Younes was twenty years old, she applied for child's insurance benefits; thereafter, in 2011, she also applied for disability insurance benefits and supplemental security income, claiming that she became unable to work as of November 1, 2007, due to anxiety, depression and irritable bowel syndrome ("IBS"). (T. 161). After early administrative denials, she requested an evidentiary hearing, and her claim was assigned to administrative law judge, Thomas Grabeel ("ALJ Grabeel").

ALJ Grabeel conducted an evidentiary hearing in October, 2012. (T. 25–41). Younes, represented by legal counsel, attended and testified. (*Id.*). The remaining sources of evidence included medical records, educational records, and medical consultant reports (both examining and nonexamining).

ALJ Grabeel denied Younes's applications in a written decision dated December 6, 2012. (T. 12–20). The Appeals Council denied Younes's request for review. (T. 1–6). Younes then instituted this proceeding.

## III. Commissioner's Decision [3]

[3]   ALJ Grabeel utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell,* 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.,* No. 1:05–CV–932, 2008 WL 759076, at *1–2 (N.D.N.Y. Mar. 19, 2008).
Generally, administrative law judges use a different and abbreviated three-step sequential analysis to determine whether children are eligible for disability-based benefits on the basis of a disability. 20 C.F.R. § 416.924(a). The five-step adult standard was required here, however, because Younes applied for child's insurance benefits after attaining age 18. *See* 20 C.F.R. § 416.924(f); *see also* 20 C.F.R. § 404.350(a)(5).

Initially, ALJ Grabeel found that Younes met the insured status requirements of the Social Security Act through June 30, 2012, and that she did not engage in "substantial gainful activity" [4] after her alleged onset of disability (even though she worked briefly). Next, ALJ Grabeel found that Younes has severe impairments consisting of irritable bowel syndrome, depression, and anxiety. (T. 15). Third, ALJ Grabeel found that Younes's impairments, singly or in combination, are not so extreme in degree as to be presumptively disabling under the Commissioner's listings of presumptively-disabling mental and physical impairments. [5] (T. 15).

[4] "Substantial gainful activity" or "SGA" is "work that involves doing significant and productive physical or mental duties" done for pay or profit, and may include part-time work even if it includes less responsibility or pay than work previously performed. 20 C.F.R. §§ 404.1510(a)(b), 404.1572, 416.910(a)(b), 416.972. Generally, when earnings from employment exceed a certain threshold amount specified in the Commissioner's regulations, it is presumed that she has demonstrated the capacity to engage in substantial gainful activity. *See* 20 C.F.R. §§ 404.1574, 416.974.

[5] The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

ALJ Grabeel then made a predicate finding of "residual functional capacity." [6] He found that Younes remains physically capable of performing a full range of work at all exertional levels, but her mental impairments create nonexertional limitations that restrict her to performing only "simple unskilled work." [7] (T. 16).

[6] "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96–8p, Titles II and XVI: Assessing Residual Functional Capacity in Initial

Claims, 1996 WL 374184, at *2 (July 2, 1996). Regarding mental impairments, an administrative law judge must take into consideration limitations on a claimant's "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting...." *See* 20 C.F.R. §§ 404.1545(c), 416.945(c).

[7] ALJ Grabeel's complete "residual functional capacity" finding was:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. The claimant is able to meet all the mental demands of simple unskilled work including understanding, remembering, and carrying out simple but not complex instructions; make decisions on simple work related issues; maintain attention and concentration required to perform simple tasks; interact appropriately with coworkers, supervisors, and the public-adapt to ordinary workplace changes; and maintain a work schedule within customary tolerances with access to a restroom.

(T. 16).

ALJ Grabeel found that Younes has no past relevant work history to contrast with her current residual functional capacity. (T. 19). Hence, ALJ Grabeel proceeded to the final step of sequential evaluation (Step 5) to determine whether there is available work that a person with Younes's residual functional capacity can perform. As an evidentiary basis for that finding, ALJ Grabeel consulted Medical–Vocational Guidelines, commonly referred to as "the grids." [8] (T. 19). He concluded that a finding of "not disabled" was appropriate under the framework of Rule 204.00. (T. 19). Thus, Younes's application was denied. (T. 19–20).

[8] The Medical Vocational Guidelines ("grids") are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater,* 915 F.Supp. 662, 667 & n. 2 (S.D .N.Y.1996).

### IV. Points of Alleged Error

**\*3**  Younes's brief proffers two "issues" recorded *verbatim* in the note below.[9]  As argued, however, Younes identifies three alleged errors restated in logical analytical sequence as follows:

[9]

> 1. Did the Administrative Law Judge fail[ ] to follow the treating physician rule and further, did the Administrative Law Judge commit reversible error by failing to afford proper weight to the consultative examiner, thus preventing meaningful review?; and,
>
> 2. Did the Administrative Law Judge commit reversible error by failing to consider the claimant's obesity at Step Two and further in determining the claimant's RFC as required by SSR 02–1p?
>
> (Dkt. No. 12, p. 1).

1. ALJ Grabeel erred in failing to consider Younes's obesity when determining severity of her impairments and residual functional capacity;

2. ALJ Grabeel failed to follow the "treating physician rule;" and

3. ALJ Grabeel failed to afford proper weight to opinions of a consultative examining physician.

### V. Obesity (Restated Point 1)

If ALJ Grabeel erred in wholly failing to consider obesity, it is likely that none of his subsequent findings could be deemed as supported by substantial evidence. Consequently, this alleged error is examined first.

#### A. Evidence

In November, 2008, Younes underwent a physical examination by her treating source, Louis Ianniello, M.D. Dr. Ianniello's treatment note recorded that Younes was a morbidly obese female weighing 258 pounds. (T. 646). Three years later, in November 2011, Younes submitted to another physical examination by a consulting physician, Kautilya Puri, M.D. At that time, Dr. Puri recorded Younes's height as 5′4″ and her weight at 204 pounds. (T. 507). Dr. Puri also observed Younes to be "obese." (*Id.*).

#### B. Governing Legal Principles

Obesity in and of itself is not a disability within the meaning of the Social Security Act. Administrative law judges, nonetheless, must consider whether obesity in combination with other impairments prevents claimants from working. *See* SSR 02–1p: TITLES II AND XVI: EVALUATION OF OBESITY, 67 Fed.Reg. 57,859, 57,860 (Sept. 12, 2002); *see also Butcher v. Colvin,* No. 1:12–cv–1662 (GLS), 2014 WL 295776, at *6 (N.D.N.Y. Jan. 27, 2014) ("while obesity is not in and of itself a disability, it is a medically determinable impairment under the regulations, which the ALJ should consider when assessing an individual's RFC").

SSR 02–1p notes that obesity can cause functional limitation, and that functions likely to be limited depend on many factors, including where excess weight is carried, whether it causes sleep apnea/fatigue, whether it impacts social functioning, and any potential problems with ability to sustain work activity.[10]  It further instructs that obesity should be evaluated at various stages of sequential evaluation including whether:

[10]

> SSR 02–1p recognizes three levels of "obesity," based on Body Mass Index ("BMI"), which is a ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m 2). *See* 67 Fed.Reg. at 57,860. Level I includes BMIs of 30.0–34.9. Level II includes BMIs of 35.0–39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. *Id.*

• The individual has a medically determinable impairment.

  • The individual's impairment(s) is severe.

  • The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings.

  • The individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy.

SSR 02–1p, 67 Fed.Reg. at 57,861.

#### C. Younes's Challenge

ALJ Grabeel's decision does not mention Younes's obesity at any sequential-evaluation step. His residual functional capacity finding contains no obesity-related limitations (*e.g.,* nonexertional postural limitations relating to climbing, bending, stooping, etc.). Younes asserts, therefore, that ALJ Grabeel failed to apply correct principles of law, and that his Step 2 finding of severe impairments and his subsequent finding of residual functional capacity are fatally flawed.

**\*4** Younes cites SSR 02–lp and cases listed in the note below [11] for the proposition that administrative law judges have a duty to discuss effects of obesity on individuals' abilities to perform basic work activities. Her brief also quotes SSR 02–lp to demonstrate potential limiting functional effects of obesity. (SSR 02–lp states that *"s omeone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone"* )

[11]   *Chavis v. Astrue,* No. 5:07–CV–0018 (LEK/VEB), 2010 WL 624039, at \*10–11 (N.D.N.Y. Feb. 18, 2010); *Fox v. Astrue,* No. 6:05–CV–1599 (NAM/ DRH), 2008 WL 828078, at \*11 (N.D.N.Y. Mar. 26, 2008); *Hogan v. Astrue,* 491 F.Supp.2d 347, 355 (W.D.N.Y.2007); *Cruz v. Barnhart,* No. 04– CV–9011 (GWG), 2006 WL 1228581, at \*9–10 (S.D.N.Y. May 8, 2006).

*D. Discussion*

ALJ Grabeel's failure to even mention obesity predictably spawned this action for judicial review. That conspicuous omission, however, does not constitute reversible error *per se.* The fact that a particular factor or evidentiary item is not *mentioned* does not necessarily mean it was not *considered.* [12]

[12]   *See Durakovic v. Colvin,* No. 3:12–CV–6 (FJS), 2014 WL 1293427, at \*8 (N.D.N.Y. Mar. 31, 2014) (citing *Barringer v. Commissioner of Soc. Sec.,* 358 F.Supp.2d 67, 79 (N.D.N.Y.2005) (quoting *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir.2000) ("failure to cite specific evidence does not indicate that it was not considered."))); *accord Phelps v. Colvin,* 20 F.Supp.3d 392, 405 (W.D.N.Y.2014).

Cases cited by Younes are fact-specific, and do not establish an across-the-board requirement that Younes advocates. In *Chavis,* an obese patient's treating physician specifically referenced "weight reduction" as a measure to alleviate existing back pain. The court remanded the decision with instructions to clearly articulate findings linking the patient's limitations, if any, to obesity. In *Hogan,* obesity was found to be a severe impairment, but it was unclear whether obesity was considered subsequently at Steps 4 of 5 of sequential evaluation. Here, no medical source—treating or consultative —has found or suggested that obesity aggravates any of Younes's medically-determinable impairments or affects her ability to perform basic work activities. Hence, the factors warranting remands in *Chavis* and *Hogan* are absent. [13]

[13]   The other cases cited by Younes, *Fox* and *Cruz,* are not analogous. In each, an administrative law judges specifically mentioned obesity in the decision. In each, the decision was affirmed over objection that obesity was not considered adequately.

Clear weight of current authority contravenes Younes's argument. First, there is no hard and fast rule requiring administrative law judges to single out claimants' obesity for discussion in all cases. [14] Especially is that the case when, as here, the evidentiary record is devoid of evidence that medical sources consider obesity a significant factor relative to a claimant's ability to perform basic work activities. [15] Further, reviewing courts recognize that administrative law judges implicitly factor obesity into their decisions when they rely on medical reports that note claimants' obesity and provide overall assessments of work-related limitations. [16]

[14]   *Ingianni v. Commissioner of Soc. Sec.,* No. 8:13– CV–13 (MAD/ATB), 2014 WL 1202624, at \*7 (N.D.N.Y. Mar. 24, 2014); *Rushford–Spink v. Astrue,* No. 1:08–cv–827 (GLS/VEB), 2010 WL 396359, at \*12 (N.D.N.Y. Jan. 25, 2010) (quoting *Yablonski v. Commissioner of Soc. Sec.,* 03–CV414 (FJS/RFT), 2008 WL 2157129, at \*6 (N.D.N.Y. Jan. 31, 2008)); *Mancuso v. Astrue,* No. 1:06–CV– 930 (GLS), 2008 WL 656679, at \*5–6 (N.D.N.Y. Mar. 6, 2008), *aff'd,* 361 Fed. App'x 176, 178 (2d Cir.2010); *Cruz v. Barnhart,* 04 CIV 9011, 2006 WL 1228581, at \*9 (S.D.N.Y. May 8, 2006).

[15]   *Farnham v. Astrue,* 832 F.Supp.2d 243, 261 (W.D.N.Y.2011); *Rockwood v. Astrue,* 614 F.Supp.2d 252, 276 (N.D.N.Y.2009) (NAM/VEB) (citing *Day v. Commissioner of Soc. Sec.,* 2008

WL 2331401, at \*5 (N.D.N.Y. June 3, 2008) (FJS/GHL)).

16    *Drake v. Astrue,* 443 Fed. App'x 653, 657 (2d Cir.2011); *Rutherford v. Barnhart,* 399 F.3d 546, 552–53 (3d Cir.2005); *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir.2004); *Paulino v. Astrue,* 08 Civ. 02813, 2010 WL 3001752, at \*18–19 (S.D.N.Y. July 30, 2010).

Here, no medical source identified Younes's obesity as a contributing factor to her impairments. Thus, one is hard-pressed to envision what there was for ALJ Grabeel to discuss. ALJ Grabeel relied on examining and reviewing consultative physicians' overall assessments of Younes's physical abilities. Examining physician, Dr. Puri, noted Younes's weight and characterized her as obese. Dr. Hoffman reviewed Dr. Puri's report as well as references to obesity in Dr. Ianneillo's treatment notes. Both sources implicitly accounted for Younes's weight.

Younes did not claim obesity as a disabling impairment, and even in current briefing before the court Younes fails to identify any limitation occasioned by her obesity. [17] Under these circumstances, ALJ Grabeel's failure to address explicitly Younes's obesity is not an error warranting remand. [18]

17    Both treating physician Ianneillo and examining physician Puri both noted that Younes was obese but in no acute distress. (T. 507, 646).

18    Younes's brief calculates her body mass index at 35.7, and concludes that she, therefore, is "considered obese." Younes's obesity is not disputed, but it is worth noting that a body mass index score of 35.7 does not necessarily equate to a severe obesity impairment. "There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment." SSR 02–1p, 2000 WL 628049, at \*4. "As with any other medical condition, we will find that obesity is a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." *Id.* Here, no medical source found or opined that Younes's obesity is a significant factor relative to her ability to perform basic work activities. Moreover, a body mass index score

of 35.7 is below Level III which represents the greatest risk of obesity-related impairments.

## VI. Weighting of Medical Opinion (Restated Points 2 and 3)

 **\*5**  Younes's remaining arguments challenge ALJ Grabeel's weighting of medical opinion evidence.

As a threshold matter, it is appropriate to note that administrative law judges, when determining existence and severity of medically-determinable impairments, and also when assessing claimants' residual functional capacities, rely principally on medical source opinion. The Commissioner categorizes medical opinion evidence by "sources" described as "treating," [19] "acceptable" [20] and "other." [21] Evidence from all three sources can be considered when determining severity of impairments and how they affect individuals' ability to function. [22]

19    *See* 20 C.F.R. §§ 404.1502, 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

20    "Acceptable" medical sources are licensed physicians (medical or osteopathic doctors), psychologists, optometrists, podiatrists, and speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides evidence about your impairments. It includes treating sources, nontreating sources, and nonexamining sources." 20 C.F.R. §§ 404.1502, 416.902. An acceptable medical source opinion or diagnosis is necessary to establish existence of a medically determinable impairment. SSR 06–03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at \*2 (SSA Aug. 9, 2006).

21    "Other" sources are ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists. 20 C.F.R.

§§ 404.1513(d), 416.913(d); SSR 06–03p, 2006 WL 2329939, at *2. Evidence from these sources "is evaluated on key issues such as impairment severity and functional effects." *Id.,* at *2–3. "Other" source opinions, even when based on treatment and special knowledge of an individual, never enjoy controlling weight presumptions. *Id.; see also* SSR 96–2p, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188, at *1 (SSA July 2, 1996) (explaining controlling-weight factors). Nor can "other" source opinion be relied upon to establish existence of a medically determinable impairment. SSR 06–03p, 2006 WL 2329939, at *2.

[22]  *See* SSR 06–03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006) ("In addition to evidence from 'acceptable medical sources,' we may use evidence from "other sources," as defined in 20 CFR 404 .1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function").

A "treating physician rule" requires administrative law judges to give controlling weight to opinions of treating sources regarding the nature and severity of impairments when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."[23]

[23]  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96–2p, 1996 WL 374188, at *1–2; *see also Morgan v. Colvin,* No. 14–991–cv, —— Fed. App'x ——, 2015 WL 668818, at *1 (2d Cir. Feb. 18, 2015) (summary order); *Halloran v. Barnhart,* 362 F.3d 28, 31–32 (2d Cir.2004); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000).

State agency medical consultants are recognized experts in evaluation of medical issues in disability claims under the Act. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e)(2). Accordingly, their opinions can constitute substantial evidence. *See Russell v. Colvin,* No. 5:13–cv–1030 (MAD/CFH), 2015 WL 570828, at *12–13 (N.D.N.Y. Feb. 11, 2015). Consultative opinions can be afforded even greater weight than treating-source opinions when there is good reason to reject treating source opinion, and substantial evidence supports them. The Commissioner instructs:

> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96–6p, TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW, 1996 WL 374180, at *3 (SSA July 2, 1996).[24]

[24]  *See also, e.g., Netter v. Astrue,* 272 Fed. App'x 54, 55–56 (2d Cir.2008) (summary order); *Diaz v. Shalala,* 59 F.3d 307, 313 n. 5 (2d Cir.1995).

*A. Evidence*

Medical evidence at issue here[25] is summarized as follows:

[25]  In addition to medical evidence summarized above, ALJ Grabeel received a report of an internal medicine examination conducted by a state agency consultative examiner, Kautilya Puri, M.D. Dr. Puri rendered a medical source opinion regarding

Younes's physical limitations. (T. 506–09). No summary or further discussion of Dr. Puri's opinion is needed because Dr. Puri's opinion does not figure into errors Younes asserts.

*Louis Ianniello, M.D. (treating primary care physician)*
Dr. Ianniello, with Capital Care Medical Group, Family Practice Cushing Center, has been treating Younes since at least age 18. (T. 642). His progress notes reflect treatment for a variety of complaints, including asthma, gastrointestinal issues, abdominal pain, irritable bowel syndrome, nausea, diarrhea, herpes simplex, anxiety, and depression. (T. 588, 589, 610, 611, 613, 615, 636, 638, 644, 646, 649, 655, 659, 661, 664, 666, 669, 670, 807). Dr. Ianniello's progress notes are consistent with Younes's emergency room visits for the same complaints during the relevant time period. (T. 226–36, 642, 806). Dr. Ianniello, as her primary care physician, received copies of consultation reports from specialists evaluating her abdominal pain, diarrhea, nausea, and vomiting. (T. 564–68, 897–98, 899–900, 901–02, 903–05).

*Toula Georgiou, Psy.D. (psychiatric consultative examiner)*
**\*6** In November 2011, Dr. Georgiou conducted a mental status examination, noting that Younes was cooperative and her manner of relating was adequate; her appearance was observed as disheveled, but well groomed; her speech was clear and expressive and receptive languages were adequate; her thought processes were coherent and goal directed; her mood was neutral; her attention and concentration was mildly impaired, but was able to do counting forward and back and simple calculations; her recent and remote memory skills were mildly impaired; her cognitive functioning was average; and her insight and judgment were fair. (T. 502–03). Dr. Georgiou diagnosed Younes with a mood disorder, personality disorder, and asthma. (T. 503). He gave her a "fair" prognosis. (T. 504). Dr. Georgiou provided the following medical source statement:

> She is able to follow and understand simple directions and instructions, perform simple tasks independently, attend and concentrate on simple tasks. She may have difficulty maintaining a regular schedule, having to perform some complex tasks at times, making vocational type decisions, relating with others in a vocational setting, and dealing with stress.

Results of the present evaluation appear to be consistent with psychiatric difficulties that may significantly interfere with the claimant's ability to function on a daily basis.

(T. 503).

*L. Hoffman, Psychology (state agency reviewing psychologist)*
In late-November, 2011, after reviewing Younes's longitudinal medical records, Dr. Hoffman completed a Psychiatric Review Technique form in which he rated Younes's functional limitations as mild in the area of activities of daily living; moderate in the areas of maintaining social functioning; and one or two in the area of repeated episodes of deterioration. (T. 520–21). Additionally, Dr. Hoffman completed a Mental Residual Functional Capacity Assessment, finding Younes "moderately" limited in 10 areas and "not significantly limited in the remaining ten areas. (T. 525–26). Moreover, Dr. Hoffman provided summary conclusions in narrative form as follows:

> ... [D]espite a severe impairment, clmt [*sic* ] is viewed as able to understand and remember simple instructions, sustain attention and concentration for simple tasks, respond and relate adequately to others and adapt to simple changes.

(T. 527).

*B. ALJ Grabeel's Credibility Assessments*
When assessing Younes's residual functional capacity, ALJ Grabeel twice cited "Exhibit 16F" which contained primary care physician Dr. Ianniello's treatment notes. (T. 17). ALJ Grabeel did not mention Dr. Ianniello by name, however. Nor did he assign any quantum of weight to evidence from Dr. Ianniello.

ALJ Grabeel mentioned both Dr. Georgiou and Dr. Hoffman by name, and he also gave their opinions regarding Younes's mental capacity "greatest weight." He "adopted and incorporated by reference" Dr. Georgiou's opinion that Younes can "follow and understand simple directions and instructions, perform simple tasks independently, and attend

and concentrate on simple tasks." (T. 18). He stated that he credited both Dr. Hoffman's and Dr. Georgiou's opinions because they were "the only acceptable medical sources to offer a detailed and precise opinion on the claimant's abilities and limitations, and provided specific work-related limitations." *Id.*

**\*7** ALJ Grabeel, however, "accorded little value" to Dr. Georgiou's conjectural notations that Younes "may have difficulty maintaining a regular schedule, having to perform some complex tasks at times, making vocational type decisions, relating with others in a vocational setting and dealing with stress." *Id.* The reasons given for rejecting this aspect of Dr. Georgiou's report was that "these limitations were based on a one-time examination, are not supported by other evidence of record and are not quantified." *Id.*

### C. Younes's Challenge

Younes contends ALJ Grabeel violated the treating physician rule by not mentioning Dr. Ianniello by name or providing his opinions controlling or any weight. Younes concedes that "Dr. Ianniello did not provide a medical source statements (*sic*) specifically outlining claimant's functional limitations," but argues that Dr. Ianniello's "copious medical records show a lengthy treating relationship with the claimant." (Dkt. No. 12, p. 4). Younes maintains that those records reflect numerous patient-reported complaints consistent with entries in medical records from other providers and treatment centers. Younes argues that ALJ Grabeel had a legal duty to provide good reasons "for not crediting the opinion of Ms. Younes's treating physician," and instead of doing so, "his decision ignores [Dr. Ianniello] completely." (*Id.*).

By *inference,* Younes argues in passing that it was error for ALJ Grabeel to afford "greatest weight" to opinions of the consultative examiner (Dr. Georgiou) and non-examining state agency medical reviewer (Dr. Hoffman). Younes *explicitly* argues, however that ALJ Grabeel's reasons for affording only "little value" to some portions of Dr. Georgiou's opinion are nonsensical.

### D. Discussion

#### 1. *Failure to Give Controlling Weight to Treating Physician*

Younes's argument that ALJ Grabeel violated the treating physician rule is based on a faulty premise that Dr. Ianniello expressed an opinion presumptively entitled to

controlling weight. The only evidence from Dr. Ianniello consists of treatment notes recording Younes's complaints and documenting prescribed medications and other treatments. Those notes do not contain a formal psychiatric review or results of mental-function diagnostic tests. Dr. Ianniello's findings or observations did not evaluate Younes's physical or mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. In short, they do not constitute a medical opinion presumptively entitled to controlling weight or susceptible to six-factor evaluation prescribed by regulation for weighing forensic medical source opinion.

Given this vacuity, ALJ Grabeel cannot be faulted for failing to give Dr. Ianniello's treatment notes controlling or any specific quantum of weight. Nor was it error for him to give "greatest weight" to opinions of the two state agency consultants who possessed greater degrees of specialization, were highly-qualified experts in Social Security disability evaluation, and were "the only acceptable medical sources to offer a detailed and precise opinion on the claimant's abilities and limitations and provided specific work-related limitations." (T. 18).

#### 2. *Incongruous Weighting*

**\*8** ALJ Grabeel afforded "greatest weight" to that portion of consultative-examining psychiatrist Dr. Georgiou's opinion which supported a finding that Younes retains capacity to meet mental demands of unskilled work. [26] He afforded "little value," however, to the portion of Dr. Georgiou's opinion indicating that Younes may have difficulty with maintaining a regular schedule, performing complex tasks, making vocational type decisions, relating with others in a vocational setting, and dealing with stress. (T. 18).

[26]     These mental activities are generally required by competitive, remunerative, unskilled work:
   • Understanding, remembering, and carrying out simple instructions.
   • Making judgments that are commensurate with the functions of unskilled work-i.e., simple workrelated decisions.
   • Responding appropriately to supervision, coworkers and usual work situations.
   • Dealing with changes in a routine work setting.
   SSR 96–9p, Titles II And XVI: Determining Capability To Do Other Work–Implications Of A Residual Functional Capacity For Less Than A

Full Range Of Sedentary Work, 1996 WL 374185, at *9 (SSA July 2, 1996); *see also* SSR 85–15, Titles II And XVI: Capability To Do Other Work– The Medical–Vocational Rules As A Framework For Evaluating Solely Nonexertional Impairments, 1985 WL 56857, at *4 (SSA 1985).

Reviewing courts decry administrative "cherry picking" of relevant evidence. This term refers to crediting evidence that supports administrative findings while ignoring conflicting evidence from the same source. *See Smith v. Bowen,* 687 F.Supp. 902, 904 (S.D.N.Y.1988) (citing *Fiorello v. Heckler,* 725 F.2d 174, 175–76 (2d Cir.1983)); *see also Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir.2011); *Robinson v. Barnhart,* 366 F.3d 1078, 1083 (10th Cir.2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."). "Cherry picking" can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both. *Genier v. Astrue,* 606 F.3d 46, 50 (2d Cir.2010).

There is no absolute bar to crediting only portions of medical source opinions. But, when doing so smacks of "cherry picking" of evidence supporting a finding while rejecting contrary evidence from the same source, an administrative law judge must have a sound reason for weighting portions of the same-source opinions differently.

ALJ Grabeel's rationale for giving greatest weight to part of Dr. Georgiou's opinion and little value to the remainder was unsound. It was nonsensical to discredit part of Dr. Georgiou's opinion on the ground that it was "based on a one-time examination" while affording greatest weight to other portions also based on a one-time examination. (T. 18). It was patently unreasonable to infer that the rejected portion was contrary to "other evidence of record" when there was no other evidence of record (except for Dr. Hoffman's subsequent opinion based largely on Dr. Georgiou's report). And, for that matter, one might have said the same about the portion of Dr. Georgiou's opinion that was afforded greatest weight.

ALJ Grabeel thus committed a "cherry picking" error in the weighting of Dr. Georgiou's forensic opinions. Even so, a reviewing court may not reverse and remand the case if that error was harmless . [27] To make that determination, the court must determine whether the result would have been the same absent the error. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("[W]here application of the correct legal principles

to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

[27]    Congressional mandates requiring courts to review administrative decrees in light of "the rule of prejudicial error" and to disregard all administrative errors and defects not affecting "substantial rights" refer to what modern jurisprudence calls "harmless error doctrine." *See Shinseki v. Sanders,* 556 U.S. 396, 406–08 (2009). Under this doctrine, a reviewing court must reverse and remand when an administrative law judge errs unless, as a matter of law, the result was not affected by the error. *See NLRB v. Enterprise Assoc,* 429 U.S. 507, 522 n. 9 (1977).

Here, ALJ Grabeel's error in weighting Dr. Georgiou's opinions was harmless. Had ALJ entirely rejected Dr. Georgiou's opinions, there is no reason for the court to conclude ALJ Grabeel would have made a different decision.

**\*9** Under the specific facts of this case, Dr. Hoffman's separate longitudinal review and opinion (that Younes, despite her severe mental impairment, is able to understand and remember simple instructions, sustain attention and concentration for simple tasks, respond and relate adequately to others, and adapt to simple changes) would constitute substantial evidence of residual functional mental capacity for unskilled work.

Conversely, if Dr. Georgiou's opinions were given "greatest weight" in their entirety (as Younes apparently advocates), there would have been no overarching reason mandating that ALJ Grabeel assess residual functional capacity differently. Dr. Georgiou opined only that Younes "may" have difficulties in performing some work activities and in dealing with stress. This ambivalent, conjectural and unspecific observation connotes only a possibility, not a reasonably-certain medical probability, that Younes has additional mental limitations. ALJ Grabeel would have acted within sound discretion in declining to include them in his residual functional capacity assessment.

Finally, ALJ Grabeel's residual functional capacity finding adequately factored in limitations in maintaining concentration, persistence and pace and difficulties dealing with stress. *See, e .g., Bartell v. Commissioner of Soc. Sec.,* No. 5:13–cv–843 (GLS/ESH), 2014 WL 4966149, at *3 (N.D.N.Y. Sept. 30, 2014) (citing cases holding that residual functional capacity assessments limiting claimants to simple

unskilled work adequately account for moderate limitations in concentration, persistence, and pace as well as difficulties with stress).

### VII. Recommendation

Taking into account the rule of prejudicial error, Younes's request to remand this action should be DENIED. The Commissioner's decision should be AFFIRMED.

### VIII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn,* 474 U.S. 140, 155 (1985); *Graham v. City of New York,* 443 Fed. App'x 657, 658 (2d Cir.2011) (summary order); *FDIC v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the *13* day of *March* 2015.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1524417

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 682654
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

ANGELO A. C.,[1] Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

[1]  To protect the personal and medical information of non-governmental parties, this Decision and Order will identify the plaintiff using only his first name and last initial, in accordance with this Court's Standing Order issued November 18, 2020.

20-CV-1579-A
|
Signed 03/08/2022

**Attorneys and Law Firms**

Amanda Louise Weber, Kenneth R. Hiller, Law Offices of Kenneth Hiller, PPLC, Amherst, NY, for Plaintiff.

Andreea Laura Lechleitner, Social Security Administration Office of General Counsel, New York, NY, for Defendant.

**DECISION AND ORDER**

RICHARD J. ARCARA, UNITED STATES DISTRICT JUDGE

**\*1**  Plaintiff Angelo A. C. ("Plaintiff"), brings this action seeking review of the Commissioner of Social Security's final decision that denied Plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), and Supplemental Security Income ("SSI") under Title XVI of the SSA. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). The parties have filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Dkt. Nos. 11, 12), and Plaintiff filed a reply (Dkt. No. 14).

The Court assumes the parties' familiarity with the administrative record, the parties' arguments, and the standard of review, to which the Court refers only as necessary to explain its decision. *See Schaal v. Apfel*, 134 F.3d 496, 500-501 (2d Cir. 1998) (summarizing the standard of review and the five-step sequential evaluation process that Administrative Law Judges [ALJs] are required to use in making disability determinations); *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (same). For the reasons that follow, the Court finds that substantial evidence supports the final decision of the Commissioner denying Plaintiff's applications for DIB and SSI under the SSA. That decision is hereby AFFIRMED.

**PROCEDURAL HISTORY**

On February 28, 2014, Plaintiff was in a motor vehicle accident and sustained injury to his neck and low back. T. 319, 388, 488-490.[2] On November 28, 2014, he underwent fusion surgery on his lumbar spine at L4-L5 and L5-S1 to address that injury, with "bilateral posterior screws and spanning rods." T. 387, 417. In June 2017, x-ray imaging revealed fracture of the bilateral posterior screws at S1; the remainder of the hardware from Plaintiff's surgery remained intact. T. 356, 387.

[2]  "T. __" refers to pages of the administrative transcript at Dkt. No. 10.

Plaintiff applied for DIB and SSI on July 19, 2017 and August 1, 2017, respectively, at the age of 32, alleging disability beginning on February 15, 2017, due to the double fusion surgery on L4-S1, herniated discs in his back and neck, depression, and anxiety. T. 224-231, 246-250.[3] His applications were initially denied in October 2017. T. 102-103, 106-117. After filing a request for a hearing, T. 118-119, Plaintiff appeared with his attorney and testified at a hearing on September 27, 2019, along with a Vocational Expert ("VE") who also testified, *see* T. 30-70. Following the hearing, the ALJ issued an unfavorable decision on November 27, 2019, finding Plaintiff not disabled within the meaning of the SSA. T. 12-29. Plaintiff thereafter requested review by the Appeals Council, but his request was denied in September 2020. T. 1-6. This action seeks review of the Commissioner's final decision. Dkt. No. 1.

[3]  With respect to Plaintiff's DIB application, Plaintiff's date last insured was December 31, 2021. T. 15, 17, 246.

**DISCUSSION**

**\*2** "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citations omitted); *see* 42 U.S.C. § 405(g). " 'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Talavera*, 697 F.3d at 151, quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

### Physical RFC finding

Plaintiff takes issue solely with the ALJ's physical Residual Functional Capacity (RFC) finding. First, he argues that the ALJ's RFC finding is unsupported by substantial evidence because the ALJ improperly rejected the opinion of consultative internal medicine examiner Hongbiao Liu, M.D. ("Dr. Liu"). Second, he argues that the ALJ improperly focused on Plaintiff's activities of daily living and conservative treatment to "minimize his physical limitations."

After finding that Plaintiff has severe impairments of degenerative disc disease of the cervical and lumbar spines, status post fusion, along with non-severe impairments of opioid dependence, adjustment disorder, bipolar disorder, and anxiety disorder, the ALJ determined that Plaintiff has the RFC to perform light work, with the following limitations: can frequently reach overhead and in all directions bilaterally; can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; and can occasionally work in vibration. T. 19.

The regulations define "light work" to include "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and to require "a good deal of walking or standing, or ... sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b); 416.967. "The full range of light work requires intermittently standing or walking for a total of approximately 6 hours of an 8-hour workday, with sitting occurring intermittently during the remaining time." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam); *see* Social Security Ruling ("SSR") 83-10, 1983 WL 31251 at *5, 1983 SSR LEXIS 30.

### *Consultative Examiner's Opinion*

Plaintiff first argues that the ALJ improperly rejected Dr. Liu's opinion as "vague," and the error is not harmless because the RFC of light work runs contrary to Dr. Liu's opinion.

As noted by the ALJ, Dr. Liu examined Plaintiff on October 2, 2017. *See* T. 21, 454-457. Plaintiff reported to Dr. Liu a history of constant neck and low back pain, and the need to change positions every five minutes when sitting or standing.

In Dr. Liu's physical examination of Plaintiff, he observed that Plaintiff was walking slowly and could not perform "heel and toe" walking or a squat due to low back pain. In performing a musculoskeletal examination of Plaintiff, Dr. Liu indicated that Plaintiff had a reduced range of motion in his cervical and lumbar spine, shoulders, and left knee; had positive straight leg raise testing;[4] and had decreased left leg sensation compared to his right side.

[4]    The straight leg raise test or "Lasègue's sign" is performed "when a subject is supine with hip flexed and knee extended, [and] dorsiflexion of the ankle causing pain or muscle spasm in the posterior thigh indicates lumbar root or sciatic nerve irritation." Stedman's Medical Dictionary 1770 (28th ed. 2006).

**\*3** There were also some normal findings, however, as noted by the ALJ. Plaintiff's stance was normal; he used no assistive device during the examination; he did not need assistance changing for the examination or getting on and off the examination table; he was able to rise from his chair without any difficulty; he had a full range of motion in his elbows, forearms, wrists, hips, and ankles bilaterally; his joints were stable and nontender; he had 5/5 strength in his upper and lower extremities; his hand and finger dexterity were intact; and his grip strength was 5/5 bilaterally.

Dr. Liu diagnosed Plaintiff with chronic neck and low back pain and indicated his prognosis was stable. As the ALJ noted, based on his examination findings, Dr. Liu opined that Plaintiff had a "moderate limitation for prolonged walking, bending, kneeling, and overhead reaching." T. 21, 456.

The ALJ found Dr. Liu's opinion "[s]omewhat persuasive," concluding that while the opinion was "supported by personal examination of the claimant" and showed "multiple deficits," the opinion was "vague" and "many of the deficits observed during th[e] exam [were] inconsistent with the claimant's longitudinal treatment history." T. 22.[5] The ALJ noted,

by way of example, Plaintiff's treatment notes that failed to document continued deficits in musculoskeletal range of motion or sensation or gait. T. 22. He concluded that the "overall record" supported "a finding that the moderate limits noted by Dr. Liu do not suggest the need for greater limitation than [those] indicated" in the RFC. T. 22.

5    Plaintiff's claims in this case were filed after March 27, 2017, which means the new regulations apply to his claims. "For claims filed on or after March 27, 2017, ALJs do not defer to, or give specific evidentiary weight to, any medical opinions. 20 C.F.R. § 416.920c(a). Instead, ALJs must evaluate medical opinions according to the following factors: supportability, consistency, relationship with the claimant, specialization, and other factors. *Id.* § 416.920c(c)(1)-(5). *Supportability and consistency are the most important factors. Id.* § 416.920c(b)(2). Supportability is the extent to which an opinion or finding is supported by objective medical evidence and the medical source's supporting explanations, and consistency is the extent to which an opinion is consistent with other medical or non-medical sources. *Id.* § 416.920c(c)(1)-(2)." *Tammy T. v. Kijakazi,* Case No. 5:21-cv-1, 2022 WL 71995 *12, 2022 U.S. Dist. LEXIS 3751 *35 (D. Vt. Jan. 7, 2022) (emphasis added).

Plaintiff argues that if the ALJ believed that Dr. Liu's opinion was vague, he should have contacted Dr. Liu to clarify what he meant by the term "moderate" before relying on that opinion. In any event, Plaintiff argues, the opinion was *not* vague, and the error is harmful because a moderate limitation for prolonged walking "could be" inconsistent with the ALJ's finding of a light RFC, "depending on what Dr. Liu meant by it."

Terminology such as "mild," "moderate," and "marked" in a consultative examiner's report to describe a plaintiff's restrictions "is not necessarily without utility." *Caci v. Comm'r of Soc. Sec.,* 6:18-cv-06533-MAT, 2020 WL 43512 *4, 2020 U.S. Dist. LEXIS 367 *9-10 (W.D.N.Y. Jan. 2, 2020) (internal quotation marks and citations omitted). "The Second Circuit has stated that a consultative examiner's report which concludes that a claimant's condition is 'mild' or 'moderate' *without additional information* does not permit an ALJ to infer that a claimant is capable of performing the exertional requirements of work, where such opinion was *the only evidence* supporting the ALJ's conclusion." *Michael V.*

*v. Comm'r of Soc. Sec.,* 20-CV-678-HKS, 2021 WL 4348741 *4, 2021 U.S. Dist. LEXIS 183491 *9 (W.D.N.Y. Sept. 24, 2021) (emphases added), citing *Curry v. Apfel,* 209 F.3d 117, 123-124 (2d Cir. 2000), *superseded by statute on other grounds as recognized in Douglass v. Astrue,* 496 F. App'x 154, 156 (2d Cir. 2012) (summary order).

 *4  In other words, "Courts routinely find it is appropriate for an ALJ to rely on medical source opinions finding that a plaintiff has mild or moderate limitations to support an RFC determination that a plaintiff can perform light work when there is other evidence of record also supporting that conclusion." *Ray v. Comm'r of Soc. Sec.,* 1:19-CV-00345 EAW, 2020 WL 2315581, *5, 2020 U.S. Dist. LEXIS 82710, *12 (W.D.N.Y. May 11, 2020). This comports with the observation that "[a]lthough some caselaw suggests that moderate or severe limitations in prolonged walking are inconsistent with [the] full range [of] light or medium work ... other courts do not consider an opinion assessing moderate limitations for sitting, standing and walking inconsistent with a determination that the claimant can perform the requirements of light or medium work." *Harrington v. Colvin,* 14-CV-6044P, 2015 WL 790756 *14, 2015 U.S. Dist. LEXIS 22357 *36-39 (W.D.N.Y. Feb. 25, 2015) (collecting cases).

Plaintiff essentially argues that the "moderate" limitations opined to by Dr. Liu were not "vague" in the context of the other evidence in the record, and thus, the ALJ should have wholesale adopted that opinion instead of finding it only "[s]omewhat persuasive." In a related fashion, Plaintiff asserts that the ALJ neglected his duty to explain how Plaintiff could perform light work even though Dr. Liu found Plaintiff had these moderate limitations, and improperly elevated his "lay opinion" over that of Dr. Liu's professional medical opinion. Upon its review of the ALJ's decision and the entire record, however, the Court disagrees.

"The ALJ is obligated to formulate a claimant's RFC based on the record as a whole, not just upon the medical opinions alone." *Sonja H. v. Comm'r of Soc. Sec.,* Case # 1:19-CV-1086-DB, 2021 WL 75657 *6, 2021 U.S. Dist. LEXIS 4039 *15 (W.D.N.Y. Jan. 7, 2021). "It is well-settled that when making an RFC assessment, an ALJ must consider all the relevant evidence, including medical opinions and facts, claimant's physical and mental abilities, non-severe impairments, and subjective evidence of symptoms that could interfere with work activities on a regular and continuing basis." *Williams v. Comm'r of Soc. Sec.,* 18-CV-1027, 2020 WL 4904947 *3, 2020 U.S. Dist. LEXIS

151236 *7 (W.D.N.Y. Aug. 20, 2020), citing 20 C.F.R. §§ 404.1545(a)-(e) and *Ferraris v. Heckler*, 728 F.2d 582, 585 (2d Cir. 1984).

Here, it is apparent from both the ALJ's decision and the record how the ALJ found Plaintiff could perform a limited range of light work. In addition to Dr. Liu's opinion, which the ALJ found "[s]omewhat persuasive," the ALJ also found that an October 11, 2017 opinion by J. Poss, M.D. ("Dr. Poss"), a State agency physician who reviewed the record evidence, was "persuasive" in that Dr. Poss opined Plaintiff was "capable of performing light work with similar limitations" to those in the RFC. T. 22; *see* T. 85-87. The ALJ reasoned that Dr. Poss's opinion was supported with explanations and citations to evidence, and unlike Dr. Liu's opinion it was consistent with the record overall, "including [Plaintiff]'s conservative treatment history and his often[-]noted lack of musculoskeletal or neurological deficits during treatment." T. 22. [6] "[R]esolving contradictory medical opinions is entirely within the discretion and expertise of the ALJ." *Smith v. Berryhill*, 17-CV-05639 (PAE)(SN), 2018 WL 5619977, *14, 2018 U.S. Dist. LEXIS 136639, *47 (S.D.N.Y. Aug. 10, 2018), *adopted by* 17 Civ. 5639 (PAE) (SN), 2018 WL 4565144 *——, 2018 U.S. Dist. LEXIS 163255 *46-47 (S.D.N.Y. Sept. 24, 2018).

[6]   Specifically, Dr. Poss opined that Plaintiff retained a light RFC with specific postural limitations, namely, frequently climb ramps and stairs; frequently climb ladders, ropes, and scaffolds; frequently balance and kneel; and occasionally stoop, crouch, and crawl. T. 86-87. He also opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for about 6 hours total in an 8-hour workday, and sit (with normal breaks) for about 6 hours in an 8-hour workday, which is all consistent with light work. T. 86.

**\*5**  Plaintiff argues that if the ALJ found Dr. Liu's opinion "vague" then the ALJ should have found Dr. Poss's opinion vague as well, because Dr. Poss relied on Dr. Liu's opinion. However, Dr. Poss reviewed not only Dr. Liu's consultative examination report, but also other medical record evidence as outlined in Dr. Poss's explanation for his or her opinion. T. 87. And Dr. Poss clearly did not rely exclusively on Dr. Liu's opinion because he or she arrived at the conclusion that Plaintiff could perform "light work," with different

limitations and degree of limitations than those Dr. Liu opined to. *Compare* T. 87 *with* T. 456.

Moreover, the ALJ clearly considered the record as a whole, not just the opinion evidence of Dr. Liu, in crafting the physical RFC. The ALJ weighed Plaintiff's hearing testimony concerning his pain, symptoms, and activities of daily living, and concluded that the testimony was "not entirely consistent with the medical evidence and other evidence in the record." T. 20. Plaintiff reported using a cane and having difficulty walking; the record revealed that Plaintiff was only infrequently observed ambulating with a cane and walking with a "somewhat slow antalgic gait." [7] T. 385, 415, 418, 455. As the ALJ accurately noted, most of the records reflected, however, that Plaintiff walked with a normal, steady, and well-balanced gait, and that Plaintiff was "fully ambulatory." T. 20-21; *see, e.g.,* T. 73, 321, 326, 356, 367, 389. The ALJ also observed the fact that at a "vast majority" of Plaintiff's visits with his primary care physician, Plaintiff was not in any distress, he exhibited a normal range of motion and no musculoskeletal or neurological deficits, and he "recently reported doing very well overall." T. 21; *see generally* T. 401-440, 530-560, 564-579, 580-588. In sum, many of the treatment notes in the record indicate that Plaintiff denied symptoms and contain normal or unremarkable objective findings.

[7]   "[T]he ALJ reasonably concluded that the evidence of record did not support a finding that use of a cane was medically necessary during the relevant time period." *Sonja H.,* 2021 WL 75657, at *4, 2021 U.S. Dist. LEXIS 4039, at *10; *see* T. 21-22 ("In this case, the record fails to document a cane prescription, and as noted above, the claimant has only been noted to use a cane sporadically during treatment. The claimant also was able to ambulate without a cane at his consultative examination. Therefore, I find that the claimant's use of a cane is not medically necessary."), citing SSR 96-9p, 1996 SSR LEXIS 6. Plaintiff does not dispute this finding.

Plaintiff argues that "[w]ithout valid evidence" of Plaintiff's ability to walk at the level required by light work, the ALJ's finding in that regard was unsupported by substantial evidence. But "[t]he Secretary is entitled to rely not only on what the record says, but also on what it does not say" (*Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983)), and "[a] medical source's failure to negatively opine

on limitations in certain functional areas indicates that the claimant had limitations only in the functional areas specified in the opinion" (*Sonja H.*, 2021 WL 75657, at *6, 2021 U.S. Dist. LEXIS 4039, at *16); *see Michael V.*, 2021 WL 4348741, at *4, 2021 U.S. Dist. LEXIS 183491, at *11 (noting "Plaintiff has not identified any medical record that supports a greater restriction as to walking").

The Court therefore concludes that remand is not required on this basis.

### Activities of Daily Living and Conservative Treatment

Second, Plaintiff argues that the ALJ improperly focused on Plaintiff's activities of daily living and conservative treatment to "minimize his physical limitations."

 **\*6** In considering a claimant's reports of pain and other limitations, "[t]he ALJ must explain his credibility finding explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Pacholczak v. Berryhill*, No. 1:16-CV-00907 (MAT), 2018 WL 1406731 *2, 2018 U.S. Dist. LEXIS 46581 *6 (W.D.N.Y. Mar. 21, 2018) (internal quotation marks and citations omitted). If Plaintiff's testimony about the "intensity, persistence or functional limitations associated with [his] pain is not fully supported by clinical evidence," then the ALJ is to consider other factors to assess that testimony, including: "1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms." *Id.*, citing 20 C.F.R. § 416.929. Pursuant to the regulations, then, the ALJ is to consider, among other things, a plaintiff's activities of daily living and what treatment or measures were taken to address his or her symptoms.

In this case, the ALJ acknowledged Plaintiff alleged a "severely limited ability to perform daily activities, including needing help with personal care." T. 22. The ALJ noted, for example, Plaintiff's hearing testimony that the severity of his pain was 8/10 and constant, and that he generally did not leave his bedroom. T. 20. However, as stated above, in evaluating the remainder of the record the ALJ found that the alleged "intensity, persistence and limiting effects" of Plaintiff's symptoms were not fully reflected in the record; for

example, there were many notations that Plaintiff lacked any musculoskeletal or neurological deficits. *See* T. 20-22.

Plaintiff argues that the ALJ cherry-picked evidence in reaching his determination, as the ALJ observed that Plaintiff was weed whacking in 2017, which "suggest[ed] a greater functional ability than alleged." T. 22. "It is well-settled that an ALJ cannot 'cherry pick' only the evidence from medical sources that support a particular conclusion and ignore the contrary evidence." *Forbes v. Colvin*, 13-CV-207(MAT), 2015 WL 4411511 *6, 2015 U.S. Dist. LEXIS 93949 *16 (W.D.N.Y. July 20, 2015).

To be sure, the weed whacking incident resulted in Plaintiff's arrival at the Emergency Department ("E.R.") on June 12, 2017, after he reportedly "bent over to pick up a bag" while weed whacking that morning and "felt an immediate sharp pain in his low back." T. 353-354. While the E.R. physician noted Plaintiff exhibited pain and a decreased range of motion, and an x-ray showed the pedicular screw fracture, Plaintiff was prescribed medications and before his departure on the same date he showed "much relief" from the medications he was given—and he "was walking around the room." T. 355-356. And in follow-up visits with his neurosurgeon, Gregory Bennett, M.D., shortly thereafter, despite Plaintiff's reduced range of motion in his lumbar region, Plaintiff was discharged "in good condition" and was noted to be a "[h]ealthy appearing male, fully ambulatory" who was in "no apparent discomfort." T. 385, 389-390, 393.

While the ALJ did not explicitly discuss these other records, "an ALJ is not required to discuss in depth every piece of evidence contained in the record, so long as the evidence of record permits the Court to glean the rationale of an ALJ's decision." *April B. v. Saul*, 8:18-CV-682 (DJS), 2019 WL 4736243 *6, 2019 U.S. Dist. LEXIS 166088 *20 (N.D.N.Y. Sept. 27, 2019) (internal quotation marks and citations omitted). The Court concludes that rather than "cherry-picking" the evidence pertaining to the weed whacker incident, the ALJ appears to have simply chosen to use it as an illustration of why he did not fully credit Plaintiff's narrative of his symptoms and limitations.

The ALJ also stated that Plaintiff's "routine and conservative" treatment history called into question the severity of his allegations and weighed against a finding of disability. T. 21-22. "Contrary to [P]laintiff's contention, the ALJ was entitled to consider evidence that plaintiff pursued a conservative treatment as one factor in determining

credibility." *Rivera v. Colvin*, No. 1:14-CV-00816 (MAT), 2015 WL 6142860 *6, 2015 U.S. Dist. LEXIS 141807 *14 (W.D.N.Y. Oct. 19, 2015), citing *Netter v. Astrue*, 272 Fed. Appx. 54, 56 (2d Cir. 2008) (summary order).

**\*7** Plaintiff argues that his "unease to pursue more surgery" due to the seriousness of the surgery and fear that the surgery would again fail (*i.e.*, the broken screw), accounts for his conservative treatment history and thus the ALJ should not have penalized him in this regard.

Plaintiff expressed to providers that he did not want to undergo further surgery. T. 73, 340. It was noted by Daniel Molloy, M.D., Plaintiff's primary care physician on July 28, 2017 that Plaintiff had "followed up with Dr. Bennett which we do not have records for. He was apparently told that there is nothing that can be done [for his broken surgical screw in his back] short of surgical revision." T. 414; *see* T. 38 (Plaintiff's hearing testimony that Dr. Bennett said his surgery would have to be completely redone, with a "very, very small probability of success").

Regardless of the reason for Plaintiff foregoing further surgery, it remains undisputed that Plaintiff's only treatment after the alleged onset date was "conservative" and solely consisted of taking medication for his symptoms (aside from his E.R. visit following the weed whacking incident on June 12, 2017, and a separate E.R. visit on April 11, 2016, when Plaintiff complained of low back, arm, and wrist pain but he left the same day, against medical advice). T. 20; *see* T. 353-358, 365-368. There is also not any other *conservative* treatment in the record, such as physical therapy or chiropractic care. Indeed, while Plaintiff had seen a chiropractor in 2014, beginning less than one month after his motor vehicle accident, *see* T. 466-504, he discontinued his treatment with that office after August 18, 2014 because his chiropractor no longer accepted his insurance, *see* T. 384, 388.

Plaintiff also points to a September 10, 2019 progress note by Dr. Bennett, which was submitted to the Appeals Counsel but not the ALJ, [8] which stated, "Explain the option of dorsal column stimulator for treating pain but he feels that symptoms have stabilized on medication and given the seriousness of his previous surgeries he doesn't want more surgery. At this stage he is sufficiently functional that he shouldn't undergo surgery." T. 73. Plaintiff argues that this note demonstrates

Dr. Bennett's "willing[ness]" to perform an implantation procedure and Plaintiff's reasonable "fear of surgery" that "controlled his decision[-]making." What Plaintiff leaves out, however, is the portion of the note that includes Plaintiff's additional reason for declining further surgery, *i.e.*, Plaintiff felt that his symptoms had stabilized on medication. Plaintiff also disregards the portion of the note where Dr. Bennett concluded that Plaintiff should *not* have surgery at this juncture because he was "sufficiently functional."

[8]   Because this new evidence was submitted only to the Appeals Council, it "became a part of the administrative record when the Appeals Council denied review." *Rayburn v. Colvin*, No. 6:14-CV-06500 (MAT), 2015 WL 8482780 *3, 2015 U.S. Dist. LEXIS 164969 *8 (W.D.N.Y. Dec. 9, 2015) (internal citations omitted).

In sum, Plaintiff's arguments that the ALJ improperly rejected Dr. Liu's opinion concerning "moderate" limitations, and that the ALJ improperly focused on Plaintiff's activities of daily living and conservative treatment in assessing his testimony concerning his physical symptoms and limitations, are without merit. The ALJ's role as the factfinder was to determine persuasiveness, which the ALJ did here, and the Court may not assume that role. The Court concludes that substantial evidence supports the ALJ's physical RFC finding, and Plaintiff did not meet his burden of showing that no reasonable factfinder could have reached the ALJ's finding on this record.

## CONCLUSION

**\*8** Is hereby ORDERED that pursuant to 28 U.S.C. § 636(b) (1) and for the reasons set forth above, Plaintiff's motion (Dkt. No. 11) for judgment on the pleadings is DENIED, the Commissioner's cross-motion (Dkt. No. 12) for similar relief is GRANTED, and the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 682654

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 706645
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

RAYMOND M., Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

5:19-CV-1313 (ATB)
|
Signed 02/22/2021

**Attorneys and Law Firms**

HOWARD D. OLINSKY, ESQ., for Plaintiff.

CHRISTOPHER L. POTTER, Special Asst. U.S. Attorney
for Defendant.

**MEMORANDUM-DECISION and ORDER**

ANDREW T. BAXTER, U.S. Magistrate Judge

**\*1** This matter was referred to me, for all proceedings and
entry of a final judgment, pursuant to the Social Security Pilot
Program, N.D.N.Y. General Order No. 18, and in accordance
with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P.
73, N.D.N.Y. Local Rule 73.1, and the consent of the parties.
(Dkt. Nos. 4, 8).

**I. PROCEDURAL HISTORY**
On May 18, 2018, plaintiff filed an application for Disability
Insurance Benefits ("DIB"), alleging disability beginning
May 6, 2018. (Administrative Transcript ("T") 155-158).
Plaintiff's application was denied initially on July 18, 2018.
(T. 88-97). Administrative Law Judge ("ALJ") Robyn L.
Hoffman granted plaintiff's request for a hearing and heard
plaintiff's testimony on May 1, 2019. (T. 30-63). On June 3,
2019, the ALJ issued an order denying plaintiff's claim. (T.
10-29). The ALJ's decision became the Commissioner's final
decision when the Appeals Council denied plaintiff's request
for review on August 26, 2019. (T. 1-6).

**II. GENERALLY APPLICABLE LAW**

    **A. Disability Standard**

To be considered disabled, a plaintiff seeking disability
insurance benefits or SSI disability benefits must establish
that he is "unable to engage in any substantial gainful activity
by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of
not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A).
In addition, the plaintiff's

> physical or mental impairment or
> impairments [must be] of such severity
> that he is not only unable to
> do his previous work but cannot,
> considering his age, education, and
> work experience, engage in any other
> kind of substantial gainful work
> which exists in the national economy,
> regardless of whether such work exists
> in the immediate area in which he
> lives, or whether a specific job vacancy
> exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20
C.F.R. sections 404.1520 and 416.920, to evaluate disability
insurance and SSI disability claims.

> First, the [Commissioner] considers
> whether the claimant is currently
> engaged in substantial gainful activity.
> If he is not, the [Commissioner]
> next considers whether the claimant
> has a "severe impairment" which
> significantly limits his physical or
> mental ability to do basic work
> activities. If the claimant suffers such
> an impairment, the third inquiry is
> whether, based solely on medical
> evidence, the claimant has an
> impairment which meets or equals
> the criteria of an impairment listed
> in Appendix 1 of the regulations. If
> the claimant has such an impairment,
> the [Commissioner] will consider

him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

**\*2** *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review "– even more so than the 'clearly erroneous standard.' " *Brault*, 683 F.3d at 448. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id.* *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot " 'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at \*6 (W.D.N.Y. Dec. 6, 2010).

### III. FACTS

Plaintiff was born on March 17, 1977, making him 42 years old on the date of the administrative hearing. (T. 35). He lived with his wife and their three children, ages 14, 9, and 4. (T. 36). Plaintiff served in the United States Army from 1996 until 2012. During his service, plaintiff was deployed to Afghanistan and Iraq as a combat engineer and infantryman, and earned a Purple Heart. (T. 37, 159, 333). He was discharged from the Army for medical reasons. (T. 341). After leaving the military, he obtained a bachelors degree and a masters degree in social work. (T. 183, 543, 757).

During his military service, plaintiff had been exposed to repeated physical trauma, including a head injury suffered after his vehicle was hit by a roadside bomb. (T. 188, 332, 341-342). He was first treated for traumatic brain injury, post-traumatic stress disorder ("PTSD"), anxiety, and depression while in the Army, including a hospitalization in 2011 after experiencing suicidal thoughts. (T. 338, 543). He continued with medication management and counseling through the Veterans Health Administration ("VHA") after leaving the military. (T. 337-339, 347, 584).

**\*3** Plaintiff held ten jobs since 2012, including associate at a grocery store, delivery driver for an auto parts retailer, and substance abuse counselor. (T. 216, 583). He reported that his PTSD symptoms and other mental impairments had repeatedly interfered with his work, typically resulted in termination or voluntary departures after a few months. (T. 39-41, 223, 315, 583, 757). His most recent employment, as a discharge coordinator at a hospital, ended in termination after three months for inadvertently violating medical privacy rules when he mistook one patient for another. (T. 38-39, 757).

The ALJ's decision and the parties' briefs provide a detailed statement of the medical and other evidence of record. Rather than reciting this evidence at the outset, the court will discuss

the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. THE ALJ'S DECISION

After reviewing the procedural history of the plaintiff's application and stating the applicable law, the ALJ found that plaintiff had not engaged in substantial gainful activity ("SGA") since his alleged onset date. (T. 15). At step two of the sequential evaluation, the ALJ found that plaintiff had the following severe impairments: left rotator cuff injury; sleep apnea; traumatic brain injury; obesity; depression; anxiety; and PTSD. (*Id.*) At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listed Impairment. (T. 16-18).

At step four, the ALJ found that plaintiff had the RFC to perform less than the full range of light work, as defined in 20 C.F.R. §§ 404.1567(b). (T. 18-22). Specifically, she found that plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, sit for up to six hours, and stand or walk for approximately six hours in an eight hour workday with normal breaks. (T. 18) Plaintiff could occasionally climb ladders, ropes, and scaffolds, and can occasionally reach overhead with his left arm. (*Id.*) With regard to mental limitations, plaintiff retained the ability to understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with all others to the extent necessary to carry out simple tasks; and handle simple, repetitive work-related stress, in that plaintiff could make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that did not require plaintiff to supervise or manage the work of others. (*Id.*)

Next, the ALJ found that plaintiff was unable to perform his prior relevant work. (T. 23-24). However, at step five, using the Medical Vocational Guidelines as a framework, the ALJ found that "the occupational base for light work is only minimally eroded by [plaintiff's] additional limitations," so there were jobs existing in significant numbers in the national economy that plaintiff could perform. (T. 24-25). Thus, the ALJ found that plaintiff was not disabled. (T. 25).

## V. ISSUES IN CONTENTION

Plaintiff contends that the ALJ erred in her evaluation of plaintiff's mental functional limitations by improperly relying on an outdated opinion of a non-examining consulting opinion and rejecting the more restrictive opinions of multiple examining sources. (Plaintiff's Brief ("Pl.'s Br.") at 12-21) (Dkt. No. 11). The Commissioner contends that the ALJ sufficiently evaluated the evidence of record, and that her decision was supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 4-23) (Dkt. No. 12). For the reasons set forth below, the court concludes that the ALJ's RFC determination was not supported by substantial evidence. As a result, the ALJ's analysis at step five and the ultimate finding that plaintiff was not disabled were tainted. Accordingly, the court orders a remand for further administrative proceedings to adequately develop and assess the medical evidence as necessary, in order to determine an RFC that is properly supported.

## DISCUSSION

## VI. RFC/EVALUATING MEDICAL EVIDENCE

### A. Legal Standards

#### 1. RFC

**\*4** RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at \*2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at \*2)); *Babcock v. Berryhill*, No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at \*12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL

587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing *SSR 96-8p, 1996 WL 374184, at *7*).

### 2. Evaluating Medical Evidence

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853. An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical

opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

**\*5** Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

### B. Application

As discussed above, plaintiff's application for benefits is governed by the amended regulations that eliminate the treating physician rule because it was filed after March 27, 2017. In this case, the ALJ considered multiple medical opinions related to plaintiff's physical and mental limitations. Plaintiff has only challenged the ALJ's evaluation of the mental health opinions. (Pl. Br. at 12-21). A summary of these mental health opinions are set out below, in chronological order. The court will then explain its reasoning for the conclusion that the ALJ's evaluation of those opinions was not supported by substantial evidence.

### 1. Consultative Examiner Dr. Corey Anne Grassl

Dr. Corey Anne Grassl performed a consultative psychiatric examination of plaintiff on June 25, 2018. (T. 543-546). Prior to the examination, plaintiff reported frequent awakening, loss of appetite, difficulty with concentration, hopelessness, a depressed mood, and feelings of worthlessness. (T. 543). He reported experiencing panic attacks three times per week, problems with short and long-term memory, and difficulties

with planning and organization. (*Id.*) Regarding activities of daily living, plaintiff reported that he required his wife's assistance with dressing, bathing, grooming, and household chores such as laundry, shopping, and cooking. (T. 545).

During the single examination by Dr. Grassl, plaintiff demonstrated a cooperative demeanor and an "adequate" manner of relating. (T. 544). He showed a coherent and goal-directed thought process with no evidence of hallucinations, delusions, or paranoia. (*Id.*) He had a depressed affect and a "severely dysthymic" mood. Plaintiff's attention and concentration were intact, and he was able to perform simple calculation and counting exercises. (*Id.*) His recent and remote memory skills appeared mildly impaired, as plaintiff was able to remember a list of three objects immediately, but only recall two of three after a delay. (T. 545). He was able to recite a series of four digits forward, but recited no digits backward. (*Id.*)

Based on her examination, Dr. Grassl opined that plaintiff showed "no evidence of limitation in his ability to understand, remember, and apply simple directions and instructions; maintain personal hygiene and appropriate attire; and be aware of normal hazards and take appropriate precautions." (*Id.*) In Dr. Grassl's opinion, plaintiff was "markedly limited in his ability to understand, remember, and apply complex directions and instructions; use reason and judgment to make work-related decisions; sustain concentration and perform a task at a consistent pace; and regulate emotions, control behavior, and maintain well-being." (*Id.*) She further opined that plaintiff was "moderately limited in his ability to interact adequately with supervisors, co-workers and the public and sustain an ordinary routine and regular attendance at work." (*Id.*) Dr. Grassl concluded that these difficulties were caused by cognitive deficits and psychiatric problems. (*Id.*) She gave plaintiff a guarded prognosis, and expected his impairments to last more than one year. (T. 546).

**\*6**  The ALJ concluded that Dr. Grassl's opinion was not persuasive. (T. 22). She found that the moderate and marked limitations described in the consultative examination opinion were "more extreme than, and not consistent with the overall medical evidence, which shows general improvement in symptoms with medication and when [plaintiff] attends treatment." (*Id.*)

### 2. State Agency Consultant Dr. Howard Ferrin

Dr. Howard Ferrin, a state agency psychological consultant, reviewed plaintiff's then-current medical records and issued a Mental RFC Assessment on July 17, 2018. (T. 80-82). Based upon that review, Dr. Ferrin opined that plaintiff had no limitations in his ability to remember locations and work-like procedures or his ability to understand and remember very short and simple instructions, and that plaintiff was "not significantly limited" in his ability to understand and remember detailed instructions. (T. 80). He further opined that plaintiff was "moderately limited" in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (T. 80-81). In addition, he considered plaintiff to be "moderately limited" in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (T. 81). Dr. Ferrin opined that plaintiff had no significant limitations with regard to social interaction, but was moderately limited in his ability to respond appropriately to changes in the work setting. (T. 81).

Dr. Ferrin explained the factors that influenced his opinion. (T. 82). He reviewed Dr. Grassl's June 2018 consultative examination, and noted that plaintiff presented with a severely dysthymic mood and showed mild memory impairment. (*Id.*) Otherwise, Dr. Ferrin found the consultative examination report to depict plaintiff as fully oriented, with intact attention and concentration, and an average range of intellectual functioning. (*Id.*) Dr. Ferrin also cited unspecified VHA records that indicated a generally euthymic mood and no significant cognitive limitation, despite plaintiff's history of traumatic brain injury. (T. 82). He noted that a speech and language evaluation conducted in January 2018 indicating mild communicative issues, but appeared to "have been based largely upon self-report checklist rather than objective exam findings." (T. 82, 425).

Dr. Ferrin also relied upon summaries of two prior neuropsychological evaluations in the VAMC records, performed in July 2012 and May 2013. (T. 82, 423) The summary of the July 2012 exam indicated that plaintiff "performs in the normal range on all cognitive tests despite his lack of consistent and optimal effort throughout testing." (T. 82, 423). According to the summary of the May 2013 report, plaintiff's low scores were "uninterpretable" due to performance validity concerns. (T. 423). Dr. Ferrin thus

concluded that "even though [plaintiff] scored within the normal range on all cognitive tests, the neuropsychologist apparently opined that [plaintiff's] cognitive test scores likely under-represented [plaintiff's] actual level of his cognitive abilities." (T. 82).

Based on these results and the mental status examinations available in the record, Dr. Ferrin opined that plaintiff "appears capable of understanding and remembering complex work procedures," and despite "... lapses in focus, motivation, and reliability, the frequency, intensity, and duration of these occurrences would not be expected to significantly detract from [plaintiff's] ability to complete work-like procedures." He also opined that plaintiff was able to relate and respond in an appropriate manner without substantial limitations, and despite "some difficulty coping in stressful circumstances," plaintiff appeared capable of adapting to customary changes in an ordinary work environment. (*Id.*) In reaching these conclusions, Dr. Ferrin recognized that his opinion was less restrictive than the only other opinion then in the record, from Dr. Grassl. (T. 83). He explained that he considered Dr. Grassl's opinion to be an overestimate of plaintiff's functional limitations. (*Id.*)

**\*7** The ALJ found Dr. Ferrin's opinion to be persuasive, in light of the state agency consultant's agency knowledge, expertise in the field, and review of the available record. (T. 22). The ALJ also found that further development of the record after Dr. Ferrin's opinion did not suggest any additional limitations that would have changed his analysis, because plaintiff improved with medication despite failing to attend several therapy sessions. (*Id.*)

### 3. Examining Psychologist Dr. Michael Thompson

Dr. Michael Thompson, a clinical psychologist, evaluated plaintiff for PTSD on July 20, 2018. (T. 580-588). He noted that plaintiff's PTSD was characterized by symptoms including hyperarousal episodes, avoidance symptoms, re-experiencing symptoms and negative cognitions. (T. 581). At the time of the examination, plaintiff reported that he was drinking an average of four to six beers per day in an attempt to self-medicate his symptoms. (*Id.*) Upon review of plaintiff's history, Dr. Thompson found that plaintiff had held approximately ten jobs since 2012, and had "been either fired from them [or] left them before he was fired because of his PTSD symptoms." (T. 583).

During the examination, plaintiff was cooperative and made good eye contact, with a rational and goal-directed thought process. (T. 587). Plaintiff's basic cognitive functioning presented as grossly intact, and Dr. Thompson estimated that his intellectual skills were in the above-average range. (*Id.*) Plaintiff's mood was anxious with some distress. (*Id.*) Plaintiff had a mildly constricted affect and an overall presentation that Dr. Thompson deemed "consistent with the current severity of his PTSD symptoms." (*Id.*) Upon review of plaintiff's 2012 PTSD evaluation results, Dr. Thompson opined that plaintiff's PTSD symptoms had progressed from moderate to "fully severe." (*Id.*) He also opined that plaintiff was "totally and permanently disabled in terms of his occupational functioning" due to his PTSD symptoms. (T. 588). In Dr. Thompson's opinion, the chronicity and marked severity of plaintiff's symptoms would preclude any capacity for maintaining "even a marginal semblance" of behavioral or emotional stability in a work setting, whether sedentary or non-sedentary. (*Id.*) Dr. Thompson also opined that plaintiff was "experiencing persistent and severe impairments in all areas of his psychosocial functioning and general quality of life. Essentially, [plaintiff's] ability to enjoy any daily activity whether solitary [or] social is severely compromised by his symptoms." (*Id.*)

The ALJ found Dr. Thompson's opinion to be "neither valuable nor persuasive." (T. 23). She found that his conclusion that plaintiff provided no specific assessment of plaintiff's ability to perform work-related activities, and his conclusion regarding overall disability was an issue reserved to the Commissioner. (T. 23).

### 4. Examining Psychologist Dr. Charles Bradshaw

Dr. Charles Bradshaw performed a neuropsychological evaluation of plaintiff on September 26, 2018. (T. 675-681). His assessment included tests for vocabulary, reading ability, and general intelligence as well as measurements of memory, depression, and anxiety. (T. 675). Dr. Bradshaw observed that plaintiff was fully oriented and alert, and able to maintain attention. (T. 675-676). He saw no evidence of tangential, disordered, or delusional thinking. Plaintiff appeared polite, friendly, and cooperative, and applied "adequate effort" to all test tasks. (T. 676). In Dr. Bradshaw's opinion, the test results were a valid indication of plaintiff's current level of cognitive functioning. (*Id.*)

**\*8** Overall, Dr. Bradshaw found that plaintiff's test results indicated average to above-average cognitive functioning, with variable memory, and severe levels of depression, anxiety, and PTSD. (*Id.*) Dr. Bradshaw opined that the severity of plaintiff's "emotional stress is probably sufficient to compromise his cognitive functioning in his daily activities, particularly in the areas of attention, concentration, learning and recall, which are sensitive to the compromising effects of emotional stress." (T. 679). Based on the examination results, Dr. Bradshaw opined that plaintiff's cognitive difficulties were more likely to be a result of his psychiatric impairments and less likely to be a result of his traumatic brain injury. (*Id.*) He further opined that plaintiff's cognition will improve if his stress can be more effectively treated. (*Id.*)

The ALJ found Dr. Bradshaw's opinion to be persuasive, "insofar as the recommendations based upon testing have been considered in formulating the B criteria and the residual functional capacity, to the extent that these recommendations are consistent with the overall medical evidence of record." (T. 23).

### 5. Treating Psychiatrist Dr. Katherine Cerio

Plaintiff's most recent treating psychiatrist, Dr. Katherine Cerio, prepared a Medical Source Statement dated October 17, 2018. (T. 548-550). As of the date of her opinion, Dr. Cerio had seen plaintiff for a total of seven visits since June 2018. (T. 548). Plaintiff had been treated by other staff at the same VHA facility since July 2016. (*Id.*) At the time of her opinion, plaintiff had been prescribed four psychiatric medications, and was regularly encouraged to participate in individual therapy sessions. (*Id.*)

Dr. Cerio opined that plaintiff would need to take two or more unscheduled breaks during the workday due to his psychiatric symptoms, and that he would be off-task for more than twenty percent of the workday. (T. 550). She estimated that these impairments would cause plaintiff to miss more than four days per month of work. (*Id.*) In Dr. Cerio's opinion, plaintiff's work-related limitations were primarily psychological, including reduced motivation, decreased attentional capacity, markedly decreased frustration tolerance and angry outbursts, as well as triggers linked to traumas from his wartime service. (*Id.*) Based upon her own treatment experience with plaintiff as well as a review of his prior treatment records, Dr. Cerio opined that plaintiff's

impairments had existed and persisted to the same degree since at least May 6, 2018. (T. 551).

The ALJ determined that Dr. Cerio's opinion was not persuasive. (T. 23). She found that the treating psychiatrist's opinion was not consistent with her own treatment notes indicating that plaintiff's symptoms improved with medication, despite several missed therapy appointments. (T. 23). In addition, the ALJ found Dr. Cerio's estimate of time off task and absent from work to be "mere speculation, not supported by her treatment notes, or the evidence of record." (*Id.*)

### 6. The ALJ's Evaluation of the Medical Opinion Evidence Was Not Supported by Substantial Evidence.

At their most basic, the amended regulations require that the ALJ explain her findings regarding the supportability and consistency for each of the medical opinions, "pointing to specific evidence in the record supporting those findings." *Jacqueline L. v. Comm'r of Soc. Sec.*, No. 6:19-CV-6786, 2021 WL 243099, at \*6. The ALJ failed to meet this requirement.

The ALJ provided no substantive explanation for her conclusion that Dr. Ferrin's opinion was persuasive, making only general reference to the state agency consultant's expertise and experience, and his review of the available record. (T. 22). This omission alone would likely warrant remand. *See Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (AJN)(KHP), 2021 WL 3633682, at \*14 (S.D.N.Y. January 29, 2021) ("Nowhere in the ALJ's decision does she explain, as the new regulations require, what the respective CEs used to support their opinions and reach their ultimate conclusions.") At least one court has held that such an error cannot be found harmless at this time. *Id.*, 2021 WL 3633682, at \*14 ("Given the newness of the regulations, the ALJ's failure to develop the record in significant areas ... and the ALJ's failure to properly apply the new regulations replacing the treating physician rule, this Court will not engage in a substantial evidence review to determine if the legal errors were harmless.").

**\*9** This case does not require the court to adopt such a rigid approach, but remand is still required. The inadequate explanation for the ALJ's reliance on Dr. Ferrin's non-examining opinion clearly leaves pertinent questions unanswered. *Danette Z. v. Comm'r of Soc. Sec.*, No. 1:19-

CV-1273 (ATB), 2020 WL 6700310, at *8 (N.D.N.Y. November 13, 2020) ("[T]he ALJ's stated reason for affording the most weight to [the non examining consultant's] opinion – '[h]is opinion is supported by his review of the record' - provides little insight into the ALJ's consideration of the conflicting evidence.")

With regard to supportability, the court notes that Dr. Ferrin appears to have heavily relied upon a summary of July 2012 and May 2013 neuropsychological examination of plaintiff, that predated plaintiff's alleged onset date of May 6, 2018 by at least five years. (T. 82, 423). At the time of his review, Dr. Ferrin did not have access to the September 2018 neuropsychological examination of plaintiff conducted by Dr. Thompson, that showed "significantly elevated levels of depression, anxiety and PTSD" "sufficient to account for his cognitive difficulties, particularly in areas of attention, concentration, learning and memory ..." (T. 676). Moreover, the record includes the full test results from 2018, rather than a mere summary, and includes Dr. Bradshaw's conclusion that the test was "a valid indication of plaintiff's current level of cognitive functioning." (*Id.*) Dr. Bradshaw also opined that plaintiff's cognition will improve if his stress can be "more effectively" treated, suggesting that his symptoms were not controlled at the time of the test.

By itself, "[a] gap of time between when an opinion is rendered and the disability hearing and decision does not automatically invalidate that opinion." *Majdandzic v. Comm'r of Soc. Sec.*, No. 17-CV-1172, 2018 WL 5112273, at *3 (W.D.N.Y. Oct. 19, 2018). However, a "meaningful change" in plaintiff's condition during the gap will do so. *Lamar v. Comm'r of Soc. Sec.*, No. 18-CV-829, 2020 WL 548376, at *3 (W.D.N.Y. Feb. 4, 2020) (emphasis supplied). A consultative opinion may thus become stale "if the claimant's condition deteriorates after the opinion is rendered and before the ALJ issues his decision." *Maxwell H. v. Comm'r of Soc. Sec.*, 1:19-CV-0148 (LEK/CFH); 2020 WL 1187610, at *5 (N.D.N.Y. March 12, 2020) (quoting *Clute ex rel. McGuire v. Comm'r of Soc. Sec.*, No. 18-CV-30, 2018 WL 6715361, at *5 (W.D.N.Y. Dec. 21, 2018)). Given the potential that plaintiff's 2018 neuropsychological test results represent a deterioration in plaintiff's condition, the ALJ should have addressed it in discussing the supportability of Dr. Ferrin's opinion.

With respect to consistency, the ALJ should have addressed the fact that Dr. Ferrin's opinion was an outlier among the medical opinions of record. A recent survey of district court cases in the Second Circuit applying the amended regulations

recognized that many of the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar. *See Cuevas*, 2021 WL 3633682, at *9 (collecting cases). For example, "[e]ven though ALJs are no longer directed to afford controlling weight to treating source opinions - no matter how well supported and consistent with the record they may be – the regulations still recognize the 'foundational nature' of the observations of treating sources, and 'consistency with those observations is a factor in determining the value of any [treating source's] opinion.' " *Shawn H. v. Comm'r of Soc. Sec.*, No. 2:19-CV-113, 2020 WL 3969879, at *6 (D. Vermont July 14, 2020) (quoting *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018)), *see also Jacqueline L. v. Comm'r of Soc. Sec.*, No. 6:19-CV-6786, 2021 WL 243099, at *4 (W.D.N.Y. January 26, 2021). As the amended regulations note, "[a] medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder." 20 C.F.R. §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v).

 *10 Dr. Ferrin described his reliance on the objective findings of plaintiff's June 2018 consultative examination, but issued a far less restrictive opinion of plaintiff's functional limitations as compared to Dr. Grassl, who actually conducted the examination. (T. 83). Dr. Ferrin's opinion was also less restrictive than the subsequent opinions of Dr. Cerio, Dr. Bradshaw, and Dr. Thompson, who had the advantage of examining plaintiff at least once. *Shawn H.*, 2020 WL 3969879, at *8 (remanding where ALJ relied upon opinion of non-examining consultant who had no opportunity to review treating source opinions that described greater restrictions); *see also Danette Z. v. Comm'r of Soc. Sec.*, No. 1:19-CV-1273 (ATB), 2020 WL 6700310, at *8 (N.D.N.Y. November 13, 2020) (remanding, in part, due to non-examining consultant's inability to review later treating source opinion). Dr. Ferrin also had no opportunity to review Dr. Cerio's psychiatric treatment notes from July 2018 to September 2018. *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is unclear whether agency consultant reviewed all of claimant's relevant medical information, consultant's opinion is not supported by evidence of record as required to override treating physician opinion).

The ALJ's evaluation of these examining physician opinions suffers from the same inadequate explanation of her conclusions regarding supportability and consistency. With respect to consulting examiner Dr. Grassl's opinion, the ALJ merely states that her assessment "is more extreme than,

and not consistent with, the overall medical evidence, which shows general improvement in symptoms with medication and when the claimant attends treatment." (T. 23). Likewise, the ALJ found Dr. Bradshaw's opinion persuasive "to the extent that these recommendations are consistent with the overall medical evidence of record." (*Id.*) The ALJ provided slightly more analysis regarding treating psychiatrist Dr. Cerio, discounting her opinion because it was "not consistent with Dr. Cerio's own treatment notes indicating improvement with medication" and plaintiff's own statements reporting improvement. (*Id.*) He also discounted Dr. Cerio's estimates that plaintiff would be off task and absent from work as "mere speculation, not supported by her treatment notes, or the evidence of record." (*Id.*)

In assessing the psychiatric opinion evidence, the ALJ repeatedly considered whether an opinion was consistent with perceived improvements in plaintiff's mental functional limitations. (T. 22-23). Beyond the vague references to the overall record, it is unclear what evidence supports the ALJ's conclusion that plaintiff's psychiatric symptoms have demonstrably improved. In June 2018, plaintiff reported that he "feels no better since an increase in his medication," had difficulty sleeping, and felt increased irritability. (T. 627, 629). Plaintiff also reported that he "has tried to push himself to be more present" but has not been enjoying recent family events such as his son's sporting events and family trips. (T. 627-628). In July 2018, plaintiff reported that his mood had not improved after an upward adjustment in his medication, and that a downward adjustment in his sleep medication still left him groggy in the morning. (T. 613). Plaintiff reported continued irritability, and intermittent suicidal thoughts. (*Id.*)

Plaintiff generally reported "feeling good" in July 2018, but upon further questioning, he reported that he was feeling depressed, with an increase in irritability and low motivation during the day. (T. 728). In August 2018, plaintiff reported that his mood was "a little better" but described continued struggles with motivation. (T. 577). Dr. Cerio observed a dysthymic affect during this counseling session, and began monitoring plaintiff for possible bipolarity. (T. 579). She increased his medication. (*Id.*) In September 2018, Dr. Cerio observed that plaintiff mood had "improved somewhat," although plaintiff merely described it as "ok ... good." (T. 672-73). Plaintiff reported more energy and motivation, but irritability persisted, and caused some conflict at home. (T. 671).

**\*11** It must be noted again that none of the medical professionals who actually examined plaintiff have endorsed the significant functional improvement described by the ALJ. (T. 546, 550, 588, 679). In light of the contrary evidence in the record, and the minimal explanation provided in her decision, it is unclear how the ALJ reached the opposite conclusion. "Although an RFC determination is an issue reserved for the Commissioner, the ALJ is a layperson, and as such is not qualified to assess a claimant's RFC on the basis of bare medical findings." *Anderson v. Comm'r of Soc. Sec.*, No. 19-CV-464, 2020 WL 5593799, at \*3 (W.D.N.Y. Sept. 18, 2020) (internal quotation marks omitted). "In other words, an ALJ's ability to make inferences about the functional limitations caused by an impairment does not extend beyond that of an ordinary layperson. While an ALJ may render common sense judgments about functional capacity, she must avoid the temptation to play doctor." *Duncan v. Comm'r of Soc. Sec.*, No. 18-CV-369, 2020 WL 1131219, at \*2 (W.D.N.Y. Mar. 9, 2020) (internal quotation marks and brackets omitted). The ALJ's minimal explanation in her evaluation of the various mental health opinions supports remand.[1] To the extent that the ALJ substituted her lay opinion for expert opinion[2] regarding plaintiff's improvement, remand would also be required.

[1]   On remand, the ALJ should reconsider those portions of Dr. Thompson's opinion that address plaintiff's emotional stability in the workplace. (T. 588). The ALJ should also consider, on remand, whether the testimony of a vocational expert is required because plaintiff's nonexertional mental impairments "significantly limit the range of work permitted by his exertional limitations." *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986). *See, e.g.*, *Chaparro v. Colvin*, 156 F. Supp. 3d 517, 538-39 (S.D.N.Y. 2016) ("courts in this district consistently have found it to be reversible error for ALJs to rely solely on the Grids when a plaintiff has moderate psychiatric limitations resulting in nonexertional limitations") (collecting cases); *Michael F. D. v. Saul*, No. 3:19-CV-600 (BKS), 2020 WL 5742704, at \*10 (N.D.N.Y. Sept. 25, 2020).

[2]   In addition, although the ALJ found that plaintiff's irregular attendance at counseling sessions further undermined Dr. Cerio's opinion, the ALJ failed to consider the possibility that Plaintiff's history of medication noncompliance was itself a

manifestation of his illness. *See Bishop o/b/o K.M.B. v. Comm'r of Soc. Sec.*, No. 1:16-CV-1190 (GTS), 2017 WL 4512163, at *8 (N.D.N.Y. Oct. 10, 2017) ("[W]illful non-compliance with psychiatric medications and treatment ... could reasonably support a fairly significant deficit in [plaintiff's] self-care abilities.").

## VII. NATURE OF REMAND

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard ... remand to the Secretary for further development of the evidence" is generally appropriate. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). This court cannot conclude that "substantial evidence on the record as a whole indicates that the [plaintiff] is disabled[,]" and thus, I cannot recommend a remand solely for the determination of benefits. *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper evaluation of the medical and other evidence, an appropriate determination of plaintiff's residual functional capacity, and other further proceedings, consistent with this Memorandum-Decision and Order, and it is

**ORDERED**, that the Clerk enter judgment for **PLAINTIFF**.

**All Citations**

Slip Copy, 2021 WL 706645

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5410550

2021 WL 5410550
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

CARMEN M., Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

20-CV-06532-MJR
|
Signed 11/17/2021
|
Filed 11/19/2021

**Attorneys and Law Firms**

Justin M. Goldstein, Kenneth R. Hiller, Law Offices of Kenneth Hiller, PPLC, Amherst, NY, for Plaintiff.

Quinn Niblack Doggett, Social Security Administration Office of General Counsel, New York, NY, for Defendant.

DECISION AND ORDER

MICHAEL J. ROEMER, United States Magistrate Judge

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties consented to have a United States Magistrate Judge conduct all proceedings in this case. (Dkt. No. 15)

Plaintiff Carmen M. [1] ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying her application for Supplemental Security Income ("SSI") pursuant to the Social Security Act (the "Act"). Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, Plaintiff's motion (Dkt. No. 13) is granted, defendant's motion (Dkt. No. 14) is denied, and the case is remanded for further administrative proceedings.

[1]   In accordance with the District's November 18, 2020, Standing Order, plaintiff is identified by first name and last initial.

**BACKGROUND** [2]

[2]   The Court presumes the parties' familiarity with Plaintiff's medical history, which is summarized in the moving papers.

Plaintiff filed for SSI on October 12, 2017, alleging a disability onset date of December 31, 2015. (Administrative Transcript ["Tr."] 166-67). The application was initially denied on January 30, 2018. (Tr. 61-74). Plaintiff timely filed a request for an administrative hearing. (Tr. 81-114). On August 5, 2019, Administrative Law Judge ("ALJ") T. Kim held a video hearing from Falls Church, Virginia. (Tr. 37-60). Plaintiff appeared in Rochester, New York with her non-attorney representative. Plaintiff testified with the assistance of a Spanish interpreter. A vocational expert also testified. The ALJ issued an unfavorable decision on September 10, 2019. (Tr. 15-36). On July 2, 2020, the Appeals Council denied Plaintiff's request for review. (Tr. 1-8). This action followed.

**DISCUSSION**

I. *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential. Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. § 405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). "The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may "not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Thus, the Court's task is to ask " 'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

**\*2** Two related rules follow from the Act's standard of review. The first is that "[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The second rule is that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588. While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual conclusions must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to apply the correct legal standard is reversible error. *Id.*

II. *Standards for Determining "Disability" Under the Act*
A "disability" is an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner may find the claimant disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and ... [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process." 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the Commissioner determines whether the claimant is "working" and whether that work "is substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b). If the claimant is engaged in substantial gainful activity, the claimant is "not disabled regardless of [his or her] medical condition or ... age, education, and work experience." *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment." *Id.* §§ 404.1520(c), 416.920(c). To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* §§ 404.1520(c), 416.920(c). As with the first step, if the claimant does not have a severe impairment, he or she is not disabled regardless of any other factors or considerations. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions: first, whether that severe impairment meets the Act's duration requirement, and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is "equal to" an impairment listed in Appendix 1. *Id.* §§ 404.1520(d), 416.920(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.* §§ 404.1520(d), 416.920(d).

**\*3** If the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity ["RFC"] based on all the relevant medical and other evidence" in the record. *Id.* §§ 404.1520(e), 416.920(e). RFC "is the most [the claimant] can still do despite [his or her] limitations." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). The Commissioner's assessment of the claimant's RFC is then applied at steps four and five. At step four, the Commissioner "compare[s] [the] residual functional capacity assessment ... with the physical and mental demands of [the claimant's] past relevant work." *Id.* §§ 404.1520(f), 416.920(f). If, based on that comparison, the claimant is able to perform his or her past relevant work, the Commissioner will find that the claimant is not disabled within the meaning of the Act. *Id.* §§ 404.1520(f), 416.920(f). Finally, if the claimant cannot perform his or her past relevant work or does not have any past relevant work, then at the fifth step the Commissioner considers whether, based on the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §§ 404.1520(g)(1), 416.920(g)(1). If the claimant can adjust to other work, he or she is not disabled. *Id.* §§ 404.1520(g)(1), 416.920(g)(1). If, however, the claimant cannot adjust to other work, he or she

is disabled within the meaning of the Act. *Id.* §§ 404.1520(g)(1), 416.920(g)(1).

The burden through steps one through four described above rests on the claimant. If the claimant carries his burden through the first four steps, "the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform." *Carroll*, 705 F.2d at 642.

### III. *The ALJ's Decision*

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since October 12, 2017, the application date. (Tr. 23). At step two, the ALJ found that Plaintiff had the following severe impairments: obesity; anxiety; adjustment disorder; personality disorder; major depressive disorder; borderline personality disorder; panic disorder; degenerative disc disease in the lumbar spine; neuropathy; and degenerative disc disease of the cervical spine. (Tr. 23-24). At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of Impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 24-26). Prior to proceeding to step four, the ALJ determined that Plaintiff retained the RFC to perform light work with the following limitations:

> [T]he claimant can frequently operate hand controls, reach, push, pull, handle, finger, and feel with both upper extremities. The claimant can occasionally kneel, crouch, stoop, balance, and crawl, and can occasionally climb stairs and ramps. The claimant can never climb ladders, ropes and scaffolds, and can never be exposed to unprotected heights and moving mechanical parts. The claimant can tolerate occasional exposure to vibration. In addition, the claimant is able to understand, carry-out, and remember simple instructions, and make simple work related decisions. The claimant can occasionally deal with supervisors and

> co-workers, and can never deal with the public

(Tr. 26-31). At step four, the ALJ found Plaintiff capable of performing past relevant work. (Tr. 31-32). At step five, the ALJ found, in the alternative, Plaintiff capable of performing jobs that exist in significant numbers in the national economy. (Tr. 20). Accordingly, the ALJ determined that Plaintiff has not been under a disability from since October 12, 2017, the application date. (Tr. 33).

### IV. *Plaintiff's Challenge*

Plaintiff argues, *inter alia*, that the ALJ erred by failing to evaluate properly all the medical opinions in accordance with applicable legal standards. The Court agrees.

"The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner 'will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion.' " *Brian O. v. Comm'r of Soc. Sec.*, 2020 WL 3077009, *4-5 (N.D.N.Y. June 10, 2020) (*quoting Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules")*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017)) (*citing* 20 C.F.R. §§ 404.1520c(a), 416.920c(a)). "Instead, the Commissioner must consider all medical opinions and 'evaluate their persuasiveness' based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and 'other factors' " *Id.* (*quoting* 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c)). "This is consistent with an ALJ's longstanding duty to fully explain exactly how a particular medical opinion or opinions are inconsistent with the medical evidence. *Pamela P. v. Saul*, 2020 WL 2561106, at *5 (N.D.N.Y. May 20, 2020) (citing *Wright v. Comm'r of Soc. Sec.*, 2020 WL 1323013, at *2 (E.D.N.Y. Mar. 20, 2020)).

**\*4** "An ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." *Brian O.*, 2020 WL 3077009, *4-5 (*quoting* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)). "With respect to 'supportability,' the new regulations provide that '[t]he more relevant the objective medical evidence and supporting explanations presented

by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.' " *Id.* (quoting §§ 404.1520c(c)(1), 416.920c(c)(1)). "The regulations provide that with respect to 'consistency,' '[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.' " *Id.* (quoting §§ 404.1520c(c)(2), 416.920c(c)(2)). "If the ALJ fails adequately to 'explain the supportability or consistency factors,' or bases her explanation upon a misreading of the record, remand is required." *Rivera v. Comm'r of the Soc. Sec. Admin.,* 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted sub nom. Rivera v. Comm'r of Soc. Sec. Admin.,* 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (quoting *Andrew G. v. Comm'r of Soc. Sec.,* 2020 WL 5848776, at *9 (N.D.N.Y. Oct. 1, 2020)).

Here, the ALJ indicated that he "considered the Physical Assessments for Determination of Employability and the Medical Source Opinion of treating providers presented in the record." (Tr. 31 (citing T 377-421, 630-33).) The ALJ did not identify the content or the source of any of the opinions, but instead found "these assessments and opinions to be less persuasive and not consistent with the medical evidence in this case." (Tr, 31), He concluded that "[a]fter considering the objective medical evidence, subjective statements made by the claimant and by third parties, and all opinions, the undersigned finds that the claimant's [RFC] as defined above accurately details the claimant's functional limitations." (Tr 31.) This analysis falls short of the new legal standard.

The Courts applying the new regulations have continued to hold that, " '[e]ven though ALJs are no longer directed to afford controlling weight to treating source opinions - no matter how well supported and consistent with the record they may be – the regulations still recognize the 'foundational nature' of the observations of treating sources, and consistency with those observations is a factor in determining the value of any [treating source's] opinion.' " *Raymond M. v. Comm'r of Soc. Sec.,* 2021 WL 706645, at *9 (N.D.N.Y. Feb. 22, 2021) (quoting *Shawn H. v. Comm'r of Soc. Sec.,* 2020 WL 3969879, at*6 (D. Vt. July 14, 2020); *citing Jacqueline L. v. Comm'r of Soc. Sec.,* 2021 WL 243099, at *4 (W.D.N.Y. January 26, 2021)). "At their most basic, the amended regulations require that the ALJ explain her findings regarding the supportability and consistency for each

of the medical opinions, 'pointing to specific evidence in the record supporting those findings.' " *Raymond M.,* 2021 WL 706645, at *8 (quoting *Jacqueline L.,* 2021 WL 243099, at *6). "The 'supportability' factor asks how well a medical source supported their opinion(s) with 'objective medical evidence' and 'supporting explanations.' " *Acosta Cuevas v. Comm'r of Soc. Sec.,* 2021 WL 363682, at *14 (S.D.N.Y. Jan. 29, 2021) (quoting 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c) (1)).

Here, this analysis was not done. The opinions collectively rejected by the ALJ consisted of six separate treating medical opinions from the relevant time frame: (1) employability assessment of Chelsea Keller, MS. MFT dated August 8, 2017 (Tr. 410-13); (2) employability assessment of Ms. Keller dated October 31, 2017 (Tr. 391-93, 406-09); (3) employability assessment of Ms. Keller dated February 20, 2018 (Tr. 396-99); (4) employability assessment of Meghan O'Connor, LMHC, NCC dated December 7, 2018 (Tr. 385-88); (5) employability assessment of R. Joseph Chapman, PA dated January 8, 2019 (Tr; 378-84); and (6) medical source statement of Ms. O'Connor dated May 6, 2019 (Tr. 631-33). Each opinion contained limitations more restrictive than the ALJ's RFC finding, and each of the longitudinal opinions provided by Ms. Keller and Ms. O'Connor contained nonexertional limitations inconsistent with all work. It is unclear how the ALJ considered the supportability and consistency of each of the five opinions when the ALJ did not discuss the content of any of the opinions and did not expressly address "supportability" and "consistency."

**\*5** The ALJ failed to discuss the treating relationship of Mr. Chapman, Ms. Keller, or Ms. O'Connor, and the ALJ failed to discuss the evidence relied upon by Mr. Chapman, Ms. Keller, or Ms. O'Connor to support each opinion. Remand is required when the ALJ failed to examine what evidence the opining sources " 'used to support their opinions and reach their ultimate conclusions.' " *Brianne S. v. Comm'r of Soc. Sec.,* 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021) (quoting *Cuevas,* 2021 WL 363682, at *14). When Mr. Chapman provided his opinion on January 8, 2019, he had previously treated Plaintiff on April 2, July 10, and December 4, 2018 and January 8, 2019 for neuropathy in her hands and feet, right pinky finger pain, headache, and chronic upper back pain. (Tr. 538-47). In addition to the clinical finings within his own treatment notes, he reviewed x-rays of the right hand revealing mild joint space narrowing of the interphalangeal joints, most significant at the fifth digit.

(Tr. 687). He reviewed x-rays of the cervical spine revealing mild degenerative disc disease at C6-C7 with only minimal disc space narrowing. (Tr. 727-29). The ALJ did not discuss the examination and treating relationship, nor the evidence considered by Mr. Chapman when formulating his opinion on January 8, 2019. The ALJ's analysis does not consider the supportability of Mr. Chapman's opinion.

When Ms. Keller provided her opinion on August 8, 2017, she had evaluated Plaintiff 21 times and noted a treatment relationship since September 2, 2015. (Tr. 410). She provided her most recent mental status examination significant for anxious mood and passive suicidal ideation. (Tr. 411). In her opinion dated October 31, 2017, she noted 37 evaluations of Plaintiff. (Tr. 391). Her mental status examination was abnormal for anxious mood. (Tr. 407). Her opinion from February 20, 2018 contained a mental status examination significant anxiety and tearfulness. (Tr. 397). The treatment notes show that Ms. Keller provided cognitive behavioral therapy on September 19, October 10 and 31, November 6 and 28, and December 12, 2017, as well as on January 9, February 20, and April 3 and 24, 2018. (Tr. 315-34, 448-64, 472-83). Plaintiff's appointment on September 19, 2017 was noted to be her 21st appointment with Ms. Keller, and her appointment on April 24, 2018 was Ms. Keller's 33rd therapy appointment. (Tr. 317, 482). Mental status examinations showed: ambivalent mood (Tr. 450, 458); sad and/or low mood (Tr. 317, 321, 322, 461 462, 474); anxious mood or significant anxiety (Tr. 317, 454, 461, 462, 474, 478, 482); tearful affect or tearfulness (Tr. 317, 461, 462); ruminative thought content (Tr. 462); thoughts of guilt (Tr. 474); fair concentration/attention (Tr. 322, 450, 458, 462, 475); fair insight (Tr. 318, 323, 328, 333, 450, 458, 463, 475, 479, 483); and fair judgment (Tr. 318, 323, 328, 333, 450, 454, 458, 463, 475, 479, 483). The ALJ did not compare any of the objective psychiatric findings to Ms. Keller's three, separate, longitudinal opinions, and the ALJ did not consider the supportability of her opinions.

Ms. O'Connor administered treatment after Ms. Keller on May 7, 2018 and thereafter provided a medical opinion on December 7, 2018. (Tr. 385-88). A mental status examination was noted for depressed mood and affect, and fair insight and judgment. (Tr. 386). On May 6, 2019, Ms. Keller provided another opinion identifying signs and symptoms of depressed mood; sleep disturbance; decreased energy; feelings of guilt or worthlessness; and difficulty concentrating or thinking. (Tr. 631). Ms. O'Connor ultimately assessed that Plaintiff would likely be absent from work about 3 days per month on

average as a result of her impairments or treatment. (Tr. 633). Since May 7, 2018 when treatment was transferred to Ms. O'Connor, Plaintiff received cognitive behavioral treatment on May 7, 24, and 25, June 10, 12, and 22, July 9, 20, and 23, September 7, 18, and 20, October 4, 11, and 24, November 16, and December 5, 7, and 26, 2018, and January 23, February 6 and 20, March 6 and 27, April 10 and 25, May 1, 2019. (Tr. 484-509, 515-33, 555-629). She was also receiving CBT Spanish group weekly as of June 12, 2018. (Tr. 504, 519, 527, 563, 567, 576, 580, 589, 598, 602, 607, 616, 624, 629). Mental status examinations included: anxious mood (Tr. 486, 490, 507, 518, 562, 566, 575, 580, 597, 602, 606, 610, 615, 619, 628); ambivalent mood (Tr. 571); sad mood (Tr. 499, 571, 584); depressed mood (Tr. 502, 503, 527, 580, 584, 588, 589, 623, 628); constricted affect (Tr. 584); flat affect (Tr. 584); tearful affect (Tr. 499, 507, 584); ruminative thought content (Tr. 523, 584); preoccupation (Tr. 527); helplessness (Tr. 584); fair insight (Tr. 518, 527, 532, 598, 602, 606, 611, 615, 619, 624, 628); and fair judgment (Tr. 487, 491, 527, 532, 576, 580, 585, 589, 598, 602, 606, 611, 615). Thus, the ALJ did not compare any of the objective psychiatric findings to Ms. O'Connor's two opinions, and the ALJ did not consider the supportability of her opinions.

**\*6** The ALJ failed to consider the consistency of the opinions of Ms. Keller and Ms. O'Connor. The four unemployability assessments completed by Ms. Keller or Ms. O'Connor on August 8, 2017, October 31, 2017, February 20, 2018, and December 7, 2018 each indicated that Plaintiff was unable to function 10-25% of the time in the following: (1) perform simple and complex tasks independently; (2) maintain attention and concentration for rote tasks; (3) regularly attend to a routine and maintain a schedule; and (4) perform low stress and simple tasks. (Tr. 387, 392, 398, 412). Each opinion indicated the inability to use public transportation. (Tr. 387, 392, 398, 412). Although provided in a different format, Ms. O'Connor's opinion from May 6, 2019 indicating that Plaintiff would likely be absent from work about 3 days per month on average as a result of her impairments or treatment is consistent with the inability to regularly attend to a routine and maintain a schedule 10-25% of the time. (Tr. 633). Thus, five opinions were consistent, and the ALJ failed to provide an analysis of the consistency of the opinions. *See Brianne S.*, 2021 WL 856909, at \*5.

The ALJ's minimal analysis does not identify evidence inconsistent with or unsupportive of the opinions of Plaintiff's treating sources. The ALJ vaguely found that the opinions were "not consistent with the medical evidence in this

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 97 of 189
Carmen M. v. Commissioner of Social Security, Slip Copy (2021)
2021 WL 5410550

case." (Tr. 31). "Where an ALJ 'merely states' that an examining physician's opinion is 'not consistent with[ ] the overall medical evidence,' he has failed to adequately explain his conclusions regarding the consistency factor." *Brianne S.*, 2021 WL 856909, at *5 (*quoting Raymond M.*, 2021 WL 706645, at *10 (alterations in original)). The ALJ's failure to identify specific evidence as inconsistent with specific portions of the five separate opinions "clearly leaves pertinent questions unanswered." *Raymond M.*, 2021 WL 706645, at *9 (*citing Danette Z. v. Comm'r of Soc. Sec.*, 2020 WL 6700310, at *8 (N.D.N.Y. Nov. 13, 2020)). Courts have found such vague and conclusory reasoning insufficient. *See Lee G. v. Comm'r of Soc. Sec.*, 2021 WL 22612, at *5 (N.D.N.Y. Jan. 4, 2021); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *McCarthy v. Colvin*, 66 F. Supp. 3d 315, 322 (W.D.N.Y. 2014); *Gibbs v. Colvin*, 2015 WL 9217081, at *4 (W.D.N.Y. Dec. 17, 2015).

The ALJ thereafter found, "These forms provide no evidence to support their restrictions, consist of generally circled form limitations or short answer descriptions of those limitations, and are generally temporary for their designation of limitations." (Tr. 31). However, as indicated above, each opinion provided by Ms. O'Connor or Ms. Kelly was accompanied by a mental status examination or identified signs and symptoms. The checkbox format of the opinions did not render the opinions unsupported or unexplained, and this reason is not sufficient to override the six separate opinions. See *Allen v. Comm'r of Soc. Sec.*, 2019 WL 4894102, at *3 (W.D.N.Y. Oct. 4, 2019) (*citing Merritt v. Comm'r of Soc. Sec.*, 2016 WL 6246436, *8 (W.D.N.Y. 2016); *Goble v. Colvin*, No. 15-CV-6302 CJS, 2016 WL 3179901, at *5 (W.D.N.Y. June 8, 2016); *Kain v. Colvin*, No. 15-CV-6645-FPG, 2017 WL 279560, at *4 (W.D.N.Y. Jan. 23, 2017); *Lewis v. Colvin*, No. 16-CV-6411L, 2018 WL 1044562, at *3 (W.D.N.Y. Feb. 26, 2018)).

Also, as indicated above, the treatment notes of Ms. O'Connor and Ms. Kelly contained consistent mental status examination findings aligned with the findings within in each opinion. Mr. Chapman also provided examination findings within his opinion and treatment notes and relied upon two x-rays when formulating his opinion. The opinions were not rendered in a vacuum, and the ALJ was required to evaluate the opinions together with the findings within the treatment notes. *See Dorsheimer v. Saul*, 2019 WL 2559517, at *5 (W.D.N.Y. June 21, 2019) (*citing Medina v. Commissioner of Social Security*, 2019 WL 1230081 (W.D.N.Y. 2019)). This is required under the supportability factor of the new

regulations. The ALJ's discussion of the evidence elsewhere in the decision does not address the positive psychiatric findings consistently noted within the treatment notes. *See* (Tr. 29, 30). Although the ALJ did cite to some allegedly normal findings, "[s]ome normal mental exams, or some general statements of improvement, still fail to constitute substantial evidence supporting a determination of a denial of disability where other evidence in the record was ignored." *Dany Z. v. Saul*, 2021 WL 1232641, at *12 (D. Vt. Mar. 31, 2021) (citing *Jacobs v. Saul*, 482 F. Supp. 3d 23, 28 (E.D.N.Y. 2020); *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)). Thus, the ALJ failed to weigh the six opinions pursuant to the appropriate legal standards.

**\*7** The ALJ's rejection of these treating opinions because of temporal limitations contained therein was also error. Courts have consistently held that it is improper for an ALJ to discount opinions based upon the expected duration language contained in the opinions. *See Lefort v. Comm'r of Soc. Sec.*, 2019 WL 2994406, at *4 (W.D.N.Y. July 8, 2019); *Garcia Medina v. Comm'r of Soc. Sec.*, 2019 WL 1230081, at *4-5 (W.D.N.Y. Mar. 15, 2019); *Fountain v. Berryhill*, 2018 WL 4658203, at *3 (W.D.N.Y. Sept. 27, 2018); *Jones v. Colvin*, 2017 WL 1321015 at *20 n.29 (E.D.N.Y. 2017); *Mura v. Colvin*, 2017 WL 2543939, at *5 (W.D.N.Y. June 13, 2017).

The ALJ's errors in evaluating the opinions are not harmless. Each of the opinions of Ms. Keller and Ms. O'Connor contain limitations supporting that Plaintiff would either be off task more than 10% of the workday or absent from work more than 1-2 days per month. The vocational expert testified that either limitation would prevent an individual from sustaining competitive employment. (Tr. 56). The four employability assessments dated between August 8, 2017 and December 7, 2018 indicated that Plaintiff would be unable to function 10-25% of the time in the following: (1) perform simple and complex tasks independently; (2) maintain attention and concentration for rote tasks; (3) regularly attend to a routine and maintain a schedule; and (4) perform low stress and simple tasks. (Tr. 387, 392, 398, 412). Ms. O'Connor's opinion from May 6, 2019 expressly indicated that Plaintiff would likely be absent from work about 3 days per month on average as a result of her impairments or treatment. (Tr. 633). As indicated above, Plaintiff received individual, group, and family mental health treatment more frequently than 3 days per month, and the record corroborates the limitations surpassing the thresholds that would preclude all employment. Thus, each of the five opinions of Ms. Keller and Ms. O'Connor contain limitations that would eliminate

all work, including Plaintiff's past work, and would lead to a finding of disability at Step 5.

Concerning Mr. Chapman's opinion, Plaintiff was limited to the following in an 8-hour workday: (1) pushing, pulling, bending 1-2 hours; and (2) ability to lift/carry 1-2 hours. (Tr. 381). If Plaintiff was limited to lifting only 1-2 hours out of an 8-hour workday, Plaintiff would not be able to perform the "frequent lifting or carry weighing up to 10 pounds" required for most light work. 20 C.F.R. § 416.967(b). If Plaintiff was limited to sedentary work, Medical-Vocational Rule 201.17 would direct a finding of disability when Plaintiff turned 45 years old given that the ALJ found Plaintiff illiterate or unable to communicate in English and having unskilled past relevant work. (Tr. 32); *see* 20 C.F.R. 404, Subpart P, Appendix 2, Medical-Vocational Rule (Grid Rule) 201.17. Thus, the ALJ would have been directed to find Plaintiff disabled as of July 24, 2018 if Plaintiff was limited to sedentary work. Thus, the ALJ's errors are not harmless.

In sum, for the reasons stated, the Court finds that the ALJ erred by failing to evaluate all the medical opinion evidence in accordance with the new Social Security regulations, and that such error was not harmless. [3] The case is therefore remanded. [4]

[3]    The Plaintiff also argues that the ALJ erred by improperly evaluating the medical opinion

evidence of consultative examiners and by relying on his own lay opinion in determining Plaintiff's manipulative limitations. The Commissioner should also consider these arguments on remand.

[4]    The Court rejects Plaintiff's argument that such remand should be for the calculation of benefits only. It is not clear to the Court that a more complete record would not support the Commissioner's decision.

## CONCLUSION

**\*8** For the above reasons, Plaintiff's motion for judgment on the pleadings (Dkt. No. 13) is granted, defendant's motion for judgment on the pleadings (Dkt. No. 14) is denied, and the case is remanded for further administrative proceedings.

The Clerk of Court shall take all steps necessary to close this case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 5410550

---

**End of Document**       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 319354
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martha VELLONE, ON BEHALF OF
Kenneth VELLONE, Dec'd, Plaintiff,

v.

Andrew SAUL, Commissioner
of Social Security, Defendant.

1:20-cv-00261 (RA) (KHP)

|

Signed 01/29/2021

**Attorneys and Law Firms**

Jeffrey David Delott, for Plaintiff.

Mary Ellen Brennan, U.S. Attorney's Office, New York, NY, for Defendant.

## Report and Recommendation

KATHARINE H. PARKER, United States Magistrate Judge

**\*1 To: Hon. Ronnie Abrams, United States District Judge**

**From: Katharine H. Parker, United States Magistrate Judge**

Named-plaintiff Martha Vellone, represented by counsel, commenced this action against the Commissioner of the Social Security Administration (the "Commissioner") on behalf of her now-deceased ex-husband, Kenneth Vellone ("Plaintiff" or "Vellone"). Pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), Vellone seeks review of the Commissioner's decision that he was not disabled under Sections 216(i) and 223(d) of the Act from June 15, 2016—Vellone's alleged disability onset date—through January 21, 2019, the date of his passing.

The parties submitted cross motions for judgment on the pleadings (ECF Nos. 28, 40), pursuant to the Court's Order at ECF No. 10. Plaintiff appeals the Commissioner's decision claiming that: (1) the Administrative Law Judge ("ALJ") failed to properly consider the relevant medical evidence of record in determining Plaintiff's residual functional capacity to perform work; (2) the ALJ's evaluation of Plaintiff's

subjective complaints were not supported by substantial evidence; and (3) the ALJ's Step 4 and Step 5 analysis was not supported by substantial evidence. For the reasons set forth below, I respectfully recommend that Plaintiff's motion be GRANTED and that the Commissioner's motion be DENIED.

## Background

Plaintiff was born on October 2, 1957. (Administrative Record ("R.") 68, 289.) He obtained a GED in 1977 and spent most of the following 35 years working as a jeweler. (R. 183.) As a jeweler, Plaintiff would fabricate and repair various types of jewelry—work which required him to walk for an hour, stand for an hour, sit for six hours, and stoop for 30 minutes each day. (R. 39, 196.) Plaintiff was also required to be able to lift equipment and/or objects of up to ten pounds. (R. 39, 196.) Plaintiff was laid off from his job in June of 2016. (R. 182.) The record reveals that Plaintiff believed he was laid off because his disability limited his ability to work as a jeweler. (*See* R. 157.) Although Plaintiff attempted to resume working at some point, he was unable to hold a job.

### *I. Procedural History and Hearing Testimony*

Plaintiff filed his initial claim for disability insurance benefits under the Act on December 5, 2017. (R. 10, 69.) The Commissioner denied Plaintiff's initial application on April 6, 2018. (R. 86.) Plaintiff contested the denial and filed a request for hearing on May 9, 2018, which was granted. (R. 10.) Unfortunately, Plaintiff passed away on January 21, 2019 due to a heart attack. (R. 32.) On April 12, 2019 Plaintiff's ex-wife, Martha Mooniaz (Vellone) appeared and testified at the ALJ hearing on Plaintiff's behalf. (R. 36.) Ms. Mooniaz testified that, starting in 2016, Plaintiff was unable to maintain a stable job because his chronic pain forced him to regularly miss work. (R. 37-38, 43, 50.) Further, Mooniaz testified that she visited Plaintiff every weekend over the course of the last couple of years prior to his passing. (R. 42.) During those visits, Mooniaz observed Plaintiff walking around his home with a noticeable limp due to his back pain. (R. 42-43.) According to Mooniaz, Plaintiff would often complain that he was unable to sit or stand for extended periods of time because of his back pain and that he suffered from back spasms, recurrent pins and needles down his legs, and numbness. (R. 43-44, 52, 54-55.) Mooniaz also testified that Plaintiff was unable to drive a car, attend his children's soccer games, or play with his children in the park due to his pain. (R. 46, 49.)

Finally, Mooniaz testified that Plaintiff took two medications – Neurontin and Oxycodone – for pain management. (R. 55.)

### II. Summary of Relevant Medical Evidence

*Hospitalizations Prior to the Alleged Disability Onset:*

**\*2** The record indicates that Vellone was hospitalized numerous times at New York Presbyterian Hospital in the year preceding the onset of his alleged disability. (R. 262-308.) However, only a few of the hospital visits are remotely relevant to the instant action. On April 21, 2015, Vellone was admitted to the emergency room complaining of pain to his left pelvic area. A physician, Edwin Naamon, M.D., assessed Vellone's hip and determined that Vellone was ambulatory, not in acute distress, and that he should be discharged. (R. 308.) Vellone was also admitted to the emergency room on multiple occasions due to his sustained use of oxycodone. For instance, on July 5, 2015 Vellone was found unconscious on a New York City bus. (R. 303.) The hospital records indicate that Vellone refused treatment and wanted to be discharged immediately. (R. 304; *see also* R. 305.) Vellone also admitted himself on November 24, 2015 due to severe oxycodone withdrawal. (R. 301.)

*Hospitalizations After the Alleged Disability Onset:*

On August 14, 2017 Vellone received an x-ray of his spine at the Philips Ambulatory Care Center, part of the Mount Sinai Beth Israel hospital system. (R. 240-41.) The x-ray was assessed by an attending radiologist and revealed mild degenerative changes involving the L3 to the S1 disc spaces, multilevel facet arthropathy, and probable muscle spasms. (R. 241.) [1]

[1]   These findings were also confirmed by the medical evaluation conducted in connection with Plaintiff's initial disability determination. (R. 74-75.)

Then, on October 1, 2017, Vellone's mother called the police because Vellone was verbally abusing and threatening her. (R. 268.) As a result, Vellone was admitted to a hospital for treatment. He told those evaluating him that he had been mixing opiates with vodka in order to, at least in part, treat his pain. (R. 268.) Just a few weeks later, on October 28, 2017, Vellone was once again found unresponsive and was admitted to New York Presbyterian. Vellone reported to the doctor assigned to his care on this occasion that he drank beer and took "2 percocets" in an attempt to relieve chronic back pain. (R. 264.)

*Dr. Abdul C. Azeez:*

The record indicates that Dr. Abdul C. Azeez, M.D. was Plaintiff's primary care physician from 1997 through Plaintiff's death in early 2019. (*See, e.g.*, R. 185.) However, the only substantive medical evidence of record directly associated with Dr. Azeez is a Medical Findings Summary from March of 2018. (R. 331-33.) The summary classified Vellone's back pain as moderately severe. (R. 331.) Further, Dr. Azeez opined that Vellone's symptoms were likely to increase if he were placed in a competitive work environment. (R. 331.) Dr. Azeez noted that Plaintiff's back pain "continuously" interfered with Plaintiff's attention and concentration (R. 331,) and that Plaintiff would be limited to three hours of sitting and three hours of standing/walking over the course of an eight-hour workday (R. 332.) Dr. Azeez also opined that Vellone could never stoop, kneel, or crouch and that he could occasionally lift materials between 10 and 15 pounds. (R. 332.) Dr. Azeez's summary also noted that Vellone could occasionally operate a motor vehicle and occasionally perform fingering and fine manipulation. (R. 332.) Finally, Dr. Azeez opined that Plaintiff's condition would force more than 3 absences from work over the course of a month, that Plaintiff would be off task over 20% of the workday, and that Plaintiff would require a daily two to three hour work break to manage his pain. (R. 333.) Dr. Azeez also clarified that these limitations applied on or before June 2016 but offered limited objective clinical findings to support his conclusions. (R. 331, 333.)

*Dr. Richard Chang:*

Plaintiff saw Dr. Richard Chang, M.D. twice during the month of December 2017 based on a referral from Dr. Azeez in light of Plaintiff's persistent back pain. (*See* R. 318.) During the first visit, on December 15, 2017, Vellone told Dr. Chang that his back pain was sharp and constant and had been worsening over the course of recent months. (R. 318.) The pain radiated from Vellone's back to his left lower extremity and worsened with any movement, especially while walking or standing. (R. 318.) Dr. Chang noted arthritic deformities in Plaintiff's hip and degenerative disc disease in Plaintiff's spine. (R. 320.) Dr. Chang outlined Vellone's treatment options, directed him to continue taking his pain medication, and prescribed gabapentin to supplement his pain management. (R. 321.)

**\*3** During the second follow-up visit, on December 29, 2017, Vellone was in even more pain. Vellone rated his back pain as ten out of ten (the worst possible pain) and reported

that the gabapentin caused negative side effects. (R. 311.) Plaintiff also reported that the pain was affecting his ability to work and support his family. (R. 311.) Dr. Chang analyzed an MRI of Plaintiff's back and found a "left central disc herniation contacting the descending left Si nerve root at L4-5" along with a "large broad based disc herniation with left central and foraminal disc protrusion contacting the exiting L4 and descending L5 nerve roots." (R. 314.) Dr. Chang also upped Plaintiff's dose of gabapentin, directed Plaintiff to continue taking his other medications, and recommended supplemental steroid injections. (R. 314.) Finally, Dr. Chang noted at both visits that Plaintiff was able to heel, toe, and tandem walk. (R. 313, 320.)

*Dr. Joseph Solberg:*

Plaintiff also saw Dr. Joseph Solberg, D.O. twice during the month of November 2018. At the first visit, which took place on November 8, 2018, Plaintiff reported nine out of ten back pain that was exacerbated by walking, sitting, and standing. (R. 328.) He reported that the pain was constant. (R. 328.) However, Vellone failed to bring his MRI to his visit with Dr. Solberg. Accordingly, Vellone scheduled a follow-up appointment to provide the MRI and to discuss a potential surgical referral. (R. 329.) At the November 20, 2018 follow-up visit, Plaintiff reported the same type of pain (radiating from the left buttock to the foot) and the same pain severity. (R. 324.) Dr. Solberg recorded Plaintiff's gait as normal and confirmed Plaintiff's ability to heel/toe walk. (R. 324.) Further, based on Plaintiff's MRI, Dr. Solberg found a "paracentral disc protrusion [at] L5-S1." (R. 326.) Because other treatment efforts had failed, Dr. Solberg referred Vellone for back surgery. (R. 326.)

*Dr. S. Ahmed:*

On March 21, 2018 Dr. S. Ahmed – a non-examining state agency medical consultant – evaluated Vellone's medical records in connection with Plaintiff's initial application for disability benefits. In short, Dr. Ahmed analyzed the medical evidence outlined above that was available and, based on those records, determined that Vellone had a severe medically determinable impairment—namely, Degenerative Disc Disease. (R. 75.) However, based on this evaluation, the disability examiner determined that Plaintiff was not disabled under the Act. (R. 77-78.)

***III. The Commissioner's Decision***

ALJ Carlton determined that Plaintiff met the insured status requirements of the Act through the end of the year 2020. (R. 12.) Although the ALJ found that Plaintiff engaged in substantial gainful activity from October 16, 2017 through November 3, 2017, he nevertheless found that there had been a continuous 12-month period since the alleged disability onset date during which Plaintiff did not engage in substantial gainful activity. (R. 12-13.) Further, the ALJ found that Plaintiff had degenerative disc disease of the lumbar spine with multilevel herniated discs and that this condition constituted a severe impairment under the Act. (R. 13.)[2] However, the ALJ concluded that Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13.) The ALJ then found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except that he could never climb ladders, ropes or scaffolds; must avoid slippery or uneven surfaces; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; have no exposure to unprotected heights; and could not operate a motor vehicle as a condition of employment. (R. 13.) As such, the ALJ determined that Plaintiff was capable of performing his past relevant work as a jeweler since that work does not require the performance of work-related activities precluded by Plaintiff's RFC. (R. 16.)

[2]     Although the record contains some evidence of potential psychological impairments, Plaintiff does not seek judicial review on that basis. (*See, e.g.*, R. 76.)

**\*4** Thus, the ALJ held that Plaintiff had not been disabled, as defined by the Act, from June 15, 2016 through January 21, 2019 (the date of his death). (R. 17.) Plaintiff appealed that determination to the Appeals Council. (R. 236-39.) The Appeals Council denied Plaintiff's appeal on December 9, 2019. (R. 1.) The instant case followed.

**Discussion**

*I. The Applicable Law*

**A. Judicial Standard of Review of the Commissioner's Determination**

A court's review of a Social Security disability determination requires two distinct inquiries. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Dwyer v. Astrue*, 800 F. Supp.

2d 542, 546 (S.D.N.Y. 2011). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. *Id.* Moreover, if the Commissioner's decision is supported by substantial evidence, the ALJ's findings as to any facts are conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3).

An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g., id.* at 266-67 (regulation); *Schaal v. Callahan*, 993 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his or her reasoning. *See, e.g., Donnelly v. Colvin*, No. 13-cv-7244 (AJN) (RLE), 2015 WL 1499227, at *8 (S.D.N.Y. Mar. 31, 2015).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). Thus, the court does not determine *de novo* whether a claimant is disabled. *Id.* (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (*per curiam*), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-cv-1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination ... with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

**\*5** If the decision denying benefits applied the correct legal standards and is based on substantial evidence, the reviewing court must affirm; if not, the court may modify or reverse the decision, with or without remand. 42 U.S.C. § 405(g).

### B. Legal Principles Applicable to the Commissioner's Disability Determination

Under the Act, every individual considered to have a "disability" is entitled to benefits. 42 U.S.C. §§ 423(a)(1), 1382. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's impairments must be "of such severity that he is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following sequential five-step inquiry:

(1) First, determine whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

(2) Second, if not gainfully engaged in any activity, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities. Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

(3) Third, if the claimant has a "severe impairment," determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled and the claimant

Case 6:21-cv-01138-MAD-TWD Document 19 Filed 02/13/23 Page 103 of 189

will be eligible for benefits. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At this stage, the Commissioner also must determine the claimant's RFC; that is, her ability to perform physical and mental work activities on a sustained basis despite her impairments.[3] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

(4) Fourth, if the claimant does not meet the criteria for being presumed disabled, the Commissioner next must determine whether the claimant possesses the RFC to perform his or her past work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

(5) Fifth, if the claimant is not capable of performing work he or she performed in the past, the Commissioner must determine whether the claimant is capable of performing other work which exists in the national economy.

[3]    A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is his maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs, the opinions of treating and consultative physicians, and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)).

 **\*6**  The claimant bears the burden of proof at the first four steps of the analysis. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). At the last step, however, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

In *Burgess v. Astrue*, the Second Circuit set forth the factors an ALJ was obligated to evaluate when determining whether to give a treating physician's medical opinion controlling weight in accordance with the so-called "treating physicians rule" per 20 C.F.R. §§ 404.1527(c), 416.927(c). 537 F.3d 117 (2d Cir. 2008). At base, the rule required an ALJ to assign weight to the medical opinions of a claimant's treating physician based on medically acceptable techniques and the other medical evidence of record. *Id.* (citation omitted).

But *Burgess* evaluated the treating physicians rule under regulations applicable to claims filed prior to March 27, 2017. Claims filed on or after March 27, 2017 are subject to new regulations set forth in 20 C.F.R. §§ 404.1520c and 416.920c.

Under these new regulations, while the Commissioner no longer needs to assign particular evidentiary weight to treating sources or their opinions (as is required under the Treating Physicians Rule), the Commissioner must still consider certain factors in considering medical opinions. *See* 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c); *see also Andrew G. v. Comm'r of Soc. Sec.*, 2020 WL 5848776, at \*5 (N.D.N.Y. Oct. 1, 2020) (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017)). The new regulatory factors are: (1) supportability, (2) consistency, (3) relationship with the claimant (which has five sub-factors of its own to consider), (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). Further, in cases where the new regulations apply, an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion, but need not expound on the remaining three. 20 C.F.R. §§ 404.1520c(b), 416.920c(b). The Commissioner is tasked with analyzing medical opinions at the source-level, meaning that the Commissioner need not discuss each and every medical opinion in the record, and may apply the new factors holistically to a single medical source. 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1). These new rules do not apply to the Commissioner's analysis or consideration of nonmedical sources. 20 C.F.R. §§ 404.1520c(d), 416.920c(d).

With respect to the two required factors, the new rules provide that, for supportability, the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Simply put, supportability is an inquiry confined to the medical source's own records that focuses on how well a medical source supported and explained their opinion. As for consistency, the new rules provide that the greater the consistency between a particular medical source/opinion and the other evidence in the medical record, the stronger that medical opinion becomes. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3). Simply put, consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record.

## C. Development of the Record

**\*7** However, even before the Court assesses whether the ALJ applied proper legal principles or whether the ALJ's decision is supported by substantial evidence, as described above, the Court must assess whether the ALJ satisfied the threshold for fully developing the administrative record. In Social Security proceedings, the ALJ must affirmatively develop the record on behalf of the claimant, including those represented by counsel. *See Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). As part of this duty, the ALJ must investigate the facts and develop the arguments both for and against granting benefits. *Moran*, 569 F.3d at 108, 112. This is so because a hearing on disability benefits is a non-adversarial proceeding. Additionally, the applicable regulations require the ALJ to develop a claimant's complete medical history. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. §§ 404.1512(d)-(f)). In other words, "the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record" before it even assesses the evidence presented. *Scott v. Astrue*, No. 9-cv-3999 (KAM) (RLM), 2010 WL 2736879, at \*12 (E.D.N.Y. July 9, 2010) (internal quotations and citations omitted).

## II. Analysis

### A. The Duty to Develop the Record and the ALJ's RFC Determination

As set forth above, the Court must, as a threshold matter, determine whether the ALJ satisfied his duty to develop the record. Where there are deficiencies or gaps in the record, an ALJ must develop a claimant's medical history, to the extent possible. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). Indeed, the ALJ has the authority to subpoena medical evidence on behalf of a claimant, but, at the very least, must request the missing records through ordinary means. *Gonell De Abreu v. Colvin*, No. 16-cv-4892 (BMC), 2017 WL 1843103, at \*5 (E.D.N.Y. May 2, 2017).

In the instant case, the record suggests that Plaintiff's primary physician was Dr. Abdul Azeez. Dr. Azeez started treating Plaintiff in 2003, at the latest. (R. 237, 331.) Some evidence indicates that Plaintiff first saw Dr. Azeez as early as 1997. (R. 185.) Either way, it is clear that Dr. Azeez treated Plaintiff for at least fifteen years prior to Plaintiff's death. However, the *only* medical record included in the administrative record from Dr. Azeez is a three-page Medical Findings Summary from March 2018. (R. 331-33.) Thus, there is a glaring gap in the record with respect to Plaintiff's medical history—a gap

which includes over a year and a half's worth of records after the onset date of Plaintiff's alleged disability. Further, there is no evidence that the ALJ or anyone from the Commissioner's office endeavored to acquire these records. (*See* R. 70-74) (referencing attempts to acquire a consultative examination report from Dr. Azeez, but no additional records).

Counsel for the Commissioner correctly points out, however, that both the SSA and the ALJ took a "number of actions to try to help Plaintiff develop the record ... including ... questioning Plaintiff at the hearing about whether any evidence was missing" and offering to help Plaintiff's counsel retrieve a missing record from Dr. Solberg's office. (ECF No. 41 at 12 n.12.) While there is no evidence that the ALJ attempted to retrieve additional medical records or treatment notes from Dr. Azeez, Plaintiff's counsel certified at the ALJ hearing that the record was complete and that no records were outstanding at that time. (R. 32.)

The Court notes that the administrative record in this case is relatively sparse. The record only contains a single functional assessment of Plaintiff's work-related capabilities and, as discussed above, lacks any medical records from a fifteen year treating relationship between Plaintiff and Dr. Azeez. An ALJ's affirmative duty to develop the record on behalf of a claimant represented by counsel is particularly important in social security cases where the record is so limited. *Ajibose v. Colvin*, 2016 U.S. Dist. LEXIS 136685, at \*30-31, 2016 WL 8711342 (E.D.N.Y. Sept. 30, 2016). However, the fact that Plaintiff's counsel affirmatively represented that no additional records were pending or missing suggests that the Plaintiff's medical history may be complete. *See Eusepi v. Colvin*, 595 Fed. App. 7, 9 (2d Cir. 2014) (summary order) (finding that the ALJ had no duty to further develop the record where claimant's attorney submitted additional post-hearing materials and then represented that the medical record was complete). Given these circumstances, whether ALJ Carlton was obligated to inquire about and obtain additional records from Dr. Azeez is a close question. Accordingly, the ALJ's treatment of the record evidence requires additional analysis.

**\*8** Notwithstanding the sparse administrative record, ALJ Carlton found that Plaintiff retained the RFC to perform sedentary work, except that he could never climb ladders, ropes or scaffolds; must avoid slippery or uneven surfaces; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; have no exposure to unprotected heights; and could not operate a motor vehicle as a condition of employment. (R. 13.) In arriving at this RFC, the ALJ

highlighted the inconsistencies between Dr. Azeez's Medical Findings Summary and the other medical evidence of record. (R. 16.) Importantly, however, the record lacks any functional assessment of Plaintiff's limitations from any medical source other than Dr. Azeez. Indeed, there is no indication that the ALJ sought to solicit additional functional assessments from other treating sources, such as Dr. Chang or Dr. Solberg. Unable to rely on such alternative functional assessments, the ALJ eventually discredited Dr. Azeez's findings based, in large part, on treatment notes from the other doctors of record. (*See* R. 16, 313-14, 320, 325-26.) The ALJ was not permitted to do so.

Even assuming *arguendo* that there are in fact material inconsistencies between Dr. Azeez's treating opinion and the other physician's treatment notes, the ALJ was not permitted to rely on his own interpretation of those treatment notes to reconcile those inconsistencies. "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Merriman v. Comm'r of Soc. Sec.*, No. 14-cv-3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015); *see also Martin v. Berryhill*, No. 16-cv-6184 (FPG), 2017 WL 1313837, at *4 (W.D.N.Y. Apr. 10, 2017) (remanding where the ALJ determined that plaintiff could perform sedentary work absent any medical opinion regarding the plaintiff's ability to work at any exertional level). The evidence ALJ Carlton relied on in rejecting Dr. Azeez's functional assessment – *i.e.*, treatment notes showing Plaintiff's generally normal gaits and ability to heel, toe, and tandem walk – is not medical opinion. Nor can such evidence overcome the need for a medical source to weigh in on Plaintiff's functional limitations. *Hooper v. Colvin*, 199 F. Supp. 3d 796, 816 (S.D.N.Y. 2016). While ALJs are sometimes permitted to make an RFC determination without a treating source opinion evidence, "the RFC assessment will be sufficient only when the record ... contains *some* useful assessment of the claimant's limitations from a medical source." *Morales v. Colvin*, No. 3:16-cv-0003 (WIG), 2017 WL 462626, at *3 (D. Conn. Feb. 3, 2017) (emphasis in original) (citation omitted). Accordingly, the intermittent references to Plaintiff's normal gait and ability to heel, toe, and tandem walk cited by the ALJ are wholly inadequate bases, on their own, to discredit Dr. Azeez's findings with respect to Plaintiff's ability to sit, stand, or walk throughout an eight-hour workday.

Further, having reviewed the entire record in detail, none of the treatment notes from other doctors address Plaintiff's work-related functional capacity in any meaningful way. To the extent that the ALJ relies on additional treatment notes referencing Plaintiff's normal motor function, normal muscle bulk, negative straight leg raising, and range of motion, the ALJ cherry picked these findings amongst far more serious symptoms, impairments, and diagnoses discussed in those very same records. (*See also* Section IIB *infra*.) Thus, there is inadequate support in the record for the ALJ's RFC determination based on the record evidence. *See Quinto v. Berryhill*, No. 3:17-cv-0024 (JCH), 2017 WL 6017931, at *13-14 (D. Conn. Dec. 1, 2017) (remanding because the "ALJ improperly substituted his own expertise and interpretation for that of the treating physician by cherry picking the evidence from the treatment notes and interpreting the complex diagnostic evidence himself").

Accordingly, I respectfully recommend that this matter be remanded with instructions to the ALJ: (1) to acquire additional medical records from Dr. Azeez concerning his longstanding medical relationship with Plaintiff and the alleged disability; (2) to seek additional medical source statements regarding Plaintiff's work-related functional limitations from the other treating sources (to the extent these sources are able to do so based on their notes and recollection); and (3) to reevaluate Plaintiff's claim and RFC based on this additional evidence.

### B. The ALJ's RFC Determination is Otherwise Not Supported by Substantial Evidence

**\*9** To start, in reviewing the ALJ's decision, it is clear that the ALJ addressed Dr. Azeez's treating opinion contained in the Medical Findings Summary both with respect to supportability and consistency, as required by the new regulations outlined above. However, the ALJ's analysis with respect to those regulatory factors, at least with respect to "consistency," was lacking.

As noted above, Dr. Azeez opined that Plaintiff's condition would force more than three absences from work over the course of a month and that Plaintiff would be off task over 20% of the workday. (R. 332.) The ALJ found, however, that the only support for these opinions was a note from Dr. Azeez that "the claimant experiences back and hip pain," which the ALJ found "does not indicate why these symptoms would warrant such severe absenteeism and off-task behavior." (R. 16.) Thus, the ALJ reasonably found that there was limited evidence provided by Dr. Azeez to substantiate his assessment

of Plaintiff's limitations. It bears noting, however, that it is possible that Dr. Azeez's findings would be further supported by records from Dr. Azeez's prior interactions with Plaintiff. Thus, as recommended above, the ALJ should endeavor to obtain those records to conduct a more complete analysis with respect to the supportability of Dr. Azeez's Medical Findings Summary, if additional records indeed exist.

The ALJ also criticized Dr. Azeez's assessment of Plaintiff's work-related limitations with respect to the regulatory factor of "consistency." The ALJ explained that Dr. Azeez's opinion was inconsistent with other medical evidence in the record—evidence which indicated that Vellone had a "generally intact musculoskeletal and neurological functioning, including generally normal gaits and an ability to heel, toe, and tandem walk ..." (R. 16.) However, this medical conclusion proffered by the ALJ misrepresents the record evidence. Indeed, some of the records ALJ Carlton cites to show Plaintiff's "generally intact musculoskeletal ... functioning" and "generally normal gaits" specifically state that Plaintiff had an "antalgic" gait—which means that Plaintiff demonstrated an abnormal walking pattern due to pain. [4] (R. 313, 320.) Further, the very same records indicate that Plaintiff had worsening lower back pain, which led the examining physician, Dr. Chang, to recommend that Plaintiff receive epidural steroid injections and to increase Plaintiff's dose of gabapentin from 300 to 600 milligrams in order to help manage the worsening pain. (R. 314.) Although one of the records cited by the ALJ does note that Plaintiff had a normal gait on November 20, 2018 (R. 326,) that record also indicates degenerative changes in Plaintiff's spine along with a "left paracentral disc protrusion" and "neuroforaminal narrowing." [5] (R. 326.) Thus, it is clear to the Court that the ALJ cherry picked treatment notes that supported his RFC determination while ignoring equally, if not more significant evidence in those same records.

[4]     See     https://www.ncbi.nlm.nih.gov/books/ NBK559243/ (last visited January 20, 2021).

[5]     Neuroforaminal narrowing refers to a narrowing of the spinal column at the point where the spinal nerve exits, which causes inflammation and pain. See https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC6615450/ (last visited, Jan. 20, 2021).

Further, while the ALJ correctly points out that Vellone was able to heel, toe, and tandem walk, that fact is insufficient to ignore the functional limitations prescribed by Dr. Azeez. See Morris v. Colvin, No. 15-cv-5600 (JFB), 2016 WL 7235710,

at *9 (E.D.N.Y. Dec. 14, 2016) ("the ALJ's reliance on [a treating physician's] medical notes indicating that plaintiff had a normal gait and normal motor and sensory exams does not justify his rejection of the treating physician's opinions"). Simply put, ALJ Carlton was not in a position to determine whether Plaintiff's ability to heel, toe, and tandem walk during a medical examination should invalidate the physical limitations set forth in Dr. Azeez's Medical Findings Summary. Thus, although the ALJ went through the motions of assessing the consistency of Dr. Aziz's opinion with the rest of the medical evidence of record, that analysis was lacking for the reasons set forth above.

**\*10** With respect to the RFC determination itself, the ALJ determined that Plaintiff was capable of performing sedentary work, with certain additional limitations. The Second Circuit acknowledges that a plaintiff/claimant must be capable of sitting for extended periods of time in order to be able to perform sedentary work. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("the concept of sedentary work contemplates substantial sitting"). Similarly, the Social Security Administration generally recognizes that an individual must be able to sit for a total of 6 hours in an 8-hour workday in order to perform sedentary work. SSR 96-9P, 1996 WL 374185, at *6 (1996). Thus, the ALJ's RFC determination materially differs from Dr. Azeez's medical opinion, which limits Plaintiff to three hours of sitting in an eight-hour workday. (R. 332.) In setting forth an RFC different from that of the lone functional assessment in the record, the ALJ failed to cite any medical evidence that directly contradicts the limitations Dr. Azeez ascribed to Plaintiff. Having reviewed the administrative record in detail, the Court notes that no such evidence exists. Instead of crediting Dr. Azeez's opinion, the ALJ found the opinion "only somewhat persuasive to the extent that it is consistent with performing work at the sedentary exertional level." (R. 16.) Therefore, absent any medical evidence that would warrant invalidating Dr. Azeez's assessment of Plaintiff's work-related capabilities, the ALJ relied on his own lay opinion to determine Plaintiff's RFC, which is patently improper. Merriman, 2015 WL 5472934, at *18.

The Commissioner cites to various cases, including Matta v. Astrue, in support of the proposition that an ALJ's conclusions need not correspond to a medical opinion in the record. Notwithstanding the fact that Matta was a mental impairment case, it is distinguishable on other grounds as well. In Matta the Court summarized the opinions of four medical sources that conflicted with one another with respect to the plaintiff's

ability to perform work. The plaintiff in *Matta* challenged the ALJ's conclusion that the evidence revealed plaintiff's stable condition and moderate symptoms. *Matta v. Astrue, 508 Fed. App. 53, 56 (2d Cir. 2013)* (summary order). The Court found that "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the ... medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Id.* Further, the court in *Matta* confirmed that the treating psychiatrist's opinion was not entitled to controlling weight since the ALJ provided sufficient reasons for departing from that opinion." *Id.* at 57.

In the instant case, the issue is not that ALJ Carlton's decision does not "perfectly correspond" with Dr. Azeez's Medical Findings Summary. The issue is that it completely departs from Dr. Azeez's opinion, which was the only functional assessment contained in the administrative record. Further, the ALJ's RFC is not otherwise consistent with the record, as was the case in *Matta*. Here, the vast majority of relevant evidence suggests that Plaintiff experienced severe back pain throughout the relevant period and that his doctors' extensive efforts to help manage that pain were consistently unsuccessful, leading Dr. Solberg to eventually recommend back surgery. (*See, e.g.*, R. 314, 326.) Indeed, the opposite was the case in *Matta*, where the plaintiff's condition deteriorated only after he stopped taking his medication. *508 Fed. App. at 57.* Moreover, the fact that ALJ Carlton ignored substantial evidence in assessing Dr. Azeez's opinion with respect to the mandatory regulatory factor of "consistency," (as explained above) demonstrates that the ALJ provided insufficient reasons to permit a departure from the treating source's functional assessment.[6]

[6]    To the extent that the Commissioner cites to cases in support of the proposition that a formal medical opinion is not required for and ALJ to properly render an RFC, those decisions are equally distinguishable. For instance, in *Trepanier v. Comm'r of Soc. Sec.*, the Court endorsed the ALJ's decision to fill gaps in a treating orthopedist's functional assessment based on other substantial evidence in the record. *752 Fed. App. 75, 79 (2d Cir. 2018)* (summary order). Quite differently, in this case, the ALJ's RFC determination totally contradicts the treating source's opinion.

Accordingly, I recommend that this matter should also be remanded because the ALJ's RFC determination is not supported by substantial evidence.

### C. Plaintiff's Subjective Complaints

 **\*11**  In order to determine whether a claimant is disabled, an ALJ must consider subjective evidence of pain or disability drawn out in a claimant's testimony or from other portions of the record. *See* 20 C.F.R. § 404.1529(a). If an ALJ finds that the claimant has a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1), the ALJ must then evaluate the "intensity and persistence of [the claimant's] symptoms, such as pain," based on all of the available evidence when determining the claimant's RFC. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c). An ALJ cannot reject subjective complaints of pain simply because the objective medical evidence of record does not substantiate those complaints. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c). Instead, the ALJ must assess the subjective complaints in relation to the other evidence of record. 20 C.F.R. §§ 404.1529(c)(3)-(4). To the extent an ALJ finds that a claimant's subjective complaints are not supported by the record, the ALJ must clearly articulate "specific reasons for the weight given" to the complaints that are consistent with and supported by the record such that a reviewing court can assess that evaluation. SSR 16-3p.

The ALJ concluded that Vellone's statements about the intensity, persistence, and limiting effects of his pain were "inconsistent with the longitudinal medical evidence of record." (R. 14.) Specifically, the ALJ discussed Dr. Chang's treatment notes evaluating multiple images of Plaintiff's spine throughout 2017 that showed mild degenerative changes, a left central disc herniation, foraminal stenosis, lumbar facet arthropathy, and degenerative disc disease at multiple levels. (R. 14-15.) However, the ALJ noted that while Plaintiff complained of ten out of ten back pain in a September 2017 hospital visit with Dr. Chang, Plaintiff was observed to be in no acute distress. (R. 15.)

In dismissing Plaintiff's subjective complaints, the ALJ also considered Dr. Solberg's treatment records. Those records indicated to the ALJ that Plaintiff had a normal gait, an ability to heal, to and tandem walk, negative straight leg raise tests, normal muscle bulk in his lumbar spine, and positive strength tests. According to the ALJ, these treatment notes were inconsistent with Plaintiff's reports of pain. (R. 15.)

Finally, rounding out the analysis, the ALJ generally stated that he considered Plaintiff's daily activities, symptoms, aggravating factors, medications and side effects, and measures used to relieve symptoms in considering Plaintiff's subjective complaints. (R. 15.)

However, as already discussed above, the ALJ failed to address various portions of these records that reflect both physicians' efforts to treat Plaintiff's pain. For example, as noted above, the ALJ cites to hospital visits with Dr. Chang at New York Presbyterian. Although the ALJ mentions certain treatment notes that could, in isolation, suggest that Plaintiff's pain was manageable, Dr. Chang concluded in the very same record: "[g]iven that the patient has not improved with tylenol, aleve, advil, and physical therapy/home exercise ... left L5 and S1 transforaminal epidural steroid injections were recommended." (R. 314.) Similarly, about a year later, treatment notes from Dr. Solberg indicated no acute distress, a normal gait, ability to heal, toe and tandem walk, negative straight leg raise tests, and normal muscle bulk in Plaintiff's lumbar spine. (R. 326.) However, that very same record concludes with Dr. Solberg explicitly saying that Plaintiff suffered from lumbosacral radiculopathy, [7] that epidurals and various medications did not alleviate Plaintiff's pain, and that, as a result, he was referring Plaintiff for surgery. (R. 326.) This progression clearly evidences severe pain as well as Plaintiff's doctors' unsuccessful efforts to help Plaintiff manage that pain. More importantly, the ALJ failed to mention any of this evidence in his decision.

[7] Lumbosacral radiculopathy describes a pain syndrome caused by compression or irritation of nerve roots in the lower back. *See* *https://www.ncbi.nlm.nih.gov/books/ NBK430837/#:~:text=Lumbosacral% 20radiculopathy% 20is% 20a% 20term,nerves% 20exit% 20the% 20spinal% 20canal*. (last visited, Jan. 28, 2021).

**\*12** To be sure, ALJ Carlton was not required to specify Plaintiff's specific symptoms that were inconsistent with the medical record. Nor was he required to mention every piece of testimony in rendering his decision. However, the ALJ was required to properly weigh the evidence corroborating Plaintiff's subjective complaints of pain. *Woodford v. Apfel*, 93 F. Supp. 2d 521, 530 (S.D.N.Y. 2000). In light of the above, the ALJ failed to fully assess the records he relied on and failed to discuss the portions of those record that contradict his findings.

In sum, the record contains objective evidence that the ALJ should have weighed in his analysis. Plaintiff was diagnosed with radiculopathy and degenerative disc disease on multiple occasions by different physicians. Plaintiff had tried a number of remedies to alleviate his pain including various over the counter medications, oxycodone, Neurontin, and gabapentin to no avail. On such a record, the ALJ should not have concluded that Plaintiff's subjective complaints of pain were not credible. *See* *Downey v. Barnhart*, 294 F. Supp. 2d 495, 503 (S.D.N.Y. 2003) (holding that ALJ did not properly consider similar evidence in evaluating Plaintiff's subjective complaints); *Woodford*, 93 F. Supp. 2d at 530 (same). Accordingly, I recommend finding that the ALJ's determination with respect to Plaintiff's subjective complaints is not supported by substantial evidence.

To the extent that the parties dispute the admissibility of Plaintiff's Function Report, the Court need not address the parties' arguments since the ALJ's assessment of Plaintiff's subjective complaints of pain was inadequate even without considering that evidence.

### D. Step Four Analysis

The Court notes that the parties present short arguments on the issue of whether the ALJ's Step Four analysis was supported by substantial evidence. However, because the Court recommends finding that the ALJ's decision was deficient, it would make little sense to evaluate the ALJ's Step Four analysis which, itself, was based on an improperly constructed RFC assessment and faulty evaluation of the record evidence.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that Plaintiff's motion be GRANTED, that the Commissioner's motion be DENIED, and that this case be remanded for further proceedings consistent with this Report and Recommendation.

### Notice

**The parties shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant**

to **28 U.S.C. § 636(b)(1)** and **Rule 72(b) of the Federal Rules of Civil Procedure**. *See also* **Fed. R. Civ. P. 6(a), (d)** (adding three additional days only when service is made under **Fed. R. Civ. P. 5(b)(2)(C) (mail), (D)** (leaving with the clerk), or (F) (other means consented to by the parties)).

If any party files written objections to this Report and Recommendation, the opposing party may respond to the objections within fourteen days after being served with a copy. **Fed. R. Civ. P. 72(b)(2)**. Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. *See* **28 U.S.C. § 636(b)(1)**; **Fed. R. Civ. P. 6(a), 6(d), 72(b)**. Any requests for an extension of time for filing objections must be addressed to Judge Abrams. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* **28 U.S.C. § 636(b)(1)**; **Fed. R. Civ. P. 6(a), 6(d), 72(b)**; *Thomas v. Arn*, **474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)**.

**All Citations**

Slip Copy, 2021 WL 319354

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2801138
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martha VELLONE, ON BEHALF OF
Kenneth VELLONE, Dec'd, Plaintiff,

v.

Andrew SAUL, Commissioner
of Social Security, Defendant.

No. 20-CV-261 (RA)
|
Signed 07/06/2021

**Attorneys and Law Firms**

Jeffrey David Delott, for Plaintiff.

Mary Ellen Brennan, U.S. Attorney's Office, New York, NY, for Defendant.

MEMORANDUM OPINION & ORDER
ADOPTING REPORT & RECOMMENDATION

RONNIE ABRAMS, United States District Judge:

**\*1** Martha Vellone, on behalf of her deceased ex-husband Kenneth Vellone, brings this action under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), and § 1631(c) (3) of the Social Security Act, 42 U.S.C. § 1383(c)(3). [1] On September 26, 2019, Administrative Law Judge ("ALJ") Carlton determined that Plaintiff was not disabled under §§ 216(i) and 223(d) of the Social Security Act and thus was ineligible for disability benefits. *See* Dkt. 27 (Administrative Record, *hereinafter* "A.R.") at 10–17 (citing 42 U.S.C. §§ 416 and 423). The Court assumes the parties' familiarity ALJ Carlton's decision, as well as the record more generally.

[1]   For the purposes of this Opinion, "Plaintiff" refers to Claimant Kenneth Vellone.

Currently before the Court is Magistrate Judge Parker's exceedingly thorough and well-reasoned Report and Recommendation, dated January 29, 2021, recommending the Court grant Plaintiff's motion for judgment on the pleadings and remand this action for further proceedings. Dkt. 45 ("Rpt."). On February 16, 2021, the Commissioner filed objections to the Report. Dkt. 49 ("Obj."). After reviewing the

Report, the parties' submissions, and the underlying record, the Court adopts the Report in full and grants Plaintiff's motion for judgment on the pleadings.

**LEGAL STANDARDS**

In reviewing a final decision of the Commissioner, "this Court is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted). "The substantial evidence standard means once an ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis omitted). If the Court determines, however, that the ALJ's decision "is not supported by substantial evidence or contains legal error, the determination must be reversed or remanded." *See Donofrio v. Saul,* No. 18-CV-9968 (ER), 2020 U.S. Dist. LEXIS 54407, 2020 WL 1487302, at \*5 (S.D.N.Y. Mar. 27, 2020) (citing *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir. 1999)).

In reviewing a report and recommendation prepared by a magistrate judge, a court must review *de novo* determination of those portions of the report to which timely and specific objection is made, but may review the remainder of the report for clear error. *Parks v. Commissioner of Social Security,* 15-CV-6470 (ER), 2017 U.S. Dist. LEXIS 110666, 2017 WL 3016946, at \*3 (S.D.N.Y. July 17, 2017) (citing 28 U.S.C. § 636(b)(1)(C) and *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir. 1997)).

**DISCUSSION**

The Commissioner has raised four objections to Judge Parker's Report. The Court will address each objection in turn.

**I. The ALJ's Determination that Plaintiff Could Perform Sedentary Work was Not Supported by Substantial Evidence**

ALJ Carlton concluded that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform sedentary work. [2] The Second Circuit has held "that the concept of sedentary work contemplates substantial

sitting." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citing *Carroll v. Sec. of Health & Human Serv's*, 705 F.2d 638, 643 (2d Cir. 1983)); *see also* 20 C.F.R. § 404.1567(b). Accordingly, in order to conclude that Plaintiff had the RFC to perform sedentary work, the ALJ needed to find that Plaintiff could remain seated for extended periods of time.

2      RFC is defined as "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Id.*

**\*2** The only evidence in the record that directly addresses Plaintiff's ability to remain seated comes from Dr. Azeez's consultative examination report. A.R. at 332–33. In that report, Dr. Azeez, who was Plaintiff's long-time treating physician, opined that Plaintiff would be limited to three hours of sitting per day. *Id.* at 332–33.

Instead of relying on Dr. Azeez's opinion to make his RFC determination, ALJ Carlton relied on the treatment notes of Doctors Chang and Solberg, two other physicians who had each treated Plaintiff on two occasions. *Id.* at 315, 338. Neither of these doctors completed a consultative examination on Plaintiff, and their reports were nearly devoid of reference to Plaintiff's ability to sit. *See generally id.* at 309–21, 324–29.[3] Instead, their reports addressed Plaintiff's spinal health more generally. For example, they noted that Plaintiff was observed to have "a normal gait, normal sensation, normal motor functioning, and a full range of motion of his extremities," and "was able to heel walk, toe walk, and tandem walk, generally had full strength in his lower extremities except for left ankle plantarflexion, and had a full, active range of motion in all planes except for a restriction with extension." *Id.* at 15 (summarizing Chang and Solberg's findings).

3      Dr. Chang's report made no mention of Plaintiff's ability to sit. *See generally* A.R. at 309–21. Dr. Solberg remarked on one occasion that "Plaintiff's pain was made worse with sitting," *id.* at 324, 328, but beyond that, his report contained no information regarding Plaintiff's ability to remain seated. *See generally id.* at 324–29.

It was on this basis that ALJ Carlton determined that Plaintiff retained the RFC to perform sedentary work. *Id.* at 15–16. This was in error. As courts in this Circuit have consistently

found, an ALJ cannot make an RFC determination based solely on information like that in the Chang and Solberg reports. *Rosa*, 168 F.3d at 81; *see also Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017); *Arteaga v. Comm'r of Soc. Sec.*, No. 19-CV-1630 (AMD), 2020 U.S. Dist. LEXIS 134536, 2020 WL 4369599, at \*5 (E.D.N.Y. July 29, 2020); *Merriman v. Comm'r of Soc. Sec.*, 14-CV-3510 (PGG) (HBP), 2015 U.S. Dist. LEXIS 124691, 2015 WL 5472934, at \*18 (S.D.N.Y. Sept. 17, 2015). As Judge Ramos recently explained, "[b]ecause an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Donofrio*, 2020 WL 1487302, at \*8. This is precisely what ALJ Carlton did here.

In *Morris v. Colvin*, (then District Court) Judge Bianco applied this rule in a case presenting starkly similar facts. *See* No. 15-CV-5600 (JFB), 2016 U.S. Dist. LEXIS 184030, 2016 WL 7235710 (E.D.N.Y. Dec. 14, 2016). In that case, the plaintiff sought disability benefits after suffering a back injury. *Id.* at \*1. The ALJ denied Morris's claim upon concluding that he had the RFC to perform light work. *Id.* at \*6. In so concluding, the ALJ discounted both Morris's subjective complaints and the opinion of Morris's treating physician, who opined that Morris could sit for no more than two hours a day. *Id.* at \*8. Instead, the ALJ relied on the treatment notes of several consultant physicians who found that Morris had, *inter alia*, "normal gait, and normal motor and sensory examinations." *Id.* at \*7. Judge Bianco remanded, concluding that the ALJ had committed "legal error" by "improperly set[ting] her own expertise against that of the treating physicians." *Id.* at \*9. In particular, Judge Bianco held that the ALJ "was not in a position to know whether the absence of an antalgic gate and abnormal motor and sensory functioning would in fact preclude the disabling loss of motion" of which Morris complained and that his treating physician diagnosed. *Id.* at \*9.[4]

4      The court in *Morris* was applying the "treating physician rule," which required ALJs to determine whether to give controlling weight to a claimant's treating physician. *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). Following a 2017 amendment to the applicable regulation, that rule no longer applies. *See Andrew G. v. Comm'r of Soc. Sec.*, No. 3:19-CV-942 (ML), 2020 U.S. Dist. Lexis 182212, 2020 WL 5848776, at \*5 (N.D.N.Y. Oct. 1, 2020) (citing *Revisions to Rules Regarding the*

*Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017)). Nonetheless, *Morris* provides useful guidance and it remains the law that an ALJ may not substitute his own medical opinion for that of a physician. *See Arteaga*, 2020 WL 4369599, at *5 (so holding in a matter initiated after the repeal of the treating physician rule).

**\*3** Here, ALJ Carlton has made the same error as the ALJ did in *Morris*. In discounting both Dr. Azeez's consultative examination report and Plaintiff's subjective complaints, ALJ Carlton was left with a record nearly devoid of evidence pertaining to Plaintiff's ability to remain seated for extended periods of time. In fact, the only other record evidence about Plaintiff's ability to remain seated indicated that Plaintiff struggled to do so. *See* A.R. at 324 (Dr. Solberg noted that Plaintiff's pain was exacerbated with sitting); *see also id.* at 328 (same). And although Doctors Chang and Solberg made note of Plaintiff's "normal gait[,] ... ability to heel and toe walk[,] ... negative straight leg raise tests, normal muscle bulk in his lumbar spine, and full five out of five strength except for some reduced strength in his left ankle and foot," *id.* at 15, as a lay-person, ALJ Carlton was not in a position to equate this evidence with an ability to remain seated. To do so, he would have needed to improperly "substitute his own judgment for competent medical opinion." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

ALJ Carlton thus committed a legal error in determining that Plaintiff retained the RFC to perform sedentary work. The Court adopts Judge Parker's recommendation on this issue.

## II. The ALJ's Decision to Discount Dr. Azeez's Consultative Examination Report was Not Supported by Substantial Evidence

As set forth in 20 C.F.R. §§ 404.1520c(a)-(c) and 416.920c(a)-(c), an ALJ must consider certain factors in assigning weight to medical opinions, including supportability, consistency, and the doctor's relationship with the claimant. Supportability analysis focuses on how well a medical source supports and explains its opinion with objective medical evidence. 20 C.F.R. § 404.1520c(c)(1). Consistency analysis assesses the consistency between a particular medical source and the other medical evidence in the record. 20 C.F.R. §§ 404.1520c(c)(2). An ALJ must explain his supportability and consistency analyses in his determination. 20 C.F.R. § 404.1520c(b).

In his decision denying Plaintiff's disability claim, ALJ Carlton did address both the consistency and the supportability of Dr. Azeez's report. He explained that he considered Dr. Azeez's medical opinion to be inconsistent with the other medical evidence contained in the record. A.R. at 16. Specifically, while Dr. Azeez—who had treated Plaintiff for approximately fifteen years—concluded that he could sit for no more than three hours a day, *id.* at 332–33, the ALJ noted that two other doctors documented "generally normal gaits and an ability to heel, toe, and tandem walk, notwithstanding some persistent back pain and tenderness," *id.* at 16. ALJ Carlton also noted that he found Dr. Azeez's opinion lacking supportability because it was based on relatively sparse notes. *Id.*

In her Report, Judge Parker determined that the conclusion on consistency was not supported by substantial evidence because ALJ Carlton "was not in a position to determine whether Plaintiff's ability to heel, toe, and tandem walk during a medical examination should invalidate the physical limitations set forth in Dr. Azeez's Medical Findings Summary," Rpt. at 20. The Court agrees; although it is the ALJ's role as factfinder to weigh competing medical evidence, as explained in more detail above, the ALJ is not permitted to come to his own medical conclusions. *See supra*. ALJ Carlton thus erred in using evidence of Plaintiff's gait to discredit Dr. Azeez's medical opinion about Plaintiff's ability to sit for extended periods of time.

Likewise, ALJ Carlton's supportability analysis is not based on substantial evidence. As he noted in his decision, Dr. Azeez's conclusion that Plaintiff would be unable to sit for extended periods was based on his observations regarding Plaintiff's "back and hip pain." A.R. at 16. Accordingly, even ALJ Carlton acknowledged that Dr. Azeez's conclusion was supported by at least some objective medical evidence. 20 C.F.R. § 404.1520c(c)(1). Dr. Azeez's report also indicated that laboratory and diagnostic test results which supported his conclusion were enclosed with his report. A.R. at 331. Although these documents appear to be missing from the administrative record, Dr. Azeez's reference to them in the report further bolsters the conclusion that his report was based on objective medical evidence.

**\*4** Lastly, ALJs are instructed to consider the doctor's treatment relationship with the claimant—including the length of the relationship—in deciding the weight to give a physician's opinion. *See* 20 C.F.R. § 404.1520c(a)-(c). The record shows that Dr. Azeez was Plaintiff's longtime

physician, having treated Plaintiff for approximately fifteen years. *See* A.R. at 185. "As Plaintiff's longtime doctor, Dr. [Azeez] was best situated to provide a detailed, longitudinal picture of Plaintiff's impairment." *Sanchez v. Comm'r of Soc. Sec.*, 18-CV-2027 (KMK) (JCM), 2019 U.S. Dist. LEXIS 69828, 2019 WL 2451432, at \*11 (S.D.N.Y. Apr. 23 2019). ALJ Carlton did not address this fact in his decision.

In sum, ALJ Carlton's decision to discount Dr. Azeez's consultative examination report was not supported by substantial evidence. The Court adopts Judge Parker's recommendation on this issue.

### III. The ALJ's Decision to Discount Plaintiff's Subjective Complaints was Not Supported by Substantial Evidence

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). If an ALJ does discount a claimant's testimony, however, he must provide "specific reasons for the finding on credibility, supported by the evidence in the case record, and [he] must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight [he] gave to the individual's statements and the reasons for that weight." *Lugo v. Apfel*, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998) (citation omitted). Where substantial evidence supports an ALJ's credibility determination, it must be upheld. *Jones v. Berryhill*, 415 F. Supp. 3d 401, 420 (S.D.N.Y. 2019).

Here, ALJ Carlton relied on the following facts as the basis for his decision to discount Plaintiff's subjective complaints:

- "[A] September 2017 physical examination at NY Presbyterian Hospital reveal[ed] a normal gait, normal sensation, normal motor functioning, and a full range of motion of his extremities."

- "December 2017 treatment records from Mount Sanai Beth Israel show[ed] that ... [Plaintiff] was able to heel walk, toe walk, and tandem walk, generally had full strength in his lower extremities except for left ankle plantarflexion, and had a full, active range of motion in all planes except for a restriction with extension."

- "[Al]though he reported ten out of ten back pain, [Plaintiff] was observed to be in no acute distress."

- "November 2018 records from Joseph Solberg, D.O., indicate[d] that the claimant had a normal gait and an ability to heel and toe walk.... He also had negative straight leg raise tests, normal muscle bulk in his lumbar spine, and full five out of five strength except for some reduced strength in his left ankle and foot." [5]

A.R. at 14–15. None of these findings suffice to support the ALJ's conclusion on Plaintiff's credibility. The majority of these findings (specifically, the findings regarding Plaintiff's lower body strength and flexibility, as well as his ability to walk) do not on their face contradict his claim of severe pain. To conclude that this clinical information alone contradicted Plaintiff's subjective complaints would be to make a independent medical conclusion, which—as discussed in more detail above—an ALJ is not permitted to do. *See supra.*

[5]     Elsewhere in his decision, ALJ Carlton noted that Plaintiff had "worked a few months prior to [when] this opinion was issued, albeit briefly, and there is no indication in the record that he was physical[ly] unable to perform the work. Rather, his former employer indicated that the work ended because there was no work for the claimant to do." A.R. at 16. To be sure, a claimant's continued employment may be evidence that he is physically capable of performing the job. But this is not necessarily the case. As the Second Circuit has recognized, "[w]hen a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefit, unless his conduct truly showed that he is capable of working." *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989). Given the brevity of this period of employment, and weighing it against Plaintiff's consistent reports of severe pain, this fact does not "truly show[ ] that [Plaintiff] [wa]s capable of working." *Id.*

**\*5** The remaining finding that Plaintiff was on one occasion "observed to be in no acute distress" is insufficient to alone support ALJ Carlton's credibility finding. This is especially true in light of Plaintiff's consistent reports of severe pain, *see, e.g.*, A.R. at 312, 318, 324, 328, 331, as well as the considerable objective evidence that supports Plaintiff's position, *see, e.g. id.* 314 (physician report documenting degenerative disc disease characterized as "severe" in parts); *id.* at 326 (physician report noting that epidurals and various

medications did not alleviate Plaintiff's pain, and that Plaintiff would be referred for spinal surgery).

In sum, ALJ Carlton's decision to discount Plaintiff's subjective complaints was not supported by substantial evidence. *See Downey v. Barnhart*, 294 F. Supp. 2d 495, 503 (S.D.N.Y. 2003) (concluding that an ALJ improperly dismissed a plaintiff's subjective complaints of pain when the plaintiff consistently complained of severe pain, "remedies including acupuncture, epidural blocks, and physical therapy" had been unsuccessful, and medical imaging revealed radiculopathy). The Court adopts Judge Parker's recommendation on this issue.

**IV. The ALJ Did Not Discharge His Duty to Develop the Record**

Regulation requires the Social Security Administration to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which" the claimant files his application. 20 C.F.R. § 404.1512(b). "[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel, but [in such cases,] the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014).

The Court recognizes the efforts the Commissioner made in this case to develop the record, and the difficulty he faced in obtaining documents, particularly from Dr. Azeez. Obj. at 12 (citing Tr. at 70) (noting that the Government made multiple attempts to obtain documents from Dr. Azeez). Nonetheless, there remain obvious gaps in the administrative record, particularly with respect to medical evidence pertaining to Plaintiff's ability to stay seated for extended periods. *See Rivera v. Comm'r of Soc. Sec.*, No. 15-CV-8439 (GBD) (HBP), 2017 U.S. Dist. LEXIS 4838, 2017 WL 120974, at *13 (S.D.N.Y. Jan. 12, 2017) ("[I]n the absence of other medical evidence in the record regarding plaintiff's functional limitations, the ALJ was under a duty to develop the record and obtain medical evidence before making his RFC determination").

For this reason, the Court adopts Judge Parker's recommendation on this issue as well.

**CONCLUSION**

Accordingly, Plaintiff's motion for judgment on the pleadings is GRANTED, and the Commissioner's motion is DENIED. It is hereby ORDERED that this case be remanded for further proceedings consistent with this Opinion and the Report.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 2801138

---

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3077009
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

BRIAN O., Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

1:19-CV-983 (ATB)
|
Signed 06/10/2020

**Attorneys and Law Firms**

JOSEPHINE GOTTESMAN, ESQ., for Plaintiff.

KEVIN M. PARRINGTON, Special Asst. U.S. Attorney, for Defendant.

**MEMORANDUM-DECISION and ORDER**

ANDREW T. BAXTER, U.S. Magistrate Judge

 **\*1** This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 7).

**I. PROCEDURAL HISTORY**
On April 5, 2018, plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning January 2, 2018. (Administrative Transcript ("T") 71, 111-12). Plaintiff's application was denied initially on July 16, 2018. (T. 74-77). Plaintiff requested a hearing, which was held before Administrative Law Judge ("ALJ") Sandra R. DiMaggio Wallis on December 4, 2018. (T. 26-53, 86). At the hearing, the ALJ heard testimony from plaintiff, as well as vocational expert ("VE") Renee B. Jubrey. (T. 26-53). On March 11, 2019, the ALJ issued an order denying plaintiff's claim. (T. 10-22). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on June 11, 2019. (T. 1-3).

**II. GENERALLY APPLICABLE LAW**

**A. Disability Standard**
To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If

the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*2 *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review "– even more so than the 'clearly erroneous standard.' " *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial

support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot " 'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

**III. FACTS**

Plaintiff was born on October 4, 1967, making him 51 years old on the date of the administrative hearing. (T. 32). He lived at home with his wife and her two daughters. (T. 32, 41). Plaintiff previously obtained some education at the college level, and worked as a truck driver until January 2, 2018. (T. 32-33).

According to the plaintiff, various medical conditions prevented him from continuing to work full-time. The pain and physical limitations in his foot, back, and shoulder precluded his ability to perform the job duties of a truck driver. (T. 34-35). Due to his pain, plaintiff had to move around constantly; he could only stand for approximately ten minutes at a time, and sit for five to ten minutes. (T. 36). It was "very difficult" for plaintiff to climb stairs. (T. 37). Plaintiff had trouble sleeping through the night, and took naps during the day. (T. 37, 39). Household chores were difficult to perform; he could not vacuum, take out the trash, or do the laundry. (T. 38, 41). His doctor limited him from lifting over 15 pounds of weight. (T. 35). On a typical day, plaintiff usually watched television, played games on his phone, and socialized on Facebook. (T. 38-39). He drove, but very little. (T. 40). Plaintiff was a volunteer offensive line coach for a local semi-professional football team. (T. 41-42).

*3 Plaintiff testified that he tried to obtain "medicine" for his pain, but was directed to treat with pain management. (T. 35). He declined steroid injections, and ultimately obtained his medical marijuana license from a physician in New York City. (*Id.*). The medical marijuana helped a "little bit." (*Id.*). He also used a hot tub, which alleviated his pain for a short duration. (T. 35-36). Laying down also helped, until he attempted to get up. (T. 36).

2020 WL 3077009

## IV. THE ALJ'S DECISION

After reviewing the procedural history of the plaintiff's application and stating the applicable law, the ALJ found that plaintiff had not engaged in substantial gainful activity ("SGA") since his disability onset date. (T. 13). At step two of the sequential evaluation, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine, status post laminectomy surgeries (two); degenerative joint disease, bilateral shoulders; and posttraumatic arthritis, left ankle and foot. (*Id.*). At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listed Impairment. (T. 15).

At step four, the ALJ found that plaintiff had the RFC for light work, as defined in 20 C.F.R. §§ 404.1567(b), except the work could not require climbing ladders, ropes or scaffolds, and no more than occasional kneeling, crouching, crawling or climbing of ramps and stairs. (T. 15). Plaintiff was further limited to working in an environment that allowed him to avoid exposure to unprotected heights, hazardous machinery, and vibration. (*Id.*).

Next, the ALJ found that plaintiff had no past relevant work. (T. 20). However, at step five, using the Medical Vocational Guidelines as a "framework," and the VE's testimony, the ALJ found that plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (T. 21-22). Thus, the ALJ found that plaintiff was not disabled. (T. 22).

## V. ISSUES IN CONTENTION

Plaintiff raises three arguments:

1. The ALJ's RFC finding was not supported by substantial evidence. (Plaintiff's Brief ("Pl.'s Br.") at 20-23) (Dkt. No. 13).

2. The ALJ did not correctly evaluate plaintiff's credibility. (Pl.'s Br. at 23-27).

3. The ALJ did not correctly evaluate the medical and non-medical evidence of record. (Pl.'s Br. at 27-28).

The Commissioner contends that the ALJ sufficiently evaluated the evidence of record, and that her decision was supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 19-19) (Dkt. No. 14). For the reasons set forth below, the court concludes that the ALJ's RFC determination was not supported by substantial evidence. As a result, the ALJ's analysis at step five and the ultimate finding that plaintiff was not disabled were tainted. Accordingly, the court orders a remand for further administrative proceedings to adequately develop and assess the medical evidence as necessary, in order to determine an RFC that is properly supported.

## DISCUSSION

## VI. RFC/EVALUATING MEDICAL EVIDENCE

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill*, No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

**\*4** In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307

F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2. Evaluating Medical Evidence

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules")*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853. An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a

medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

**\*5** Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

### B. Application

Plaintiff's first and most persuasive argument contends that the ALJ's RFC for modified light work is not supported by substantial evidence. In order to perform the work described by the ALJ, plaintiff would be required to, among other things, stand and walk for up to 6 hours a day, and sit for up to 2 hours. *See* 20 C.F.R. §§ 416.967(b), 404.1567(b); *Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) ("[l]ight work requires the ability to lift up to 20 pounds occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to two hours"). Plaintiff argues that the record fails to support plaintiff's ability to fulfill such exertional requirements. The court agrees.

In rendering her RFC determination, the ALJ relied on a medical opinion prepared by consultative examiner Trevor Litchmore, M.D. (T. 345). On July 9, 2018, Dr. Litchmore performed a physical examination of the plaintiff. Among his various findings, Dr. Litchmore observed plaintiff to have a normal gait and stance, with the ability to walk on his heels and toes without difficulty. (T. 346). Plaintiff required no assistance changing for the exam or getting on and off the examination table. (*Id.*). He was able to rise from the chair without difficulty. (*Id.*). Dr. Litchmore found plaintiff to have some limited range of motion in his cervical and lumbar spine, but full range of motion in his shoulders, elbows, forearms, and wrists. (T. 347). Plaintiff's joints were stable and nontender. (*Id.*). He exhibited full strength in the upper and lower extremities, with no evident muscle atrophy. (*Id.*). Plaintiff retained the ability to unzip a zipper, untie a shoelace, and unbutton a button. (*Id.*). Dr. Litchmore noted plaintiff's full grip strength. (*Id.*).

Based on his physical examination of the plaintiff, Dr. Litchmore opined that plaintiff would have "limitation in terms of activities that require repetitive twisting and turning motion of both hands in the context of his carpal tunnel syndrome." (T. 348). He also stated that plaintiff would have "limitation as it relates to lifting and carrying heavy objects in the context of his chronic back and neck pain." (*Id.*). Last, Dr. Litchmore stated that plaintiff would have "limitation in terms of walking up and down ramps and stairs, climbing, or [sic] within the context of his chronic neck and back pain." (*Id.*).

In evaluating Dr. Litchmore's opinion, the ALJ found "unusual" the absence of findings or complaints about plaintiff's left ankle and foot injury, which was "described in very different terms by [plaintiff's treating orthopedist], who followed him for this condition over the period in question[.]" (T. 17). Nevertheless, the ALJ found the absence of any specific sitting, standing, or walking limitations in Dr. Litchmore's opinion to be consistent with plaintiff's ability to perform the exertional requirements of light work. (T. 19).

**\*6** The record otherwise lacks any formal medical opinions, including from plaintiff's treating physicians. However, the ALJ considered some of the "more casual" assessments found in the administrative record. For example, the ALJ considered a comment by plaintiff's treating orthopedist, Dr. Perkins, that "[plaintiff] can do sedentary duties ... he should not lift heavy or continuously." (T. 19). The ALJ found Dr. Perkins assessment "somewhat persuasive but only to the extent that [plaintiff] would be limited in his ability to lift." (*Id.*).

The ALJ further considered a statement, prepared in the context of plaintiff's workers' compensation claim, by independent medical examiner Dr. Chiarmonte. In March 2018 Dr. Chiarmonte opined that plaintiff could work "with restrictions of no lifting over 15-20 pounds, limited sitting, [and] no repetitive use of bilateral shoulders and right elbow." (T. 218). After acknowledging that Dr. Chiarmonte's opinion was the only examiner's [1] opinion that placed any defined, relevant functional limitations on plaintiff's capacity for work, the ALJ found it consistent with the other opinions of record that did not "explicitly place[ ]" limitations on plaintiff's ability to stand or walk. (T. 19).

[1]  The state agency's medical consultant determined that plaintiff was capable of a full range of medium work, including the ability to lift and carry 50 pounds on occasion, 25 pounds frequently, and stand and walk for a total of six hours in an eight

hour day. (T. 16, 65). The ALJ rejected the agency's determination, finding that the evidence before her was persuasive of a more restrictive residual functional capacity. (T. 16).

The Second Circuit has made clear that where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required[.]" *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations omitted). However, under such circumstances an "RFC assessment will be sufficient only when the record is 'clear' and contains 'some useful assessment of the claimant's limitations from a medical source.' " *Johnson v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 286, 293 (W.D.N.Y. 2018) (quoting *Muhammad v. Colvin*, No. 6:16-CV-06369, 2017 WL 4837583, at \*4 (W.D.N.Y. Oct. 26, 2017)); *see also Martin v. Comm'r of Soc. Sec.*, No. 6:18-CV-06365, 2020 WL 1322572, at \*5 (W.D.N.Y. Mar. 20, 2020) (acknowledging the *Monroe* decision, but nevertheless ordering remand because the record was "devoid of any assessment of plaintiff's exertional limitations," and contained no "useful discussion of such limitations.").

In this case, the record lacks a useful assessment of plaintiff's limitations, particularly with respect to his ability to fulfill the exertional requirements of light work. Other than the opinion rendered at the state agency level, which the ALJ implicitly found less than persuasive, there is no evidence that discusses plaintiff's ability to stand or walk during the course of an eight-hour workday. Dr. Litchmore's failure [2] to discuss plaintiff's limitations in these functional abilities, or lack thereof, does not constitute substantial evidence that plaintiff could perform them without restriction. *See Frank v. Comm'r of Soc. Sec.*, No. 5:17-CV-103, 2019 WL 430887, at \*7 (D. Vt. Feb. 4, 2019) ("[T]he absence of evidence indicating that plaintiff can [perform a relevant functional ability] does not constitute substantial support for the ALJ's RFC determination."); *Rodgers v. Colvin*, No. 16-CV-6739, 2018 WL 446220, at \*3 (W.D.N.Y. Jan. 17, 2018) (where consultative examiner did not address relevant functional abilities, the ALJ could not assume there were no limitations); *Jermyn v. Colvin*, No. 13-CV-5093, 2015 WL 1298997, at \*20 (E.D.N.Y. Mar. 23, 2015) ("[T]he ALJ was not permitted to construe the silence in the record as to Plaintiff's functional capacity as indicating support for his determination as to Plaintiff's limitations."). It was improper for the ALJ to conclude that Plaintiff's only limitations were those vaguely identified in the consultative examiner's opinion.

2
Although Dr. Litchmore vaguely assessed that plaintiff would have "limitations" for walking up and down ramps and stairs, he otherwise failed to discuss plaintiff's capacity for sitting, standing, or walking. (T. 348). The court also notes a typographical error in the last sentence of Dr. Litchmore's medical source statement, presumably omitting a final function in which he opined plaintiff endured some degree of limitation. (*Id.*).

 **\*7** Moreover, it is not "clear" from the record that plaintiff could perform the walking or standing exertions required in order to perform light work.[3] Plaintiff maintained, at both the state agency level and at his administrative hearing, that his ability to stand or walk for long periods of time was significantly limited by his back pain, as well as his left foot condition. (T. 36, 150). His treating physicians often observed him to walk with an "abnormal" or "antalgic" gait. (T. 242, 245, 248, 251, 518, 522, 539). On several occasions, plaintiff displayed steppage due to left foot drop, as well as left lower extremity weakness. (T. 245, 248-49, 522, 571). His left leg exhibited muscle atrophy. (T. 242, 248). On September 27, 2018, plaintiff sought a second opinion for his left foot and ankle. (T. 517). At that time, orthopedic surgeon Dr. Kelmanovich recommended at CT scan and possible future arthrodesis[4] at the transverse tarsal joint. (T. 519). On November 30, 2018, plaintiff presented to the emergency department complaining of numbness in his right foot and ankle, and an inability to walk due to significant back pain. (T. 570). On December 5, 2018, Dr. Perkins acknowledged plaintiff's chronic, worsening symptoms of back pain, and scheduled plaintiff for a lumbar fusion at various levels. (T. 580). Based on this medical evidence, this is not the type of case where plaintiff's impairments "were so minimal that the ALJ could permissibly make a common sense judgment as to Plaintiff's [physical RFC]." *Johnson v. Berryhill*, No. 1:16-CV-974, 2018 WL 3688313, at *4 (W.D.N.Y. Aug. 2, 2018); *see also Zayas v. Colvin*, No. 15-CV-6312, 2016 WL 1761959, at *4 (W.D.N.Y. May 2, 2016) ("Depending on the circumstances, like when the medical evidence shows only minor physical impairments, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment").

3
The court recognizes that light work can alternatively involve "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). Nevertheless, there is even less support in the record that plaintiff could perform such activities in the course of gainful employment. The only assessment regarding plaintiff's ability to sit came from workers' compensation examiner Dr. Chiarmonte, who opined that plaintiff could work under circumstances including "limited sitting." (T. 218). Moreover, plaintiff's capacity for pushing and pulling is called into question by Dr. Litchmore's vague opinion that plaintiff would have "limitation" for activities involving repetitive twisting and turning motions with the hands (T. 348), and Dr. Chairmonte's opinion that plaintiff must avoid repetitive use of his shoulders and right elbow. (T. 218).

4
Arthrodesis is the surgical immobilization of a joint so that the bones grow solidly together. *See https://www.merriam-webster.com/dictionary/arthrodesis.*

In sum, the ALJ attempted to craft an RFC primarily supported by her lay interpretation of plaintiff's imaging studies, "irregularities" among the physical examination findings of plaintiff's various treating providers, a lack of any recommendation for aggressive treatment,[5] and the absence of any opinion regarding plaintiff's capacity for standing and walking throughout the course of an eight-hour work day. Because the evidence considered by the ALJ failed to discuss, or even identify, plaintiff's capacity for standing and walking, the record did support not the ALJ's RFC determination. *Johnson v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d at 293; *see also Quinto v. Berryhill*, No. 3:17-CV-24, 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017) ("[W]here the medical findings in the record merely diagnose the claimant's exertional impairments and do not relate these diagnoses to specific residual capacities ... the Commissioner may not make the connection himself.") (citations omitted). On remand, the ALJ should further develop the record by obtaining medical opinion evidence specific to plaintiff's physical limitations, in order to determine whether plaintiff can fulfill the exertional requirements for light work.

5
Arguably, the recommended spinal fusion and arthrodesis constitute aggressive treatment.

## VII. REMAINING ARGUMENTS

Plaintiff has identified additional reasons why he contends the ALJ's decision was not supported by substantial evidence. However, because the court has already determined, for the

2020 WL 3077009

reasons previously discussed, that remand of this matter for further administrative proceedings is necessary, the Court declines to reach these issues. *See Bell v. Colvin*, No. 5:15-CV-01160 (LEK), 2016 WL 7017395, at *10 (N.D.N.Y. Dec. 1, 2016)* (declining to reach arguments "devoted to the question whether substantial evidence supports various determinations made by [the] ALJ" where the court had already determined remand was warranted); *Morales v. Colvin*, No. 13-CV-06844, 2015 WL 2137776, at *28 (S.D.N.Y. Feb. 10, 2015)* (the court need not reach additional arguments regarding the ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand").

**\*8  WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper evaluation of the medical and other evidence, an appropriate determination of plaintiff's residual functional capacity, and other further proceedings, consistent with this Memorandum-Decision and Order, and it is

**ORDERED**, that the Clerk enter judgment for **PLAINTIFF**.

**All Citations**

Slip Copy, 2020 WL 3077009

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 507367
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

ELIZABETH P., Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 3:20-CV-891 (CFH)
|
Signed 02/18/2022

**Attorneys and Law Firms**

OF COUNSEL: PETER A. GORTON, ESQ., Lachman, Gorton Law Firm, P.O. Box 89, 1500 East Main Street, Endicott, New York 13761, Attorneys for plaintiff.

OF COUNSEL: CANDACE LAWRENCE, ESQ., Social Security Administration, J.F.K. Federal Building, 15 New Sudbury Street, Rm. 625, Boston, Massachusetts 02203, Attorneys for defendant.

**MEMORANDUM-DECISION AND ORDER** [1]

[1]    Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18. See Dkt. No. 7.

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

*1 Elizabeth P. [2] ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. See Dkt. No. 1 ("Compl."). Plaintiff moves for reversal and remand for the determination of benefits. See Dkt. No. 13. The Commissioner cross-moves for judgment on the pleadings. See Dkt. No. 18. Plaintiff replies. See Dkt. No. 19-1. For the following reasons, the Commissioner's cross-motion for judgment on the pleadings is denied and the determination of the Commissioner is reversed and remanded for further proceedings.

[2]    In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify plaintiff's last name by initial only.

**I. Background**

On February 20, 2018, plaintiff filed Title II and Title XVI applications for disability insurance benefits and supplemental security income. See T. at 204-11, 220-22. [3] Plaintiff alleged a disability onset date of August 19, 2015. See id. at 205. The Social Security Administration ("SSA") denied plaintiff's claim on May 8, 2018. See id. at 118. Plaintiff requested a hearing, see id. at 143, and a hearing was held on August 28, 2019, before Administrative Law Judge ("ALJ") Gretchen Mary Greisler. See id. at 35-85. On October 9, 2019, the ALJ issued an unfavorable decision. See id. at 14-28. On June 8, 2020, the Appeals Council denied plaintiff's request for review. See id. at 1-5. Plaintiff commenced this action on August 6, 2020. See Compl.

[3]    "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. See Dkt. No. 12. Citations to the administrative transcript refer to the pagination in the bottom, right-hand corner of the page, not the pagination generated by CM/ECF.

**II. Legal Standards**

**A. Standard of Review**

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1388(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied or it was not supported by substantial evidence. See Johnson v. Bowen, 817 F.2d 983, 985-86 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Elizabeth P. v. Commissioner of Social Security, Slip Copy (2022)

2022 WL 507367

mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). The substantial evidence standard is "a very deferential standard of review.... [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would have to conclude otherwise." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotations marks, citation, and emphasis omitted). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence. See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817 F.2d at 986). However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

**B. Determination of Disability**

**\*2** "Every individual who is under a disability shall be entitled to a disability ... benefit...." 42 U.S.C. § 423(a)(1)(E). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. See id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based on objective medical facts, diagnoses[,] or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

> If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities.

> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

> Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24 (2003). The plaintiff bears the initial burden of proof to establish each of the first four steps. See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. (citing Berry, 675 F.2d at 467).

**III. The ALJ's Decision**

Applying the five-step disability sequential evaluation, the ALJ first determined that plaintiff had not engaged in substantial gainful activity since August 19, 2015, her alleged onset date. See T. at 17. At step two, the ALJ found that plaintiff had the following severe impairments: "trochanteric

bursitis in the left hip, sprain of left knee and ankle, obesity, migraine headache, irritable bowel syndrome, colitis, gastroesophageal reflux disease, tarsal tunnel syndrome in the left foot, myalgia polyarthropathy, attention deficit hyperactivity disorder, report of borderline intellectual functioning, provisional post traumatic stress disorder, and anxiety disorder[.]" Id. At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. See id. The ALJ determined that plaintiff had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. See id. at 18-19. Before reaching step four, the ALJ concluded that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except

> **\*3** [she] requires a brief 1-2 minute change in position after sitting, standing or walking for 30 minutes but retains the ability to remain on task; the claimant can occasionally stoop and climb stairs and ramps but cannot crouch, crawl, kneel, climb ladders, ropes or scaffolds or work at unprotected heights; the claimant cannot perform more than rudimentary math; the claimant is able to remember and carry out very short and simple instructions without additional cues or reminders; the claimant should not work in an environment that is stringently production or quota-based, and thus may not perform fast-paced assembly line type of work, but can meet production requirements that allow him or her to sustain a flexible and goal-oriented pace; the claimant can tolerate occasional interaction with supervisors, coworkers and the public; the claimant can perform work involving only simple, work-related decisions and few, if any, workplace changes; the claimant requires ready access to a restroom but the need to use the restroom can be accommodated

> by the normal morning, lunch and afternoon breaks and an additional five minute break each morning and afternoon; and the claimant should avoid work outdoors in bright sunshine and work with bright or flickering lights such as would be experience[d] in welding or cutting metals.

Id. at 21. At step four, the ALJ determined that plaintiff was unable to perform relevant past work. See id. at 27. At step five, considering the plaintiff's age, education, work experience, and RFC, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that plaintiff could perform. See id. Thus, the ALJ determined that plaintiff had "not been under a disability, as defined in the Social Security Act, from August 19, 2015, through the date of this decision[.]" Id. at 28.

## IV. Arguments[4]

[4] The Court's citations to the parties' briefs refer to the pagination generated by CM/ECF in the pages' headers.

Plaintiff argues that the ALJ (1) "d[id] not properly assess [p]laintiff's limitations to time off-task and/or attendance"; (2) "d[id] not include appropriate limitations in the RFC"; (3) legally erred in assessing the medical opinions of record under 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c);[5] (4) erred in her step-five determination and (5) erred in relying on state agency medical consultant, E. Kamin, Ph.D.'s, opinion. Dkt. No. 13 at 13, 25.

[5] 20 C.F.R. § 404.1520c contains the relevant regulations for Title II applications. 20 C.F.R. § 416.920c reflects identical rules for claimants filing under Title XVI. Plaintiff filed an application under both Titles. See T. at 204-11, 202-22. Throughout this Memorandum-Decision and Order, the Court will reference the Title II regulations as that is what plaintiff primarily cites in her brief. See Dkt. No. 13 at 20, 23-24.

The Commissioner argues that the ALJ was entitled to discount all of the medical opinions opining off task or absenteeism limitations because they are not supported by

the record. See Dkt. No. 18 at 6-11. The Commissioner also argues that the ALJ appropriately considered Dr. Kamin's opinion and the 20 C.F.R. § 404.1520c(a)-(c) factors, and that the step-five determination is supported by substantial evidence. See id. at 26; 20-22, 27.

## V. Discussion

A plaintiff's RFC is defined as "what an individual can still do despite his or her limitations.... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis[.]" Pardee v. Astrue, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted)). "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, [and] symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." Id. (citing 20 C.F.R. § 404.1545(a)). "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment.' " Hendrickson v. Astrue, No. 5:11-CV-927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (alteration in original) (quoting Titles II & XVI: Capability to Do Other Work-The Medical-Vocational Rules As A Framework For Evaluating Solely Nonexertional Impairments, Social Security Rulings ("SSR") 85-15, 1985 WL 56857, at *6 (1985)). The RFC determination "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). A mental health "RFC assessment process requires 'a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments....' " Linda E. v. Saul, No. 3:19-CV-357 (NAM), 2020 WL 1875671, at *8 (N.D.N.Y. Apr. 15, 2020) (quoting Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184, at *4 (July 2, 1996)).

**\*4** "Part and parcel to the RFC determination is the ALJ's review of the medical opinion evidence...." Dumas v. Comm'r of Soc. Sec., No. 7:13-CV-1099 (GTS/TWD), 2015 WL 1403342, at *13 (N.D.N.Y. Mar. 26, 2015). Under the new regulations applicable to plaintiff's claim, the Commissioner will no longer give specific evidentiary weight to medical opinions. See Warren I. v. Comm'r of Soc. Sec., No. 5:20-CV-495 (ATB), 2021 WL 860506, at *4 (N.D.N.Y. Mar. 8, 2021). Rather, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on: supportability; consistency; relationship with the claimant (which includes the length of treatment relationship, frequency of examinations, purpose and extent of the treatment relationship, and examining relationship); specialization; and "other factors." 20 C.F.R. § 404.1520c(a)-(c). Although the ALJ is not required to assign a specific "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. § 404.1520c(a) and (b)(1). The ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. Id. § 404.1520c(b)(2). "[S]upportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(1). "[C]onsistency" means that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(2). "If the ALJ fails adequately to explain the supportability and consistency factors, or bases [his or] her explanation upon a misreading of the record, remand is required." Rivera v. Comm'r of the Soc. Sec. Admin., No. 19-CV-4630 (LJL/BCM), 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), report and recommendation adopted, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (citation and quotation marks omitted). The ALJ is generally "not required to, explain how [he or she] considered the" remaining factors. 20 C.F.R. § 404.1520c(b)(2). However, if the ALJ "find[s] that two or more medical opinions ... about the same issue are both equally well-supported ... and consistent with the record ... but are not exactly the same, [he or she] will articulate how [he or she] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions...." Id. § 404.1520c(b)(3).

"[T]he ALJ's conclusion [need] not perfectly correspond with any of the opinions of medical sources cited in his [or her] decision, [and] he [or she] [i]s entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent

with the record as a whole." Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). The Court "defer[s] to the Commissioner's resolution of conflicting evidence[.]" Smith v. Berryhill, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order) (citation and quotation marks omitted). Therefore, even if a plaintiff disagrees with the ALJ's assessment of opinion evidence and can point to evidence in the record to support his or her position, "whether there is substantial evidence supporting the [plaintiff's] view is not the question [ ]; rather, [the Court] must decide whether substantial evidence supports the ALJ's decision." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) (emphasis omitted). The ALJ must not "ignore evidence or cherry pick only the evidence from medical sources that support a particular conclusion and ignore the contrary evidence" but "[t]he Court will not reweigh the evidence that was before the ALJ." April B. v. Saul, No. 8:18-CV-682 (DJS), 2019 WL 4736243, at *6 (N.D.N.Y. Sept. 27, 2019) (citations and internal quotation marks omitted).

"It is well settled that, under both the old and new regulations concerning the evaluation of medical evidence, an ALJ may rely on the opinion of a non-examining state agency consultant in disability claims." Amber H. v. Saul, No. 3:20-CV-490 (ATB), 2021 WL 2076219, at *5 (N.D.N.Y. May 24, 2021). "[A]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the reviewing court] to glean the rationale of an ALJ's decision." Renalda R. v. Comm'r of Soc. Sec., 20-CV-0915 (TWD), 2021 WL 4458821, at *5 (N.D.N.Y. Sept. 29, 2021) (citations and quotation marks omitted).

### A. Consistency and Supportability of Opinions

Plaintiff argues that the ALJ failed to articulate how she found each medical opinion consistent with, or supported by, the record as required under 20 C.F.R. § 404.1520c(b)(2). See Dkt. No. 13 at 20. The Commissioner contends that "[t]he ALJ expressly considered both factors in evaluating each opinion." Dkt. No. 18 at 24.

### 1. Consultative Examiners and State Agency Medical Consultants

### a. Opinions Related to Plaintiff's Mental Limitations

**\*5** Amanda Slowik, Psy.D., performed plaintiff's consultative psychiatric evaluation. She noted, in relevant part, that plaintiff had restless motor behavior and was fidgeting during the examination; plaintiff's "[t]hought processes were often tangential and at times totally out of context to the conversation"; her affect and mood were anxious and somewhat exaggerated; and her "[a]ttention and concentration were moderately to markedly impaired due to a lack of effort and some anxiety[.]" T. at 372-74. Dr. Slowik determined that plaintiff was moderately limited in sustaining concentration. See id. Dr. Slowik explained that plaintiff's "[d]ifficulties are caused by distractibility, cognitive deficits, personality dysfunction, and anxiety" but "it is unclear as to whether or not they are significant enough to interfere with [her] ability to function on a daily basis." Id. Finally, Dr. Slowik stated that plaintiff would "need assistance in managing her funds, due to self-reported difficulties in this area." Id. at 375. The ALJ considered Dr. Slowik's opinion to be "partially persuasive because ... Dr. Slowik did not opine on the claimant's ability to understand and remember simple instructions and routine."[6] Id. at 24. Moreover, the ALJ concluded that, "[w]hile Dr. Slowik's opinion was generally consistent with the examination findings, the overall records, including the claimant's activities of daily living and course of mental health treatment, support slightly less severe restrictions." Id.[7]

6    In Dr. Slowik's medical source statement she wrote, "[t]he claimant's ability to understand simple directions and instructions; sustain an ordinary routine. The claimant's ability to understand and comply complex directions and instructions and interact adequately with supervisors, co-workers, and the public, as well as regulate emotions is moderately to markedly limited." T. at 374. The first sentence appears incomplete, and the Court cannot determine the level of limitation Dr. Slowik intended to opine related to plaintiff's ability to understand simple directions and instructions.

7    In referencing Dr. Slowik's opinion, the ALJ cited "Exhibit 4F." T. at 24. This appears to be a scrivener's error as Dr. Slowik's opinion is located at Exhibit 3F. See id. at 371-75.

The ALJ mentioned that "Dr. Slowik opined that the claimant had moderate limitations being able to sustain concentration" and, in a separate part of the decision, noted Dr. Slowik's examination finding that plaintiff's attention and

concentration were moderately- to markedly-impaired. T. at 24; 23; see Jeanette J. v. Saul, No. 6:19-CV-0795 (ML), 2020 WL 4932047, at *5 (N.D.N.Y. Aug. 24, 2020) ("It is proper to read the ALJ's decision as a whole and it would be a needless formality to have the ALJ repeat substantially similar factual analyses."); cf. West v. Comm'r of Soc. Sec., No. 5:15-CV-1042 (GTS/WBC), 2016 WL 6833060, at *7 (N.D.N.Y. Oct. 18, 2016), report and recommendation adopted, 2016 WL 6833995 (N.D.N.Y. Nov. 18, 2016) ("[A] reading of the ALJ's decision as a whole indicated that the ALJ applied the proper legal standard and substantial evidence supported her credibility determination."). However, the ALJ did not mention Dr. Slowik's examination finding that plaintiff's "[t]hought processes were often tangential and at times totally out of context to the conversation"—a finding that appears consistent with other providers' notes and opinions that plaintiff had more severe limitations in maintaining attention and concentration. T. at 373; see Andrea G. v. Comm'r. of Soc. Sec., No. 5:20-CV-01253 (TWD), 2022 WL 204400, at *5 (N.D.N.Y. Jan. 24, 2022) (finding no error in the ALJ's rejection of a time off task limitation where the consultative psychologist found that the plaintiff "was cooperative with coherent and goal-directed thought processes," her "attention and concentration were intact"). The ALJ summarily concluded that Dr. Slowik's more severe limitations were unsupported by plaintiff's "course of mental health treatment[ ]" but failed to explain the correlation. See T. at 24; see also Pamela P. v. Saul, No. 3:19-CV-575 (DJS), 2020 WL 2561106, at *6 (N.D.N.Y. May 20, 2020) (finding error where, "[i]n partially rejecting Slowik's opinion, the ALJ offered only that her stated limitations were an 'overstatement of the claimant's mental functioning' with no effort to quantify or explain in what way this was true."). Plaintiff saw a therapist throughout 2017, 2018, and 2019. See T. at 388-405, 440-68. As explained below, plaintiff's treating therapist noted continuously tangential thoughts during counseling sessions and similarly opined more severe limitations. See id. at 388-89, 395, 415. The record reflects a gap in plaintiff's counseling sessions between November 2018 and June 2019. See id. at 455, 458. However, the ALJ does not explain whether it was because plaintiff was receiving treatment, the gap in treatment, the findings during treatment, or another factor, that "support slightly less severe restrictions" than Dr. Slowik reached. Further, based on a review of the record, the Court cannot determine her rationale.

**\*6** State agency medical consultant E. Kamin, Ph.D., opined that plaintiff was not significantly limited in her

ability to remember locations and work-like procedures; understand, remember, or carry out very short and simple instructions; ask simple questions and request assistance; maintain socially-appropriate behavior; and adhere to basic standards of neatness. See T. at 95-96. Dr. Kamin determined that plaintiff was moderately limited in her ability to: carry out detailed instructions, maintain attention and concentration for extended periods of time, work in coordination with others without being distracted, complete a normal workday without interruptions from her psychologically-based symptoms, perform at a consistent pace, respond appropriately to changes in the workplace, and set realistic goals. See id. at 95-96. Dr. Kamin found "no evidence of limitation[s]" related to plaintiff's ability to: make simple, work-related decisions; perform activities within a schedule; maintain a regular schedule; sustain an ordinary routine without supervision; be aware of normal hazards; or travel to unfamiliar places. See id. at 95-96. In explaining these limitations, Dr. Kamin wrote "see below[,]" and in the "additional explanation" section he recounted Dr. Slowik's consultative examination findings. Id. at 96-97. Dr. Kamin determined that plaintiff "retain[ed] the ability to perform unskilled work on a sustained basis." Id. at 97. The ALJ reviewed Dr. Kamin's opinion and found it to be "partially persuasive. The totality of the record supported additional limitations on the claimant's mental functioning ability. Generally, Dr. Kamin's opinions were consistent with the record. Dr. Kamin had the opportunity to review the record, and Dr. Kamin has knowledge of the agency's program and its evidentiary policies." Id. at 24.

The ALJ did not explain what records supported additional limitations. See T. at 24. Dr. Kamin did not examine plaintiff and primarily relied on Dr. Slowik's examination, but as plaintiff notes, they came to slightly different conclusions, creating inconsistencies that the ALJ did not reconcile. See id. at 96-97, 374; see Dkt. No. 13 at 26. For example, Dr. Slowik did not address whether plaintiff was limited in her ability to understand and apply simple directions, and Dr. Kamin found she was "not significantly limited" in carrying out very short and simple instructions. T. at 95; 374. Dr. Slowik determined that plaintiff was moderately-to markedly-limited in understanding and complying with complex directions and instructions, interacting with others, and regulating emotions, but Dr. Kamin found that she was only moderately limited in each category. See id. at 95-96, 374. It is not evident what records Dr. Kamin reviewed to conclude that plaintiff's abilities were moderately limited. See id. at 95-95. Dr. Slowik also concluded that plaintiff was mildly- to moderately-limited in making work-related

2022 WL 507367

decisions, but Dr. Kamin found "[n]o evidence of limitation in this category." Id. at 95, 374. As Dr. Kamin reiterated Dr. Slowik's conclusions verbatim, the Court is unable to determine why Dr. Kamin found "no evidence" of this limitation. Id. at 95. The ALJ's conclusory reference to Dr. Kamin's expertise and "the totality of the record" fails "to meet the[ ] minimum levels of articulation [and] frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." Id. at 25; Warren l., 2021 WL 860506, at *8; see also Raymond M. v. Comm'r of Soc. Sec., No. 5:19-CV-1313 (ATB), 2021 WL 706645, at *8 (N.D.N.Y. Feb. 22, 2021) (finding error where "[t]he ALJ provided no substantive explanation for her conclusion that [an] opinion was persuasive, making only general reference to the state agency consultant's expertise and experience, and his review of the available record.").

Upon examination, Adam Krantweiss, Ph.D., determined that plaintiff's IQ was 75, placing her in the "Borderline to Low-Average Range." T. at 408. He assessed that her "reading and spelling are high enough to suggest she would be able to function in the workplace. Her lower score on math suggests she would struggle in a job where anything beyond rudimentary understanding of math was required." Id. at 410. The ALJ summarily stated that "Dr. Krantweiss' opinion was persuasive and consistent with the record as well as the examination findings." Id. at 26. This cursory explanation is insufficient to "explain how [she] considered the supportability and consistency factors." 20 C.F.R. § 404.1520c(b)(2) (emphasis added); see Jaleesa H. v. Comm'r of Soc. Sec., No. 1:20-CV-01180 (EAW), 2022 WL 174337, at *5 (W.D.N.Y. Jan. 18, 2022) (remanding where "the ALJ did not explain anything—instead, he made a conclusory statement that [an] opinion was 'generally consistent and supportive,' without any explanation of how he assessed the opinion in connection with the consistency and supportability factors which, as explained above, is required by the new regulations."). Dr. Krantweiss noted that during plaintiff's examination "[t]here was no evidence of circumstantial or tangential thinking and no disorganization was observed." T. at 408. He also opined that plaintiff's "Working Memory Index score," which "is a reflection of a test-taker's attention, concentration, and ability to hold and manipulate simple information in memory in order to complete a task[,]" was in the borderline range. Id. at 409. Without sufficient explanation, the Court cannot determine whether the ALJ's conclusion as to the opinion of Dr. Krantweiss is supported by substantial evidence, particularly where Dr. Slowik's and plaintiff's treating therapist's notes reflect that plaintiff had

persistently "tangential" "thought process[es]." Id. at 373, 389, 395, 397, 400, 404. Further, it was not explained, and the Court cannot determine, whether a borderline Working Memory Index score supports or invalidates other providers' opinions regarding plaintiff's concentration.

### b. Opinions Related to Plaintiff's Physical Limitations

**\*7** Gilbert Jenouri, M.D., conducted plaintiff's physical consultative examination. He determined that plaintiff had "[m]ild to moderate restriction[s] walking, standing long periods, bending, stair climbing, lifting, and carrying. The claimant should avoid smoke, dust, and other respiratory irritants." T. at 380. The ALJ found Dr. Jenouri's opinion "partially persuasive. The totality of the record supported slightly greater restrictions. Generally, Dr. Jenouri's opinion regarding the nature of the claimant's restriction was consistent with the record, and was supported by the examination findings." Id. at 25.

State agency medical consultant S. Putcha, M.D., opined that plaintiff could occasionally lift or carry twenty pounds, and frequently lift or carry ten pounds. See T. at 93. Plaintiff could also stand, walk, or sit, for "[a]bout 6 hours in an 8-hour workday[.]" Id. Dr. Putcha advised that plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation because of her "asthma respiratory precautions." Id. at 94. In the explanation section, Dr. Putcha noted his reliance on a December 2017 orthopedic exam where plaintiff had a "left hip-Trochanteric bursitis" and low back pain, as well as the findings from Dr. Jenouri's consultative examination. Id. The ALJ found Dr. Putcha's opinion to be "partially persuasive. Additional and more severe restrictions were supported by the totality of the record. Dr. Putcha did not have the opportunity to examine the claimant, but Dr. Putcha's opinions were consistent with the record at the time they were rendered." Id. at 24.

Although the ALJ found Dr. Jenouri's and Dr. Putcha's opinions to be "partially persuasive" she did not explain what they relied on in coming to their conclusions—i.e., what supported their opinions. T. at 24; see Carmen M. v. Comm'r of Soc. Sec., No. 20-CV-06532 (MJR), 2021 WL 5410550, at *5 (W.D.N.Y. Nov. 19, 2021) (citations and quotation marks omitted) (remanding because "the ALJ failed to examine what evidence the [plaintiff's treating] sources used to support their opinions and reach their ultimate conclusions[ ]"; therefore, "the ALJ did not consider the supportability of

[the] opinions."); see also Cuevas v. Comm'r of Soc. Sec., No. 20-CV-502 (AJN/KHP), 2021 WL 363682, at *14 (S.D.N.Y. January 29, 2021) ("Nowhere in the ALJ's decision does she explain, as the new regulations require, what the respective CEs used to support their opinions and reach their ultimate conclusions."). The ALJ's two-sentence synopsis regarding Dr. Jenouri's and Dr. Putcha's opinions run afoul of the requirements of the applicable regulations because it "precludes the Court from undertaking meaningful review of [the] evaluation of [the] opinion[s]." Jaleesa H., 2022 WL 174337, at *6; see also 20 C.F.R. § 404.1520c(b)(2); Warren l., 2021 WL 860506, at *7 ("Considering the brevity of [the] medical source statement, and lack of supporting explanation, the court questions how the ALJ came to the conclusion that the consultative examiner's opinion constituted substantial evidence for the RFC determination."). The ALJ determined that the record supported additional, greater, or more severe restrictions than either provider concluded. See T. at 24-25. However, in failing to explain what records supported the conclusions, and what records did not, the Court cannot then determine whether the persuasiveness determinations are supported by substantial evidence.

### 2. Treating Providers

#### a. Opinions related to Plaintiff's Physical Limitations

Nathaniel Baer, M.D., treated plaintiff from September to December 2017 for pain in her left knee following a fall. See T. at 279-309. In September 2017, Dr. Baer's treatment note reflected that plaintiff would need four- to six-"weeks of physical therapy before she would be able to work full time on her feet from the knee and ankle standpoint. Part-time work ... with progressive physical therapy over the coming [six] weeks is likely the most reasonable intermediary step." Id. at 300. The ALJ found this "opinion [to be] minimally persuasive due to the temporary restrictions which were issued during the acute phase of the claimant's injury. The basis for the claimant's ability to perform part time work was not supported by the record." Id. at 25.

**\*8** Dr. Baer also completed a medical assessment form in September 2017 wherein he noted that plaintiff could work for twenty hours a week for six weeks while participating in treatment and rehab, and that during that time she could stand, walk, sit, and bend for "0 to 2 hours max/day"; could lift and carry ten to twenty pounds; and would need the opportunity to alternate between walking, sitting, standing, and bending

"at will" throughout the day. T. at 413. The ALJ explained that this opinion "was partially persuasive." Id. at 25. The ALJ found "[n]othing in the record indicat[ing] th[e] basis for Dr. Baer's opinion that the claimant was limited to part time work[,] ... Dr. Baer did not specify whether the limitation to working part time was applicable to all work or only the claimant's past work[,]" and he "did not indicate limitations other than lifting and the record does support additional lim[it]ations." Id. at 25. The ALJ did not acknowledge Dr. Baer's opinion that plaintiff could walk, stand, bend, or sit for no more than two hours in a day or determine whether that finding was consistent with, or supported by, the record. See id. at 25, 413; see also Nicole L. v. Kijakazi, No. 6:20-CV-01576 (NAM), 2022 WL 160274, at *9 (N.D.N.Y. Jan. 18, 2022) (remanding because "[a]lthough the ALJ discussed the supportability of certain limitations, ... he completely ignored others."). Dr. Baer's treatment notes during the six-week period beginning at the end of September 2017 reflect that plaintiff's pain was primarily in her left hip, left thigh, and lower back with "giveway weakness" in her hip and "4/5 hip flexion." T. at 293; 287-88, 290. It is not clear how these symptoms would result solely in a lifting limitation, and the ALJ does not explain how the records do not support the remaining limitations. See id. at 25, 413.

To be considered disabled, a plaintiff's limitations must be "expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A); see, e.g., S.J. v. Comm'r of Soc. Sec., No. 3:20-CV-560 (ATB), 2021 WL 1699916, at *11 (N.D.N.Y. Apr. 29, 2021) (finding that substantial evidence supported the ALJ's decision to give opinions less weight because they "only addressed [the] plaintiff's physical condition for the period between May and July 2018 while [the] plaintiff recovered from surgery" and "the broader medical record ... show[ed] that [the] plaintiff displayed significant recovery[.]"). Although Dr. Baer's medical source statement appears to be limited to the "6 weeks while [plaintiff is] participating in treatment/rehab[,]" his notes following that six-week period reflect that plaintiff "note[d] no significant change in her pain" and she continued to have "[d]ecreased hip range of motion with limited flexion[.]" T. at 413; 279, 285, 287.

The ALJ's conclusions are confounding because of a lack of explanation. The ALJ did not discount entirely Dr. Baer's medical source statement because of its temporary nature and instead found the opinion "partially persuasive." T. at 25. Therefore, it seems that the ALJ considered Dr. Baer's

Case:6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 130 of 189
Elizabeth P. v. Commissioner of Social Security, Slip Copy (2022)

2022 WL 507367

opined lifting and carrying limitation to be consistent with, and supported by, the record. See id. However, as to the additional limitations, because the ALJ did not mention them and erroneously stated that "Dr. Baer did not indicate" any other limitations, the Court cannot determine whether the ALJ determined that the record did not support additional limitations because she found them to be limited in duration or for another reason. Id. Further, the ALJ explained that the record supported "slightly greater restrictions" than Dr. Jenouri's opined "mild to moderate restrictions walking, standing long periods, bending, stair climbing, lifting, and carrying[.]" Id. It is contradictory to conclude that additional limitations beyond a lifting limitation were not warranted in one instance (Dr. Baer's opinion), but walking, standing, bending, climbing, and carrying limitations were not severe enough, in another (Dr. Jenouri's opinion). See id. As the ALJ failed to sufficiently explain what records supported her conclusions, the Court cannot "glean" her rationale. Mongeur, 722 F.2d at 1040; see also Drollette v. Colvin, No. 8:13-CV-0280 (GTS/CFH), 2014 WL 2880022, at *13 (N.D.N.Y. June 23, 2014) (citation and quotation marks omitted) ("Remand is appropriate ... when the reviewing court is unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision.").

Kristen Bishop, A.N.P., submitted a medical questionnaire wherein she opined that plaintiff's gastro-esophageal reflux disease ("GERD") and irritable bowel syndrome—"[p]rimary symptoms are constipation and diarrhea with pain"—would: (1) require unlimited access to the bathroom; (2) cause an "urgent and immediate" need to use the bathroom; (3) cause her to be off task for ten- to fifteen-percent of a workday; and (4) cause her to miss three days per month. T. at 431-32. The ALJ found Ms. Bishop's opinion to be "minimally persuasive due to the short treating relationship that Ms. Bishop had with the claimant. Ms. Bishop's expectation of such severe symptoms was inconsistent with the length of treatment. The claimant's bowel related impairment of constipation did not support the claimant's need for such frequent bathroom use." Id. at 25.

**\*9** The record reflects that from December 2018 to January 2019 plaintiff was hospitalized for "extensive colitis/anemia/electrolyte imbalance." T. at 589. Manuja Warnakulasuriya, M.D., plaintiff's primary care physician, noted that after leaving the hospital, plaintiff reported abdominal cramps, but her stools were becoming formed with less frequent bowel movements. See id. In March 2019,

Ms. Bishop explained that plaintiff had "intermittent episodes of diarrhea which is chronic for her[,]" and "report[ed] a 60 pound weight loss, severe epigastric pain that is only relieved by drinking milk." Id. at 420. At the same time, plaintiff reported to Dr. Warnakulasuriya that she was experiencing severe abdominal pain in the right upper quadrant for two months with associated fever and nausea and there were no "relieving factors." Id. at 604. By May 2019, Ms. Bishop noted that plaintiff "had resolution of her diarrhea symptoms and in fact her symptoms had returned to constipation which has been a long-term issue as part of her irritable bowel syndrome[ ]" and she did not report any vomiting, unintentional weight loss, or epigastric pain. Id. at 423. However, despite medications and daily stool softener plaintiff continued to have constipation, pain, nausea, and "frequent breakthrough symptoms" of her GERD. Id. at 423; 425. Ms. Bishop commented that for plaintiff's GERD, she should continue taking medication "along with antireflux lifestyle measures including elevation of the head of the bed, small frequent meals, avoidance of triggers, avoidance of smoking, [ ] avoidance of eating prior to lying down[,]" limiting the use of NSAID mediations, and "limit[ing] consumption of alcoholic beverages." Id. at 425.

The ALJ addressed the supportability factor as it related to plaintiff's bowel related symptoms, however, she did not explain whether the symptoms from plaintiff's GERD, reflected in Ms. Bishop's records, support Ms. Bishop's opinion. See T. at 25. Further, the ALJ did not discuss the consistency of Ms. Bishop's opinion as required under the regulations, which defines "consistency" as related to "the evidence from other medical sources and nonmedical sources in the claim[.]" 20 C.F.R. § 404.1520c(c)(2). The inquiry for the Court is not whether there is evidence to support plaintiff's claim, but whether substantial evidence supports the ALJ's conclusions. See Bonet ex rel. T.B., 523 F. App'x at 59. However, because the ALJ did not indicate whether she found Ms. Bishop's opinion supported by the totality of the symptoms reflected in Ms. Bishop's treatment records, or consistent with the entire record—particularly Dr. Warnakulasuriya's records indicating similar symptomology —the Court cannot determine whether the ALJ's decision to find Ms. Bishop's opinion less persuasive is supported by substantial evidence. See Kathleen M. v. Comm'r of Soc. Sec., No. 8:20-CV-1040 (TWD), 2022 WL 92467, at *7 (N.D.N.Y. Jan. 10, 2022) (remanding because "the ALJ explained she was 'more persuaded by [another] assessment, as it appears to be better supported and more consistent with the record as a whole' ... [but t]his comparative conclusion offers no

insight into how the ALJ evaluated [the] medical opinion under the supportability and consistency factors ... with sufficient specificity to enable this Court to decide whether the persuasive value assigned ... is supported by substantial evidence.").

Sajid Khan, M.D., plaintiff's pain management provider, opined that because of plaintiff's fibromyalgia and "tenderness," she would be off task between fifteen and twenty percent of a workday, would be absent two days a month, could sit for six hours, would need to change positions every thirty minutes, could stand and walk for two hours, and should never lift over ten pounds. T. at 471-72. The ALJ found Dr. Khan's opinion to be "partially persuasive. Dr. Khan's limitations of the claimant being off task and absences were speculative. [8] Otherwise, Dr. Khan's opinion was consistent with the record." Id. at 26.

[8]     To the extent the Commissioner argues that Dr. Khan did not diagnose or treat plaintiff for fibromyalgia, the ALJ did not reject Dr. Khan's time-off task limitation on this ground. See Dkt. No. 18 at 8.

Plaintiff's pain management records reflect that plaintiff consistently presented with headaches, neck pain, and low back pain. [9] See T. at 529, 537, 554, 551, 559. Plaintiff reported severe neck pain that was aggravated by "bending, driving, exertion, rotation, turning head and twisting." Id. at 529, 551. Her low back pain was aggravated by ascending and descending stairs and resulted in a loss of balance. See id. at 537. On examination, Dr. Khan noted tenderness and spasms in plaintiff's lumbar spine and buttock with "[t]rigger points palpated in the lumbar paraspinals both sides." Id. at 539. Dr. Khan noted an active painful range of motion and a decreased passive range of motion in plaintiff's cervical spine and "[m]aximum tenderness" in plaintiff's right greater occipital nerve." Id. at 554. He also noted mild pain and mild restrictions in extension and bending of the lumbar spine. See id. at 554-555.

[9]     Plaintiff was seen by Dr. Khan and Oana Stingu, RPAC, for pain management. See T. at 558, 565.

*10   The ALJ did not state a level of supportability related to Dr. Khan's opinion. See T. at 26; see Warren I., 2021 WL 860506, at *8 (quoting Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5858 (S.S.A. Jan. 18, 2017))

("The new regulations promulgated by the Social Security Administration set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.' "). The Commissioner argues that the ALJ's failure to address the supportability factor is harmless error "because Dr. Khan's limitations are consistent with the RFC." Dkt. No. 18 at 26. However, although the ALJ incorporated most of Dr. Khan's limitations, she did not incorporate his time off task or absenteeism limitation, claiming it to be "speculative." T. at 26. Without discussing whether Dr. Kahn's "objective medical evidence and [ ] explanations"—the severe pain, tenderness, spasms, and limited range of motion reflected in Dr. Khan's records—supported his opinion, the Court disagrees that the ALJ's failure to discuss supportability is harmless error. 20 C.F.R. § 404.1520c(c)(1). Moreover, the ALJ did not state, but seemingly found, Dr. Khan's time off task limitation to be inconsistent with the record but failed to reconcile that implicit conclusion with four other providers' opined off task limitation. See T. at 26. This is particularly noteworthy because, as discussed below, this opinion is work preclusive. See David H. v. Comm'r of Soc. Sec., No. 20-CV-6357 (LJV), 2021 WL 5371464, at *4 (W.D.N.Y. Nov. 18, 2021) ("Had the ALJ properly compared [the] opinion with the other opinions and medical evidence and evaluated it in light of the medical evidence supporting it, that might well have resulted in an RFC that rendered David disabled."); but see Sandra D. v. Comm'r of Soc. Sec., No. 5:20-CV-1067 (LEK/ATB), 2022 WL 344058, at *2, 6 n.1 (N.D.N.Y. Feb. 4, 2022) (finding no error in the ALJ's conclusion that a time off task limitation "was speculative and not supported by any objective evidence[ ]" because it was "the only opinion to specifically address off-task time" and "the record does address the issue, but conspicuously lacks any mention of the necessity of greater limitation, that [the p]laintiff cannot remain on task during or after a position switch. Thus, the ALJ was entitled to find that [the p]laintiff could remain on task.").

Treating physician Henda Bouali, M.D., and C. O'Brien, FNP, [10] completed a medical questionnaire noting that plaintiff's fibromyalgia and low-back pain would cause her to be off task between twenty and thirty percent of a workday and miss more than three days a month. See T. at 624-25. Dr. Bouali and Ms. O'Brien also determined that plaintiff could sit, stand, and walk for four hours; would need to change positions every hour; and could occasionally lift over ten pounds. See id. at 625. The ALJ found the opinion to be "partially persuasive. The claimant's absenteeism and off task limitations were speculative. The record did not support

such restrictive limitations on the claimant's ability to sit. Otherwise, however, the limitations set forth were consistent with the record." Id. at 26.

10      The medical questionnaire has Ms. O'Brien's signature above Dr. Bouali's name; therefore, the ALJ refers to it as both individuals' opinion. See T. at 625.

The ALJ explained that, "[i]n January 2018, the claimant had muscle spasm in the cervical spine, and tenderness in the left knee and left hip[.]" T. at 22 (citing T. at 478). However, a review of the record reveals that throughout 2018 and 2019 plaintiff's pain was persistent, with her pain level varying between three to ten out of ten but most often an eight. See id. at 279, 285, 481, 487, 503, 537, 571, 575, 604. As explained above, plaintiff's pain management records revealed that her back pain was aggravated by ascending and descending stairs. See id. at 537. Further, her back pain caused an associated loss of balance, trigger points and spasms in lumbar spine and buttock, and a decreased active range of motion in her lumbar spine. See id. at 287, 484, 499, 506, 538-39, 546, 554, 571. The record also notes that plaintiff "failed physical therapy and her neck and headache is worsening. X-ray shows retrolisthesis at 3 levels. MRI for significant left biceps and triceps weakness was ordered.... Return in 4 weeks with Dr. Khan or sooner if needed." Id. at 562. The ALJ noted plaintiff's subjectively "reported pain was precipitated by activity" but, in reviewing the medical opinions, did not mention the objective examination findings by multiple providers who observed pain with movement, limited ranges of motion, spasms, and tenderness. Id. at 22-36.

The Commissioner contends that "[b]ecause [Dr. Bouali and Ms. O'Brien] identified no justification for their limitations and the record contains no treatment notes from them, there was no supported evidence to discuss." Dkt. No. 18 at 26. First, Dr. Bouali and Ms. O'Brien credited plaintiff's limitations to her "[f]ibromyalgia and low back pain. Patient taking [Savella] and using a muscle relaxer as needed. Recommended referral to aqua therapy." T. at 624. Second, the record contains treatment records from Ms. O'Brien during two of plaintiff's rheumatology follow-ups. 11 See id. at 502, 510. In March 2019, plaintiff "present[ed] for myalgia, Vit D deficiency, low back pain and left knee pain." Id. at 495. An examination revealed that plaintiff had mild-to moderate-pain with motion in her spine, but a normal gait and otherwise normal range of motion. See id. at 499. For plaintiff's myalgia, Ms. O'Brien noted that plaintiff was

unable to find relief with the attempted medications and she had an upcoming appointment with Dr. Khan for pain management. Id. at 500. As to her low back, Ms. O'Brien noted that plaintiff was doing well and continuing with her current medication. See id. Plaintiff again saw Dr. O'Brien in June 2019 for her joint pain and her "[s]everity level [was] 10. It occurs constantly and is stable ... The pain is relieved by elevation, rest, siting and laying down. Associated symptoms include decreased mobility, difficulty imitating sleep, joint instability, joint tenderness, nocturnal awakening, nocturnal pain, numbness, spasms and weakness." Id. at 503. An examination revealed moderate and mild pain with range of motion in plaintiff's spine, hip, and knees. See id. at 506. Ms. O'Brien noted that plaintiff would try a new medication, Savella, for her fibromyalgia because she had not tolerated others, that her low-back pain was still being controlled with medication, and that she would try aquatherapy for her hip instability. See id. at 507.

11      Plaintiff went to UHS for primary care, rheumatology, orthopedics podiatry, and pain management. See T. at 279-370, 517-619. The record does not contain a treatment note from Dr. Bouali.

**11  The ALJ did not discuss how Ms. O'Brien's and Dr. Bouali's opinion was inconsistent with Ms. O'Brien's records which reflected plaintiff's continued pain with range of motion and her continued attempts to find a medication or alternative therapies to resolve that pain. See T. at 26; see also Warren I., 2021 WL 860506, at *7 ("The new rules provide that the [supportability] of a medical opinion is increased as the relevance of the objective medical evidence and explanations increase."); Baker v. Berryhill, No. 17-CV-8433 (AT/DF), 2019 WL 1062110, at *30 (S.D.N.Y. Feb. 19, 2019), report and recommendation adopted, No. 17-CV-8433 (ATD/CF), 2019 WL 1059997 (S.D.N.Y. Mar. 6, 2019) ("The ALJ erroneously failed to acknowledge any of this evidence, let alone reconcile it with his findings."). As to plaintiff's ability to sit, Ms. O'Brien and Dr. Bouali determined that plaintiff could sit for four hours, Drs. Khan and Putcha opined that she could sit for six hours, and Dr. Baer found that she could sit for two hours. See T. at 94, 413, 471, 625. As explained, the ALJ appeared to find Dr. Baer's lifting limitation persuasive despite it being of limited duration but made no finding related to Dr. Baer's sitting limitation. See id. at 24. Because Dr. Baer's opined sitting limitation was stricter that Dr. Bouali's and Ms. O'Brien's—limiting plaintiff to sitting for two hours—and the ALJ did not explicitly review Dr. Baer's opinion, it is unclear whether Dr. Bouali's and Ms.

O'Brien's opinion limiting plaintiff to four hours of sitting is unsupported. See id.

### b. Opinions Related to Plaintiff's Mental Limitations

Plaintiff's therapist Theresa Dearie, LCSW, completed a medical assessment form and opined that plaintiff was moderately limited in understanding and remembering instructions, interacting appropriately with others in a work setting, and maintaining personal hygiene. See T. at 415. She concluded that plaintiff was very limited in understanding, remembering, and carrying out instructions; maintaining attention and concentration; making appropriate decisions; maintaining socially-appropriate behavior; and functioning in a work setting at a consistent pace. See id. Ms. Dearie also opined that plaintiff would be absent from work ten or more days per month. See id. The ALJ found Ms. Dearie's opinion to be "partially persuasive" because, "[w]hile the nature of the limitations ... were consistent with the record, the severity of the limitations were not. While the record does indicate significant mental findings, the claimant is still capable of taking care of her activities of daily living and care for a young child without assistance." Id. at 25.

The ALJ explained that "providers noted [plaintiff's] mood and affect were normal and appropriate ... her insight was normal without delusions or hallucinations, and [she] denied suicidal or homicidal ideation"; however, "[i]n June 2019, [plaintiff] was noted with a tangential thought process, poor confidence, and poor insight." T. at 23 (citing T. at 441). The ALJ is correct that plaintiff sometimes presented with a normal mood and affect. See id. at 322, 340, 361, 421, 499, 562, 608. However, the ALJ did not reference Ms. Dearie's remaining treatment records. See id. at 23-25. Ms. Dearie's counseling record indicates that throughout 2017, 2018, and 2019, plaintiff's thought processes were tangential and she had poor insight and impaired judgment. See id. at 388-89, 395, 397, 400, 404. Ms. Dearie also noted that there was "[e]vidence seen of poor memory and learning disabilities." Id. at 446. The ALJ also did not discuss Dr. Slowik's finding that plaintiff's "thought processes were often tangential and at times totally out of context to the conversation" or notes from plaintiff's primary care physician reflecting "[i]nappropriate mood and affect. Flight of ideas. Hopelessness. Inappropriate affect – flat. Poor insight. Pressured speech." Id. at 25, 373, 395, 415, 444-47, 451-53, 596, 578, 617. By failing to acknowledge these records, the Court cannot discern the ALJ's rationale in determining that the severity of

Ms. Dearie's proposed limitations was inconsistent with the record. See Stacey v. Comm'r of Soc. Sec. Admin., 799 F. App'x 7, 10 (2d Cir. 2020) (summary order) ("[W]e have cautioned ALJs against scouring medical notes to draw their own conclusions based on isolated descriptions.").

**\*12** Plaintiff's primary care physician Dr. Warnakulasuriya determined that based on plaintiff's "[b]ipolar disorder with depression" and anxiety, she had (1) marked limitations in maintaining regular attendance, accepting instructions, responding appropriately to criticism, getting along with co-workers, and responding appropriately to stressors in a work setting; and (2) extreme limitations in maintaining attention and concentration, performing activities within a schedule, and interacting appropriately with the public. T. at 513-14. Additionally, Dr. Warnakulasuriya opined that plaintiff would be off task for more than thirty-three percent of a workday and miss three or more days per month. See id. at 514. The ALJ concluded that "Dr. Warnakulasuriya's opinion was not persuasive." Id. at 26. The ALJ explained that Dr. Warnakulasuriya's limitations regarding plaintiff being off task or absent from work "were speculative." Id. Moreover, the ALJ observed that plaintiff "does not live in a supportive environment, and ... is able to perform activities of daily living without assistance. The claimant was able to attend medical appointments, advise her doctors of her medical history, live alone, and provide for her child. These activities contradicted the severity of the limitations noted by Dr. Warnakulasuriya." Id. Dr. Warnakulasuriya's treatment notes reflect that in 2018 and 2019, plaintiff had "poor attention span and concentration," pressured speech, "inappropriate mood and affect[,]" "flight of ideas" and "difficulty concentrating." Id. at 578, 586, 617. The ALJ did not explain the extent to which Dr. Warnakulasuriya's opinion was consistent with, or supported by, his own notes or the medical record as a whole. See id. at 26.

The ALJ discounted Ms. Dearie's and Dr. Warnakulasuriya's opinions because plaintiff was "still capable of taking care of her activities of daily living[,] car[ing] for a young child without assistance[,]" "attend[ing] medical appointments, [and] advis[ing] her doctors of her medical history." T. at 25-26. The ALJ stated that plaintiff "reported being able to shop, go out alone, cook, do laundry, clean, bathe, dress, and groom herself ... she lived alone with her 15-month-old daughter ... [and] she walked daily because she did not have a car[.]" Id. at 23. The ALJ cited three records to support plaintiff's activities of daily living: Dr. Jenouri's physical consultative examination and two treatment records from

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 134 of 189
Elizabeth P. v. Commissioner of Social Security, Slip Copy (2022)

2022 WL 507367

Staci J. Olsen, M.D. See id. at 23-26, 331, 343, 377-80. Dr. Jenouri noted that plaintiff "reports cooking five times a week. She shops on occasion. She showers and dresses on occasion. She watches TV and listens to the radio." Id. at 377. The record the ALJ cited to support the contention that plaintiff lived alone with her fifteen-month-old daughter reads: "Patient states that July 15 she rolled down a hill while chasing her daughter and injured her left knee and left foot. Pt is currently being seen by orthopedic and PT for her left knee.... Patient is unable to hold her 15 month old daughter." Id. at 343. The record the ALJ cited to support the contention that plaintiff walks everywhere because she does not have a car also stated that plaintiff's "daughter [occasionally] goes to stay with Godparents...." Id. at 331. Ms. Dearie noted that plaintiff had "some family who do help with the baby at times." Id. at 440

During her hearing, plaintiff testified that her daughter, who was three years old at the time, plays with her toys or sits on plaintiff's lap playing with her tablet. See T. at 52-53. She explained that she does not like leaving the house and only goes out on her deck if her daughter wants to play outside, and a friend takes plaintiff and her daughter to the park. See id. at 59-60. She also testified that she uses paper plates because she loses feeling in her hands if she cleans for too long, her "best friend does [her] laundry[,]" and her neighbor carries her groceries inside. Id. at 53-55; see Baker, 2019 WL 1062110, at *28 ("It should also be noted that, even if [the] [p]laintiff was able to perform certain activities of daily living, this would not have precluded a finding of disability, especially if she could only perform those activities to a limited extent or needed assistance to engage in them."); but see Freund v. Berryhill, No. 17-CV-9967 (JOP), 2019 WL 1323992, at *12 (S.D.N.Y. Mar. 25, 2019) (citing Ellington v. Astrue, 641 F. Supp. 2d 322, 332 (S.D.N.Y. 2009)) ("If a claimant performs housework on a daily basis, the ALJ can consider such work as evidence that the claimant is not disabled.").

In her function report, plaintiff explained: a friend watches her daughter when she has appointments; putting shoes on is difficult; her arms and shoulders hurt when she brushes her hair; she has trouble getting off of the toilet; she "put[s] sticky notes for reminders to take shower"; she only goes outside for her appointments; she goes shopping once a month, but had not gone in three months; she can pay bills and count change but she is finding it harder to concentrate; and she has trouble remembering things if they are not written down. T. at 235-42. Dr. Slowik noted in her consultative examination

that plaintiff would need help managing funds because of self-reported difficulty in that area. See id. at 375.

**\*13** It appears that the ALJ omitted relevant testimony and information related to plaintiff's activities of daily living and cited only the portions of the record that support the RFC. Thus, the Court cannot reconcile the ALJ's decision to find the various medical opinions less persuasive because of those activities. See Amber H., 2021 WL 2076219, at *6 ("Considering [the] plaintiff's statements regarding her activities of daily living in their totality, the court cannot agree that they are consistent with, or constitute substantial evidence of, [the] plaintiff's purported ability to perform the lifting, walking, or standing requirements of light work."); Pamela P., 2020 WL 2561106, at *6 ("There is no apparent connection between" "[t]he daily activities identified by the ALJ includ[ing] [the] [p]laintiff's ability to dress, bathe, and groom herself, prepare meals, grocery shop, provide childcare, and do laundry" and the "[p]laintiff's mental functional abilities."); but see Williams v. Colvin, No. 14-CV-947S (WMS), 2017 WL 3404759, at *7 (W.D.N.Y. Aug. 9, 2017) (finding no error where "the ALJ considered [the p]laintiff's ability to perform basic activities when he determined that it contradicted [a medical] opinion, [but] he also considered [the p]laintiff's symptoms and the objective medical record."). The ALJ's reliance on plaintiff's activities of daily living to discount the medical opinions is especially problematic when it is viewed in combination with the insufficient review of the medical opinions under the consistency and supportability factors, as discussed above.

### 3. Medical Opinions Related to Time-Off Task and Absenteeism

Five medical providers opined that plaintiff would be off task or absent from work because of her mental or physical impairments: (1) Ms. Dearie opined that plaintiff would miss ten days per month; (2) Ms. Bishop determined that she would be off task for ten- to fifteen-percent of a day and miss three days per month; (3) Dr. Khan stated that plaintiff would be off task twenty percent of the day and miss two day per month; (4) Dr. Warnakulasuriya opined that plaintiff would be off task for thirty-three percent of a day and miss three or more days per month; and (5) Ms. O'Brien and Dr. Bouali found that plaintiff would be off task between twenty and thirty-three percent of a workday and miss three days per month. See T. at 415, 432, 471-72, 514, 624. Each opinion is work preclusive because the vocational expert testified

that "[a]nything greater" than one unexcused absence per month or more than fifteen percent off task "rules out all employment." Id. at 79. The ALJ did not reconcile these opinions. Under the specific circumstances of this case, the ALJ's failure to explain sufficiently the supportability and consistency of each opinion relating to time off task and absenteeism with the treatment record and the other opinions requires remand. [12] Compare Pamela P., 2020 WL 2561106, at *6 (remanding where "[a]ll of the opinions ... recognize that [the] [p]laintiff has some degree of limitation in her ability to attend and concentrate on the job, though those opinions range from some degree of moderate limitation to an extreme limitation."), with Tamara M. v. Saul, No. 3:19-CV-1138 (CFH), 2021 WL 1198359, at *10 (N.D.N.Y. Mar. 30, 2021) ("That [two] [treating providers] reached similar but conclusory findings does not entitle either of them to greater weight – their consistency with each other does not equate to consistency with the overall medical treatment notes or the other well-supported medical opinions.").

[12]   The Commissioner argues that the opinions that provided a time off task or absenteeism limitation are less persuasive "because the providers gave no explanation for their limitations and their treatment notes did not supply that missing justification" but the ALJ found that the opinions of those who opined no time off task limitations to be persuasive because they "included narrative explanations and identified objective findings to support their limitations." Dkt. No. 18 at 3, 15. The ALJ did not articulate this reasoning in her decision, and the Court will not consider post hoc rationalizations. See Tasha W. v. Comm'r of Soc. Sec., No. 3:20-CV-731 (TWD), 2021 WL 2952867, at *8 (N.D.N.Y. July 14, 2021) ("Post hoc explanations do not constitute substantial evidence.").

As the Commissioner points out, this Court has rejected arguments similar to plaintiff's regarding an ALJ's determination that a time off task limitation is speculative. See Dkt. No. 18 at 13; see Amanda R. v. Comm'r of Soc. Sec., No. 6:20-CV-596 (DNH), 2021 WL 3629161, at *6 (N.D.N.Y. Aug. 17, 2021). The Commissioner relies primarily on Tamara M.; however, there, the ALJ applied the treating physician rule and explained that "in finding several medical records indicating normal or less than severe findings, the ALJ reasonably concluded that [two] highly restrictive opinions were unsupported by their treatment notes, and, therefore, were speculative." 2021 WL 1198359,

at *8. Moreover, "only [one] acceptable medical source [ ] conclude[d] that these limitations were above a moderate degree of restriction." Id. at *4. Here, the ALJ was bound by the new regulations to "explain how [she] considered the supportability and consistency factors for [the] medical source's medical opinions[.]" 20 C.F.R. § 404.1520c(b)(2). Stating that a portion of an opinion is "speculative" without reference to that provider's records or the record as a whole does not explain the supportability or consistency of the opinion such that the Court can glean the ALJ's rationale. Further, unlike Tamara M., all five medical opinions opining off-task limitations are work preclusive. See T. at 24-26.

 **\*14**   This Court has explained that findings related to time off task or absenteeism present "analytical difficulty" because "neither ... can be readily confirmed or dispelled just by examining treatment notes or objective criteria ... [but] rest in some substantial part on the black box of the treating providers' experience with [the] plaintiff's various conditions." Amanda R., 2021 WL 3629161, at *8. "Thus, one place an ALJ can look to analyze this issue is to other opinions in the record that examine the overall severity of a claimant's mental impairments in the relevant functional area." Id. "Another place an ALJ can look is to a claimant's activities of daily living, which sometimes shed light on the ability to make and keep a routine and/or a daily schedule." Id. (explaining that the ALJ appropriately noted that the time off task opinions appeared "with[out] a clear record-based explanation[,]" and appropriately recounted the records indicating the "relatively 'mild' mental limitations caused by [the] plaintiff's bipolar disorder" and "[the] plaintiff's self-reported ability to perform a fairly wide range of activities of daily living[ ]").

Here, the ALJ did not appropriately review the severity of plaintiff's limitations in considering how they affect plaintiff's ability to remain on task or regularly attend work, nor did she reconcile the five opinions opining off-task limitations with one another. See T. at 22-26. Additionally, although the ALJ reviewed plaintiff's activities of daily living, she seemingly ignored records that indicated that plaintiff was less capable. Without sufficient explanations in both areas, the Court cannot determine whether the ALJ's decision regarding plaintiff's time off task and absenteeism is supported by substantial evidence. Accordingly, remand is warranted for further consideration of the supportability and consistency factors considering the entire record. See, e.g., Nicole L., 2022 WL 160274, at *10 (remanding for consideration

of the plaintiff's "overall RFC" and the consistency and supportability of the medical opinions of record).

### B. Equally-Persuasive Opinions

Plaintiff raises a related argument that the ALJ erred by "never articulat[ing] how [s]he considered the additional factors in § 404.1520c(c)(3)-(5)[.]" Dkt. No. 13 at 23. The Commissioner argues that the ALJ was not required to review the remaining 20 C.F.R. § 404.1520c(c) factors because, "although the ALJ described different opinions as being minimally or partially persuasive, those opinions were not identical[ ]" and the ALJ did not find "two or more medical opinions ... equally well-supported." Dkt. No. 18 at 26.

The regulation states:

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(3). Given the relative novelty of the regulations, there is a dearth of caselaw interpreting what triggers the ALJ's responsibility to discuss the "other most persuasive factors[.]" 20 C.F.R. § 404.1520c(b)(3). The SSA, in providing comments on the regulations, explained that, "[b]ecause the content of evidence, including medical opinions ..., varies with each unique claim, it would not be appropriate to set out a detailed rule for when this situation may occur. We expect that each adjudicator will use his or her discretion to determine when this situation occurs." Revisions to Rules Regarding the Evaluation of Medical Evidence,

82 Fed. Reg. 5844, 5858 (SSA Jan. 18, 2017). Further, the SSA stated that, "[u]nder final sections 404.1520c(b)(3) and 416.920c(b)(3), the medical opinions ... must be 'both equally well-supported' under sections 404.1520c(c)(1) or 416.920c(c)(1) 'and consistent with the record' under sections 404.1520c(c)(2) or 416.920c(c)(2). In addition, the opinions or prior administrative medical findings must not be 'exactly the same.' " Id. (emphasis added). The Court therefore reads the regulations, in combination with the SSA's comments, to mean that for the ALJ to be required to discuss the remaining factors he or she must find that two medical opinions: (1) address the same issue; (2) are both well-supported (meaning that a finding that two opinions are unpersuasive would not trigger this requirement); (3) are both consistent with the record; and (4) the opined limitations or conclusions are not identical. See Kelly B.R. v. Kilakazi, No. 2:20-CV-00339 (JHR), 2022 WL 204634, at *4 (D. Me. Jan. 23, 2022) ("[M]erely using the same descriptor for two or more opinions (e.g., 'not very persuasive') does not render them 'equally persuasive.' The ALJ neither characterized any two or more opinions or administrative findings as 'equally persuasive' nor made the underlying nuanced findings [that they were equally well-supported and consistent] supporting such a characterization[.]"); Parr v. Comm. of Soc. Sec., No. 2:20-CV-13173, 2021 WL 5986920, at *8 (E.D. Mich. Aug. 31, 2021), report and recommendation adopted, 2021 WL 5370483 (E.D. Mich. Nov. 18, 2021) ("When medical opinions or prior administrative findings are 'equally persuasive,' 'well-supported' and 'consistent with the record' [and are] 'about the same issue,' 'but are not exactly the same,' [the ALJ] will articulate how [he or she] considered the other most persuasive factors[.]").

**\*15** Here, it appears that there are two medical opinions that trigger this requirement. The ALJ found Dr. Putcha's and Dr. Jenouri's opinions to be "partially persuasive." T. at 24-25. Both opinions were addressing the same issue—plaintiff's physical limitations. See id. at 93-94, 380. The ALJ found that they were "consistent with the record[.]" Id. at 24-25. The ALJ also found that in both instances, the record supported "additional and more severe restrictions" or "slightly greater restrictions" but were otherwise well-supported. Id. at 24-25. Finally, the physicians opined different physical limitations. See id. at 93-94, 380. Although the Court is ordering remand because of the deficiencies in the ALJ's review of the consistency and supportability factors, on remand the Commissioner should note the remainder of the additional factors when required to do so by the regulations. [13]

13    As remand is required, the Court does not reach
plaintiff's remaining arguments concerning the
ALJ's RFC and step-five determinations, and the
alleged deficiencies in Dr. Kamin's opinion. See
Dkt. No. 13 at 25-27; see also Devra B. B. v.
Comm'r of Soc. Sec., No. 6:20-CV-00643 (BKS),
2021 WL 4168529, at *8 (N.D.N.Y. Sept. 14, 2021)
("Because the Court has determined that remand
is required, the Court does not reach Plaintiff's
remaining arguments.").

### VI. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**ORDERED**, that plaintiff's Motion for Judgment on the
Pleadings, Dkt. No. 13, is **GRANTED**; and it is further

**ORDERED**, that defendant's Cross-Motion for Judgment on
the Pleadings, Dkt. No. 18, is **DENIED**, and the matter is
**REVERSED** and **REMANDED** pursuant to sentence four
of 42 U.S.C. § 405(g), to the Commissioner for further
proceedings consistent with this Memorandum-Decision &
Order.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 507367

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Flores v. Commissioner of Social Security, S.D.N.Y., December 8, 2022

2021 WL 3475625
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Enzo PRIETO Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

20-CV-3941 (RWL)
|
Signed 08/06/2021

**Attorneys and Law Firms**

Joseph Albert Romano, Law Office of Joseph A. Romano, Bronx, NY, for Plaintiff.

Joseph Anthony Pantoja, U.S. Attorney's Office, SDNY, New York, NY, for Defendant.

## DECISION AND ORDER:
## SOCIAL SECURITY APPEAL

ROBERT W. LEHRBURGER, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff Enzo Prieto, represented by counsel, commenced the instant action against Defendant Andrew Saul, Acting Commissioner of the Social Security Administration (the "Commissioner") pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that Prieto is not entitled to disability insurance benefits under 42 U.S.C. § 423 et seq. Prieto has filed a motion for summary judgement on his claims pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. (Dkt. 22.) The Commissioner opposes the motion and seeks judgement on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 24.) For the reasons stated below, this Court concludes that Prieto's motion should be GRANTED, the Commissioner's motion should be DENIED, and the case should be REMANDED.

## Background

### A. Prieto's Personal And Employment History

Enzo Prieto was born on February 14, 1973. Prieto has a twelfth-grade education and worked as a handyman for fifteen years. (R.102, 115. [1] ) As a handyman, Prieto was responsible for performing repair and maintenance tasks. (R. 240.) Prieto was able to walk and stand for eight hours each day, sit for one hour each day, and frequently lift and carry fifty pounds or more. (R. 240.) Prieto began suffering back pain in November 2015 after attempting to lift a piano into a sanitation truck. (R. 340.) He was forty-two years old at the onset of his injury. (R. 87, 239.) After that incident, Prieto took three days off work and thereafter "continued [to work] with low-grade symptomatology" on "light duty." (R. 428.) Several months later, in March 2016, Prieto reinjured his back moving a five-pound bucket of compound. (R. 428.) Prieto has not worked since. (R. 686.)

[1]     "R." refers to the Administrative Record (Dkt. 14).

### B. Procedural History

On May 11, 2017, Prieto filed an initial claim for disability insurance benefits ("DIB") pursuant to the Social Security Act (the "Act"), alleging disability beginning on November 12, 2015, as a result of the spinal injury he incurred while working as a handyman. (R. 210.) On July 12, 2017, the Social Security Administration (the "Administration") denied his claim, concluding that Prieto's condition was "not severe enough to keep [him] from working." (R. 125.) On August 16, 2017, Prieto requested a hearing before an Administrative Law Judge ("ALJ") to review his claim, which took place on December 12, 2018 (the "Hearing"). (R. 133-34, 78-106.) Prieto, represented by counsel, appeared for a video hearing before ALJ George Gaffney. (R. 78-106.) The ALJ took testimony from Prieto and a vocational expert.

On January 25, 2019, the ALJ issued a decision finding Prieto not disabled and denying Prieto's claim. (R. 39-47.) Prieto timely appealed the ALJ's decision to the Appeals Council, but on April 24, 2020, his request was denied, rendering the ALJ's decision the final determination of the Commissioner. (R. 1-4.) On May 21, 2020, Prieto filed the operative complaint, seeking district court review pursuant to 42 U.S.C. § 405(g). (Dkt. 1.) On July 10, 2020, the parties consented to my jurisdiction for all purposes. (Dkt. 11.)

### C. The Medical Treatment Record

 **\*2** Both Prieto and the Commissioner have provided summaries of the medical evidence and other facts contained in the Record. Each party emphasizes the facts most favorable to their position; however, the summaries are consistent in material respects. The Court accordingly adopts Prieto's and the Commissioner's summaries of the medical evidence and other objective facts as accurate and complete for purposes of the issues raised in the cross-motions. Rather than reprise all the medical evidence presented by the parties, the Court discusses the medical evidence relevant to Prieto's disorders of the spine and to the adjudication of the motions in the context of the legal analysis below.

The Court notes here, however, that Prieto received treatment from two physicians from whom no medical source opinions appear in the record. Given the importance of that omission, the Court summarizes those two treatment relationships.

From 2015 to 2018, Prieto sought treatment for his chronic back pain from Dr. Yong Kim, an orthopedic surgeon, at least nineteen times. (R. 315-38, 357-58, 394-413, 440-441, 446-552.) On June 6, 2016, Dr. Kim performed a lumbar transforaminal epidural steroid injection on Prieto. (R. 333-34.) The injection, however, did not provide Prieto with sufficient pain relief, which led Dr. Kim to perform a lumbar laminectomy for lumbar spinal stenosis on September 13, 2016. (R. 304.) Despite the lumbar laminectomy, Prieto continued to experience considerable pain. Once again, attempting to treat Prieto's pain, Dr. Kim performed lumbar spine fusion surgery on January 23, 2018. (R. 511-27.) Even after the surgery, however, Prieto's pain persisted. (R. 534.) Upon examination on May 11, 2018, Dr. Kim determined that Prieto was temporarily, totally disabled; and after another examination on August 3, 2018, Dr. Kim determined that Prieto was temporarily disabled. (R. 544, 550.)

From 2015 to 2018 Prieto also consistently sought treatment for his back from Dr. Marc L. Orgel, his primary care provider. On initial examination in 2015, Dr. Orgel diagnosed Prieto with "lumbago, primary." (R. 570.) In August 2016, Dr. Orgel noted in Prieto's pre-operative medical assessment that he "ha[d] persistent lower back pain, radiating to the right lower extremity," "ha[d] been diagnosed with a herniated intervertebral disc," and his "low back pain ha[d] not improved with [physical therapy]." (R. 700.) Months later in December 2017, Dr. Orgel noted that Prieto was "ambulatory with assistance of a cane." (R. 729.) As with Dr. Kim, Prieto and Dr. Orgel have a bona fide doctor-patient relationship; the ALJ obtained several hundred pages of Prieto's medical

records from Dr. Orgel when purporting to develop the record. (R. 567-781.)

### D. Opinion Evidence

#### 1. Workers' Compensation Evaluations
In connection with a claim for workers' compensation, Prieto was examined and given disability evaluations by three healthcare providers. First, Dr. Regina Hillsman, an orthopedic surgeon, performed an independent medical examination on Prieto on May 12, 2015. (R. 353-55.) Dr. Hillsman found that despite Prieto's limited spinal mobility, Prieto was still able to ambulate without an assistive device and did not have muscle atrophy. (R. 354.). Prieto was diagnosed with a "lumbar sprain/strain, resolving." (R. 355.) Dr. Hillsman opined that Prieto may work but cannot carry or lift objects over fifteen pounds. (R. 355.)

Second, Dr. Carl Wilson, an orthopedic surgeon, performed an independent orthopedic medical evaluation on Prieto on January 4, 2017. (R. 428.) During the examination, Prieto shared that he still had "pain in [his] back and right leg, pain when walking, sitting, [and] sleeping." (R. 428.) Dr. Wilson noted that Prieto exhibited "difficulty in maneuvering, twisting, and bending; slow walking, [used] no orthotics or ambulatory aids" and demonstrated positive straight leg raise, indicating pain. (R. 429.) Dr. Wilson noted that Prieto's "[t]reatment ha[d] been reasonable and necessary" and that he "ha[d] a marked temporary restriction of work activity precluding any lifting, twisting, or bending. He [was] unable to extensively stand or walk or climb stairs." (R. 429.) Accordingly, Dr. Wilson opined that Prieto had marked disability. (R. 430.)

 **\*3** Third, Dr. Pierce Ferriter, an orthopedic surgeon, performed two independent medical examinations on Prieto. The first exam occurred on November 8, 2017. (R. 454-58.) Dr. Ferriter observed that Prieto had limited spinal mobility; more specifically, his flexion was at 50/90 degrees, his extension was at 10/30 degrees, right and left lateral bending at 15/30 degrees, and right and left rotation at 50/80 degrees. Dr. Ferriter also observed a positive straight leg raise in the sitting and supine positions. (R. 457.) Despite Prieto's limitations, Dr. Ferriter observed full motor strength and no muscle atrophy in the lower extremities. (R. 457.) Based on his examination and the review of Prieto's medical records, Dr. Ferriter opined that Prieto had a 75% degree of causally related disability and was able to return to light work "with

restrictions of no repetitive bending and no heavy lifting greater than 10 pounds." (R. 457.)

Dr. Ferriter's second examination took place on June 28, 2018, after Prieto's lumbar fusion surgery. (R. 459-62.) During the examination, Prieto complained of back pain and reported "difficulty with walking, bending, sleeping and lifting." (R. 460.) Prieto had taken Tramadol and was using a cane. (R. 460.) Dr. Ferriter observed that Prieto's flexion was at 70/90 degrees, his extension was at 20/30 degrees, right and left lateral bending at 20/30 degrees, and right and left rotation at 60/80 degrees. (R. 461.) Dr. Ferriter also observed a negative straight leg raise in the sitting and supine positions. (R. 461.) Prieto's motor and muscle strength remained unchanged from the time Dr. Ferriter had previously examined him. (R. 461.) Based on his examination, Dr. Ferriter opined that Prieto demonstrated "evidence of a moderate (50%) disability," and could "return to light duty work with restrictions of no repetitive bending and no lifting greater than 10 pounds." (R. 461-62.)

### 2. Consultative Examining Doctor

Dr. Carol McLean Long conducted a one-time consultative examination of Prieto on July 3, 2017. (R. 388-93.) During the examination Prieto rated "the pain in [his] back [at] about an 8/10." (R. 388.) Prieto also complained of leg pain, and Dr. Long observed that Prieto's spine had a limited range of motion. She also noted that Prieto was able to ambulate slowly without an assistive device, had a negative straight leg raise test, and no evidence of muscle atrophy. Under "activities of daily living" Dr. Long wrote that "claimant can do cooking, cleaning, laundry, shopping, and childcare. He can shower and dress himself daily, but sometimes he needs help with the lower half. He watches TV, listens to the radio, and goes out for walks for exercise." (R. 389.) Dr. Long also stated that Prieto "can walk about two to three blocks," but it "takes him 15 minutes." (R. 388.) Dr. Long opined that at the time of examination Prieto had mild to moderate limitation in his ability to squat and walk on heels and toes, and concluded the exam with a "fair" prognosis. (R. 391.)

### E. Prieto's Testimony Before The ALJ

At the Hearing, Prieto testified that he uses his cane at all times, including in his home because it is "very difficult to walk without it." (R. 83.) The ALJ, however, noted that after the lumbar fusion surgery Prieto's medical records did not reflect "any use of a cane." [2] (R. 93.) Prieto also testified that he had been taking Tramadol, cyclobenzaprine, diclofenac,

and Aleve from January 2017 to the time the hearing took place. (R. 82.) Prieto noted that the medication makes him very drowsy, and he "can't function the next day off the medication." (R. 90.) In addition to his medication, Prieto lies down and uses a heating pad to help alleviate his pain. (R. 98.) At the hearing, Prieto's pain was so intense from sitting that he had to stand in order to obtain temporary relief. (R. 84.) He testified that his daily functions are limited – he is able to bathe and dress himself, but he requires help putting on his socks and shoes. (R. 88.) His wife takes care of the cooking, cleaning, laundry, and shopping. (R. 88-89.) Prior to his injury, he handled the shopping. (R. 89.)

[2]   The ALJ's statement was incorrect. Dr. Ferriter noted Prieto's use of a cane at his June 28, 2018 examination, after the lumbar fusion surgery. (R. 460.)

**\*4**  Prieto stated that on a typical day he "do[es not] do much" because he is "in pain" and his medications "drowse [him] out." (R. 90-91.) He tried to go off the pain medications for a time after his surgery because of the side effects, but the "pain was too intense," so he "had to go back on the medication." (R. 95.) Other than doctors' appointments, he does not leave his house and he does not have hobbies. (R. 91.) He is only able to "walk a block and a half, maybe two." (R. 93.) He cannot lift or carry objects, stoop, kneel, or crouch. (R. 93.) He noted that he still sees Dr. Kim regularly, as he continues to have pain in his lower back and leg. (R. 89.) Prieto noted that Dr. Kim recommended physical therapy, but it exacerbated his pain. (R. 90.) He had also been referred to a new doctor, Dr. Kahn, for pain management, and to a neurologist. (R. 89-90.)

### F. Vocational Expert's Testimony

At the Hearing, Jacquelyn Schubacker, a vocational expert, noted that Prieto was previously employed as a handyman, which is characterized as a skilled, SVP 7 job that is medium work as defined in 20 C.F.R. § 404.1567(c), although Prieto performed it as heavy work as defined in 20 C.F.R. § 404.1567(d). [3] (R. 100.) The ALJ provided the vocational expert with two hypothetical scenarios that entailed a 45 year old individual. (R. 102.) The first hypothetical limited lifting to 20 pounds occasionally and 10 pounds frequently, standing and sitting, with a sit/stand option, to 6 hours out of an 8-hour workday; and also occasionally calling for one to "[use] stairs, stoop, balance, kneel, crouch, and crawl." (R. 102.) The hypothetical would also never require one to use ladders, but there would be "occasional exposure to extremes

2021 WL 3475625

of cold and to wetness." (R. 103.) The vocational expert posited that an individual with the same age, education, and work experience as Prieto could perform several jobs with this hypothetical profile, including inspector, hand packager, electrical accessories assembler, and plastic hospital products assembler. (R. 103.)

3    "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c). "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work." 20 C.F.R. § 404.1567(d).

Next, the ALJ provided a second hypothetical that "limit[ed] lifting to ten pounds occasionally; five frequently; stand[ing to] two hours in an eight-hour workday; [and] sit[ting] for six," with the remaining facts the same as the first hypothetical. (R. 104.) The vocational expert posited that an individual with the same age, education, and work experience as Prieto could perform a job with that hypothetical profile, including final assembler, inspection positions such as a touchup screener, and an order clerk. (R. 104.) When the ALJ inquired as to whether adding a cane to ambulate would alter the ability of the hypothetical profile to perform the jobs, the vocational expert responded that it would not alter her analysis. (R. 104.) Lastly, the vocational expert noted that if missing two days a month were added to the second hypothetical, Prieto would still be able to perform the previously listed jobs. (R. 104.) At the conclusion of the Hearing, the ALJ agreed that Prieto could not perform the work he previously did as a handyman, but he needed to decide whether Prieto was able to perform unskilled, light work.

**G. The ALJ's Decision**

Using the five-step sequential evaluation process that the Social Security Administration prescribes to determine whether an individual is disabled, the ALJ decided that Prieto was not disabled under sections 216(i) and 223(d) of the Social Security Act and thereby was not entitled to disability insurance benefits. (R. 47.) Steps one and two are not at issue in the instant case, as the ALJ determined that Prieto has not engaged in substantial gainful activity since the day of his

accident, and that Prieto has the following severe medically determinable impairments: asthma, tobacco dependence, and degenerative disc disease status-post lumbar spine surgery. (R. 41.) The degenerative disc disease status-post lumbar spine surgery is particularly relevant.

**\*5** At step three, the ALJ determined that Prieto's spine disorder was not of a severity to meet or medically equal the criteria of Listing 1.04, *Disorders of the Spine*, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525 and 404.1526). (R. 42.) In making this determination, the ALJ simply recited a portion of the definition of Listing 1.04 and made the following conclusory statement:

> The claimant's degenerative disc disease does not meet or equal Listing 1.04, *Disorders of the Spine*. The claimant does not have a disorder of the spine resulting in compromise of a nerve root or the spinal cord with: evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication manifested by chronic nonradicular pain and weakness.

(R. 42.) At no point did the ALJ reference the record to provide support for his determination.

Lastly, the ALJ found that Prieto had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except he could occasionally lift 20 pounds, frequently lift 10 pounds, stand, sit, and walk for six hours out of an eight-hour day, and required a sit/stand option. (R. 42.) He could never climb ladders, occasionally climb stairs, stoop, balance, kneel, crouch, and crawl, and could tolerate occasional exposure to cold extremes, wetness, and hazards. (R. 42.) The ALJ also determined that although Prieto had "an underlying medically determinable physical [ ] impairment ... that could be reasonably expected to produce claimant's pain or other symptoms," Prieto's "statements concerning the

intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 43.)

The ALJ concluded that Prieto's combination of impairments did not rise to a disabling level because the medical treatment notes indicate that he retained more functional capacity than alleged. (R. 43.) For support, the ALJ referenced the opinions of Drs. Hillsman, Wilson, Ferriter, and Long. With the exception of Dr. Long's opinion, every opinion that the ALJ relied on was procured for Prieto's workers' compensation claim. When considering the medical opinions of Drs. Wilson and Ferriter in his decision, the ALJ noted that, per 20 C.F.R. §§ 404.1504 and 416.904,

> a decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. ... Therefore, a determination made by another agency ... that you are not disabled or blind is not binding on us.

(R. 44.) The ALJ used that rule as justification to assign "little weight" to the medical opinions of Drs. Wilson and Ferriter. Conversely, the ALJ arbitrarily did not assign "little weight" to Dr. Hillsman's opinion, despite the fact that Dr. Hillsman's opinion was also procured for Prieto's workers' compensation claim. Instead, the ALJ assigned "less than great weight" to Dr. Hillsman's opinion. Dr. Hillsman opined "that [Prieto] could not lift or carry more than 15 pounds" and "the medical evidence discussed demonstrates that [Prieto] retains the ability to occasionally lift 20 pounds and frequently lift 10 pounds." (R. 44-45.) The ALJ did not cite to the record to support his hypothesis of Prieto's lifting capabilities. In reaching his conclusion regarding Prieto's residual functional capacity, the ALJ relied upon the opinions of Dr. Long – which he assigned great weight – and Dr. Hillsman – which he assigned "less than great weight" – and failed to even mention Drs. Kim or Orgel anywhere in his decision, even though they were Prieto's treating physicians.

**\*6** In accordance with the vocational expert's testimony, the ALJ noted that Prieto was unable to perform any past relevant work as a handyman because it required greater exertional capacity than Prieto had based on his residual functional capacity assessment. (R. 45.) The ALJ nonetheless found that considering Prieto's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Prieto could perform. (R. 46.) The ALJ referenced the jobs that the vocational expert testified Prieto would be able to perform, such as inspector, electrical assembler, and hospital product assembler. (R. 46.) The ALJ thus concluded that Prieto had not been under disability, as defined in the Social Security Act, from November 12, 2015, through the date of the decision. (R. 46.)

## Applicable Law

### A. Standard of Review

The court's review of an appeal of a denial of disability benefits requires two levels of inquiry. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. *Id*. So long as they are supported by substantial evidence in the administrative record, the findings of the ALJ after a hearing as to any facts are conclusive. 42 U.S.C. § 405(g).

An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g., id.* (regulation); *Schaal v. Callahan*, 993 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his or her reasoning. *Crysler v. Astrue*, 563 F. Supp.2d 418, 429 (N.D.N.Y 2008).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Social Security Administration Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d

108, 112 (2d Cir. 2009)). Thus, the court does not determine de novo whether a claimant is disabled. *Id.* The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)). Pursuant to the substantial evidence standard, a reviewing court may reject an ALJ's findings of fact "only if a reasonable factfinder would have to conclude otherwise." *Brault,* 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala,* 29 F.3d 1287, 1290 (8th Cir. 1994)).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. § 423(d)(5)(B). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue,* 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Commissioner Of Social Security,* 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler,* 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart,* No. 01-CV-1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

**\*7** If the decision denying benefits applied the correct legal standards and is based on substantial evidence, the reviewing court must affirm; if not, the court may modify or reverse the decision, with or without remand. 42 U.S.C. § 405(g).

## B. Legal Principles Applicable To Social Security Determinations

### 1. Overview Of The Five-Step Inquiry

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is entitled to receive disability benefits, the Commissioner conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not gainfully engaged in any activity, the Commissioner must determine whether the claimant has a "severe impairment" that significantly limits the claimant's ability to do basic work activities. Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe." 20 C.F.R. § 404.1520(a)(4)(ii). Third, if the claimant has a severe impairment, the Commissioner must determine whether the impairment is (or medically equals) one of those included in the "Listings" of the regulations contained at 20 C.F.R. Part 404, Subpart P, Appendix 1. If it is, the Commissioner will presume the claimant to be disabled, and the claimant will be eligible for benefits. 20 C.F.R. § 404.1520(a)(4)(iii).

After step three, but before step four, the Commissioner must assess the claimant's residual functional capacity – that is, the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her impairments. At step four, the ALJ determines whether the claimant possesses the residual functional capacity to perform the claimant's past work. 20 C.F.R. § 404.1520(a)(4)(iv). Fifth and finally, if the claimant is not capable of performing prior work, the Commissioner must determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proof at the first four steps. *Selian v. Astrue,* 708 F.3d 409, 418 (2d Cir. 2013). Once the claimant has established that they are unable to perform their past work, however, the Commissioner bears the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 642 (2d Cir. 1983)).

### 2. Evaluation Of Medical Opinion Evidence

**\*8** ALJs must consider medical opinion evidence of record. Until recently, regulations required application of the so-called "treating physician rule" pursuant to which the opinion of a claimant's treating physician presumptively was entitled to "controlling weight." 20 C.F.R. § 404.1527(c)(2). For claims filed prior to March 27, 2017, in order to assign less than controlling weight to the opinion of the treating physician, "the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam) (brackets omitted); *see also* 20 C.F.R. § 404.1527(c)(1)-(6). After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2). With respect to assigning weight to the opinions of non-treating physicians, an ALJ applying the earlier regulations must consider the same factors considered when the ALJ does not give controlling weight to a treating physician. 20 C.F.R. § 404.1527(c).

For claims filed on or after March 27, 2017, the new regulations promulgated in 20 C.F.R. § 404.1520c apply. Under the new regulations, a treating doctor's opinion is no longer entitled to a presumption of controlling weight. Instead, all medical opinions must be assessed under the same standard of supportability and consistency with no presumption that one opinion carries more weight than another. 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ... including those from your medical sources").

The new regulations give most importance to two of the same factors previously considered to determine whether a treating doctor's opinion should be given controlling weight; i.e., the extent to which a treating physician's opinion is supported by well-accepted medical evidence and not inconsistent with the rest of the record. 20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate the persuasiveness of medical opinions ... are supportability ... and consistency"). In most instances, the ALJ may, but is not required to, discuss the other factors previously required to assess medical opinion evidence (i.e., relationship with the claimant, specialization, and other relevant factors). 20 C.F.R. § 404.1520c(b)(2). The ALJ must consider those additional factors, however, if there are "two or more medical opinions or prior administrative medical findings about the same issue that are both equally well-supported [ ] and consistent with the record [ ] but are not exactly the same ...."[4] 20 C.F.R. § 404.1520c(b)(3).

4      More specifically, if medical opinions on the same issue are equally well-supported and consistent with the record but are not identical, the ALJ must "articulate how [he] considered the other most persuasive factors." 20 C.F.R. § 404.1520c(c)(3). Of the remaining factors, the third is the relationship with the claimant, for which the ALJ must consider the (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship. The fourth factor − specialization − requires the ALJ to account for whether the medical opinion is provided by a specialist that has expertise in the area related to the medical issue. Lastly, the fifth factor is a catchall, which accounts for "other factors that tend to support or contradict a medical opinion or prior administrative finding." That includes, but is not limited to, evidence showing a medical source has familiarity with other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(5).

**\*9** An ALJ must not only consider supportability and consistency in evaluating medical source opinions but also must explain the analysis of those factors in the decision. 20 C.F.R. § 404.1520c(b); *Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at \*6 (S.D.N.Y. Jan. 29, 2021), *R. & R. adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("in cases where the new regulations apply, an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion") (emphasis in original). As noted in the Administration's revisions to the regulations, "the articulation requirements in [the] final rules" are intended to "allow a ... reviewing court to trace the path of an adjudicator's reasoning ...." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017); *see also Amber v. Saul*, No. 20-CV-490, 2021 WL 2076219, at \* (N.D.N.Y. Feb. 24, 2021) ("Although the new regulations eliminate the perceived hierarchy of medical sources ... the ALJ must still 'articulate how [he or

2021 WL 3475625

she] considered the medical opinions' and 'how persuasive [he or she] find[s] all of the medical opinions") (alterations in original) (citing 20 C.F.R. § 404.1520c(a) and (b)(1)).

Under the previous regulations, an ALJ's failure to consider the factors prescribed by the treating physician rule was grounds for remand. Similarly, under the current regulations, an ALJ's failure to properly consider and apply the requisite factors is grounds for remand. [5] *See, e.g., Rivera v. Commissioner Of Social Security*, No. 19-CV-4630, 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), *R. & R. adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (remanding so that ALJ may "reevaluate the persuasiveness assigned to the opinion evidence of record and explicitly discuss both the supportability and consistency of the consulting examiner's opinions"); *Andrew G. v. Commissioner Of Social Security*, No. 19-CV-942, 2020 WL 5848776, at *6-9 (N.D.N.Y. Oct. 1, 2020) (remanding due to ALJ's failure to adequately explain the supportability or consistency factors that led her to her decision).

[5]     Although not relevant here, another modification under the revised regulations is that the ALJ now must analyze opinions at the source-level, rather than separately analyze multiple opinions of the same source presented in the record. 20 C.F.R. § 404.1520c(b)(1). That means that the ALJ "will articulate how [he] considered the medical opinions ... from [a] medical source together in a single analysis." *Id.*

## Discussion

Prieto argues that the ALJ's decision should be reversed or remanded on several grounds. First, Prieto asserts that the ALJ failed to properly evaluate whether Prieto's impairments meet or equal Listings 1.04A and 1.04C. (Pl. Mem. at 15-17. [6]) In response, the Commissioner argues that there is substantial evidence in the record to support the finding that Prieto did not meet any subsection of Listing 1.04. (Def. Mem. at 16-19. [7]) Prieto further argues that the ALJ erred by failing to account for the side effects of Prieto's medication in determining Prieto's residual functional capacity. (Pl. Mem. at 17.) The Commissioner responds that the "record contains no treatment records corroborating [Prieto's] allegedly disabling medication side effects," and that Prieto's statements concerning the intensity, persistence, and limited effects of his symptoms "were not entirely

consistent with the medical evidence and other evidence of record." (Def. Mem. at 22-23.)

[6]     "Pl. Mem." refers to Prieto's "Memorandum Of Law In Support Of Plaintiff's Motion For Summary Judgment On The Pleadings" (Dkt. 22).

[7]     "Def. Mem." refers to the Commissioner's "Memorandum Of Law In Opposition To Plaintiff's Motion For Judgment On The Pleadings And In Support Of The Commissioner's Cross-Motion For Judgment On The Pleadings" (Dkt. 24).

**\*10**  Next, Prieto argues that the ALJ failed to afford any weight to the opinions of Prieto's treating physicians, Dr. Orgel and Dr. Kim, and improperly gave significant weight to the opinion of a one-time consultative examiner, Dr. Long. (Pl. Mem. at 17-19.) The Commissioner responds that Dr. Orgel, Prieto's primary care physician, did not supply a medical opinion, so there was no medical opinion to be weighed. (Def. Mem. at 19-21.) Additionally, the Commissioner notes that the "only opinions provided by [treating physician] Dr. Kim were that [Prieto] was disabled[;] those opinions were thus on matters reserved for the Commissioner and not entitled to any special significance." (Def. Mem. at 20.) Accordingly, the Commissioner argues that the ALJ's failure to reference Dr. Kim's opinions was, at most, harmless error. (Def. Mem. at 20.)

Prieto further argues that the ALJ failed to consider that his persistent efforts to obtain relief of pain and other symptoms bolstered his credibility. (Pl. Mem. at 19-21.) The Commissioner counters that the ALJ's decision plainly shows that the ALJ considered Prieto's complaints of back pain and the lengths he went to obtain treatment. (Def. Mem. at 24.) Lastly, Prieto argues that the ALJ failed to fully assess Prieto's need for an assistive device on his ability to perform light work. (Pl. Mem. at 21.) The Commissioner disagrees, emphasizing that at the Hearing the vocational expert testified that the jobs available to someone like Prieto would not be reduced if the hypothetical worker had to use a cane. (Def. Mem. at 5, 25.)

For the reasons discussed below, the Court finds that the ALJ erred principally by failing to sufficiently attempt to obtain the opinions of Prieto's treating physicians. As a result of that lapse, the ALJ failed to adequately develop the record and committed legal error. The ALJ also erred in failing to provide an analysis of supportability and consistency to

Case 6:21-cv-01138-MAD-TWD  Document 19  Filed 02/13/23  Page 146 of 189
Prieto v. Commissioner of Social Security, Slip Copy (2021)

2021 WL 3475625

justify his weighting of the medical opinions that are in the record. Remand is required to afford the ALJ an opportunity to remedy those errors.

**A. The ALJ Failed To Adequately Develop The Record**
Although Prieto did not raise an express challenge to the sufficiency of the record, the Court must independently consider whether the ALJ failed to satisfy his duty to develop the record. *Sanchez v. Saul*, No. 18-CV-12102, 2020 WL 2951884, at *23 (S.D.N.Y. Jan. 13, 2020) ("As a threshold matter, and regardless of the fact that the Plaintiff did not raise an express challenge to the adequacy of the Record, this Court must independently consider the question of whether the ALJ failed to satisfy his duty to develop the Record."), *R. & R. adopted*, 2020 WL 1330215 (S.D.N.Y. March 23, 2020); *Castillo v. Commissioner Of Social Security*, No. 17-CV-9953, 2019 WL 642765, at *7 (S.D.N.Y. Feb. 15, 2019). An ALJ has "regulatory obligations to develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *see* 20 C.F.R. § 416.912(b)(1). That obligation results from the non-adversarial nature of the instant proceedings, and exists "even when ... the claimant is represented by counsel." *Pratts*, 94 F.3d at 37. "Courts in this Circuit have held on multiple occasions," albeit in the treating physician context, "that remand is required when ALJs fail to satisfy their duty to develop the record ... by failing to request (and receive) a functional assessment from the treating physicians." *Romero v. Commissioner Of Social Security*, No. 18-CV-10248, 2020 WL 3412936, at *13 (S.D.N.Y. June 22, 2020).

The ALJ must make every reasonable effort to obtain evidence from the medical entity that maintains a claimant's medical records. 20 C.F.R § 404.1512(b)(1)(i). In order to have made a "reasonable effort," the ALJ must "make an initial request for evidence from [the claimant's] medical source or entity that maintains [the claimant's] medical source's evidence, **and**, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, [the ALJ] will make **one follow-up request** to obtain the medical evidence necessary to make a determination." 20 C.F.R. § 404.1512(b)(1)(i) (emphasis added). The receipt of some medical records is not enough to discharge an ALJ's duty. Rather,

> **\*11** the ALJ must obtain the treating physician's opinion

regarding the claimant's alleged disability; "raw data" or even complete medical records are insufficient by themselves to fulfill the ALJ's duty. ... It is the *opinion* of the treating physician that is to be sought; it is his *opinion* as to the existence and severity of a disability that is to be given deference.

*Dimitriadis v. Barnhart*, No. 02-CV-9203, 2004 WL 540493, at *9 (S.D.N.Y March 17, 2004) (emphasis in original) (internal citation omitted); *see also Pabon v. Barnhart*, 273 F. Supp.2d 506, 514 (S.D.N.Y 2003) ("[T]he duty to develop a full record ... compels the ALJ ... to obtain from the treating source expert opinions as to the nature and severity of the claimed disability ....") (alterations in original); *Alvarez v. Commissioner Of Social Security*, No. 14-CV-3542, 2015 WL 5657389, at *18 (E.D.N.Y. Sept. 23, 2015) ("In order to satisfy his threshold duty to develop the record, the ALJ had an obligation to obtain an opinion from Plaintiff's medical sources, including ... the doctors Plaintiff[ ] referenced in [his] testimony." When documents received by an ALJ "lack any necessary information, the ALJ should recontact the treating physician." *Oliveras Ex Rel. Gonzalez v. Astrue*, No. 07-CV-2841, 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *R. & R. adopted*, 2008 WL 2540816 (S.D.N.Y. June 25, 2008). A medical opinion is part of the "necessary information" that an ALJ should attempt to obtain from a treating physician. *See Dimitriadis*, 2004 WL 540493 at *9; *Vera v. Barnhart*, 2007 WL 756577, at *10 (S.D.N.Y. March 13, 2007) (remanding because "ALJ had a clear duty to seek an opinion from [claimant's treating physician] regarding the existence, the nature, and the severity of plaintiff's claimed disability" but did not).

Here, the ALJ did not make the requisite follow-up attempt to obtain medical opinions from either of the treating physicians – Drs. Orgel and Kim. On June 8, 2017, the ALJ requested medical records from Dr. Kim and from Montefiore Medical Center, where Dr. Orgel is employed. (R. 108-10.) Medical records were received from both Dr. Kim and Montefiore Medical Center; those records did not include, however, a medical opinion from either treating physician. (R. 108-10.) The ALJ had a duty to send a follow-up request to both Drs. Orgel and Kim. *See* 20 C.F.R § 404.1512(b)(1)(i). The record does not reveal any such follow-up attempt to obtain their medical opinions. Having failed to do so, the ALJ did not

fulfill his duty to develop the record, and his decision must be remanded for that reason alone. *See Rosa v. Callahan,* 168 F.3d 72, 80 (2d Cir. 1999) (remanding due to ALJ's failure to obtain "adequate information from [claimant's] treating physician"); *Wilson v. Colvin,* 107 F.Supp.3d 387, 402 (2d Cir. 1982) (remanding where there was an obvious gap in the record); *Oliveras,* 2008 WL 2262618 at *6-7 (remanding so the ALJ could make all reasonable efforts to obtain treating physician's opinion).

The Commissioner does not address the ALJ's failure to develop the record. He does, however, attempt to explain why the ALJ did not discuss the records of Drs. Orgel or Kim anywhere in his decision. The Commissioner makes separate arguments with respect to each doctor, but none of them make up for the ALJ's failure to sufficiently develop the record.

**\*12**  With respect to Dr. Orgel, the Commissioner argues that he did not provide a medical opinion, so there was no medical opinion to be weighed. (Def. Mem. at 20.) While that is true, the omission only highlights the ALJ's failure to develop the record. The Commissioner also argues that the ALJ was not required to discuss Dr. Orgel's treatment of Prieto because the ALJ was not obligated to discuss every piece of evidence in the record. (Def. Mem. at 19-21.) That too highlights the ALJ's failure to develop the record. In his decision, the ALJ relied on seeming inconsistencies between the independent medical examiners' reports and Prieto's testimony. (R. 43.) Where there are such conflicts or inconsistencies in the record, the ALJ " 'bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.' " *Hynes v. Astrue,* No. 12-CV-719, 2013 WL 3244825, at *11 (E.D.N.Y. June 26, 2013) (quoting *Hartnett v. Apfel,* 21 F.Supp.2d 217, 221 (E.D.N.Y. 1998)); *see also Louis v. Berryhill,* No. 17-CV-4597, 2018 WL 8545833, at *12 (S.D.N.Y. Oct. 11, 2018), *R. & R. adopted,* 2019 WL 1856490 (S.D.N.Y. April 25, 2019). Given the inconsistencies highlighted in the ALJ's opinion, the ALJ's failure to seek out additional information from Dr. Orgel was all the more significant.

With respect to Dr. Kim, the Commissioner implicitly argues that Dr. Kim's statements in his treatment notes were, in fact, medical opinions. The Commissioner makes that assertion in the context of arguing that the ALJ was permitted to dismiss Dr. Kim's opinion on the ultimate issue that Prieto was disabled. (Def. Mem. at 20.) The Commissioner is correct that Prieto's disability determination is a matter reserved for the ALJ but incorrect that Dr. Kim's statements were

medical opinions in the sense required in the DIB context. For purposes of determining an applicant's eligibility for disability insurance benefits, a medical opinion is:

> [A] statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions...;
>
> (ii) Your ability to perform mental demands of work activities...;
>
> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2). The record does not include a medical opinion from Dr. Kim discussing Prieto's ability to perform the physical demands of work activities and his ability to adapt to environmental conditions. (R. 318, 481, 544, 550.) The statements that Dr. Kim made as a part of Prieto's treatment notes thus do not equate to a medical opinion for the purposes of determining his eligibility for DIB. In short, the Commissioner cannot cover the ALJ's failure to obtain a medical opinion from Dr. Kim by characterizing as medical opinions statements that are not.

As aptly observed by another court, "[i]t is fundamentally unfair for the ALJ not to develop the record by obtaining treating sources' opinions while at the same time basing his disability determination, *inter alia*, on the ground that 'the record does not contain any non-conclusory opinions ... from treating or examining physicians indicating that the claimant is currently disabled.' " *Blair v. Colvin,* No. 16-CV-5983, 2017 WL 4339481, at *5 (S.D.N.Y. May 15, 2017), *R. & R. adopted,* 2017 WL 4342123 (S.D.N.Y. Sept. 27, 2017). The ALJ's affirmative duty to develop the record was thus especially important with respect to sending a follow-up request for a medical opinion from Dr. Kim.

The ALJ should have attempted to obtain medical source opinions from Drs. Kim and Orgel as to the limiting effects of Prieto's spinal impairment, particularly in light of their extensive histories treating Prieto. The ALJ's failure to do so

was legal error. Accordingly, this case will be remanded for further development of the record.

## B. The ALJ Did Not Properly Evaluate The Medical Opinions Of Record

**\*13** The ALJ also erred by failing to explain his application of the supportability and consistency factors to the medical opinions that he did consider. As noted, the ALJ "***must***," on a source-level, "explain his [ ] approach with respect to the [supportability and consistency factors] when considering a medical opinion." *Vellone*, 2021 WL 319354, at \*6 (emphasis in original); *see also* 20 C.F.R. § 404.1520c(b)(2) ("We will explain how we considered the supportability and consistency factors for a medical source's medical opinions ... in your determination or decision").

To analyze supportability, the ALJ must assess the objective medical evidence and supporting explanations presented with the medical opinions. The more relevant the evidence and explanations are, the more persuasive the medical opinion is. 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ... the more persuasive the medical opinions ... will be."). The ALJ must also analyze the consistency of the medical opinions. To do so, the ALJ must assess how consistent the medical opinion is with the other medical and nonmedical sources in the claim. The more consistent the medical opinion being analyzed is with the other sources, the more persuasive the medical opinion is. 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be.").

Here, the ALJ failed to satisfy his obligations under the applicable regulations. The ALJ afforded the most weight to the opinion of Dr. Long, the consulting doctor who examined Prieto one time. But rather than analyzing the supportability and consistency factors as applied to Dr. Long's opinion, the only reasoning the ALJ provided was entirely conclusory; the ALJ said only that Dr. Long's opinion was "supported by the medical evidence of record and by her underlying examination." (R. 45.) Such a conclusory statement is an insufficient explanation of the supportability factor and is grounds for remand. *See Vellone* 2021 WL 319354 at \*4 ("Eschewing rote analysis and conclusory explanations, the ALJ must discuss the 'crucial factors in any determination ... with sufficient specificity to enable

the reviewing court to decide whether the determination is supported by substantial evidence.") (internal citation omitted); *Warren I. v. Commissioner Of Social Security*, No. 20-CV-860506, 2021 WL 860506, at \*4 (N.D.N.Y. March 8, 2021) (remanded because the ALJ "failed to discuss what, if any, objective medical evidence and/or supporting explanations," supported the conclusions of the primary medical opinion on which he relied) (internal quotations omitted); *Brianne S. v. Commissioner Of Social Security*, No. 19-CV-1718, 2021 WL 856909, at \*5 (W.D.N.Y. March 8, 2021) (ALJ committed legal error by failing to adequately apply the supportability factor because the ALJ "did not examine what [the doctors] used to support their opinions and reach their ultimate conclusions.")

The ALJ further erred in his consideration of the three doctors who offered opinions in the workers' compensation context – Drs, Hillsman, Wilson, and Ferriter. The standard for disability for workers' compensation purposes is different than the standard for DIB and Supplemental Security Income. *Lopez v. Berryhill,*, 448 F.Supp.3d 328, 345 (S.D.N.Y. 2020); *see* 20 C.F.R. § 404.1504 ("Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled ... is based on its rules, it is not binding on us"). Accordingly, "the opinion provided in a workers' compensation claim ... is not controlling with respect to a claim of disability claim under the Act." *Urbanak v. Berryhill*, No. 17-CV-5515, 2018 WL 3750513, at \*24 (S.D.N.Y. July 18, 2018), *R. & R. adopted*, 2018 WL 3745667 (S.D.N.Y. Aug. 7, 2018); *see also Mangum v. Colvin*, 13-CV-4213, 2015 WL 629403, at \*11 n.13 (S.D.N.Y. Feb. 13, 2015) ("the characterization of Plaintiff as 'disabled' by medical providers for purposes of his Workers' Compensation claim is not particularly useful in the Social Security context because the two statutory schemes have completely different definitions of disability.") ALJs thus often afford workers' compensation medical opinions little weight. *See, e.g.*, *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 492 (S.D.N.Y. 2018) (finding that ALJ did not err in giving little weight to doctor's opinion provided in claimant's workers' compensation case, and noting that definition of disability in a workers' compensation context is not the same as under the Act).

**\*14** Nonetheless, in evaluating the medical opinions of doctors provided for workers' compensation purposes, the ALJ must consider the factors delineated in 20 C.F.R. § 404.1520c(c)(1-6). *See* 20 C.F.R. § 404.1520c(b) ("We will articulate in our determination or decision how persuasive

we find all of the medical opinions ... in your case record"); 20 C.F.R. § 404.1504 (although decision of another governmental agency or nongovernmental entity about whether you are disabled is not binding, "we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim").

The ALJ in the instant case based his decision in part on the workers' compensation disability opinions provided by three different physicians: Drs. Hillsman, Wilson and Ferriter. But the ALJ made no mention of the supportability and consistency factors when affording Dr. Hillsman's opinion "less than great weight" and the opinions of Drs. Wilson and Ferriter "little weight." Instead, the ALJ made a blanket statement that he "considered the medical opinion(s) and prior administrative findings in accordance with the requirements of 20 C.F.R. § 404.1520c" (R. 42), without explaining what the relevant factors were and how he applied them, even though that is what the regulation requires. 20 C.F.R. § 404.1520c(b)(2) ("we will explain how we considered the supportability and consistency factors for a medical source's medical opinion"). The absence of such analysis is particularly noteworthy because the ALJ afforded Dr. Hillsman's opinions more weight than those of Drs. Ferriter and Wilson, even though Dr. Hillsman's opinion was the least supported of the three opinions. *See Rodriguez v. Berryhill*, No. 16-CV-9951, 2018 WL 1508739, at *4 (S.D.N.Y. March 7, 2018) (ALJ erred by failing to explain basis for favoring earlier opinion over a more recent medical opinion); 20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate the persuasiveness of medical opinions ... are supportability ... and consistency").

The ALJ's selective and unexplained weighting of the medical opinions also violates the principle against cherry-picking. An ALJ may not " 'cherry-pick' medical opinions that support his or her conclusions while ignoring opinions that do not." *Salisbury v. Saul*, No. 19-CV-706, 2020 WL 913420, at *34 (S.D.N.Y. Feb. 26, 2020) (citing *Tim v. Colvin*, No. 12-CV-1761, 2014 WL 838080, at *7 (N.D.N.Y. March 4, 2014)); *see also Castillo*, 2019 WL 642765 at *8. Such cherry-picking, without proper analysis of the supportability and consistency factors, is ground for remand. *See Jones v. Saul*, No. 19-CV-5542, 2020 WL 5775525, at *12 (S.D.N.Y. Sept. 11, 2020), *R. & R. adopted,* 2020 WL 5775195 (Sept. 28, 2020) (remanding in part because an "ALJ may not 'cherry-pick' medical opinions, or selectively cite treating notes or diagnostic imaging that support the ALJ's own view while ignoring opinions and evidence that do not"); *Marrero Santana v. Commissioner Of Social Security*, 2019 WL 2330265, at *12 (S.D.N.Y. Jan, 17, 2019), *R. & R. adopted*, 2019 WL 2326214 (May 30, 2019) (remanding because the ALJ "cherry-pick[ed] evidence in order to assign [a medical opinion] little weight"); *Andrew G.*, 2020 WL 5848776 at *6-9 (remanding because ALJ cannot "pick and choose evidence in the record to support his conclusions," as doing so results in "inadequate review [that] fail[s] to set forth the crucial factors justifying the ALJ's findings with sufficient specificity to allow the Court to determine whether substantial evidence support[s] the assigned persuasiveness of the [medical] opinions ....") (internal citation omitted).

**\*15** Accordingly, the ALJ erred not only in failing to adequately develop the record by attempting to obtain the opinions of Prieto's treating physicians, but also in failing to explain the supportability and consistency of the opinion evidence that he did consider.

**C. The ALJ Did Not Sufficiently Explain His Conclusion Regarding The Listings**
It is the ALJ's responsibility to "build an accurate and logical bridge from the evidence to [his] conclusion to enable meaningful review." *Horton v. Saul*, No.19-CV-8944, 2021 WL 1199874, at *12 (S.D.N.Y. March 30, 2021) (citing *Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp.2d 133, 142 (N.D.N.Y. 2012)). Accordingly, where there is record evidence that appears to support a conclusion that most or all of the elements of a Listing are met, an ALJ must explain why a claimant's condition does not satisfy the Listing. *See Woods v. Saul*, 19-CV-336, 2021 WL 848722, at *15 (S.D.N.Y. March 5, 2021) ("[T]he ALJ must provide an explanation of his reasoning as to why he believes the requirements [of a Listing] are not met and explain the credibility determinations and inferences he drew in reaching that conclusion") (internal citation omitted); *Debbie I. v. Commissioner Of Social Security,* No. 19-CV-1089, 2020 WL 6866378, at *3 (W.D.N.Y. Nov. 23, 2020) (remanding where "[d]espite th[e] evidence suggesting that, at the very least, Plaintiff met some of the requirements of Listing 1.04, the ALJ here never discussed it"); *Kuleszo v. Barnhart*, 232 F. Supp.2d 44, 52 (W.D.N.Y. 2002) ("Where the claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings").

Here, there is considerable evidence in the record that Prieto met many of the requirements of Listing 1.04(A). [8] Prieto was diagnosed with spinal stenosis and a degenerative disc disease resulting in compromise of a nerve root. (R. 58, 61, 73-74, 303, 305, 316-17, 327, 332.) Prieto had nerve root compression, as evidenced by his need for surgery to decompress his nerve root. (R. 302, 305, 315.) Prieto also demonstrated neuro-anatomic distribution of pain, as he experienced severe leg pain in addition to his back pain (R. 316, 318, 331, 340, 376), and he had limited motion of the spine (R. 318, 373, 400, 432, 493). There is also evidence in the record suggesting that Prieto had motor loss with associated muscle weakness, accompanied by sensory or reflex loss. (R. 65, 316, 317, 318, 336, 616.) And, Prieto consistently demonstrated positive straight leg tests while sitting and supine. (R. 315, 318, 319, 332, 338, 341, 429, 433, 482.)

[8]    The requirements for Listing 1.04(A) are as follows: "[S]pinal stenosis ... [or] degenerative disc disease ... resulting in compromise of a nerve root (including the cauda equina) or the spinal cord" with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Part 404, Subpart P, Appendix 1.

**\*16** At the same time, however, there also is evidence suggesting that Prieto may not meet some of the elements of Listing 1.04(A). In several examinations, Prieto exhibited no atrophy with associated muscle weakness. (R. 113, 302, 354, 391, 416, 457.) Additionally, Prieto was at times able to demonstrate negative straight leg tests while sitting and supine. (R. 56, 113, 354, 390.)

Rather than discuss the assorted evidence, however, the ALJ merely wrote a conclusory statement that Prieto did not meet Listings 1.04(A) or (C), quoting portions of the Listings without any explanation. (R. 42.) The Court thus is left with no basis on which to evaluate whether substantial evidence supported the ALJ's determination; the ALJ failed to build any "logical bridge" to "enable meaningful review." *Horton*, *2021 WL 1199874.* In order to aid the reviewing court, on remand "the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings." *Kuleszo*, 232 F. Supp.2d at 52; *see also Norman v. Astrue*, 912 F.Supp.2d 33, 77-81 (S.D.N.Y. 2012) (the ALJ erred by "not provid[ing] any reasoning whatsoever for his conclusion at step three of the analysis"); *Horton*, 2021 WL 1199874 at *13 (on remand, the ALJ should provide a "real analysis to bridge the relevant evidence to her determinations").

### D. Prieto's Additional Arguments

In light of remand for the ALJ's failure to develop the record, the Court need not separately address Prieto's additional arguments, namely that the ALJ failed to: (1) account for side effects of medication in determining Prieto's residual functional capacity; (2) consider that Prieto's persistent efforts to obtain relief of pain and other symptoms enhances his credibility; and (3) consider the impact of Prieto's need for an assistive device on his ability to perform light work. Each of those issues should be re-evaluated on remand in the context of a fully developed record.

### Conclusion

For the reasons stated above, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's motion is DENIED, the Plaintiff's motion is GRANTED, and the case is REMANDED for further proceedings consistent with this opinion.

SO ORDERED.

### All Citations

Slip Copy, 2021 WL 3475625

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 151 of 189
Matthews v. Commissioner of Social Security, Not Reported in Fed. Supp. (2018)
2018 WL 4356495, 258 Soc.Sec.Rep.Serv. 687

2018 WL 4356495
United States District Court, W.D. New York.

Iaisha N. MATTHEWS, Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

1:17-cv-00371-MAT
|
Signed 09/13/2018

**Attorneys and Law Firms**

Dennis A. Clary, Lewiston, NY, for Plaintiff.

Kristina Danielle Cohn, Social Security Administration Office of General Counsel, New York, NY, for Defendant.

**DECISION AND ORDER**

HONORABLE MICHAEL A. TELESCA, United States District Judge

**INTRODUCTION**

*1  Iaisha N. Matthews ("Plaintiff"), represented by counsel, brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Acting Commissioner of Social Security ("Defendant" or "the Commissioner") denying her application for supplemental security income ("SSI"). The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 1383(c). Presently before the Court are the parties' competing motions for judgement on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Plaintiff's motion is granted to the extent that the matter is remanded for further administrative proceedings and Defendant's motion is denied.

**PROCEDURAL BACKGROUND**

On January 24, 2013, Plaintiff protectively filed applications for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI"), alleging disability as of January 1, 2005 due to a learning disability, anxiety disorder, manic depressive disorder, bipolar disorder, and schizophrenia. Administrative Transcript ("T.") 95, 107. The claims were initially denied on July 3, 2013. T. 113-18. At Plaintiff's request, a hearing

was conducted on September 3, 2015, in Buffalo, New York by administrative law judge ("ALJ") Bruce Mazzarella, with Plaintiff appearing with her attorney. A vocational expert ("VE") also testified. T. 31-93. At the hearing, Plaintiff withdrew her Title II application for DIB, noting a lack of significant medical evidence of disability prior to the date last insured of September 30, 2005. T. 35-36.

The ALJ issued an unfavorable decision on December 31, 2015. T. 10-25. Plaintiff timely requested review of the ALJ's decision by the Appeals' Council. T. 8. On April 11, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. T. 1-5. Plaintiff then timely commenced this action.

**THE ALJ'S DECISION**

The ALJ applied the five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. See 20 C.F.R. § 404.1520(a). At step one of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date. T.15.

At step two, the ALJ determined that Plaintiff had the "severe" impairments of: learning disability; schizoaffective disorder; bipolar disorder; anxiety disorder; panic disorder; alcohol abuse; and mild carpal tunnel syndrome. Id.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. T. 16.

Before proceeding to step four, the ALJ assessed Plaintiff as having the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to performing simple, repetitive and routine tasks, with only occasional contact with the general public and fellow workers; and should not engage in constant, repetitive gross and fine dexterity with the hands. T. 17.

*2  At step four, the ALJ determined that Plaintiff had no past relevant work. T. 24. At step five, the ALJ relied on the VE's testimony to find that, taking into account Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 152 of 189

Matthews v. Commissioner of Social Security, Not Reported in Fed. Supp. (2018)
2018 WL 4356495, 258 Soc.Sec.Rep.Serv. 687

can perform, including the representative occupations of: cleaner, housekeeper; picking table worker; and routing clerk. *Id.* The ALJ accordingly found that Plaintiff was not disabled as defined in the Act. T. 25.

## SCOPE OF REVIEW

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. *See* 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quotation omitted). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ).

## DISCUSSION

### I. Assessment of the Opinion of Consultative Examiner Dr. Renee Baskin

Plaintiff seeks remand of this matter, arguing that although the ALJ purported to give great weight to the opinion of consultative examiner Dr. Renee Baskin, he improperly ignored Dr. Baskin's finding that Plaintiff would have moderate limitations in her ability to maintain attention and concentration, and to maintain a regular schedule. For the reasons set forth below, the Court agrees that the ALJ failed to properly explain his assessment of Dr. Baskin's opinion.

Dr. Baskin performed a psychiatric evaluation of Plaintiff on May 6, 2013. T. 382-85. Dr. Baskin noted that upon examination, Plaintiff's attention and concentration were mildly impaired due to limited intellectual functioning (lack of formal education). T. 384. Plaintiff was able to do simple

calculations, but unable to do serial threes. *Id.* Plaintiff's recent and remote memory skills were mildly impaired - she was able to recall three out of three objects immediately, but only one out of three objects after five minutes. *Id.* Dr. Baskin estimated Plaintiff's intellectual functioning to be in the borderline range. *Id.* Based on her examination of Plaintiff, Dr. Baskin opined Plaintiff would have minimal to no limitations being able to follow and understand simple directions and instructions, and perform simple tasks independently. However, Plaintiff would have moderate limitations being able to maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others and deal appropriately with stress. T. 384-85. Dr. Baskin further opined that these results were consistent with psychiatric problems which may significantly interfere with Plaintiff's ability to function on a daily basis. T. 385.

**\*3** In his decision, the ALJ gave "greatest weight" to Dr. Baskin's opinion, noting her findings and opinion were consistent with the treatment notes from Niagara County Department of Mental Health ("NCDMH"), and consistent with Plaintiff's acknowledged activities of daily living. T. 22-23. However, without explanation, the ALJ failed to fully adopt Dr. Baskin's opinion when crafting the RFC finding, in particular omitting the finding that Plaintiff would have moderate limitations maintaining attention and concentration, and maintaining a regular schedule. *See* T. 17. The Court finds that the ALJ's failure to explain his rejection of this portion of Dr. Baskin's opinion was error.

In resolving evidence, an ALJ is entitled to accept parts of a doctor's opinion and reject others. *See Veino v. Barnhart*, 312 F.3d 578, 588-89 (2d Cir. 2002). However, an ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified without providing some reasonable explanation. *See Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir. 2000) (finding error where the ALJ relied on part of a physician's opinion but rejected other portions without explanation); *see also Labonte v. Berryhill*, No. 16-CV-518-FPG, 2017 WL 1546477 at \*3 (W.D.N.Y. May 1, 2017) ("when an ALJ adopts only portions of a medical opinion he or she must explain why the remaining portions were rejected"); *Agron v. Colvin*, No. 15-CV-6572, 2016 WL 4510432, at \*2 (W.D.N.Y. Aug. 26, 2016) (while an " 'ALJ is not obligated to reconcile explicitly every conflicting shred of medical testimony,' the ALJ must explain why a medical opinion was not adopted

Matthews v. Commissioner of Social Security, Not Reported in Fed. Supp. (2018)

2018 WL 4356495, 258 Soc.Sec.Rep.Serv. 687

when his RFC assessment conflicts with that medical source opinion - especially where, as here, the ALJ gave '[g]reat evidentiary weight' to the opinion undermining his RFC finding.") (quoting *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) ); *Searles v. Astrue*, No. 09-CV-6117, 2010 WL 2998676, at *4 (W.D.N.Y. July 27, 2010) ("An ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified." (citation omitted) ); *cf.* Social Security Ruling ("SSR") 96-8p 1996 WL 374184, at *7 (July 2, 1996) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted").

In this case, the ALJ purported to give "greatest weight" to Dr. Baskin's opinion, but then failed to discuss her opinion that Plaintiff had moderate limitations in the ability to maintain attention and concentration, and to maintain a regular schedule. The ALJ's failure to explain his assessment of this portion of Dr. Baskin's opinion prevents the Court from meaningfully reviewing his decision, and warrants remand. *See Marthe v. Colvin*, No. 6:15-cv-0643(MAT), 2016 WL 3514126, at *8 (W.D.N.Y. June 28, 2016) (the ALJ's failure to specify reasons for discounting a medical opinion prevented the Court from conducting a meaningful review of the substantiality of the evidence supporting the ALJ's decision).

The Commissioner argues that remand is not required because the ALJ's RFC finding was consistent with Dr. Baskin's opinion, inasmuch as incorporating the opinion that Plaintiff has a moderate limitation in her ability to maintain attention and concentration would not alter the ALJ's ultimate disability decision. There is indeed case law to support the conclusion that a moderate limitation in attention and concentration may be accounted for with a limitation to unskilled work. *See, e.g., Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 315 (W.D.N.Y. 2013) (concluding that an RFC determination limiting a claimant to simple, routine, repetitive tasks was consistent with the ALJ's assessment that claimant had moderate difficulties with concentration, persistence and pace); *Martinez v. Comm'r of Soc. Sec.*, No. 3:16-CV-0908, 2017 WL 2633532, at *7 (N.D.N.Y. June 15, 2017) (finding that an RFC determination for unskilled work is not necessarily inconsistent with moderate mental limitations). However, in this case, the consultative examiner noted both moderate limitations in attention and concentration and moderate limitations in the ability to maintain a regular schedule, and the ALJ failed to state in his

opinion that these limitations were accounted for in the RFC finding. To the contrary, while the ALJ expressly stated that Plaintiff's difficulties in performing complex and varied tasks, learning new tasks, relating to others, and dealing with stress were accounted for by the limitation to simple, repetitive, and routine tasks (*see* T. 23), he made no mention whatsoever of Plaintiff's limitations in attention and concentration and in maintaining a schedule. The ALJ's omission of these specific limitations in his discussion undercuts any conclusion that he meant for them to be accounted for therein.

**\*4**  While moderate limitations in mental functioning may not necessarily preclude the performance of simple, repetitive tasks, the ALJ's failure in this case to explain his conclusions prevents the Court from meaningfully reviewing the basis therefor and from concluding that Dr. Baskin's opinion was subsumed within the RFC assessment. "[T]he ALJ is required to provide [a] rationale in the written decision sufficient to allow this Court to conduct an adequate review of [his] findings.... It is not the function of this Court to speculate as to the evidence and legal standards on which the ALJ based [his] decision, nor to supply its own rationale where the ALJ's decision is lacking or unclear." *Dittmar v. Comm'r of Soc. Sec.*, No. 1:16-CV-0404 (CFH), 2017 WL 2333836, at *5 (N.D.N.Y. May 30, 2017). As such, the Court will not speculate that the ALJ meant to implicitly include all of the limitations identified by Dr. Baskin in the RFC finding, particularly where he omitted specific limitations from his analysis while expressly discussing others.

*Barry v. Colvin*, 606 F. App'x 621 (2d Cir. 2015), on which the Commissioner relies, is inapposite. In *Barry*, unlike in this case, the ALJ expressly considered and discussed the consultative examiner's opinion that the plaintiff was unable to maintain a regular schedule, but ultimately concluded that the other substantial evidence of record did not support that conclusion. *Id.* at 624. However, in this case, as discussed above, the ALJ made no mention of Dr. Baskin's opinion regarding Plaintiff's ability to maintain a regular schedule. *Barry* therefore does not support the ALJ's determination in this case.

For all the reasons discussed above, the Court finds that the ALJ failed to appropriately explain his assessment of Dr. Baskin's opinion, thus depriving the Court of the ability to perform a meaningful review. In particular, the ALJ failed to explain his conclusion regarding Dr. Baskin's finding that Plaintiff had moderate limitations in the ability to maintain attention and concentration and the ability to maintain a

regular schedule, and in fact omitted those limitations entirely from his discussion of Dr. Baskin's opinion. Accordingly, remand of this matter for further administrative proceedings is warranted.

## II. Assessment of the Opinion of Plaintiff's Therapist Juliana Corsaro

Plaintiff also argues that the ALJ inappropriately credited Dr. Baskin's opinion over the opinion of her treating therapist, Licensed Clinical Social Worker - R ("LCSW-R") Juliana Corsaro, without explanation. The Court agrees, and finds that this error by the ALJ further warrants remand.

Plaintiff has been treated by LCSW-R Corsaro, under the supervision of treating psychiatrist Dr. Brian Joseph, on a biweekly basis since April 2013. T. 396-404, 621. Based on two years of biweekly treatment, LCSW-R Corsaro opined on May 8, 2015, that Plaintiff had moderate limitations with her: activities of daily living; ability to understand, remember and carry out instructions; and ability to respond appropriately to supervision. T. 622-23. She further opined Plaintiff had marked limitations in: maintaining social functioning; concentration, persistence or pace resulting in failure to complete tasks in a timely manner; her ability to respond appropriately to co-workers; and her ability to satisfy an employer's normal quality, production, and attendance standards. T. 622-24. LCSW-R Corsaro also opined Plaintiff had severe limitations in her ability to: respond to customary work pressures; perform complex tasks on a sustained basis in a full-time work setting; and perform simple tasks on a sustained basis in a full-time work setting. T. 624. Finally, she reported Plaintiff has experienced repeated episodes of deterioration or decompensation (on three or more occasions within one year, for at least two weeks at a time), causing her to withdraw from that situation or to experience exacerbation of signs and symptoms. T. 623.

 **\*5** In his decision, the ALJ found that LCSW-R Corsaro's opinion should not be given controlling weight because LCSW-R Corsaro is not a physician. T. 23. The ALJ further found the opinion was inconsistent with Dr. Baskin's report and inconsistent with NCMHD treatment notes over the treatment period. *Id.* He accordingly gave LCSW-R Corsaro's opinion little weight. *Id.*

The Court acknowledges that mental health counselors are "not an acceptable treating source as defined by the Commissioner." *Esteves v. Barnhart,* 492 F. Supp. 2d 275, 281 (W.D.N.Y. 2007). "Acceptable medical sources" include licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). Nonetheless, opinions from other sources must be considered by the adjudicator, as the regulations require the Commissioner to "consider all relevant evidence in the case record when [making] a determination or decision about wether [an] individual is disabled. SSR 06-03p, 2006 WL 2329939, at \*4 (S.S.A. Aug. 9, 2006). Furthermore, the opinions from medical sources such as Licensed Clinical Social Workers and Nurse Practitioners are "important and should be evaluated on key issues such as ... functional effects [of an impairment]." *Anderson v. Astrue,* No. 07–CV–4969, 2009 WL 2824584, at \*9 (E.D.N.Y. Aug. 28, 2009). Notably, this is even more relevant within the context of "mental disabilities, which by their nature are best diagnosed over time." *Santiago v. Barnhart,* 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006).

While an ALJ may reject the opinion of a mental health counselor where it is inconsistent with the claimant's treatment records (*Bulavinetz v. Astrue,* 663 F. Supp. 2d 208, 212 (W.D.N.Y. 2009) ), the ALJ is required to use the same factors as used for the evaluation of the opinions from "acceptable medical sources" enumerated in 20 C.F.R. § 404.1527(c) (*see* § 404.1527(f) ), including properly explaining weight given to such opinions in such a way that "allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.*

In this case, the ALJ again failed to provide the specificity required by the regulations to allow for a meaningful review of his reasoning. *See Marthe,* 2016 WL 3514126, at \*8. In particular, the ALJ indiscriminately cited no less than 150 pages of treatment notes from over a period of more than two years, making the conclusory assertion that LCSW-R Corsaro's assessment was inconsistent with them. T. 23. Given the length of time over and frequency with which LCSW-R Corsaro treated Plaintiff, the Court finds the ALJ did not meet his burden of properly explaining his rejection of LCSW-R Corsaro's disability-supporting opinion. Accordingly, on remand, the Court instructs the ALJ to give a thorough and proper analysis of LCSW-R Corsaro's opinion, in conjunction with a thorough review of the NCMHD treatment notes, and to then provide an appropriate explanation of the weight assigned to the opinion.

2018 WL 4356495, 258 Soc.Sec.Rep.Serv. 687

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Docket No. 11) is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Commissioner's opposing motion for judgement on the pleadings (Docket No. 13) is denied. The Clerk of the Court is directed to close this case.

**\*6  ALL OF THE ABOVE IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4356495, 258 Soc.Sec.Rep.Serv. 687

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 4042939, 147 Soc.Sec.Rep.Serv. 781

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Dale A. M. v. Commissioner of Social Security,
N.D.N.Y.,  March 29, 2021

2009 WL 4042939

United States District Court,

W.D. New York.

Jessica MECKLENBURG, Plaintiff,

v.

Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 07–CV–760.
|
Nov. 19, 2009.

West KeySummary

1    **Social Security**  ⬦ Particular conditions or
impairments in general

**Social Security**  ⬦ Medical evidence in
general

**Social Security**  ⬦ Nature and Severity of
Condition or Impairment

The administrative law judge (ALJ) failed to
properly apply the "treating physician" rule
as it pertained to the opinion of the primary
care physician of claimant for supplemental
security income (SSI) and disability insurance
benefits (DIB) as to the nature and severity
of claimant's limitations. ALJ was required to
give "good reasons" for discounting the opinion
of claimant's treating physician, who opined
that claimant was "totally disabled" as a result
of severe degenerative disc disease, insomnia
secondary to pain, spasms, and limited range
of motion. ALJ discredited treating physician's
opinion as unsupported by specific and objective
clinical findings, but the opinion contained
specific diagnoses and should have triggered the
ALJ's duty to develop the record. Social Security
Act, § 205(g),  42 U.S.C.A. § 405(g).

16 Cases that cite this headnote

**Attorneys and Law Firms**

Regina A. Walker, Buffalo, NY, for Plaintiff.

Kevin D. Robinson, U.S. Attorney's Office, Buffalo, NY, for
Defendant.

**DECISION and ORDER**

MICHAEL A. TELESCA, District Judge.

*INTRODUCTION*

**\*1**  Plaintiff Jessica A. Mecklenburg ("plaintiff") brings
this action pursuant to Titles II and XVI of the Social
Security Act ("The Act") seeking review of a final decision
of the Commissioner of Social Security ("Commissioner")
denying her application for Supplemental Security Income
and Disability Insurance Benefits. [1] Specifically, the plaintiff
alleges that the decision of the Administrative Law Judge
("ALJ") O. Price Dodson denying her application for benefits
was not supported by substantial evidence in the record and
was contrary to applicable legal standards.

[1]        This case was transferred to the undersigned by
the Honorable John T. Curtin, Judge, United States
District Court for the Western District of New York
by Order dated October 29, 2009.

The plaintiff moves for judgment on the pleadings pursuant
to Fed.R.Civ.P. 12(c) and 42 U.S.C. 405(g) seeking to reverse
the Commissioner's decision or, in the alternative, remand to
the Commissioner for reconsideration of the evidence. The
Commissioner also moves for judgment on the pleadings
pursuant to 42 U.S.C. 405(g) on the grounds that the findings
of fact of the Commissioner are supported by substantial
evidence. For the reasons discussed below, I hereby deny the
Commissioner's motion for judgment on the pleadings, grant
plaintiff's motion for judgment on the pleadings, and remand
this claim to the Commissioner for further proceedings
consistent with this decision.

*BACKGROUND*

On May 4 and May 10, 2004, plaintiff filed applications
for Supplemental Security Income and Disability Insurance

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 157 of 189
Mecklenburg v. Astrue, Not Reported in F.Supp.2d (2009)

2009 WL 4042939, 147 Soc.Sec.Rep.Serv. 781

Benefits, respectively, claiming that she had become disabled as of June 1, 2003 due to discogenic and degenerative back disorder. (Transcript 28, 252) (hereinafter "Tr."). Plaintiff's applications were denied on December 7, 2004. (Tr. 28, 252). She subsequently requested a hearing before an Administrative Law Judge ("ALJ") which took place on July 12, 2006. (Tr. 258A). The plaintiff appeared in Buffalo at a video hearing, and was represented by counsel. The ALJ presided over the hearing from an office in Norfolk, Virginia. (Tr. 10). In addition to the plaintiff, a vocational expert also testified.

In a decision dated July 25, 2006, the ALJ found that although the plaintiff had severe impairments due to the residual effects of cervical fusion and lumbar degenerative disc disease, she was not disabled within the meaning of the Act and was capable of performing past relevant work as a social worker. (Tr. 10–17). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 14, 2007. This action followed. (Tr. 4–7).

### DISCUSSION

#### I. Jurisdiction and Scope of Review

Title 42, section 405(g) of the United States Code grants jurisdiction to Federal District Courts to hear claims based on the denial of Social Security benefits. *Matthews v. Eldridge,* 424 U.S. 319, 320, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This section has been made applicable to SSI cases by 42 U.S.C. section 1383(c)(3). Additionally, the section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. *See Bubnis v. Apfel,* 150 F.3d 177, 181 (2d Cir.1998); *see also Williams v. Comm'r of Soc. Sec.,* No. 06–2019–cv, 2007 U.S.App. LEXIS 9396, 2007 WL 1192405 at *3 (2d Cir. Apr. 24, 2007).

**\*2** Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Metropolitan Stevedore Co. v. Rambo,* 521 U.S. 121, 149, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Section 405(g) thus limits this Court's scope of review to two inquiries: (i) whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole, and (ii) whether

the Commissioner's conclusions are based upon an erroneous legal standard. *Green–Younger v. Barnhard,* 335 F.3d 99, 105–06 (2d Cir.2003); *see also Wagner v. Secretary of Health & Human Serv.,* 906 F.2d 856, 860 (2d Cir.1990) (holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are conclusive if supported by substantial evidence).

The Plaintiff and the Commissioner both move for judgment on the pleadings pursuant to 42 U.S.C. 405(g) [2] and Rule 12(c) of the Federal Rules of Civil Procedure. Section 405(g) provides that the District Court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2009). Under Rule 12(c), judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988). If, after a review of the pleadings, the Court is convinced that "the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief," judgment on the pleadings may be appropriate. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

[2]   As provided in Title XVI (Supplemental Security Income), codified at 42 U.S.C. 1383(c)(3).

#### II. Standard for entitlement to benefits

Under the Social Security Act, a disability is defined as the "inability to engage in substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ..." 42 U.S.C. § 423(d)(1)(A) (concerning Old–Age, Survivors', and Disability Insurance); 42 U.S.C. § 1382c (a)(3)(A) (concerning SSI payments). An individual will only be considered "under a disability" if his impairment is so severe that he is both unable to do his previous work and unable to engage in any other kind of substantial gainful work that exists in the national economy. §§ 423(d)(2)(A) and 1382c(a)(3)(b).

"Substantial gainful work" is defined as "work that exists in significant numbers either in the region where the individual lives or in several regions of the country." *Id.* Work may be considered "substantial" even if it is done on a part-time basis,

if less money is earned, or if work responsibilities are lessened from previous employment. 20 C.F.R. § 404.1572(a); 20 C.F.R. § 416.972(a). Work may be considered "gainful" if it is the kind of work usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b) and 416.972(b). Furthermore, "substantial gainful work" is considered available to an individual regardless of whether such work exists in his immediate area, whether a specific job vacancy exists for him, or whether he would be hired if he were to apply for work. 42 U.S.C. §§ 423(d) (2)(A) and 1382c(a)(3)(B).

**\*3** In determining whether or not a claimant is disabled, SSA regulations require the ALJ to perform the following five-step sequential evaluation:

(1) if the claimant is performing substantial gainful work, he is not disabled;

(2) if the claimant is not performing substantial gainful work, his impairment(s) must be "severe" before he can be found disabled;

(3) if the claimant is not performing substantial gainful work and has a "severe" impairment(s) that has lasted or is expected to last for a continuous period of at least 12 months, and if the impairment(s) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry;

(4) if the claimant's impairment(s) do not meet or medically equal a listed impairment, the next inquiry is whether the claimant's impairment(s) prevent him from doing his past relevant work, if not, he is not disabled;

(5) if the claimant's impairment(s) prevent him from performing his past relevant work, and other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v) (2009). After determining that the plaintiff met the insured status requirements of the Social Security Act under sections 216(i) and 223, the ALJ performed the required five-step evaluation and determined that: (i) plaintiff had not engaged in substantial gainful activity; (ii) plaintiff had severe impairments due to the residual effects of cervical fusion and lumbar degenerative disc disease; (iii) plaintiff did not have an impairment that met or equaled a listed impairment

under 20 C.F.R. Part 404, Subpart P, Appendix 1; (iv) plaintiff had the residual functional capacity ("RFC") to perform past relevant work as a social worker; (v) plaintiff was not under a "disability" as defined in the Social Security Act.

### III. The ALJ's decision to deny plaintiff benefits is not supported by substantial evidence and contains errors of law.

#### A. The ALJ failed to consider the record on the whole and failed to properly weigh medical evidence in making his RFC findings.

At the outset, the Regulations are clear that the Commissioner must consider all the evidence presented by a claimant in making a disability determination. *See* 20 C.F.R. § 404.1520(a)(4) ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled."). If a claimant's impairments do not meet the criteria for a Listed impairment under Part 404, Subpart P, Appendix 1, the Commissioner "will assess and make a finding about [a claimant's] residual functional capacity based on all the relevant medical and other evidence in your case record, as explained in § 404.1545. [3] " 20 C.F.R. § 404.1520(e); 20 C.F.R. § 416.920.

[3]  20 C.F.R. 416.945 (as provided in Title XVI). Section 404.1545 then notes that "the limiting effects of all [a claimant's] impairments" are considered in accordance with § 404.1529(c).

In delineating the "substantial evidence" test, the Second Circuit Court of Appeals has also noted that "the record as a whole" is considered to determine if the Commissioner's decision is supported. *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir.2008). Furthermore, the Eight Circuit Court of Appeals has noted that "the substantial evidence test ... is more than a mere search of the record for evidence supporting the Secretary's findings." *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987). Rather, "substantial evidence on the record as a whole" is distinguished from mere "substantial evidence" because " 'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' " *Gavin,* 811 F.2d at 1199 (quoting *Universal Camera Corp. v. National Labor Relations Board,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456). Therefore, "the court must ... take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin,* 811 F.2d at 1199 (citing *Steadman v. Securities and Exchange Commission,* 450 U.S. 91, 99, 101 S.Ct. 999, 67

L.Ed.2d 69 (1981). The role of the "district court [is] to evaluate in detail the evidence it used in making its decision and how any contradictory evidence balances out." *Gavin,* 811 F.2d at 1199. Indeed, the Second Circuit adopts the view that "[t]he Court carefully considers the whole record, examining evidence from both sides 'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.' " *Wynn v. Astrue,* 617 F.Supp.2d 177, 183 (W.D.N.Y.2009) (quoting *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999).

**\*4** Inherent in considering the record on the whole is weighing medical opinions as provided under the regulations. When evidence is in any way inconsistent, under 20 C.F.R. §§ 404.1527 and 416.927, the Commissioner will weigh all the evidence in making a disability determination. When such evidence is a medical opinion, the regulations provide factors that must be followed to properly weigh such opinions. 20 C.F.R. §§ 404.1527(d) and 416.927(d). The Second Circuit has stated, "[a]fter considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.' " *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir.2008). Remand is appropriate where the ALJ fails to provide " 'good reasons' for not crediting the opinion of a claimant's treating physician." *Burgess,* 537 F.3d at 129–30 (citing *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir .)).

Although "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," [4] the regulations specify that "a treating sources's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) will be given 'controlling weight' if the opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record.' " *Green–Younger,* 335 F.3d 99, 106 (2d Cir.2003) (citing 20 C.F.R. 404.1527(d)(2); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000); *Rosa v. Callahan,* 168 F.3d 72, 78–79 (2d Cir.1999)). Even where a treating source's opinion is not given controlling weight, the Commissioner must "apply the factors listed ... [and] will always give good reasons ... for the weight [he] give[s] [claimant's] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2) and 416(d)(2).

[4]      Citing *Snell,* 177 F.3d 128, 133 (2d Cir.).

An ALJ need not mention every piece of evidence in the record, [5] but at the same time he cannot pick and choose only parts of a medical opinion favoring his conclusion of nondisability [6] and he cannot "ignore an entire line of evidence that is contrary to [his] findings." [7]

[5]      *Monguer v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983).

[6]      *Robinson v. Barnhart,* 366 F.3d 1078, 1083(10th Cir.2004).

[7]      *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir.2001) (quoting *Henderson v. Apfel,* 179 F.3d 507, 514 (7th Cir.1999)).

Here, adequate balancing of contradictory evidence and consideration of the record on the whole is not apparent in the ALJ's opinion. First, substantive discussion of the plaintiff's cervical fusion surgery or symptoms precipitating it is lacking. The ALJ devotes only one sentence to plaintiff's surgery, which was a risky and invasive procedure in which the treating neurosurgeon, Dr. Walter Grand, appropriately warned plaintiff that "there are no guarantees" and she "might need multiple neck operations," and that there were "always dangers to life and limb [sic] including paralysis and throat injury." (Tr. 143). Imaging of plaintiff's cervical spine around that time revealed pathology, including

> "C5–6: small left paramedian herniation of the nucleus pulposus of the protrusion type and hypertrophy of the left uncovertebral joint resulting in some narrowing of the left foramen [without] stenosis; C6–7: broad based disc bulge without stenosis or cord compression; C7–T1: right paramedian herniation of the nucleus pulposus of the protrusion type with ild [sic] encroachment upon the right foramen."

**\*5** In response to this imaging, Dr. Grand commented "MRI scan of the cervical region shows a right sided C7–T1 disc.... a small disc at C5–6 and C6–7 ...." (Tr. 143). Further, he noted "[t]he only thing [he] could advise would be a C7–T1 diskectomy, fusion, bone dowel and plating. This seems to correlate at this point clinically with [plaintiff's] complaints relating to the hand which seems to involve the C8 nerve

root." (Tr. 143). Dr. Grand's operative report notes "[o]ut laterally on the right side, which was the side of the patient's pain, she had a tear in the posterior longitudinal ligament, and there was herniated disc over the C–8 nerve root extending out laterally, as well as medially...." (Tr. 126).

Although Dr. Grand's subsequent notes document post-surgical relief of plaintiff's symptom of arm pain, his last note indicates that she "still has some shoulder pain and neck pain," and that he would see her again in three months, which would have been June 2004. (Tr. 137). A note from plaintiff's then primary care physician, Dr. Santhananthan, dated June 28, 2004 indicates plaintiff was still complaining of "upper-mid back pain [and] thoracic-lumbar area pain" and "would like a second opinion" because "Dr. Grand has scheduled [a] nerve block procedure [for] 6/30/04." (Tr. 162). The record does not contain a note from Dr. Grand corresponding to his recommended nerve block, nor does the record contain any indication that plaintiff underwent the nerve block. Rather, this sequence of medical opinions appeared to occasion plaintiff's changing treatment sources.

Moreover, in making his RFC determination, the ALJ improperly discounted the opinion of a consultative physician, Dr. Balderman, who found moderate limitations in plaintiff's ability to move her head. (Tr. 148). Although the ALJ stated that this limitation is "not supported by the objective evidence in the record,"[8] Dr. Balderman did give a specific and detailed assessment of the range of motion of plaintiff's spine and other joints. (Tr. 150). In fact, the Commissioner's brief provides a frame of reference for normal ranges of motion, and simple comparison reveals that plaintiff's cervical ranges of motion are less than those that would be considered normal. (Defendant's brief, 8). This would therefore provide objective support for Dr. Balderman's assessment.

[8]    Tr. 15.

Here, the ALJ also does not discuss evidence from Dr. Gibbons, the plaintiff's "second opinion" neurosurgeon, that is inconsistent with his finding of lack of disability. Moreover, the ALJ gives the false impression of a long-standing treatment relationship in assigning weight to this opinion by noting the doctor "has personally observed the claimant's condition over a significant period of time." (Tr. 15). In fact, Dr. Gibbons only saw plaintiff twice. When Dr. Gibbons first saw plaintiff on November 8, 2004, he noted "diffuse hyporeflexia" on examination and opined that her

"high thoracic pain ... may be related to her previous neck problem" and he recommended x-rays to further evaluate this complaint. (Tr. 195). Dr. Gibbons also diagnosed plaintiff with "a degree of neurogenic claudication," which is "the characteristic symptom of spinal stenosis ... characterized by pain, numbness, tingling and weakness in one or both lower extremities, brought on by walking and relieved only by sitting, bending forward or lying down [in which s]ymptoms tend to come on insidiously and slowly worsen,"[9] for which he recommended MRI and physical therapy. (Tr. 195). Finally, he diagnosed plaintiff with cervical spondylosis[10] without myelopathy. (Tr. 195).

[9]     4–11 Attorneys' Textbook of Medicine (3d edition) P 11.50 (2009).

[10]    "[D]evelopment of abnormal bone growths on the vertebrae." 4–13 Attorneys' Textbook of Medicine (3d edition) P 13.20 (2009).

**\*6** At the second and last known appointment with Dr. Gibbons on June 27, 2005, the doctor again diagnosed cervical and lumbar spondylosis. (Tr. 236–37). Although he noted that MRI of the lumbar spine was essentially normal for plaintiff's age, there was only x-ray of the cervical spine which revealed "minimal spurring at the 5–6 and 6–7 levels." (Tr. 236). Nonetheless, the plaintiff had presented to the appointment on that day complaining of "continued pain" in her neck and back, and physical examination revealed "reasonable range of motion" of the neck, which does not equal a "normal" range of motion. In all, the ALJ picks the portions of the two exams by Dr. Gibbons that support his conclusion.

The ALJ also failed to properly apply the "treating physician" rule as pertains to the opinion of Dr. Sauret, the plaintiff's more recent primary care physician. As discussed above, an ALJ need not give deference to determinations reserved to the Commissioner such as whether a plaintiff is disabled, but he must give "good reasons" for discounting the opinion of treating physician regarding the nature and severity of a claimant's limitations. *Green–Younger,* 335 F.3d at 105–06 (2d Cir.2003).

Here, although Dr. Sauret opined that the plaintiff was "totally disabled" the ALJ stated that Dr. Sauret did not "identify specific and objective clinical findings that supported his finding or disability." While an "ALJ may discredit treating physicians' opinions that are conclusory,

brief, and unsupported by the record as a whole ... or by objective medical findings," [11] in this case Dr. Sauret's office notes document severe degenerative disc disease, insomnia secondary to pain, spasms, and limited range of motion. (Tr. 227, 229). Further, the ALJ's finding regarding Dr. Sauret's opinion should have triggered his duty to develop the record.

[11] *Batson v. Comm'r: of Social Security Administration,* 359 F.3d 1190, 1195 (9th Cir.2004).

Therefore, because the ALJ's decision does not evince appropriate balancing of the record on the whole and is not supported by substantial evidence, I conclude that the ALJ's RFC determination was improper.

**B. The ALJ failed to make adequate findings and articulate adequate reasons to support his determination that plaintiff lacked credibility.**

In his decision, the ALJ dismisses the plaintiff's subjective complaints after finding these complaints "not entirely credible." (Tr. 15). The ALJ argues that plaintiff's statements are not credible because her "complaints of 'disabling' pain are inconsistent with:" (i) "the conservative treatment required since the cervical surgery," (ii) objective findings, and (iii) "her reported activities of daily living." (Tr. 14). All three reasons for finding the plaintiff lacked credibility are legally erroneous.

Under the Regulations and subsequent interpretive rulings, when making a credibility finding, in addition to objective medical evidence, an ALJ must consider:

(i) the claimant's daily activities;

(ii) "the location, duration, frequency and intensity of the [claimant's] pain or other symptoms;"

**\*7** (iii) "factors that precipitate and aggravate the symptoms;"

(iv) any medication the claimant has taken to alleviate symptoms, including the "type, dosage, effectiveness, and side effects" of the medications;

(v) non-pharmacological treatment a claimant has received to relieve pain or symptoms;

(vi) any other measures the claimant has used to alleviate pain or symptoms;

(vii) any other factors that might have a bearing on the claimant's functional limitations and restrictions caused by pain or other symptoms.

20 C.F.R. § 404.1529(c); 20 C.F.R. § 416.929(c); SSR 96–7p.

First, regarding plaintiff's "conservative treatment," an ALJ "may not impose [ ] [his respective] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered...." *Burgess,* 537 F.3d at 129 (2d Cir.2008) (quoting *Shaw v. Chater,* 221 F.3d 126, 134–35(2d Cir.2000)). Rather, conservative treatment "*may* ... help to support the Commissioner's conclusion that the claimant is not disabled *if* that fact is accompanied by other substantial evidence in the record ...." *Burgess,* 537 F.3d at 129 (2d Cir.2008) (citing *Diaz v. Shalala,* 59 F.3d 307, 314 (2d Cir.1995) (emphasis mine). SSR 96–7p emphasizes the importance of considering a claimant's longitudinal medical history and indicates that while an "individual's statements may be less credible if the level ... of treatment is inconsistent with the level of complaints .... the adjudicator must not draw any inferences about an individual's symptoms and their functional effects ... without first considering any explanations that the individual may provide, or other information in the case record...." One possible explanation here, provided as an example in the ruling, is that an "individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual." SSR 96–7p. Thus, that plaintiff was not a surgical candidate, as noted by the ALJ, [12] may be explained on this basis.

[12] Tr. 15.

Second, while "objective medical evidence" is one factor that may lend to credibility, the very need to make a credibility finding occurs *because* objective evidence may not be present.

Finally, the ALJ mischaracterizes the plaintiff's ability to perform activities of daily living to her disadvantage. *Kohler v. Astrue,* 546 F.3d 260, 268 (2d Cir.2008). Specifically, the ALJ notes that plaintiff "reported being independent in her ability to bathe and dress.... [s]he reported reading, fixing simple meals and doing 'light laundry.' ... [she] also reported watching television, visiting relatives and working on "Sudoko" puzzles," and concluded that her "daily activities show that her concentration is not seriously

2009 WL 4042939, 147 Soc.Sec.Rep.Serv. 781

impaired by pain," and that "complaints of 'disabling' pain are inconsistent ... with her reported daily activities." (Tr. 14).

**\*8** While an individual's daily activities must be considered in determining the credibility of complaints under SSR 96–7p, the Second Circuit has noted, "[w]hen a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." The Sixth and the Eighth Circuits concur: "[t]he fact that appellant can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping, does not necessarily indicate that this appellant possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of the pain suffered by appellant;" [13] "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." [14]

[13]   *Walston v. Gardner,* 381 F.2d 580, 586 (6th Cir.1967).

[14]   *Swope v. Barnhart,* 436 F.3d 1023 (2006) (citing *Hogg v. Shalala,* 45 F.3d 276, 278 (8th Cir.1996)).

Here, the activities of daily living listed by the ALJ closely resemble those noted by Courts of Appeals as not indicative of the ability to engage in substantial gainful activity. Further, they are a mischaracterization of the extent of impairment reported by plaintiff. In her hearing testimony, the plaintiff indicated that she is in and out of bed during the course of the day and lays down for periods of one to two hours, is awakened by pain after only four hours of sleep at night, and requires assistance to accomplish grocery shopping. (Tr. 267–68).

SSR 96–7p provides seven factors that must be considered by an ALJ in determining the credibility of a claimant's statements. Because these factors were not adequately considered in the ALJ's decision, I conclude that his determination that the plaintiff's subjective complaints were not entirely credible was based on improper application of the correct legal standard and is not supported by substantial evidence.

**C. The ALJ improperly discounted plaintiff's subjective complaints and required her to prove disability through "objective" medical evidence.**

Social Security Regulations, rulings, and relevant case law consistently state that objective evidence is not required to prove disability. *See Green–Younger,* 335 F.3d 99 (2d Cir.2003); 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96–7p. Moreover, "subjective *pain* may serve as the basis for establishing disability, even if ... unaccompanied by positive clinical findings of other 'objective' medical evidence." *Green–Younger,* 335 F.3d at 108 (2d Cir.2003) (citing *Donato v. Sec. of Dep't of Health and Human Servs.,* 721 F.2d 414, 418–19 (2d Cir.1983).

When an adjudicator finds, as here, that there is "an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms," and "the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on consideration of the entire case record." SSR 96–7p. Thus, a lack of objective evidence does not provide justification for wholesale rejection of a plaintiff's subjective complaints. Rather, it indicates the need to initiate further, thorough analysis.

**\*9** Here, the ALJ repeatedly refers to lack of objective evidence as a basis for his decision. For example, he states "objective findings on examinations are not consistent with 'disabling' pain" and "[plaintiff's] complaints of 'disabling' pain are inconsistent with ... the objective findings on examination." (Tr. 14). The ALJ's concluding statement in his RFC finding is "objective medical evidence in this case supports the residual functional capacity determined in the finding above." However, determining residual functional capacity with a disproportionate emphasis on objective findings constitutes legal error.

The Eight Circuit has stated, "an arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably had no practical effect on the outcome of the case." *Brown v. Chater,* 87 F.3d 963, 966 (8th Cir.1996) (quoting *Benskin v. Bowen,* 830 F.2d 878, 883 (8th Cir.1987)). However, such is not the case here. There is insufficient indication in the ALJ's decision to demonstrate that he properly considered the requisite seven credibility factors noted above. 20 C.F.R. § 404.1529(c); 20 C.F.R. § 416.929(c); SSR 96–7p. I therefore conclude that the ALJ's failure to

consider the plaintiff's subjective complaints, and thereby make a fair credibility assessment, constitutes legal error.

**D. The ALJ failed to fully develop the record.**

As noted above, an ALJ has an affirmative duty to develop the record in a disability proceeding. *See Batista v. Barnhart,* 326 F.Supp.2d 345, 353 (E.D.N.Y.2004) ("[t]he responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law," citing *Brown v. Apfel,* 174 F.3d 59 (2d Cir.1999)); *see also* SSR 96–7p ("the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements.").

Moreover, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir.2008) (citing *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999)). The Second Circuit has stated, "the ALJ must not only develop the proof but carefully weigh it." *Burgess,* 537 F.3d at 79. Further, the Tenth Circuit has noted that an ALJ's statement that a doctor's "records did not give a reason for his opinion that claimant is unable to work triggered the ALJ's duty to seek further development of the record before rejecting the opinion." *Robinson,* 366 F.3d at 1084 (10th Cir.2004).

Here, the ALJ did not adequately develop the record related to two important aspects of the medical evidence, and thus he did not consider the plaintiff's disability claim in its entirety.

First, the ALJ failed to develop the record regarding plaintiff's pursuit of second opinions. Specifically, at least one important note from Dr. Grand, the surgeon that performed the plaintiff's cervical fusion, appears missing. A note from her then primary care physician, Dr. Santhananthan, who was never mentioned by the ALJ, indicates plaintiff "would like [a second] opinion—Dr. Grand has scheduled [a] nerve block procedure." (Tr. 162). That the plaintiff sought a second opinion would have been an important factor to consider in making a proper credibility determination. SSR 96–7p.

**\*10** In response to plaintiff's request for a second opinion, Dr. Santhananthan recommended that she "follow with Dr. Grand." (Tr. 162). This note dated June 28, 2004 appears to be the last date on which plaintiff saw Dr. Santhananthan. According to the available records, it appears plaintiff subsequently sought treatment from a different primary care physician, Dr. Sauret, beginning in August 2004. His initial

intake note indicated that plaintiff "want[ed a second] opinion regarding back surgery." (Tr. 206). Dr. Sauret then referred plaintiff to "Dr. Gutterman" [sic]; plaintiff was ultimately evaluated on November 8, 2004 by a nurse practitioner and Dr. Gibbons, both of whom are associated with University at Buffalo Neurosurgery along with Dr. Guterman. (Tr. 191).

Under SSR 96–7p, "[p]ersistent attempts ... to obtain relief of pain or other symptoms, such as by ... referrals to specialists, or changing treatment sources may be a *strong indication* that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms." (emphasis mine). Thus, failure to obtain missing information may have yielded an erroneous credibility finding, and thus an erroneous finding that plaintiff was not disabled.

Second, the ALJ's duty to develop record was triggered when Dr. Sauret opined that plaintiff was "totally disabled" without, according to the ALJ, "identify [ing] specific and objective clinical findings that supported his finding or disability." (Tr. 15). *See Robinson,* 366 F.3d at 1084 (10th Cir.2004) (An ALJ's statements that a doctor's "records did not give a reason for his opinion that claimant is unable to work triggered the ALJ's duty to seek further development of the record before rejecting the opinion."). However, the ALJ's characterization of the evidence might not be fully accurate, as Dr. Sauret's progress notes document weakness, severe degenerative disc disease, insomnia secondary to pain, muscle spasms, and limited range of motion. (Tr. 206, 227, 229).

I therefore conclude that the ALJ failed to apply the proper legal standard by neglecting to fully develop the record.

When the opinions of plaintiff's treating physicians and other treating sources are considered along with plaintiff's hearing testimony, the record provides ample documentation of "objective" findings and substantial evidence that plaintiff cannot perform her past relevant work as a social worker. I therefore find that the plaintiff is disabled within the meaning of the Social Security Act.

*CONCLUSION*

For the reasons set forth above, I find that the Commissioner's decision that the plaintiff is not disabled was based on errors or law and was not supported by substantial evidence. The record contains substantial evidence of disability such that

further evidentiary proceedings would serve no purpose. I therefore grant plaintiff's motion for judgment on the pleadings insofar as the case is remanded to the Social Security Administration for calculation and payment of benefits.

**\*11** ALL OF THE ABOVE IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 4042939, 147 Soc.Sec.Rep.Serv. 781

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 2865724

2016 WL 2865724
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kalisha F. WHITE, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

5:14-CV-1140 (GTS/WBC)
|
Signed April 21, 2016

**Attorneys and Law Firms**

LAW OFFICE OF HARRY J. BINDER, AND CHARLES E. BINDER, P.C., 60 East 42 nd St., Ste. 520, OF COUNSEL: CHARLES E. BINDER, ESQ., New York, New York 10165, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL – REGION II, 26 Federal Plaza – Room 3904, OF COUNSEL: BENIL ABRAHAM, ESQ., New York, NY 10278, Counsel for Defendant.

*REPORT and RECOMMENDATION*

William B. Mitchell Carter, U.S. Magistrate Judge

**\*1** This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 19.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Kalisha F. White ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 12, 17.) For the reasons set forth below, it is recommended that Plaintiff's motion be granted in part, in the extent it seeks remand under Sentence Four of 42 U.S.C. § 405(g), and denied in part, and Defendant's motion is denied in part and granted in part.

**I. RELEVANT BACKGROUND**

  **A. Factual Background**

Plaintiff was born on August 23, 1983. (T. 150.) She completed her GED. (T. 194.) Generally, Plaintiff's alleged disability consists of anxiety, depression, back impairment and neck impairment. (T. 193.) Her alleged disability onset date is May 1, 2011. (T. 78.) Her date last insured is June 30, 2012. (*Id.*) She previously worked as a cashier, home health aide, housekeeper, and in security. (T. 181.)

  **B. Procedural History**

On April 16, 2012, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II, and Supplemental Security Income ("SSI") under Title XVI, of the Social Security Act. (T. 178.) Plaintiff's applications were initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On April 10, 2013, Plaintiff appeared before the ALJ, John P. Ramos. (T. 43–77.) On June 24, 2013, ALJ Ramos issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 22–41.) On December 4, 2014, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 3–8.) Thereafter, Plaintiff timely sought judicial review in this Court.

  **C. The ALJ's Decision**

Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 28–36.) First, the ALJ found that Plaintiff met the insured status requirements through June 30, 2012, and Plaintiff had not engaged in substantial gainful activity since May 1, 2011. (T. 28.) Second, the ALJ found that Plaintiff had the severe impairments of fibromyalgia, depressive disorder, post-traumatic stress disorder ("PTSD"), and anxiety. (*Id.*) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 29–31.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work. (T. 31.) [1] Specifically, the ALJ determined Plaintiff could:

> stand and walk for [five] hours and sit for [six] hours in an [eight]-hour workday with normal breaks. [Plaintiff] could bend and stoop [three] hours and balance and climb for [two] hours in an [eight]-hour work

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 2865724

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 166 of 189

period. She retain[ed] the ability to understand, and follow simple instructions and directions; perform simple tasks with supervision and independently. She [could] maintain attention and concertation for simple tasks; regularly attend to a routine and maintain a schedule; and relate to, and interact appropriately with others to the extent necessary to carry out simple tasks. She [could] handle reasonable levels of simple, repetitive work-related stress in that she [could] make decisions directly related to the performance of simple work, and handle usual work place changes and interactions associated with simple work.

**\*2** (*Id*.) Fifth, the ALJ determined that Plaintiff was incapable of performing her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T.34–35.)

1   Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b), 416.967(b).

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A. Plaintiff's Arguments
Plaintiff makes four separate arguments in support of her motion for judgment on the pleadings. First, Plaintiff argues the ALJ failed to properly weigh the medical evidence in the record. (Dkt. No. 12 at 13–19 [Pl.'s Mem. of Law].) Second,

Plaintiff argues the ALJ failed to properly evaluate Plaintiff's credibility. (*Id*. at 19–22.) Third, Plaintiff argues the ALJ erred in relying on the Medical–Vocational Guidelines ("the Girds") at step five. (*Id*. at 22–24.) Fourth, and lastly, Plaintiff argues the ALJ failed to adequately consider Plaintiff's obesity. (*Id*. at 24–25.)

### B. Defendant's Arguments
In response, Defendant makes four arguments. First, Defendant argues Plaintiff's obesity was not a severe impairment. (Dkt. No. 17 at 5–6 [Def.'s Mem. of Law].) Second, Defendant argues the ALJ properly considered the medical evidence. (*Id*. at 7–11.) Third, Defendant argues the ALJ properly assessed Plaintiff's credibility. (*Id*. at 11–13.) Fourth, and lastly, Defendant argues the ALJ properly found that Plaintiff could perform other work. (*Id*. at 13–15.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review
A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

**\*3** "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 2865724

sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

### B. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to

perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982).

## IV. ANALYSIS

### A. The ALJ's Assessment of the Medical Opinion Evidence in the Record and Ultimate RFC Determination

The relevant factors considered in determining what weight to afford an opinion include the length, nature and extent of the treatment relationship, relevant evidence which supports the opinion, the consistency of the opinion with the record as a whole, and the specialization (if any) of the opinion's source. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

The opinion of a treating source will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). It is well established that a treating physician's opinion as to the nature and severity of an impairment is given controlling weight. *Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir.2015) (per curiam). But a treating physician's opinion is not entitled to controlling weight when it is not supported by medically acceptable, clinical, and laboratory diagnostic techniques or is inconsistent with other evidence in the record. *Greek,* 802 F.3d at 375.

**\*4** The following factors must be considered by the ALJ when deciding how much weight the treating source opinion should receive, even if the treating source is not given controlling weight: "(i) the frequency of examination and

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 2865724

the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. §§ 404.1527(c)(2)(i)-(iv), 416.927(c)(2)(i)-(iv). The ALJ is required to set forth his reasons for the weight he assigns to the treating physician's opinion. *Id., see also* SSR 96–2p, 1996 WL 374188 (July 2, 1996); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000) (quoting *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998)).

RFC is defined as: "what an individual can still do despite his or her limitations." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*

When making a RFC determination, the ALJ considers Plaintiff's physical abilities, mental abilities, and symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. §§ 404.1545(a), 416.945(a). An RFC finding will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations. *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990).

Plaintiff received her primary care from Hoplyn Beaton, M.D. and Ethan Flaks, M.D at North Medical Family Physicians. (T. 392–447.) Dr. Beaton completed a form titled "Physician's Medical Report" for JOBSplus! dated March 16, 2012. (T. 272–273.) [2] Therein, Dr. Beaton opined she began treating Plaintiff on January 5, 2010. (T. 272.) Dr. Beaton indicated Plaintiff suffered from low back pain, anxiety, and depression. (*Id.*) She stated Plaintiff underwent an MRI, was treated by pain management, and was referred to an orthopedist. (*Id.*) Dr. Beaton opined that Plaintiff was "moderately limited" (able to perform from two to four hours/day) in her ability to: walk, stand, use hands, and use public transportation. (T. 273.) Dr. Beaton opined that Plaintiff was "very limited" (able to perform one to two hours/day) in her ability to: push, pull, bend, lift, carry, and climb. (*Id.*) Dr. Beaton opined that Plaintiff had no limitations in her ability to sit, see, hear, and speak. (*Id.*)

2    JOBSplus! assists recipients of public assistance. See http://www.jobsplus.cc/about_us.htm (last accessed April 18, 2016).

Dr. Flaks completed a "Multiple Impairment Questionnaire" on November 28, 2012. (T. 371–378.) Dr. Flaks began treating Plaintiff in October of 2012 for her fibromyalgia, morbid obesity, depression, and anxiety. (T. 371.) Dr. Flaks stated that Plaintiff's fibromyalgia diagnosis was supported by multiple pain trigger points over her extremities and torso. (*Id.*) When asked to identify laboratory and diagnostic test results to support Plaintiff's diagnosis, Dr. Flaks wrote "no simple diagnostic test is available (to my knowledge) that will prove the existence or non-existence of fibromyalgia." (T. 372.)

In terms of exertional limitations, Dr. Flaks opined Plaintiff could sit up to one hour in an eight-hour day and stand/walk up to one hour in an eight-hour day. (T. 373.) Dr. Flaks opined that he would not recommend that Plaintiff sit continuously in a work setting and Plaintiff would need to "get up and move around" every 15 to 20 minutes for a period of 15 to 20 minutes before she could sit again. (T. 373–374.) Dr. Flaks reported that Plaintiff could frequently lift and carry up to 10 pounds and occasionally lift and carry up to 50 pounds. (T. 374.) [3]

3    The terms "frequent" and "occasional" are not defined on the form. (T. 374.) The options presented were: frequent, occasional, and never. (*Id.*)

**\*5** In terms of non-exertional impairments, Dr. Flaks opined Plaintiff had "marked" limitations in her ability to grasp, turn, and twist objects. (T. 374.) [4] Dr. Flaks reported Plaintiff had "moderate" limitations in her ability to: use her fingers and hands for fine manipulation, and use her arms for reaching. (T. 375.) Dr. Flaks reported Plaintiff "constantly" experienced pain and was incapable of even "low stress" work. (T. 376.) Dr. Flaks indicated Plaintiff would have good days and bad days and would be absent from work more than three times a month due to her impairments or treatment. (T. 377.) Dr. Flaks reported Plaintiff could not push, pull, kneel, bend, or stoop, and would need to avoid fumes, gases, and heights. (*Id.*)

4    "Marked" was defined as "essentially precluded" and "moderate" was defined as "significantly limited but not completely precluded." (T. 374.)

The Plaintiff was also examined by consultative examiner, Kalyani Ganesh, M.D. on May 23, 2012. (T. 318–321.) Based

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 169 of 189

2016 WL 2865724

on her examination of Plaintiff, Dr. Ganesh opined Plaintiff had no gross physical limitations for sitting, standing, walking or the use of her upper extremities. (T. 321.) Dr. Ganesh opined Plaintiff had "mild limitations" with lifting, carrying, pushing, and pulling. (*Id.*)

The ALJ afforded Dr. Beaton's medical opinion "little weight." (T. 29.) The ALJ reasoned her opinion was not supported by diagnostic studies. (*Id.*) The ALJ afforded Dr. Flaks's medical source statement "less weight." (T. 32.) The ALJ reasoned that Dr. Flaks did not have a strong treatment history with Plaintiff and the opinion was inconsistent with Plaintiff's reported activities of daily living. (*Id.*) The ALJ afforded Dr. Ganesh's opinion "significant weight." (T. 33.) The ALJ reasoned that Dr. Ganesh found "no real fibromyalgia," examined Plaintiff, and had professional and programmatic expertise. (T. 32–33.)

For the reasons further outlined herein, the ALJ erred in weighing the medical opinion evidence in the record; and further, his RFC determination was not supported by substantial evidence.

Impairments generally are defined as "anatomical, physiological, or psychological abnormalities ... demonstrable by medically acceptable clinical and laboratory techniques." *See* 42 U.S.C. § 423(d)(3); 20 C.F.R. §§ 404.1508, 416.908. Applying this definition is a straightforward exercise with respect to most physical and mental impairments because they can be identified objectively through standard laboratory, imaging, physical examination and psychological diagnostic techniques. It becomes problematic, however, with respect to fibromyalgia, a medical abnormality consisting of a syndrome of chronic pain of musculoskeletal origin but uncertain *cause*. *Campbell v. Colvin*, No. 5:13–CV–451, 2015 WL 73763, at *5 (N.D.N.Y. Jan. 6, 2015) (citing *Green– Younger v. Barnhart*, 335 F.3d 99, 101 n. 1 (2d Cir.2003)).

Persons afflicted with fibromyalgia may experience severe and unremitting musculoskeletal pain, accompanied by stiffness and fatigue due to sleep disturbances, yet have normal physical examinations, e.g., full range of motion, no joint swelling, normal muscle strength and normal neurological reactions. *Campbell*, 2015 WL 73763, at *5 (citing *Preston v. Secretary of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir.1988)). Thus, lack of positive, objective clinical findings does not rule out the presence of fibromyalgia or its symptoms.

To be sure, the ALJ was correct in his assertion that Plaintiff's treatment and diagnosis of fibromyalgia was "not well documented" (T. 32); however, the record does contain long standing complaints consistent with fibromyalgia, an eventual diagnosis of fibromyalgia, and treating source medical opinions regarding Plaintiff's functional limitations due to her fibromyalgia.

*6 The ALJ stated that the first notation of fibromyalgia was made by Dr. Beaton in July of 2012 (T. 32); however, Dr. Beaton mentioned fibromyalgia in notations dated June 18, 2012 (T. 371). At that time, Dr. Beaton referred Plaintiff to a rheumatologist for a "fibromyalgia workup." (T. 414.) However, the record does not contain treatment notations from a rheumatologist until January 17, 2013 when Plaintiff met with Ramzi Khairallah, M.D. (T. 459.) Dr. Khairallah concluded that based on his physical examination of Plaintiff, she had "clear-cut severe fibromyalgia." (T. 462.) [5] He noted that he ordered x-rays and a rheumatic panel to "look into all the possibilities and be on the safe side." (T. 462.) Dr. Khairallah noted on examination that Plaintiff had 18 out of 18 total tender points. (*Id.*) Dr. Khairallah noted Plaintiff had morning stiffness, headache, and paresthesia. (T. 461.) He reported that Plaintiff complained of all day morning stiffness, fatigue, headache, and numbness/tingling of her hands and feet. (T. 459.) Of note, Dr. Khairallah's physical examination indicated Plaintiff had full range of motion in all of her joints without swelling or tenderness; however, Plaintiff had significant limitation in her cervical spine and some tenderness in her right wrist. (*Id.*) Dr. Khairallah met with Plaintiff in February of 2012 and again he indicated Plaintiff had "clear-cut severe fibromyalgia." (T. 454.) In March of 2012, Plaintiff was advised to increase sleep quality, decrease stress, and engage in "light weight bearing exercise." (T. 451.)

| 5 | Dr. Khairallah's notations indicate that Plaintiff reported she had received a diagnosis of fibromyalgia and was being treated with Flexeril and Neurontin; however, the record does not contain a diagnosis of fibromyalgia previous to Dr. Khairallah's diagnosis. Dr. Beaton's notations from January through June 2012, indicated that Plaintiff was prescribed Flexeril for low back pain. (T. 413, 415, 417, 419, 421, 425.) |
|---|---|

In January of 2013 Plaintiff also met with Martin Schaeffer, M.D., with the Onondaga Musculoskeletal Group. (T. 388.) Dr. Schaeffer conducted a physical examination, which was

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 2865724

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 170 of 189

substantially normal; however, Dr. Schaeffer noted "diffuse tenderness" in 17 out of 18 classic distribution points. (T. 389.) Dr. Schaeffer's notations indicated he reviewed records from Plaintiff's primary care providers and an MRI report. (*Id.*) Dr. Schaeffer increased Plaintiff's dosage of Flexeril and Neurontin. (*Id.*) Interestingly, the ALJ afforded Dr. Schaeffer's opinion "more weight" reasoning it was consistent with Dr. Ganesh's opinion. (T. 29.) However, the ALJ only cited to Dr. Schaeffer's relatively normal physical examination findings and failed to acknowledge that despite these benign findings, Dr. Schaeffer examination also indicated 17 out of 18 tender points consistent with Plaintiff's fibromyalgia. (T. 389.)

Although the record indicated that Plaintiff was not officially diagnosed with fibromyalgia until January of 2013, the record contained complaints of symptoms consistent with those ultimately attributed to her fibromyalgia. For example, Plaintiff complained of back pain and had pain on palpitation in July of 2011(T. 432), January 2012 (T. 426), February 2012 (T. 421, 424), March of 2012 (T. 419), and April 2012 (T. 418).

Here, the ALJ erred in affording "little weight" to Dr. Beaton's medical source statement. (T. 29.) The ALJ's only reason for providing Dr. Beaton's statement "little weight" was that it was not supported by diagnostic studies. (*Id.*) To be sure, Dr. Beaton's March 2012 statement did not contain a diagnosis of fibromyalgia; however, a longitudinal reading of the record indicates that Plaintiff's symptoms could reasonably stem from fibromyalgia before the January 2013 diagnosis. *Campbell,* 2015 WL 73763, at *11 (ALJ erred in discrediting treating source's medical opinion for a perceived lack of objective corroborating evidence).

The ALJ also erred in reasoning Dr. Flaks's medical source statement deserved "less weight" because he did not have a strong treatment history with Plaintiff and his opinion was inconsistent with Plaintiff's activities. (T. 32.) To be sure, under the Regulations, frequency is a factor to be considered in evaluating the opinion of a treating source. 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). Dr. Flaks indicated he first treated Plaintiff in October of 2012 and had most recently seen her in November of 2012 (T. 371); however, Dr. Flaks took over Plaintiff's care after Dr. Beaton left the practice, thus Dr. Flaks was aware of Plaintiff's treatment history with the practice. In addition, frequency is just one factor in assessing a treating source's opinion. Dr. Flaks, unlike Dr. Ganesh,

had the benefit of Plaintiff's treatment record and personally examined her on more than one occasion.

*7 Further, the ALJ erred in his determination that Plaintiff's activities of daily living did not support Dr. Flaks's statement. (T. 32.) The ALJ mischaracterized Plaintiff's activities of daily living. The ALJ provided a summary of Plaintiff's testimony regarding her activities of daily living. (T. 30.) However, it is apparent that the ALJ relied solely on Dr. Ganesh's report; essentially that Plaintiff could cook three meals three times a week, clean and do laundry twice a week, shop three times a week, and care for her children. (T. 30.) The ALJ stated that Plaintiff watched television, read and went to church. (*Id.*) The ALJ also stated that Plaintiff was taking online courses for her associates degree and was planning on getting a Master's degree. (*Id.*) However, Plaintiff testified that she cannot do regular household chores, she can only do one task a day, and that the older children assist with a lot of the housework. (T. 58.) Although she cares for her children, she testified that it takes her over two hours to get herself up and "situated" before she could wake her children for the day. (T. 60.) During the hearing, Plaintiff specifically stated that she had not attended church in a year because the constant standing and sitting caused her pain. (T. 63.) Plaintiff also testified that two to three times a month her pain was so bad she could not get out of bed and her mother had to come help with the children. (T. 74–75.) At the hearing Plaintiff also testified that she was no longer taking online courses because she couldn't complete assignments on time and had trouble sitting in front of the computer "for so long." (T. 74.) These statements contradict the ALJ's reading of Plaintiff's activities of daily living. *See Crysler v. Astrue,* 563 F.Supp.2d 418, 443 (N.D.N.Y.2008). The ALJ was entitled to resolve conflicts in the record, but his discretion was not so wide as to permit him to pick and choose only evidence that supported a particular conclusion. *See Smith v. Bowen,* 687 F.Supp. 902, 904 (S.D.N.Y.1988) (citing *Fiorello v. Heckler,* 725 F.2d 174, 175–76 (2d Cir.1983)); *see also Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir.2011); *Robinson v. Barnhart,* 366 F.3d 1078, 1083 (10th Cir.2004).

Therefore the ALJ's determination to afford Dr. Flaks's statement "less weight" is not supported by substantial evidence. Dr. Flaks may have treated Plaintiff only a few times, but he took over her care from another doctor in the practice and personally treated Plaintiff on more than one occasion. Further, the ALJ fundamentally misstated Plaintiff's activities of daily living.

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 2865724

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 171 of 189

Overall, the ALJ's RFC determination was not supported by substantial evidence. The ALJ afforded Dr. Ganesh's opinion "significant weight," reasoning that Dr. Ganesh examined Plaintiff and was an expert both professionally and programmatically. (T. 3233.) However, Dr. Ganesh's medical source opinion was vastly inconsistent with the medical evidence in the record and further, Dr. Ganesh's medical opinion was too vague to alone constitute substantial evidence to support a determination that Plaintiff could perform the exertional and non-exertional requirements of light work.

To be sure, it is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(e), 416.912(b)(6), 416.913(c), and 416.927(e).

The Regulations "recognize that the Commissioner's consultants are highly trained physicians with expertise in evaluation of medical issues in disability claims whose opinions may constitute substantial evidence in support of residual functional capacity findings." *Lewis v. Colvin,* 122 F.Supp.3d 1, at 7 (N.D.N.Y.2015) (citing *Delgrosso v. Colvin,* 2015 WL 3915944, at *4 (N.D.N.Y. June 25, 2015), *adopting Report & Recommendation,* (rejecting similar "global objection to reliance on nonexamining medical advisers' opinions" by same plaintiffs' counsel)). Opinions of consultative examiners, such as Dr. Ganesh, may constitute substantial evidence "if they are consistent with the record as a whole." *Leach ex. Rel. Murray v. Barnhart,* No. 02–CV– 3561, 2004 WL 99935, at *9 (S.D.N.Y.Jan.22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole."). Here, Dr. Ganesh's medical source opinion was not "consistent with the record as a whole."

Dr. Ganesh's opinion that Plaintiff had no limitations in her ability to sit, stand, walk or use her upper extremities was strikingly inconsistent with the medical opinions of Plaintiff's treating sources who opined that Plaintiff had severe limitations in these areas. To be sure, the medical source statements provided by Plaintiff's treating providers, Dr. Beaton, Dr. Flaks, and Victor Petrovets do not perfectly mirror each other; however, they are substantially more consistent in the functional limitations they impose than the limitations imposed by Dr. Ganesh. At the very least, the statements by Plaintiff's treating providers would exclude the

ability to perform light work. Further, Dr. Flaks's and Mr. Petrovets, unlike Dr. Ganesh, had the benefit of Plaintiff's ultimate fibromyalgia diagnosis.

**\*8** Further, the ALJ provides no analysis of how Dr. Ganesh's statement that Plaintiff had "no limitations" in sitting, standing and walking and "mild" limitations with lifting, carrying, pushing and pulling equated to the exertional demands of light work. The ALJ did not conclude that Dr. Ganesh's opinion was supported by any other medical evidence in the record, the ALJ only reasoned that Dr. Ganesh's opinion was based on his examination, Dr. Ganesh found "no real fibromyalgia," and Dr. Ganesh was an expert. (T. 32–33.) Again, the ALJ substituted his own interpretation of the medical record. *Selian v. Astrue,* 708 F.3d 409, 421 (2d Cir.2013) ("What [consultative examiner] means by "mild degree" and "intermittent" is left to the ALJ's sheer speculation."). [6]

[6]      For example, the ALJ determined that Plaintiff could bend and stoop three hours in a work-day and balance and climb for two hours in a work-day. (T. 31.) The ALJ's decision provided no analysis or decision of how the ALJ reached that conclusion, thus indicating the ALJ relied on his own lay opinion in formulating Plaintiff's RFC. *See Dusharm v. Colvin,* 14–CV–1562, 2016 WL 1271490, at *6 (N.D.N.Y. Mar. 31, 2016) (remanding where the ALJ's RFC indicated that Plaintiff had greater physical abilities than opined by any medical opinion of record).

Other providers, such as Dr. Khairallah and Dr. Schaeffer, noted mostly normal physical examination findings, as did Dr. Ganesh; however, these treating sources also noted that despite these normal findings Plaintiff suffered from fibromyalgia and she had symptoms consistent with that diagnosis. (T. 389, 459.) The ALJ appears to conclude, based on his own interpretation of the evidence, that Plaintiff's limitations could not be due to her fibromyalgia because of her normal physical examinations. However, this is a fundamental misunderstanding of fibromyalgia. Again, "[p]ersons afflicted with fibromyalgia may experience severe and unremitting musculoskeletal pain, accompanied by stiffness and fatigue due to sleep disturbances, yet have normal physical examinations, e.g., full range of motion, no joint swelling, normal muscle strength and normal neurological reactions. Thus, lack of positive, objective clinical findings does not rule out the presence

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 2865724

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 172 of 189

of fibromyalgia, but may, instead, serve to confirm its diagnosis." *Campbell,* 2015 WL 73763, at \*5.

The ALJ also improperly determined that Dr. Ganesh found "no real fibromyalgia." (T. 32.) The ALJ's conclusion implied that Dr. Ganesh tested Plaintiff for fibromyalgia, or otherwise reviewed treatment notations regarding Plaintiff's treatment and ultimately disagreed; however, Dr. Ganesh did neither. (T. 318–321.) Dr. Ganesh's report does not once mention fibromyalgia. (*Id.*) Case Ganesh performed his examination on May 23, 2012; Plaintiff was first referred to a rheumatologist for fibromyalgia work up by Dr. Beaton in June of 2012. The ALJ improperly substituted his own lay opinion and interpretation of Dr. Ganesh's statement, or lack thereof. Further, any focus by the ALJ on the absence of a diagnosis by Dr. Ganesh of fibromyalgia was misplaced, because "its absence [was] no more indicative that the patient's fibromyalgia [was] not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996).

Therefore, for the reasons stated herein and for the reasons outlined in Plaintiff's brief, the ALJ erred in the weight afforded to the medical source opinions in the record and the ALJ's RFC determination was not supported by substantial evidence.

Plaintiff also argues that the ALJ deprived her of her due process right to cross-examine Dr. Ganesh on his findings before relying on his report, despite Plaintiff's objections. (Dkt. No. 12 at 17 [Pl.'s Mem. of Law].) The Second Circuit has held that "the right to due process in a social security disability hearing does not require that a reporting physician be subpoenaed any time a claimant makes such a request." Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir.1998). Although the ALJ erred in his assessment of the medical opinions in the record, he did not commit legal error in denying Plaintiff's request to subpoena Dr. Ganesh. The medical record before the ALJ at the time of the hearing was complete and Plaintiff had the opportunity to supply, and did supply, treatment records and medical source statements from her providers. Therefore, Plaintiff had a fair and meaningful opportunity to present her case. Yancey, 145 F.3d at 111.

**\*9** In addition, Plaintiff argues the ALJ erred in his assessment of Plaintiff's mental health care providers, Eileen Essi, LCSW and Bill Hines, M.D. (Dkt. No. 12 at 19 [Pl.'s Mem. of Law].) Ms. Essi and Dr. Hines completed a medical source statement dated April 9, 2013. (T. 470–477.) The ALJ

stated that Dr. Hines's statement was "not entitled to extra weight as a treating physician because of the short treatment relationship." (T. 34.) Overall, the ALJ afforded the opinion "some, but less weight." (*Id.*)

The Second Circuit has held that a physician's opinion is entitled to less weight when the physician did not treat the plaintiff on an ongoing basis. In *Mongeur v. Heckler*, the court emphasized that the opinion of a treating physician is given extra weight because of his unique position resulting from the "continuity of treatment he provides and the doctor/patient relationship he develops." 722 F.2d at 1039 n. 2 (2d Cir.1983). By contrast, the Court reasoned that a physician who examined a plaintiff only "once or twice" did not see the plaintiff regularly and thus did not develop a physician/patient relationship with him. Id. The Second Circuit concluded that such a physician's medical opinion was "not entitled to the extra weight of that of a 'treating physician.' " *Id.*; see also 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2) (an ALJ should generally "give more weight to" the opinion of a doctor who treated a claimant on an ongoing basis and thus could provide a "detailed, longitudinal picture of [the claimant's] medical impairment(s)," offering a more "unique perspective to the medical evidence" than provided by reports from "individual examinations, such as consultative examinations or brief hospitalizations").

Therefore, the ALJ did not err in his conclusion that Dr. Hines's opinion was entitled to lesser weight because he did not have an ongoing treating relationship with Plaintiff; however, the ALJ's analysis of the opinion ends there. The ALJ failed to provide any further discussion of the opinion in accordance with the Regulations at 20 C.F.R. § 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

In sum, the ALJ failed to provide a sufficient analysis of the medical evidence in the record, further, the ALJ's RFC determination was not supported by substantial evidence in the record. Therefore, remand is recommended so that the ALJ may properly evaluate the medical opinion evidence in the record and formulate a RFC based on a proper weighing of those opinions.

**B. The ALJ's Credibility Determination**
A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue,* 614 F.Supp.2d 252, 270 (N.D.N.Y.2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 2865724

not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood,* 614 F.Supp.2d at 270.

The ALJ must employ a two-step analysis to evaluate the claimant's reported symptoms. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96–7p. First, the ALJ must determine whether, based on the objective medical evidence, a plaintiff's medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96–7p. Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit the claimant's ability to do work. *See id.*

 **\*10** At this second step, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms; (5) other treatment the claimant receives or has received to relieve his pain or other symptoms; (6) any measures that the claimant takes or has taken to relieve his pain or other symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to his pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii); SSR 96–7p.

Here, the ALJ determined that Plaintiff's medically determinable impairments could reasonably cause her alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of the symptoms was not entirely credible "for the reasons explained in this decision." (T. 34.)

Plaintiff argues the ALJ's vague conclusion was insufficient to support his credibility determination. (Dkt. No. 12 at 21 [Pl.'s Mem. of Law].) Further, Plaintiff argues the ALJ erred in reasoning her conditions "began or aggravated after the expiration of insured status" because the ALJ failed to cite to evidence to support this conclusion and further, Plaintiff also

filed a claim for SSI benefits which have no insured status requirement. (*Id.* at 21.)

First, for the reasons stated herein, the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to properly assess the opinions in the record. Therefore, the ALJ's credibility determination was inherently flawed. Without a proper assessment of the medical opinion evidence in the record the ALJ cannot properly evaluate Plaintiff's statements in light of that evidence. Second, in his credibility analysis the ALJ placed almost exclusive emphasis on Plaintiff's alleged activities of daily activity, which, for the reasons discussed herein, the ALJ fundamentally mischaracterized. (T. 34.) Third, regarding Plaintiff's insured status, the ALJ again appeared to mischaracterize the record. To be sure, the first diagnosis of Plaintiff's fibromyalgia in the record was dated January of 2013, seven months after Plaintiff's date last insured (T. 459), and the first mention of fibromyalgia in the record occurred on June 18, 2012, twelve days before Plaintiff's date last insured. (T. 371). However, as stated herein, a reading of the longitudinal record indicated that Plaintiff suffered from symptoms associated with fibromyalgia well before her actual diagnosis. In addition, Plaintiff applied for SSI, which does not take into considerate Plaintiff's impairments in relation to a date last insured. Therefore, remand is also recommended for a proper credibility analysis.

### C. The ALJ's Step Five Determination

At step 5 in the sequential evaluation, the ALJ was required to perform a two part process to first assess Plaintiff's job qualifications by considering his physical ability, age, education, and work experience, and then determine whether jobs exist in the national economy that Plaintiff could perform. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f); *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983). The second part of this process is generally satisfied by referring to the applicable rule of the Medical–Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly called "the Grids" or the "Grid"). *See Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986).

 **\*11** The Second Circuit has explained that the ALJ may not solely rely on the Grids if a non-exertional limitation "has any more than a 'negligible' impact on a claimant's ability to perform the full range of work." *Selian v. Astrue,* 708 F.3d 409, 421 (2d Cir.2013) (quoting *Zabala v. Astrue,* 595 F.3d 402, 411 (2d Cir.2010)). A non-exertional impairment is

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 174 of 189

White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 2865724

non-negligible "when it ... so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Zabala,* 595 F.3d at 411. Whether VE testimony is required must be determined on a "case-by-case basis." *Bapp* 802 F.2d at 605–06. Further, "the mere existence of a non-exertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the [Grids]." *Id.* at 603.

Plaintiff argues the ALJ's reliance on the Grids at step five was improper due to Plaintiff's "significant non-exertional limitations." (Dkt. No. 12 at 22–23 [Pl.'s Mem. of Law].) Because remand is recommended for a proper RFC determination, including a proper credibility analysis, remand is therefore also recommended for a step five determination based on Plaintiff's RFC.

### D. Obesity

Plaintiff argues the ALJ erred in his determination that Plaintiff's obesity was not a severe impairment. (Dkt. No. 12 at 24–25 [Pl.'s Mem. of Law].) At step two of the sequential evaluation process, the ALJ must determine whether the plaintiff has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. *See* C.F.R. §§ 404.1520(c), 416.920(c). The plaintiff bears the burden of presenting evidence establishing severity. *Taylor v. Astrue,* 32 F.Supp.3d 253, 265 (N.D.N.Y.2012) (citing *Miller v. Comm'r of Social Sec.,* No. 05–CV–1371, 2008 WL 2783418, at *6–7 (N.D.N.Y. July 16, 2008); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a)). Although the Second Circuit has held that this step is limited to "screen[ing] out de minimis claims," *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." *Coleman v. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995).

Indeed, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* No. 97–CV–5759, 1999 WL 294727, at *5 (E.D.N.Y. March 19,1999) (quoting *Bowen v. Yuckert,* 482 U.S. 137, 154 n.12, 107 S.Ct. 2287 (1987)).

In addition, "[w]here an ALJ has omitted an impairment from step two of the sequential analysis, other courts have declined to remand if the ALJ clearly considered the effects of the impairment in the remainder of his analysis." *Chavis v. Astrue,* No. 07–CV–0018, 2010 WL 624039, at *12 (N.D.N.Y.Feb.18, 2010); *Lasiege v. Colvin,* No. 12–CV–01398, 2014 WL 1269380, at *10–11 (N.D.N.Y. Mar. 25, 2014); *Reices–Colon v. Astrue,* 523 Fed.Appx. 796, 798 (2d Cir.2013) (finding the alleged step two error harmless because the ALJ considered the plaintiff's impairments during subsequent steps); *see also* 20 C.F.R. § 404.1523, 416.923 (stating that the ALJ is required to consider the "combined effect of all of [plaintiff's] impairments without regard to whether any such impairment, if considered separately would be of sufficient severity").

Here, the ALJ did not err in classifying Plaintiff's obesity as a non-severe impairment. As stated in Defendant's brief, one treatment note that Plaintiff's obesity caused knee pain and citations to Plaintiff's weight in the record was not enough to establish that Plaintiff's obesity was severe. (Dkt. No. 17 at 6 [Def.'s Mem. of Law] ; *see also Martin v. Astrue,* 337 Fed.Appx. 87, 89 (2d Cir.2009) (finding the ALJ did not err in his step two determination that plaintiff's obesity was a non-severe impairment where there was no evidence that plaintiff's obesity limited plaintiff's work ability). However, given that remand is recommended for a properly evaluation of the medical evidence in the record, this recommendation should not be read as to preclude the ALJ from making a severity determination on remand should he find the evidence to support such a conclusion.

**\*12  RECOMMENDED**, that the Plaintiff's motion for judgment on the pleadings be **GRANTED in PART and DENIED in PART**, and the Commissioner's determination be **GRANTED in PART and DENIED in PART**, and the matter be **REMANDED** for further proceedings under sentence four of 42 U.S.C. § 405(g) and consistent with this report.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 175 of 189

**White v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)**
2016 WL 2865724

**All Citations**

Not Reported in Fed. Supp., 2016 WL 2865724

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

White v. Comm'r of Soc. SEC., Not Reported in Fed. Supp. (2016)

2016 WL 2858859

2016 WL 2858859
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kalisha F. WHITE, Plaintiff,

v.

COMM'R OF SOC. SEC., Defendant.

5:14-CV-1140 (GTS/WBC)

|

Signed 05/16/2016

**Attorneys and Law Firms**

BINDER & BINDER, 60 East 42nd Street, Suite 520, OF COUNSEL: CHARLES E. BINDER, ESQ., New York, NY 10165, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN. OFFICE OF REG'L GEN. COUNSEL – REGION II, 26 Federal Plaza, Room 3904, OF COUNSEL: BENIL ABRAHAM, ESQ., New York, NY 10278, Counsel for Defendant.

## **DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this Social Security action filed by Kalisha F. White ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c) (3), is the Report and Recommendation of United States Magistrate Judge William B. Mitchell Carter, recommending that Plaintiff's motion for judgment on the pleadings be granted to the extent that it seeks remand, and that Defendant's motion for judgment on the pleadings be granted in part and denied in part. (Dkt. No. 20.) Objections to the Report and Recommendation have not been filed, and the time in which to do so has expired. (*See generally*, Docket Sheet.)

A district court reviewing a magistrate judge's Report and Recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Parties may raise objections to the magistrate judge's Report

and Recommendation, but they must be "specific written objections," and must be submitted "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); *accord*, 28 U.S.C. § 636(b)(1)(C). When no objection is made to a report and recommendation, the Court subjects that report and recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After carefully reviewing the relevant papers herein, including Magistrate Judge Carter's thorough Report and Recommendation, the Court can find no clear error in the Report and Recommendation. Magistrate Judge Carter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 20.)

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Carter's Report and Recommendation (Dkt. No. 20) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. Nos. 11, 12) is **GRANTED** in part, and **DENIED** in part; and it is further

**ORDERED** that the Commissioner's determination is **VACATED**; and it is further

**ORDERED** that the matter is **REMANDED** to the Commissioner of Social Security for further proceedings consistent with the specific instructions outlined in the Report and Recommendation.

## **All Citations**

Not Reported in Fed. Supp., 2016 WL 2858859

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Gutowski v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 2266796, 268 Soc.Sec.Rep.Serv. 204

2019 WL 2266796
United States District Court, W.D. New York.

Matthew M. GUTOWSKI, Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

17-CV-1246
|
Signed 05/28/2019

## Attorneys and Law Firms

Lewis L. Schwartz, Lewis L. Schwartz, PLLC, Buffalo, NY, for Plaintiff.

Ariella Renee Zoltan, Social Security Administration Office of General Counsel, New York, NY, Pamela McKimens, Office of the General Counsel Social Security Administration, Kansas City, MO, for Defendant.

DECISION AND ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT JUDGE

 *1 On November 30, 2017, the plaintiff, Matthew M. Gutowski,[1] brought this action under the Social Security Act ("the Act"). He seeks review of the determination by the Commissioner of Social Security ("Commissioner") that he was not disabled. Docket Item 1. On November 2, 2018, Gutowski moved for judgment on the pleadings, Docket Item 14, and on January 30, 2019, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 18. On February 20, 2019, Gutowski replied. Docket Item 19.

[1]  Due to a typographical error, the plaintiff's name is sometimes incorrectly spelled "Gutkowski" in the docket. *See* Docket Item 19 at 1 n.1.

For the reasons stated below, this Court grants Gutowski's motion in part and denies the Commissioner's cross-motion.

## **BACKGROUND**

## I. PROCEDURAL HISTORY

On December 9, 2013, Gutowski applied for disability insurance benefits. Tr. 95. He claimed that he had been disabled since October 31, 2012, due to major depression, trouble concentrating, anxiety, head trauma, migraine headaches, double vision, post concussion syndrome, post traumatic headaches, and post traumatic stress disorder. *Id.*

On July 2, 2014, Gutowski received notice that his application was denied because he was not disabled under the Act. Tr. 105-08. He requested a hearing before an administrative law judge ("ALJ"), Tr. 109-11, which was held on December 9, 2016, Tr. 47. The ALJ then issued a decision on February 10, 2017, confirming the finding that Gutowski was not disabled. Tr. 26. Gutowski appealed the ALJ's decision, but his appeal was denied, and the decision then became final. Tr. 1-3.

## II. RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Gutowski's objection. Gutowski was examined by several different providers but only one—Jessica Englert, Ph.D., a clinical neuropsychologist—is of most significance to this Court's review of the ALJ's decision.

### **Jessica J. Englert, Ph.D., Clinical Neuropsychologist**

On March 28, 2016, and again on July 26 the same year, Dr. Englert, a clinical neuropsychologist, evaluated Gutowski. Tr. 334-340. Gutowski was referred to Dr. Englert for "evaluation given longstanding cognitive, functional, and mood concerns." Tr. 334.

Gutowski told Dr. Englert that he had "multiple hits to the head from various altercations" over the past five years. *Id.* He "reported that he is having difficulty with memory" and that "he has slower processing of information overall." *Id.* Gutowski also reported that he lives with his mother and stepfather and "is hoping to be placed within a transitional housing program which will assist him with employment and stabilization while moving forward in his life." Tr. 336.

Dr. Englert found that Gutowski "demonstrated strong intellectual functioning" and "strong intellectual abilities across all domains assessed." Tr. 338. He also "demonstrated strong working memory." *Id.* She determined that despite Gutowski's "history of multiple head injuries ... he has had minimal, if any, changes in cognitive abilities related to such injuries." Tr. 339.

Case 6:21-cv-01138-MAD-TWD Document 19 Filed 02/13/23 Page 178 of 189

Gutowski v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 2266796, 268 Soc.Sec.Rep.Serv. 204

**\*2** But Dr. Englert also found that Gutowski had "a severe level of depression and mood symptoms related to a history of traumas." Tr. 339. Although Dr. Englert "believe[d] that [Gutowski] would be able to complete a Bachelor's degree once [his] mood symptoms are stabilized," she also believed that "in the meantime, ... he should be placed within transitional housing or a transitional support program so that he may gain independence in living, which will help with the mood symptoms and help him to secure employment at least on a part-time basis." Tr. 340. "It is hoped that he can start on a part-time basis for employment since it has been quite a long time since he has been engaged in employment and he does need to readjust, particularly with his significant mood symptoms." *Id.* "He should not be put at risk for relapse by increased stressors related to vocational difficulties." *Id.*

Dr. Englert provided a "series of strategies to assist with daily functioning" that she recommended Gutowski implement. *Id.* Among those recommendations was "work[ing] in brief periods of time (30 to 45 minutes) with a brief break (approximately 5 minutes) when he [is] encouraged to engage in a physical task such as brief exercise, as cardiovascular activity may increase blood flow and refocus attention." *Id.*

### III. THE ALJ'S DECISION

In denying Gutowski's application, the ALJ evaluated Gutowski's claim under the Social Security Administration's five-step evaluation process for disability determinations. *See* 20 C.F.R. § 404.1520. At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful employment. § 404.1520(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. § 404.1520(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments. § 404.1520(a)(4)(ii). If there are no severe impairments, the claimant is not disabled. *Id.* If there are any severe impairments, the ALJ proceeds to step three. § 404.1520(a)(4).

At step three, the ALJ determines whether any severe impairment or impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). If the claimant's severe impairment or impairments meet or equal one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that none of the severe impairments meet any in the regulations, the ALJ proceeds to step four. § 404.1520(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e). The RFC is a holistic assessment of the claimant—addressing both severe and nonsevere medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. *See* 20 C.F.R. § 404.1545.

After determining the claimant's RFC, the ALJ completes step four. 20 C.F.R. § 404.1520(e). If the claimant can perform past relevant work, he or she is not disabled and the analysis ends. § 404.1520(f). But if the claimant cannot, the ALJ proceeds to step five. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1520(a)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ determined at step one that Gutowski had not engaged in substantial gainful activity from his alleged onset date through the date last insured—March 31, 2016. Tr. 19. At step two, the ALJ found that Gutowski had the following severe impairments: "migraines headaches[,] depression[,] and anxiety." *Id.* At step three, the ALJ determined that these severe impairments did not medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

**\*3** In assessing Gutowski's RFC, the ALJ determined that Gutowski could perform medium work as defined in 20 C.F.R. § 404.1567(c),[2] except he was limited to unskilled work with a specific vocational preparation level[3] of 1 or 2. Tr. 21. The ALJ based this finding in part on "the statements of [Dr.] Englert, ... that the claimant may wish to implement various strategies consistent with unskilled work in order to assist with daily functioning." Tr. 24. The ALJ assigned "great weight" to these statements, noting that

> [t]hese statements are generally consistent with the record, which

Case 6:21-cv-01138-MAD-TWD    Document 19    Filed 02/13/23    Page 179 of 189

Gutowski v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 2266796, 268 Soc.Sec.Rep.Serv. 204

although documents the claimant's depression, anxiety and related symptoms, and documents that the claimant's headaches are brought on in part due to mental stress and exertion, otherwise shows that the claimant was observed to be cooperative and oriented with appropriate hygiene, good eye contact, clear speech, and intact attention at his treatment visits and was observed to have a normal mood and affect, intact attention, normal concentration, and normal memory at other physical care visits, and which shows the extent of the claimant's activities of daily living ... suggesting that the claimant retains the ability to perform unskilled positions with an SVP of 1 or 2.

*Id.* The ALJ did not give "great weight" to all Dr. Englehart's "strategies to assist with daily functioning," however. *See id.* He gave "little weight to [her] statement ... that [Gutowski] should work in brief periods of time with a brief break if required to perform physical activites, as this statement is generally inconsistent with the claimant's unremarkable physical examinations and with his own reported abilities to walk 2 to 3 miles at [sic] lift up to 50 to 100 pounds." *Id.*

2    "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

3    "Specific Vocational Preparation [("SVP")] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, Appendix C § II, 1991 WL 688702 (4th ed. 1991). SVP Level 1 includes jobs requiring a "[s]hort demonstration only" for training. *Id.* SVP Level 2 includes jobs requiring "[a]nything beyond short demonstration up to and including 1 month" for training." *Id.*

At step four, the ALJ determined that Gutowski "was capable of performing past relevant work as a warehouse worker." Tr.

25. The ALJ found that Gutowski was able to perform his past work both as he actually performed that work and as that work is generally performed throughout the economy. Tr. 26.

## LEGAL STANDARDS

"The scope of review of a disability determination ... involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Social Security Administration ("SSA")] applied the correct legal principles in making the determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the ... regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.' " *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

**\*4** Gutowski argues that the ALJ erred "in misstating and failing ... to properly evaluate the favorable opinion of consulting clinical neuropsychologist Dr. Englert." Docket Item 14-1 at 12-17. For the following reasons, this Court agrees.

When determining a plaintiff's RFC, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). "Among the ALJ's legal obligations is the duty to adequately explain his reasoning in making findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence." *Klemens v. Berryhill*, 703 F. App'x 35, 36 (2d Cir. 2017) (quoting *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010)). "[T]he ALJ must *both* identify evidence that supports his conclusion *and* 'build an accurate

and logical bridge from that evidence to his conclusion.' " *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)) (emphasis in original).

Here, the record includes statements from Dr. Englert reflecting her judgment that Gutowski's anxiety, depression, and mood symptoms were so severe that he was able to work no more than part time at the time he was evaluated. *See* Tr. 334-40. Specifically, she found that Gutowski "is experiencing a severe level of depression and mood symptoms related to a history of traumas." Tr. 339. She thought that Gutowski might well recover from his mental impairments, predicting that "he would be able to complete a Bachelor's degree once mood symptoms are stabilized." Tr. 340. But she noted that "in the meantime, I believe that he should be placed within transitional housing or a transitional support program so that he may gain independence in living, which will help with the mood symptoms and help him to secure employment *at least on a part-time basis.*"[4] *Id.* (emphasis added). She said that "[i]t is hoped that he can start on a part-time basis for employment since it has been quite a long time since he has been engaged in employment and he does need to readjust, particularly with his significant mood symptoms." *Id.* She explained that Gutowski "should not be put at risk for relapse by increased stressors related to vocational difficulties." *Id.* In social-security speak, Dr. Englert opined that in light of Gutowski's mental impairments, he could work only part time without placing him "at risk for relapse." *Id.*

[4]     The Commissioner argues that by "at least on a part-time basis," Dr. Englert was suggesting that Gutowski could work part-time or more—that is, full-time. *See* Docket Item 18-1 at 15. Taken in context, however, it is clear that she was saying the exact opposite.

The ALJ purportedly assigned "great weight" to Dr. Englert's opinion, but he completely ignored the aspects of her opinion that were most favorable to Gutowski. Instead, the ALJ focused on Dr. Englert's "series of strategies to assist with daily functioning." Tr. 24 (citing Tr. 340). And the ALJ extrapolated from those "strategies" the conclusion—contrary to Dr. Englert's opinion—that Gutowski "retains the ability to perform unskilled positions." *Id.*

For example, Dr. Englert suggested that Gutowski could "make a 'to do list' that allows for some flexibility and

is realistic in terms of the tasks to be accomplished" on a daily basis. *See* Tr. 340. From this, the ALJ inferred—quite reasonably—that Gutowski had some basic capability to function with that strategy. Tr. 24. But the fact that Gutowski's psychologist believed that he needed "strategies" to assist with the tasks of his daily life suggests that doing more than basic daily functioning—engaging in employment, for example—might indeed be difficult for him. *See* Tr. 340. Moreover, the ALJ did not address Dr. Englert's opinion that Gutowski's depression and mood disorders were so severe that he could not work more than part time. *See id.* And the ALJ ignored Dr. Englert's explicit finding that Gutowski "should not be put at risk for relapse by increased stressors related to vocational difficulties." *See id.*

**\*5** Perhaps even more significantly, the ALJ completely misunderstood one of Dr. Englert's recommendations—the only one with which the ALJ took issue. In this regard, he noted that he gave "little weight to the statement of Dr. Englert that [Gutowski] should work in brief periods of time with a brief break if required to perform physical activities." Tr. 24. The ALJ gave "little weight" to this "statement" because, he explained, it was "generally inconsistent with the claimant's unremarkable physical examinations and with his own reported abilities to walk 2 to 3 miles at [sic] lift up to 50 to 100 pounds." Tr. 24. But Dr. Englert did not say that Gutowski needed brief breaks from brief periods of physical labor. *See* Tr. 340. On the contrary, Dr. Englert said that after Gutowski worked for thirty to forty-five minutes, he should be given a brief break and "encouraged to engage in a physical task such as brief exercise" because such "cardiovascular activity may increase blood flow and refocus attention." *Id.* In other words, Dr. Englert believed that Gutowski's anxiety and depression were so severe that he needed five-minute exercise breaks every thirty minutes or so. *See id.* So contrary to the ALJ, Dr. Englert was not recommending that Gutowski's physical activity be limited; in fact, she was recommending the exact opposite. *See id.*

For the same reason, the ALJ was incorrect in finding that Dr. Englert's recommendation was "inconsistent with the claimant's unremarkable physical examinations and with his own reported abilities to walk 2 to 3 miles [and] lift up to 50 to 100 pounds." Tr. 24. The fact that Gutowski was physically capable of walking two to three miles at a time or lifting up to 100 pounds is irrelevant to the judgment reflected by Dr. Englert in this recommendation—that Gutowski's mental impairments severely impact his ability to sustain work and focus for prolonged periods of time and that interim exercise

Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 181 of 189

Gutowski v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 2266796, 268 Soc.Sec.Rep.Serv. 204

might help remedy that. The ALJ's misreading of Dr. Englert's recommendation requires remand for that reason alone.

SSA regulations required the ALJ to "evaluate every medical opinion" received. 20 C.F.R. § 404.1527(c). "Although the ALJ was not required to mention every piece of evidence, providing 'an accurate and logical bridge' required him to confront the evidence in [Gutowski's] favor and explain why it was rejected before concluding that [his] impairments did not impose more than a minimal limitation on [his] ability to perform basic work tasks." *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (quoting *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013)). Here, the ALJ's failure to address Dr. Englert's recommended work limitations, as well as his complete misunderstanding of a key recommendation as noted above, lead to the conclusion that he did not meet those requirements. Therefore, this case is remanded for a full evaluation of Dr. Englert's opinion regarding the severity of Gutowski's mental impairments and so that the ALJ can reconsider her recommendation about the brief exercise breaks necessary for Gutowski to work. Without any such analysis, this Court cannot "be satisfied that the claimant has had a full hearing under the ... regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran*, 569 F.3d at 112 (quoting *Cruz*, 912 F.3d at 11). [5]

[5] Gutowski also argues that the ALJ erred by "formulating a benign function-by-function physical RFC without any medical authority" and that the ALJ should have further developed the record. Docket Item 14-1 at 17-22. And he

argues that the ALJ inadequately addressed an opinion from a vocational rehabilitation counselor. Docket Item 14-1 at 22-25. Because Gutowski's "case must return to the agency either way for the reasons already given, the Commissioner will have the opportunity on remand to obviate th[ese] disputes altogether by" fully explaining the basis of Gutowski's physical RFC, developing the record further if necessary, and fully addressing the vocational rehabilitation counselor's opinion. *See Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 94 (2d Cir. 2019). Therefore, this Court does not address these issues.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 18, is DENIED, and Gutowski's motion for judgment on the pleadings, Docket Item 14, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

**\*6** SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2019 WL 2266796, 268 Soc.Sec.Rep.Serv. 204

---

2022 WL 17828844
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

LYNN S., Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

Case # 1:20-cv-1915-DB
|
Filed December 21, 2022

**Attorneys and Law Firms**

Amy C. Chambers, Delmar, NY, Justin M. Goldstein, Kenneth R. Hiller, Law Offices of Kenneth Hiller, PPLC, Amherst, NY, for Plaintiff.

Timothy A. Razel, Office of Program Litigation, Office 2 Office of General Counsel Office of the General Counsel Social Security Administration, Baltimore, MD, for Defendant.

MEMORANDUM DECISION AND ORDER

DON D. BUSH, UNITED STATES MAGISTRATE JUDGE

**INTRODUCTION**

**\*1** Plaintiff Lynn S. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 14).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9, 10. Plaintiff filed a reply (ECF No. 12), and the Commissioner filed a sur-reply (ECF No. 15). For the reasons set forth below, Plaintiff's motion (ECF No. 9) is **GRANTED**, the Commissioner's motion (ECF No. 10) is **DENIED**, and this matter is **REMANDED** to the Commissioner for further administrative proceedings as set forth below.

**BACKGROUND**

On April 12, 2016, Plaintiff protectively filed her DIB application alleging disability beginning July 3, 2017 (the disability onset date), due to (among other things) bipolar disorder and depression. Transcript ("Tr.") 12, 132. Plaintiff's claim was denied initially on June 21, 2016, after which she requested an administrative hearing. Tr. 12. On June 19, 2017, Administrative Law Judge William M. Weir ("the ALJ") held a hearing in Buffalo, New York. Tr. 12. Plaintiff appeared and testified at the hearing and was represented by Keith Herald, an attorney. Lanell R. Hall, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id.* The ALJ issued an unfavorable decision on August 1, 2017. Tr. 12-22. On December 18, 2017, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1-6), and the ALJ's August 1, 2017 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

Thereafter, Plaintiff brought an action in this Court. *See* Case No. 1:18-cv-00241-LJV. In an order dated August 23, 2019, this Court found in favor of Plaintiff and remanded her case for further proceedings. Tr. 500-07. Specifically, the Court found that the ALJ's mental residual functional capacity ("RFC") was not based on medical opinion evidence or otherwise properly supported, as the ALJ provided no reasoning to link the medical evidence of record to the RFC limitations and appeared to rely on his lay assessment of the medical records. *Id.* The Court ordered the ALJ to "reconsider [Plaintiff's] RFC and support his determination with substantial evidence, by developing the record or otherwise." Tr. 507. Tr. 508. Thereafter, on September 9, 2019, the Appeals Council remanded the matter to the ALJ to update the record, offer a new hearing, and issue a new decision consistent with the Court's decision. Tr. 511.

The ALJ held a hearing on May 29, 2020 and a subsequent hearing on August 3, 2020. Tr. 389, 416-45, 446-58. Plaintiff appeared by telephone at both hearings and was represented by Nicholas DiVirglio, an attorney. *Id.* Medical expert Henry Urbaniak, M.D., an orthopedic specialist, also testified at the May 29, 2020 hearing. Also appearing and testifying at the August 3, 2020 telephonic hearing were psychological expert Gwendoline Dewitt, Ph.D., medical expert John F. Kwock, M.D., and vocational expert Larry Underwood. Tr. 389. On September 9, 2020, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled. Tr. 389-407.

Thereafter, Plaintiff appealed the decision directly to this Court.

## LEGAL STANDARD

### I. District Court Review

**\*2** "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II. The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id.* § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id.* § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id.* § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform

physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id.* § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id.* If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id.* § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his September 9, 2020 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since January 2, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has major depressive disorder; bipolar disorder; and chronic obstructive pulmonary disease ("COPD"), each of which constitutes a severe impairment (20 CFR 404.1520(c)).

**\*3** 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. The claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) [1] except she should not be exposed to concentrated pulmonary irritants such as dust, fumes, gases, etc. She can do simple repetitive one- and two-step tasks. She

Lynn S. v. Commissioner of Social Security, Slip Copy (2022)
Case 6:21-cv-01138-MAD-TWD   Document 19   Filed 02/13/23   Page 184 of 189

2022 WL 17828844

cannot do complex work, defined as work involving multiple simultaneous goals or objectives or the need to independently set quantity, quality, or method standards.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on October 12, 1968 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age on October 11, 2018 (20 CFR 404.1563).).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2016, through the date of this decision (20 CFR 404.1520(g)).

Tr. 389-407.

1      "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors

such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Accordingly, the ALJ determined that, for the application for a period of disability and disability insurance benefits, protectively filed on April 12, 2016, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 407.

## ANALYSIS

Plaintiff asserts two points of error. First, Plaintiff argues that the ALJ failed to follow the remand orders of this Court and the Appeals Council, and as a result, the ALJ's conclusions and findings, including his RFC finding, were not supported by substantial evidence. *See* ECF No. 19-1 at 17–22. Next, Plaintiff argues that the ALJ's rejection of the mental health opinions and evidence created an evidentiary gap in the record, resulting in a mental RFC finding that was based on a selective reading of the record and the ALJ's lay opinion, and therefore, not supported by substantial evidence. *See id.* at 22-30.

*4 In response, the Commissioner argues that, because the ALJ supported his mental RFC finding with substantial evidence, he complied with the Court's order. *See* ECF No. 10-1 at 3, 7-26. Further, argues the Commissioner, the ALJ was not required to rely on any medical opinion in formulating Plaintiff's RFC, and properly considered the evidence as a whole, including objective medical evidence, Plaintiff's reported daily activities, the effects of her treatment, her instances of treatment non-compliance, and Plaintiff's statements regarding her ability to work, such as her testimony that she could probably perform a simple sit-down job. *See id.* (citing Tr. 46-47, 399). Furthermore, argues the Commissioner, the ALJ sufficiently articulated his reasoning for finding that Plaintiff could perform a range of simple, repetitive, one- to two-step tasks. *See id.*

The Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa,* 168 F.3d at 77.

Upon review of the ALJ's decision and the entire record, the Court finds that, while the ALJ further developed the record by obtaining opinion evidence from medical expert(s) and Plaintiff's treating psychotherapist as directed by the remand order, he substantially discounted or rejected these mental health opinions, appearing to craft a mental RFC largely based on his own lay interpretation of the medical findings and a selective reading of the record. As such, there was no competent medical opinion supporting the mental RFC finding, and there is reasonable basis for doubt as to whether the ALJ's determination that Plaintiff was capable of light work with the noted limitations was supported by substantial evidence. Tr. 396-405. Accordingly, remand is warranted.

The record reflects a lengthy history of mental health treatment, including hospitalizations for suicidal ideation. On January 3, 2016, Plaintiff was admitted to the Emergency Department ("ED") at Buffalo General Hospital ("BGH"), for treatment and evaluation after taking "some extra pills of Celexa and Amitryptilline to help her go to sleep quicker." Tr. 312-47. She also admitted taking cocaine prior to that. Tr. 313. Plaintiff was referred for inpatient psychiatric admission due to suicidal ideation. *Id.* Tr. 314.

After being medically stabilized, Plaintiff was transferred to Erie County Medical Center ("ECMC") on January 6, 2016, for inpatient psychiatric treatment and stabilization. Tr. 253-66. Plaintiff reported a history of bipolar disorder and depression, as well as a marijuana use disorder. Tr. 255. Plaintiff also reported a prior suicide attempt by medication in 2014, but she denied any other suicide attempts. Tr. 256. While she was not fully cooperative with providers at admission, she became participative in treatment after one or two days and did well for the remainder of her stay, participating in individual, group, and milieu therapy.[2] Tr. 257. It was noted that Plaintiff had numerous psychosocial stressors that could not be resolved by treatment, including unstable housing, financial issues, drug use, limited special supports, and difficulty with children. Tr. 257, 264. She was determined to be in stable condition and discharged to a women's shelter on January 19, 2016. Tr. 257, 258.

[2]    According to WebMD, milieu therapy is a safe, structured, group treatment method for mental health issues. It involves using everyday activities and a conditioned environment to help people with interaction in community settings. Milieu therapy is a flexible treatment intervention that may work together with other treatment methods.

*See* https://www.webmd.com/mental-health/what-is-milieu-therapy (last visited Dec. 15, 2022).

**\*5** On July 2, 2016, Plaintiff was again admitted to ECMC for "suicidal ideation with plan to overdose on medication." Tr. 353. Plaintiff reported that she was sober until April 2016, when she "relapsed on alcohol and crack cocaine," but she stated she had been sober since that time. *Id.* She reported current stressors including foreclosure of the home where she had been living and missing her youngest daughter, who is able to see only intermittently under supervised settings. *Id.* Plaintiff also admitted she had been non-compliant with her medications. Tr. 356. Her medications were restarted, and she improved during her admission, including participating in therapeutic activities on her unit. *Id.* Plaintiff was discharged on July 6, 2016: at the time of discharge, her mental status examination was within normal limits, and she was released to return to school or work without restrictions. Tr. 357-58.

From approximately January 6, 2016 to March 17, 2020, Plaintiff received outpatient mental health treatment at ECMC for bipolar disorder, depression, suicidal ideation, overdose and other conditions. Tr. 348-64, 365-75, 839-97, 1075-1143. She also received mental health treatment and counseling at Endeavor Health Services from approximately February 2, 2016 to October 28, 2019, for bipolar disorder current or recent episode manic, moderate or mixed, severe; cocaine use severe; and cannabis use, mild. Tr. 936-1074. She reported depression (mild to severe); hypomania or mania (mind racing), mood swings, anger issues, suicide attempts; sleep difficulty; little energy; appetite disturbance; anxious; suicidal thoughts; worry; substance history; healthy boundaries; stressors; and other symptoms. Tr. 936-1074, 987. Although she was noted to be compliant with treatment (Tr. 959, 1008), she also occasionally missed appointments (Tr. 961, 970, 1036).

In April 2019, Plaintiff reported to treating therapist Elizabeth Kern, LMHCP ("Ms. Kern"), at Endeavor Health, that she had severe difficulty concentrating for ten minutes; standing, standing up from sitting down; staying by herself for a few days; getting household work done as quickly as needed; and moderate difficulty in multiple other activities. Tr. 1023-25.

In July, August, September, and October of 2019, Plaintiff received Sustenna[3] injections with no adverse reactions reported. Tr. 1037, 1042, 1045, 1051, 1060. In December 2019 and February 2020, she reported suicidal ideation; and in April 2020, she denied suicidal ideation. Tr. 1182-87, 1197. In February 2020, her bipolar was mild, and she had

psychosocial stressors of inadequate housing and low income. Tr. 1188. She reported anxiety with housing; excessive sleep and continued lack of motivation; and she did not think medications were effective. Tr. 1189.

3       According to WebMD, Sustenna (generic name: paliperidone palmitate is a medication used to treat certain mental/mood disorders (such as schizophrenia, schizoaffective disorder). Paliperidone is an antipsychotic drug (atypical type). It works by helping to restore the balance of certain natural chemicals (neurotransmitters) in the brain. It can decrease hallucinations and help users think more clearly and positively, feel less agitated, and take a more active part in everyday life.   *See*   https://www.webmd.com/drugs/2/drug-152807/invega-sustenna-intramuscular/details (last visited Nov. 9, 2022).

On March 17, 2020, Plaintiff went to ECMC because of suicidal ideations. She had recently moved from an apartment to her daughter's house and denied any alcohol and illegal drug use. She was diagnosed with a bipolar disorder, appeared calm, cooperative, not aggressive or belligerent and she was not currently manic or psychotic. Tr. 1129. Plaintiff was transferred from ECMC to Brylin Hospital for psychiatric inpatient treatment for suicidal ideation with plan to overdose, and bipolar disorder. Tr. 1128-60, 1180-1209. She was diagnosed with a bipolar disorder while in the depressed phase, adjustment disorder, generalized anxiety disorder, PTSD, chronic back pain, COPD, seasonal allergies, hyperlipidemia, and GERD. Tr. 1153, 1158. Mental status exams showed abnormalities like poor judgment; flat affect; tired of life and stressed; difficulty adjusting; noted drowsiness; and depressed. Tr. 1152-53. She continued to show depressive symptoms despite medication adjustments and underwent electroconvulsive therapy ("ECT") [4] treatment with nine inpatient treatments and was to continue outpatient ECT treatment. Tr. 1153-54. At discharge, she was instructed to continue Wellbutrin, Trazodone, and Hydroxyzine, and medical medications. Tr. 1154.

4       Electroconvulsive therapy is a medical treatment most commonly used in patients with severe major depression or bipolar disorder that has not responded to other treatments.   *See*   American Psychiatric Association; What is Electroconvulsive therapy (ECT)? Available

at https://www.psychiatry.org/patients-families/ect (last visited Nov. 8, 2022).

*6   Plaintiff had a telephone encounter with therapist Ms. Kern on April 15, 2020, two days after her discharge. Tr. 1193. Plaintiff stated that "she thinks [the hospital visit] helped," and she no longer felt suicidal ideation. *Id.* She also stated that "now that she is home she [was] only going to be able to do [ECT] once per week." *Id.* She also reported having difficulty talking to Ms. Kern because she was feeling "tired and a little confused," which she said were side effects of the ECT treatment. *Id.* Ms. Kern had a brief (five minutes) follow-up encounter with Plaintiff on April 30, 2020, during which Plaintiff reported "there was nothing new." Ms. Kern noted that Plaintiff gave one-word responses such as "good" and "the same" and reported she was no longer attending ECT because it was too hard for her to get there. Tr. 1194.

On June 11, 2020, Ms. Kern completed a medical source statement related to Plaintiff's mental health. Tr. 1163-68. Ms. Kern noted that Plaintiff had been treated by Endeavor Health since December 2018 for bipolar disorder and generalized anxiety disorder. Tr. 1163. She noted various signs and symptoms, including decreased energy, thoughts of suicide, and mood disturbance. Tr, 1164. Ms. Kern opined that Plaintiff was seriously limited or unable to meet competitive standards with maintaining attention and concentration for two-hour segments, maintaining regular attendance and being punctual, sustaining an ordinary performing at a consistent pace, accepting instructions and responding appropriately to criticism, carrying out detailed instructions, setting realistic goals or making plans, and dealing with stress of semi-skilled and skilled work. Tr. 1165-66. She also found Plaintiff was limited but satisfactory or unlimited in other areas. *Id.* She noted that she was unable to assess Plaintiff's absences. She noted that Plaintiff had been non-compliant with treatment or medication but indicated both "yes" and "no" to the question of whether this was part of Plaintiff's symptoms. Tr. 1167.

Psychological expert Gwendoline Dewitt, Ph.D. ("Dr. Dewitt"), testified at the August 3, 2020 hearing. Tr. 421-428, 1171-1179. Dr. Dewitt opined that Plaintiff met Listing criteria 12.04(A) and (C) of depression, citing to various exhibits in the record. Tr. 421-28. Dr. Dewitt found substance abuse was not material to Plaintiff's mental health impairments, and Plaintiff's symptoms persisted from 2018 until currently. Tr. 421. Dr. Dewitt found that Listing 12.04(A) was met in January 2016 with depression and suicide attempt, but she found that Listing 12.04(C) was not met at that time because it was not chronic for two years. Tr. 422-23.

Dr. Dewitt found that Plaintiff met Listing 12.04(C) criteria in 2018 as her symptoms persisted. Tr. 425. Dr. Dewitt did not have an opinion as to the criteria for Listing 12.04(B), because there was no assessment that spoke to her functioning. *Id.* Per Listing 12.04(A)(1), Dr. Dewitt found that Plaintiff met: depressed mood, diminished interest, changes in appetite, sleep disturbance, decreased energy, feelings of guilt worthlessness, difficulty concentrating, and thoughts of suicide a few times; nearly all of them. Tr. 425-26. Dr. Dewitt found evidence of marginal adjustment and minimal changes in environment was most clear from record in March 2020 that showed she was hospitalized again for suicide ideations, and this spoke "pretty loudly" to Plaintiff's inability to manage or adapt. Tr. 426. Dr. Dewitt opined that, even if there were occurrences of substance use in 2016, this may have been Plaintiff self-medicating, and Plaintiff's mental illness was "much beyond substance use." *Id.* Dr. Dewitt found diagnoses of history of bipolar disorder, generalized anxiety disorder, and major depression; and she found Plaintiff consistently met criteria for depression. Tr. 428.

**\*7** A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all the relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). Although the RFC determination is reserved for the commissioner, *see* 20 C.F.R. §§ 404.1527(e)(2) and 416.927(e)(2), "an ALJ's RFC assessment is a medical determination that must be based on probative medical evidence of record.... Accordingly, an ALJ may not substitute his own judgment for competent medical opinion." *Dailey v. Astrue*, No. 09CV-0099 A M, 2010 WL 4703599, at \*10 (W.D.N.Y. Oct. 26, 2010), *report and recommendation adopted*, No. 09-CV-99A, 2010 WL 4703591 (W.D.N.Y. Nov. 19, 2010) (citing *Lewis v. Comm'r of Soc. Sec.*, No. 6:00 CV 1225 GLS, 2005 WL 1899399, at \*1 (N.D.N.Y. Aug. 2, 2005)); *see also Goldthrite v. Astrue*, 535 F.Supp.2d. 329, 339 (W.D.N.Y. 2008) (Telesca, J.) ("An ALJ must rely on the medical findings contained within the record and cannot make his own diagnosis without substantial medical evidence to support his opinion."); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

As an initial matter, the Court notes some inconsistencies between the ALJ's citations to certain treatment records and what was actually written in the records cited. For instance, with respect to Plaintiff's July 2016 psychiatric admission for suicidal ideation, the ALJ stated she "quickly improved" after

restarting medications (Tr. 401), but the record cited actually says "she improved over time" (Tr. 356). When Plaintiff was hospitalized for nearly a month in March 2020 with diagnoses of bipolar disorder and suicidal ideation with plan, the ALJ stated: "once her medications were adjusted, she reported that, 'I feel much better.'" Tr. 402 (citing Tr. 1193). However, this page of the treatment record doesn't say this at all. In fact, it is record of a 15-minute telephone visit with therapist Ms. Kern on April 15, 2020, shortly after Plaintiff was discharged. Tr. 1193. The hospital treatment record actually states that Plaintiff continued to show depressive symptoms despite medication adjustments, and she underwent ECT treatment with nine inpatient treatments and was to continue ECT treatment on an outpatient basis. Tr. 1153-54. While these inaccurate citations to the record may seem minor, they call into question the credibility of the ALJ's analysis.

Even with respect to Plaintiff's April 15, 2020 telephone call with Ms. Kern, the ALJ inaccurately cited the record. The ALJ stated that Plaintiff told Ms. Kern that she felt better (Tr. 403), but all Plaintiff really said was that she "thinks that [the hospital visit] helped," and she no longer felt suicidal ideation. Tr. 1193. Although the ALJ noted that Plaintiff reported "being tired and a little confused (Tr. 403), he failed to note that Plaintiff told Ms. Kern she was having difficulty talking on the phone "due to being tired and a little confused which she said were side effects of the ECT" (Tr. 1193). Plaintiff had another telephone encounter with Ms. Kern a couple of weeks later on April 30, 2020. Tr. 1194. Although the ALJ accurately noted that Ms. Kern noted that Plaintiff "reported there was nothing new" (Tr. 403), Ms. Kern additionally wrote that Plaintiff had stopped going to ECT because it was "too hard for her to get there;" she gave one-word answers such as "good" and "the same;" and said she had nothing else to discuss with Ms. Kern. Tr. 1194. Thus, the ALJ's characterization of Plaintiff's level of improvement following her hospitalization appears greater than Ms. Kern's notes seem to indicate. *See* Tr. 402, 1193, 1194.

**\*8** The ALJ discounted Ms. Kern's opinion because she was not an acceptable medical source; he also stated that Ms. Kern greatly overstated limitations citing to Plaintiff's symptoms, intact attention and concentration on mental status examinations, and Plaintiff's activities. Tr. 404-05. However, Ms. Kern's mental status examinations also showed abnormalities such as mood dysfunction, flat affect; diminished insight and chronically limited insight and judgment; and other findings which the ALJ ignored. Tr. 257, 359-360, 848, 851, 853, 857, 866, 1132-1133,

1152-1553. While a [therapist's] opinion is not entitled to controlling weight, under Social Security Ruling ("SSR") 06–03p, the opinions of non-acceptable medical sources, who often have "close contact with ... individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time," are to be considered as "valuable sources of evidence for assessing impairment severity and functioning." SSR 06–03p. Additionally, the regulations stated that depending on the facts of a particular case, "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an acceptable medical source, including the medical opinion of a treating source." *Id.*; *see also Mikrazi v. Colvin*, 2016 WL 5110035, *9 (W.D.N.Y. Sept. 21, 2016).

The ALJ also found medical examiner Dr. DeWitt's opinion was not consistent with the record, citing longitudinal evidence of Plaintiff's ability to live alone, look for improved housing, care for others, and perform activities of daily living. Tr. 404 (citing Tr. 847, 882, 995, 1030). First, with respect to housing, the record reflects that Plaintiff lived with family members, rented rooms in rooming houses, or lived in a shelter for most of the relevant period. At almost every doctor visit, she cited housing insecurity as a stressor. With respect to caring for others, the activities cited by the ALJ were not performed regularly (babysitting grandchildren and helping care for her aunt) and do not seem comparable to sustained activities necessary to perform competitive work.

The ALJ also cites Plaintiff's inconsistent statements about her ability to work, noting that when asked during her 2017 hearing what would prevent her from performing a job sitting at a desk matching socks, Plaintiff replied, "boredom." Tr. 399. The Court notes, however, that this small snippet of testimony suffers from a lack of context. The ALJ asked Plaintiff if she could perform a job sitting at a desk matching socks if "it paid well and [she] had nothing else [she] had to do." Tr. 46-47. Plaintiff initially replied "boredom," as the ALJ cites, but when pressed further by the ALJ, Plaintiff replied, she "could probably" do such a job and then stated "maybe if I could sit down and stand." Tr. 47. Thus, Plaintiff's testimony was not exactly as the ALJ characterized. Plaintiff's response was not unreasonable under the scenario presented by the ALJ, and the Court will not fault Plaintiff for answering as she did.

In discounting the opinions of Dr. Dewitt and Ms. Kern, the ALJ also cites reports of some improvement in Plaintiff's

symptoms, but these improvements were temporary in nature. The record shows that Plaintiff had periods of hypomania, mania, and multiple hospitalizations for suicide ideation and plan, as well as diverse treatment regimens, including multiple prescription medications, electroconvulsive therapy, and psychotropic injections, that were, at best, only temporarily successful.

In reaching a decision, the ALJ "must *both* identify evidence that supports his conclusion and 'build an accurate and logical bridge from that evidence to his conclusion.' " *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)) (emphasis in original). "[P]roviding 'an accurate and logical bridge' require[s] him to confront the evidence in [a claimant's] favor and explain why it [is] rejected before concluding that her impairments [do] not impose more than a minimal limitation on her ability to perform basic work tasks." *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (quoting *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013)). "Where [courts] are 'unable to fathom the ALJ's rationale in relation to the evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ,' [courts] will not 'hesitate to remand for further findings or a clearer explanation for the decision.' " *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)). Such is the case here.

**\*9** As noted above, the ALJ miscied and mischaracterized evidence, particularly with respect to Plaintiff's improvement after a lengthy hospitalization that included ECT, and her alleged ability to look for improved housing and care for others. Furthermore, the ALJ rejected all mental opinions, many of which contradicted his conclusions, and failed to adequately explain his reasoning. As such, the ALJ's conclusions appear to be based on his own lay opinion and a selective reading of the evidence, and therefore, the ALJ's mental RFC finding was not supported by substantial evidence. There is simply no accurate and logical bridge between the evidence and the ALJ's conclusions as to Plaintiff's mental functioning. Accordingly, the Court remands this case so that the ALJ may address the deficiencies noted above. On remand, the ALJ. should thoroughly explain the findings related to the evidence of Plaintiff's mental impairments and the impact of such on Plaintiff's RFC.

Plaintiff has raised an additional argument in her Reply that the ALJ erred at step three in finding that her impairments did not meet Listing 12.04, specifically paragraphs A and C (*see*

2022 WL 17828844

ECF No. 12 at 2-7), an argument which the Commissioner argues should be considered waived because Plaintiff failed to raise it in her initial briefing (*see* ECF No. 14 at 3-6). However, because the Court has already determined that remand of this matter for further administrative proceedings is necessary, the Court declines to address this issue. *See, e.g.*, *Morales v. Colvin*, No. 13cv06844 (LGS) (DF), 2015 WL 2137776, at *28 (S.D.N.Y. Feb. 10, 2015) (the court need not reach additional arguments regarding the ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand"), *adopted*, *261 2015 WL 2137776 (S.D.N.Y. May 4, 2015).

**CONCLUSION**

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **GRANTED**, the Commissioner's Motion for Judgment on the Pleadings (ECF No. 10) is **DENIED**, and this matter is **REMANDED** to the Commissioner for further administrative proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g). *See Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000).

**IT IS SO ORDERED**.

**All Citations**

Slip Copy, 2022 WL 17828844

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.